UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 719 PENSION TRUST FUND, on Behalf of Itself and All Others Similarly Situated, <br><br>           Plaintiff, <br><br>   vs. <br><br> DICK'S SPORTING GOODS, INC., EDWARD W. STACK, NAVDEEP GUPTA, and LAUREN R. HOBART, <br><br>           Defendants. | Civ. Action No. 2:24-cv-196 <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned counsel, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon investigation as to all other matters conducted by and through plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Dick's Sporting Goods, Inc. ("DSG" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## BACKGROUND AND OVERVIEW

1.      This is a securities fraud class action on behalf of all purchasers of DSG common stock between May 25, 2022 and August 21, 2023, inclusive (the "Class Period"). This action is brought against DSG, its Executive Chairman, Edward W. Stack ("Stack"), its President and Chief Executive Officer ("CEO"), Lauren R. Hobart ("Hobart"), and its Chief Financial Officer ("CFO"), Navdeep Gupta ("Gupta"), for violations of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5, promulgated thereunder.

2.      DSG is a leading sporting goods retailer that sells sports equipment, apparel, footwear, and accessories to retail consumers throughout the United States. DSG is an "omni-channel" retailer, meaning it offers products to consumers in physical store locations as well as online and through mobile apps. The Company has over 700 physical locations across the United States.

3.      DSG was founded in Binghamton, New York by Richard "Dick" Stack in 1948. His son, defendant Stack, became President, CEO, and Chairman of the Board of Directors in 1984, when the Company had only two stores. Stack grew the business substantially and moved its headquarters to Pittsburgh, Pennsylvania in 1994. The Company went public through an initial

public offering in 2002.  Hobart became President in 2017 and joined the Board of Directors in 2018.  Stack stepped down as CEO in January 2021 and was succeeded by Hobart in February 2021.  Stack remains the Company's Executive Chairman and Chairman of the Board of Directors.  Gupta became CFO in October 2021.

4.     The Company divides its product offerings into four categories: hardlines (40% of sales as of 2022), apparel (34%), footwear (24%), and other (2%).  It operates several different types of physical locations in addition to the primary DICK'S Sporting Goods stores: Golf Galaxy, Public Lands, Going, Going, Gone!, and DICK'S House of Sport.  The Company operates "'store-within-a-store'" concepts at its DICK'S Sporting Goods physical locations, which typically contain the following specialty shops: Team Sports, Athletic Apparel, Outdoor, Golf, Fitness, and Footwear.

5.     The COVID-19 pandemic began severely affecting the U.S. economy in March 2020, precipitating unprecedented economic recovery efforts by the federal government, including direct stimulus payments to U.S. citizens, over the next 12 months.  DSG benefitted from the macroeconomic tailwinds caused by the government stimulus programs, and the Company's sales and profitability grew consistently throughout 2021.  For example, DSG's pre-tax margins surged from an average of 5.0% in 2019 to 16.5% in 2021.  Additionally, the conditions caused by the pandemic particularly benefitted certain categories of product – the "COVID winners" – among them, the Company's Outdoor segment within the hardlines category.

6.     During the Class Period, DSG, Stack, Hobart, and Gupta misrepresented the Company's business and financial condition by issuing misleading statements and omissions regarding the Company's financial performance, and particularly the Company's inventory, margins, and prospects.  Specifically, as the unique, post-pandemic macroeconomic climate normalized in 2022, the Company touted its ability to maintain significantly improved post-pandemic margins and earnings, but misrepresented and omitted to state the extent to which demand for certain inventory,

especially in the Outdoor segment, had fallen, negatively impacting earnings and margins. Additionally, during the Class Period, Stack, Hobart, and Gupta sold personally-held shares of DSG common stock while in possession of material non-public information about the Company.

7.      On May 25, 2022, the Company announced its financial results for the first quarter of fiscal year 2022, including sales, profit margins, and earnings. *See* ¶29, *infra*. As the unique post-pandemic macroeconomic climate normalized, the Company announced that it had undergone a "transformation" and made "fundamental changes" that would allow it to sustain "the majority of our merchandise margin rate expansion that we've driven over the past 2 years." These new "structural capabilities" included: (i) leveraging relationships with manufacturers to obtain more exclusive, "higher heat" product that was less "susceptible to promotion"; (ii) improving, "surgical" pricing technology and a "significantly changed" approach to marketing that would alleviate the need to do "big promotions" to clear inventory; and (iii) use of the Company's new "Going, Going, Gone!" outlet locations (launched in 2021) to move clearance products in a more efficient manner. In addition, defendants (defined herein) announced that sales in the Outdoor segment had "normalized" (*i.e.*, gone down from their 2021 surge) but only "as . . . expected," and that they were not "anticipating any significant markdown risk"; rather, Outdoor and other segments that had surged in 2021 had "rebaseline[d] meaningfully higher than our pre-pandemic volume."

8.      On August 23, 2022, the Company announced its financial results for the second quarter of fiscal year 2022, including sales, profit margins, and earnings. *See* ¶31, *infra*. Hobart and Gupta reiterated that margins would remain elevated due to "structural" improvements and spoke favorably about the Company's current inventory position.

9.      On September 7, 2022, Hobart and Gupta spoke at the Goldman Sachs Retail Conference. *See* ¶¶33-34, *infra*. They reiterated that margins would remain elevated due to

"structural" improvements to inventory management.  Gupta discussed the Company's Outdoor segment inventory, commenting: "The good thing is those products don't go obsolete . . . ."

10.    On November 22, 2022, the Company announced its financial results for the third quarter of fiscal year 2022, including sales, profit margins, and earnings.  *See* ¶ 35, *infra*.  Defendants reiterated that "structural changes" allowed them to manage inventory and maintain profitability.

11.    On December 6, 2022, Hobart and Gupta spoke at the Morgan Stanley Global Consumer and Retail Conference.  *See* ¶36, *infra*.  They reiterated that margins would remain elevated due to "structural" improvements.  Hobart stated that the Company's Outdoor segment sales had "rebaselined bigger."

12.    On March 7, 2023, the Company announced its financial results for the fourth quarter and full year of fiscal year 2022, including sales, profit margins, and earnings.  *See* ¶37, *infra*.  Defendants reiterated that "structural change[s]" allowed them to manage inventory and maintain profitability.

13.    On March 14, 2023, Stack, Hobart, and Gupta spoke at the Bank of America Consumer and Retail Conference.  *See* ¶38, *infra*.  Stack stated that the Company's "transformation" enabled it to sustain the improved margins from the previous years, explaining that the Company was "not merely a COVID beneficiary."  Hobart stated that the Company's Outdoor segment sales had "landed at levels that are above 2019."

14.    On May 19, 2023, TD Cowen and Telsey Advisory Group issued analyst reports lowering their sales and earnings per share estimates for DSG for both the first quarter and full year of fiscal year 2023 due to concerns about the "durability of margin expansion since 2019."  *See* ¶39, *infra*.  Following the publication of these analyst reports, the price of DSG common stock declined 6.8% to close at $126.67 per share on May 19, 2023, on trading volume of 3.9 million shares.  *See* ¶40, *infra*.

15.     On May 23, 2023, the Company announced its financial results for the first quarter of fiscal 2023, including sales, profit margins, and earnings.  *See* ¶41, *infra*.  The Company reiterated that margins would remain elevated due to "structural" improvements and spoke favorably about the current inventory position.

16.     Defendants' representations about DSG's inventory, margins, and prospects were each misleading when made.  The true facts, which were then known to or recklessly disregarded by defendants DSG, Stack, Hobart, and Gupta, included:

(a)     demand for products in DSG's Outdoor segment was slowing faster than defendants represented, resulting in excess inventory;

(b)     the "structural changes" that defendants repeatedly touted, including differentiated products, improved pricing technology, and more efficient clearance channels, did not allow the Company to manage its excess inventory without hurting the Company's profitability;

(c)     the need to liquidate excess inventory, including in the Outdoor segment, would have a materially negative effect on the Company's profitability; and

(d)     as a result of (a)-(c) above, defendants' statements about DSG's business condition and prospects were materially false and misleading when made.

17.     On August 22, 2023, the Company announced disappointing results for the second quarter of fiscal 2023 and attributed significantly reduced margins and profitability primarily to promotional sales of excess Outdoor inventory.  *See* ¶43, *infra*.  Following this announcement, the price of DSG common stock declined 24% to close at $111.53 per share, on trading volume of 19.3 million shares.  *See* ¶47, *infra*.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

21.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

22.     Plaintiff Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund purchased DSG common stock during the Class Period, as set forth in the certification attached hereto, incorporated herein by reference, and suffered damages as a result of the violations of the federal securities laws alleged herein.

23.     Defendant Dick's Sporting Goods, Inc. is a Delaware corporation with its principal executive offices located in Coraopolis, Pennsylvania.  DSG common stock trades on the New York Stock Exchange ("NYSE") under the symbol "DKS."

24.     Defendant Edward W. Stack served as Executive Chairman of DSG during the Class Period.

25.     Defendant Lauren R. Hobart served as CEO of DSG during the Class Period.

26.     Defendant Navdeep Gupta served as CFO of DSG during the Class Period.

27.     Defendants Stack, Hobart, and Gupta are referred to herein as the "Individual Defendants."   DSG and the Individual Defendants are referred to herein, collectively, as "defendants."

28.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

29.     On May 25, 2022, DSG issued a press release announcing its financial results for the first quarter of fiscal year 2022, ended April 30, 2022, and discussed the results on an accompanying earnings call on the same day.  On the call, Hobart announced that the Company had undergone a "transformation" and made "fundamental changes" that would allow it to sustain "the majority of our merchandise margin rate expansion that we've driven over the past 2 years."  Hobart detailed that the changes facilitating the Company's "structurally higher . . . merchandise margin compared to pre-COVID levels" included: (i) leveraging relationships with manufacturers to obtain more exclusive, "higher heat" product that was less "susceptible to promotion"; (ii) improved, "surgical" pricing technology and new "digital marketing tools"; and (iii) use of the Company's new "Going,

Going, Gone!" outlet locations (launched in 2021) to "consolidate[] the clearance" and move obsolete inventory in a more efficient manner. Gupta also discussed the Company's "structurally higher . . . merchandise margin compared to pre-COVID levels" and attributed these new "structural capabilities" to "our disciplined and more sophisticated promotional strategies and clearance pricing," which purportedly alleviated the need to do "big promotions."

30.     In addition, Hobart commented on demand for the Company's Outdoor products on the May 25, 2022 earnings call. Hobart stated: "[W]e had anticipated that certain categories, like fitness and outdoor equipment would normalize this year. And they have normalized as we expected" but added, "[w]e are not anticipating any significant markdown risk" because the Outdoor segment, among others, "ha[d] rebaseline[d] meaningfully higher than our pre-pandemic volume."

31.     On August 23, 2022, DSG issued a press release announcing its financial results for the second quarter of fiscal year 2022, ended July 30, 2022, and discussed the results on an accompanying earnings call on the same day. Hobart noted that: "As we look to the promotional environment for back-to-school and holiday [*i.e.*, the rest of the year], we are anticipating a slightly more normalized pricing and promotion environment. If you look versus last year, it was an incredibly benign pricing promotion environment." In other words, the Company expected some pressure on margins in the second half of 2022, but assured investors that "all of that is reflected in our go-forward guidance." Thus, on the call, Gupta reiterated that due to "structural drivers, we continue to expect our merchandise margin rate to be meaningfully higher than pre-COVID levels," and stated that the Company's inventory was "very well positioned and very healthy." Hobart added:

> Our increasingly differentiated product assortment, combined with our sophisticated and disciplined pricing strategies and favorable product mix, continue to drive strong merchandise margin. Our merchandise margin rate was up 439 basis points versus Q2 2019 as we maintained the majority of the merchandise margin expansion that we drove over the past 2 years.

> Before continuing, let me emphasize a critical point.  The content of the product that we carry today is very different from the product that we carried 5 years ago.  It's higher heat and more narrowly distributed than what you'll find in the marketplace and therefore, it is not as susceptible to promotions.  In addition, the tools we have today to surgically adjust pricing and promotions are significantly more sophisticated than they were several years ago.

She also stated "there are many structural changes in our business.  There's almost nothing structurally the same in our business as there was several years ago," specifically noting:

> I think one of the most important things is that we have moved our entire marketing effort from what used to be a long-term print-based effort, where we had to make decisions multiple weeks and even months in advance on how we wanted to price and promote, we've moved that all to a digital marketing capability, where we can be much more surgical, much more real-time, much more personalized, so we don't have to put the whole store or the whole website on sale.  We can be very, very specific with our pricing and leverage data science to do that.

Similarly, Hobart stated: "[W]e also work really real-time to determine how best to move through product.  And we have, in our case, a really elevated clearance process, including our new Going, Going, Gone! concept, which allows us to work – to move product really quickly through if there are any overages."

32.    In addition, Hobart commented specifically on the Company's Outdoor inventory, noting: "When it comes to some of our hardline categories, say, fitness and outdoor equipment, we have bought – that is – we have a lot of inventory there that we just – we're buying around for next year.  So no issues with flow there," and, "I think it's important to restate that our inventory is very healthy and we do not – we are not concerned that there's toxicity in our inventory."

33.    On September 7, 2022, Hobart and Gupta participated in a conference call with analysts and investors at the Goldman Sachs Retail Conference.  Hobart stated: "We . . . did see significant gains in margin over the pandemic time frame, and we've been very public that we think . . . that we can maintain more than half of those gains.  And that's because there are so many structural differences in our business."  She added:

> And we used to be – I'm going back a long time now, but we used to be in newspapers and you had to decide 8 weeks before you would release what was going to be on sale and what was – you had no idea about supply, demand and any of that.
>
> Obviously, that's completely gone now.  And as we've moved into digital channels, we can be very surgical.  We can be personalized, so we don't just give a whole house offer, a whole site offer.  We just are motivated to promote when – if we have too much inventory, if ever, we'll put it on sale.  But yes, so huge changes, structural across the whole P&L.

Gupta added:

> The clearance channel, having a channel like Going, Going, Gone! that we didn't have a couple of years ago, allows us to be much more surgical in terms of the markdown cadence that we have, allows us to concentrate the inventory and liquidate that much more efficiently than we were able to do before.
>
> Over the last few years, [that] has allowed us to build out on our pricing optimization capability, and that's when should a product go on promotion, what type of elasticity do we see in that product.  And all of that has allowed us to – like to Lauren's point, gives us the confidence that we can hold on to more than 50% of the gains that we have delivered over the last few years.

34.    In addition, Gupta commented specifically on the Company's Outdoor inventory, noting: "There are pockets of inventory like in outdoor categories like fitness and bikes, where we have a little bit more of.  The good thing is those products don't go obsolete, that you can always buy around them."

35.    On November 22, 2022, DSG issued a press release announcing its financial results for the third quarter of fiscal year 2022, ended October 29, 2022, and discussed the results on an accompanying earnings call on the same day.  On the call, defendants stated that the Company's "structural changes" allowed them to manage inventory.  For example, Hobart stated:

> [W]e were heavy in apparel, and we aggressively took care of that this quarter to clean up our inventory so that we could maintain – so we've taken holiday merchandise and start 2023 clean.
>
> So we absolutely believe in the structural changes in our overall margin.  I would point to the fact that our EBT margin, even with that investment that we made to clean up apparel, it was 10.3%.  So over 3x what it was pre-2019, we have tremendous confidence in the long-term sustainability of our profitability.

Gupta added:

During the quarter, we focused on cleaning up some targeted inventory overages due to late arriving spring products.  We moved excess apparel inventory to our value chain concept and have been very successful in liquidating much of this product.  We intend to continue addressing this overage in Q4 in order to start 2023 clean.

Our Q4 merchandise margin expectations are appropriately reflected within our annual outlook.  Compared to 2019, our merchandise margin rate is 141 basis points higher driven by a differentiated assortment, combined with our sophisticated and disciplined pricing strategies and a favorable product mix.  Because of these structural drivers, we continue to expect our merchandise margin rate to remain meaningfully higher than pre-COVID levels on an annual basis.

Thus, Gupta concluded: "[M]uch of the clearance activity that we were activating in [the] third quarter is behind us."  Hobart concurred: "[W]e expect to be clean going into next year."

36.     On December 6, 2022, Hobart and Gupta participated in a conference call with analysts and investors at the Morgan Stanley Global Consumer and Retail Conference.  Hobart commented on the "COVID winner" categories, assuring investors that "all of the pandemic categories . . . so bikes, outdoor equipment, generally fitness, all have rebaselined bigger."  An analyst asked: "You mentioned rebaseline.  So what gives you that confidence that these durables have rebaselined?  How do we know it's done[?]"  Hobart responded:

Because the sales are significantly – so if they were "x" in 2018 or '19, and they spiked in '20 and '21, they are here now.  So . . . they're not receding to the levels that they were before. . . .  So there was a surge, but it's come back at a higher level.

Hobart also discussed the Company's "structurally higher margins," noting:

[W]e do have now personalized digital tools where we can be much more surgical, much more targeted.  So if we have a lump of some inventory that we're trying to clear out, we can be very targeted with that and we can turn it on, turn it off.  We don't have to decide 6 weeks in advance what's going on there.  And that structurally is meaningfully different from how it was.

Gupta added:

And then the second one that I would add is clearance, the work that we have done over the last, call it, 3-plus years, around how to be effectively managing our clearance with the concept like Going, Going, Gone! and the Warehouse plus store, which allows us to kind of concentrate all the clearance inventory into these selling locations.

- 11 -

And, then you are able to light it up online as well.

37.     On March 7, 2023, DSG issued a press release announcing its financial results for the fourth quarter and full year of fiscal year 2022, ended January 28, 2023, and discussed the results on an accompanying earnings call on the same day.  On the call, Gupta stated: "[W]e continue to address targeted inventory overages due to late arriving Sprin[g] product.  As a result of these actions, our inventory is in great shape as we start 2023."  Hobart added: "[W]hile we managed through a lot of inventory disruptions last year, there was no return to an overall promotional environment," and credited the Company's ability to use its "Going, Going, Gone!" outlet stores and "manage on a personalized basis what pricing we want to offer" for allowing the Company to effectively manage its inventory without bringing margins below expectations.  She concluded: "[O]ur fiscal '22 level of merch[andise] margin is indeed a new baseline."

38.     On March 14, 2023, Stack, Hobart, and Gupta participated in a conference call with analysts and investors at the Bank of America Consumer and Retail Conference.  Stack stated:

> Clearance merchandise is meaningfully higher than if we did it in the store, which then clears space out of the stores, which we bring in more newer product that has higher margins.  And I mean, it's – and you can see it in the results that more than double the operating margins from – to well over 11% in this last year.  It's a very different business.  And people don't quite understand, and I think they're starting to understand that we're not merely a COVID beneficiary that this transformation was going on before COVID.  And right now, what you're seeing is the – really the benefits of those investments that we made beginning back in 2016, 2017.  And we think it's very sustainable.

An analyst asked about the Company's "better clearance margins," and Gupta responded: "[W]e are able to liquidate this product in a much more efficient way and [with] much better margins than we were able to do before."  Another analyst asked specifically about demand for the Company's "COVID beneficiaries" categories, such as the Outdoor segment, and Hobart responded, "each one of them had big surges, but has landed at levels that are above 2019."  In response to another analyst question later in the call, Stack stated: "Our #1 brand in fitness are our own brands.  It's really an

important aspect of our – of the outdoor category we have, and these are all hard lines that, again, margin rates that are meaningfully higher than what the company as a whole is."

39.     On May 19, 2023, TD Cowen and Telsey Advisory Group issued analyst reports lowering their sales and earnings per share estimates for DSG for both the first quarter of fiscal year 2023 and the full year.  The TD Cowen analyst report stated, in relevant part: "We are lowering estimates for comps and EPS for . . . Dick's. . . .  Debates on [the] stock[] remain firmly centered on durability of margin expansion since 2019.  Positioning/Sentiment in our view already suggests investor caution on Q1."   The report continued: "We're cautious on DKS going into the Q1 print . . . .  We expect Q1 gross margin down -100bps, as lower merchandise margins are partially offset by freight tailwinds."  Similarly, the Telsey Advisory Group analyst report stated, in relevant part: "We are lowering our 1Q23 and annual estimates for Dick's Sporting Goods, as the company faces a broader retail industry shift in consumer spending away from discretionary categories and higher wages, while lapping strong growth from the last three years supported by US government stimulus and pandemic-fueled demand."  The report continued: "We now expect greater pressure on sales as a result of a worsened macroeconomic environment, in addition to lapping difficult comparisons over the last few years (driven by stimulus and pandemic-related gains)."

40.     Following the release of the TD Cowen and Telsey Advisory Group analyst reports, the price of DSG common stock declined 6.8% to close at $126.67 per share on May 19, 2023, on trading volume of 3.9 million shares.

41.     On May 23, 2023, DSG issued a press release announcing its financial results for the first quarter of fiscal year 2023, ended April 29, 2023, and discussed the results on an accompanying earnings call on the same day.  On the call, an analyst again asked about demand for the "COVID winners," including the Company's Outdoor segment.  Hobart responded: "[T]hose COVID categories you talked about, maybe bikes or fitness, they are all – while they have retrenched, they're

well above where they were in 2019."  Hobart also made positive statements about the Company's

current inventory levels, commenting: "Our inventory is clean.  It's well positioned."  Similarly,

Gupta stated: "Our inventory is clean and well positioned."  Both defendants also reiterated the

Company's ability to manage margins, due to structural changes.  For example, Hobart stated: "Our

value chain [*i.e.*, Going, Going, Gone!] and Warehouse stores are a really great tool for us to clear

out the product . . . .  So we have a tool now that helps us manage through this significantly."  Gupta

added:

> So as we have said, we are really happy with the Going, Going, Gone! and the
> Warehouse store strategy that we have had.  We have perfected this work over the
> last 3 years now.  What it has allowed us to do is to move more clearance inventory
> out of the DICK'S store into our Going, Going, Gone! channel.  What it allows us to
> do is, one, get much better recovery rate on the clearance margin in the – in this
> value chain store itself.

42.     Defendants' representations about DSG's inventory, margins, and prospects were

each misleading when made.  The true facts, which were then known to or recklessly disregarded by

defendants DSG, Hobart, and Gupta, included:

(a)     demand for products in DSG's Outdoor segment was slowing faster than

defendants represented, resulting in excess inventory;

(b)     the "structural changes" that defendants repeatedly touted, including

differentiated products, improved pricing technology, and more efficient clearance channels, did not

allow the Company to manage its excess inventory without hurting the Company's profitability;

(c)     the need to liquidate excess inventory, including in the Outdoor segment,

would have a materially negative effect on the Company's profitability; and

(d)     as a result of (a)-(c) above, defendants' statements about DSG's business

condition and prospects were materially false and misleading when made.

43.     Before the market opened on August 22, 2023, DSG issued a press release

announcing financial results for the second quarter of fiscal year 2023, ended July 29, 2023, and

discussed the results on an accompanying earnings call on the same day.  In the press release, DSG revealed that profitability for the second quarter was significantly lower than previously represented. Specifically, the Company's net income was $244 million (compared to the analyst consensus estimate of $338 million), earnings per share were $2.82 (compared to the analyst consensus estimate of $3.81), gross margin was 34.4% (compared to the analyst consensus estimate of 36.3%), and pre-tax margin was 10.2% (below the Company's previously-issued guidance of 11.7%).  The Company also lowered its profitability guidance for the rest of fiscal 2023.

44.     Hobart was quoted in the press release stating: "'[O]ur Q2 profitability was short of our expectations due in large part to the impact of elevated inventory shrink [*i.e.*, retail theft], an increasingly serious issue impacting many retailers.'"  On the earnings call, however, Hobart revealed that, "beyond shrink, we also took decisive action on excess products, particularly in the outdoor category, to allow us to bring in new receipts and ensure our inventory remains vibrant and well positioned."  Gupta added that the profitability "decline was driven by lower merchandise margin of 254 basis points.  As Lauren discussed, we took decisive action on excess product, particularly in the outdoor category to keep our inventory well positioned."  Gupta revealed that "shrink" only represented "[a third] of our merchandise margin decline," with the majority attributed to promotional sales of excess Outdoor inventory.  In response to a request for clarification from an analyst, Gupta confirmed that "[t]he largest driver of the decline . . . was around the fact that we continue to be decisive in keeping our inventory clean.  Outdoor was a perfect example of that." Hobart added: "I want to add just a couple of things about the outdoor category.  We had – there was excess inventory in the marketplace. . . .  And so we were aggressive . . . ."

45.     Later in the call, an analyst noted, "we've been talking about some weakness in outdoor for a while, but necessitated the write-down now?  Or why did you do it now?"  Hobart responded: "[T]he product we got aggressive with in Q2 . . . sold very well, and we've moved

through it such that we don't have to pack a majority of it away.  And we were heading to a place where we were going to have to do that."

46.     Gupta also commented on the Company's reduced guidance going forward, explaining that the Company would likely need to resort to additional promotions in the future:

> And the second driver was the decisive action that we took to keep our inventory claims, the example you gave of the outdoor.  And we have assumed some of this moderation . . . some of this activity in the back half expectation as well to continue to keep our inventory fresh and well positioned.

Another analyst asked for additional clarification on the reduced guidance, noting: "I think it's 140 basis points.  50 of that is because of the higher shrink.  What's the rest of it?"  Gupta responded: "[W]e moderated our merchandise margin expectations in the back half, in line with the actions that we discussed here in Q2.  We are just wanting to make sure that we are keeping our inventory fresh and vibrant . . . ."  The analyst responded: "So you'd always talked about the margins baselining. And last year, it's supposed to be the baseline.  Now clearly the last year is not the baseline because of the shrink issue and other things."

47.     Following the August 22, 2023 press release and conference call, the price of DSG common stock declined 24% to close at $111.53 per share, on trading volume of 19.3 million shares.

## LOSS CAUSATION/ECONOMIC LOSS

48.     During the Class Period, as detailed herein, defendants made false and misleading statements and/or engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of DSG common stock and operated as a fraud or deceit on Class Period purchasers of DSG common stock.  As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of DSG common stock fell precipitously, as the prior artificial inflation came out of the stock price.  As a result of their purchases of DSG common stock during the Class Period, plaintiff and other members of the Class (as defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of DSG common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company at all relevant times and members of their immediate families, the legal representatives, heirs, successors, or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DSG common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of shares of DSG common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by DSG or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of DSG; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

54.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF FRAUD-ON-THE-MARKET PRESUMPTION

55.    The market for DSG common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, DSG common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased DSG common stock relying upon the integrity of the market price of DSG common stock and market information relating to DSG, and have been damaged thereby.

56.    During the Class Period, the artificial inflation in the price of DSG common stock was caused by the material misrepresentations and/or omissions particularized in this complaint, which caused the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false and/or misleading statements about DSG's business, prospects, and operations.  These material

misstatements and/or omissions created an unrealistically positive assessment of DSG and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and, when the truth was disclosed, the value of the Company's common stock was negatively affected.  Defendants' materially false and/or misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing DSG common stock at artificially inflated prices, and each of them has been damaged as a result.

57.     At all relevant times, the market for DSG common stock was an efficient market for the following reasons, among others:

(a)     DSG common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, DSG filed periodic public reports with the SEC and/or the NYSE;

(c)     DSG regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     DSG was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

58.     As a result of the foregoing, the market for DSG common stock promptly digested current information regarding DSG from all publicly available sources and reflected such information in DSG's common stock price.  Under these circumstances, all purchasers of DSG

common stock during the Class Period suffered similar injury through their purchase of DSG common stock at artificially inflated prices and a presumption of reliance applies.

59.     A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

60.     Plaintiff incorporates herein each and every allegation contained above.

61.     During the Class Period, defendants engaged in a scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase DSG common stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions set forth herein.

62.     Defendants:

      (a)     employed devices, schemes, and artifices to defraud;

      (b)     made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and

- 20 -

(c)      engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for DSG common stock in violation of §10(b) of the 1934 Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

63.      Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about DSG's financial well-being and prospects, as specified herein.

64.      Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DSG's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material fact and/or omitting to state material facts necessary in order to make the statements made about DSG and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

65.      Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts:

(a)      the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof;

(b)     each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports;

(c)     each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and

(d)     each of these Individual Defendants were aware of the Company's dissemination of information to the investing public, which they knew and/or deliberately disregarded was materially false and misleading.

66.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DSG's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

67.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of DSG common stock

was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the markets in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired DSG common stock during the Class Period at artificially high prices and were damaged thereby.

68.     At the time of said misrepresentations and/or omissions, plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that DSG was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased their DSG common stock, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

69.     By virtue of the foregoing, defendants violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

70.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### COUNT II

**For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     The Individual Defendants acted as controlling persons of DSG within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their high-level positions and their ownership

and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

74. As set forth above, DSG and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 16, 2024           SAXTON & STUMP LLC
                                     LAWRENCE F. STENGEL


                                     *s/ Lawrence F. Stengel*
                                     LAWRENCE F. STENGEL
                                     Attorney I.D. No. 32809
                                     280 Granite Run Drive, Suite 300
                                     Lancaster, PA  17601
                                     Telephone:  717/556-1000
                                     215/925-6471 (fax)
                                     lfs@saxtonstump.com

                                     Local Counsel

                                     ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     DARREN J. ROBBINS
                                     DARRYL J. ALVARADO
                                     655 West Broadway, Suite 1900
                                     San Diego, CA  92101
                                     Telephone:  619/231-1058
                                     619/231-7423 (fax)
                                     darrenr@rgrdlaw.com
                                     dalvarado@rgrdlaw.com

SUGARMAN SUSSKIND BRASWELL
  & HERRERA, P.A.
HOWARD S. SUSSKIND
D. MARCUS BRASWELL, JR.
150 Alhambra Circle, Suite 725
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)
hsusskind@sugarmansusskind.com
dbraswell@sugarmansusskind.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _29_ day of January, 2024.

Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund

By:   _____

Anthony Salgado, Business Manager

DICK'S SPORTING GOODS

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/27/2022 | 65 | $83.51 |
| 08/24/2022 | 40 | $110.49 |
| 09/09/2022 | 70 | $113.29 |
| 01/25/2023 | 50 | $124.97 |
| 01/26/2023 | 10 | $124.16 |
| 01/26/2023 | 99 | $124.47 |
| 01/30/2023 | 15 | $127.78 |
| 04/26/2023 | 110 | $147.05 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 07/07/2022 | 128 | $82.09 |
| 11/03/2022 | 49 | $110.86 |
| 11/10/2022 | 55 | $110.23 |
| 02/10/2023 | 105 | $129.43 |
| 03/02/2023 | 15 | $128.14 |
| 03/02/2023 | 38 | $128.54 |
| 07/05/2023 | 27 | $130.52 |

Prices listed are rounded up to two decimal places.

*Opening position of 1,727 shares.