UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re DICK'S SPORTING GOODS, INC. SECURITIES LITIGATION | ) ) ) | Civ. Action No. 2:24-cv-00196-JNR-KT |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | CONSOLIDATED COMPLAINT FOR |
| ALL ACTIONS. | ) ) ) | VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | ) | DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND OVERVIEW ........................................................................1

II.   JURISDICTION AND VENUE ...............................................................................6

III.  PARTIES .................................................................................................................7

IV.   BACKGROUND TO DEFENDANTS' FRAUDULENT STATEMENTS AND
      COURSE OF CONDUCT .......................................................................................8

      A.    About the Company ......................................................................................8

      B.    Pandemic-Era Conditions Drive Dramatic Sales and Profitability
            Improvements ...............................................................................................9

      C.    Merchandise Margins Are a Critical Metric for Investors ........................12

      D.    Margins Contract During the Class Period but Defendants Maintain a
            Positive Narrative on DSG's Profitability ................................................15

            1.    2Q22 Results (Issued on August 23, 2022) ...................................16

            2.    3Q22 Results (Issued on November 22, 2022) ...............................18

            3.    4Q22 Results (Issued on March 7, 2023) .......................................19

            4.    First Cracks in the Façade .............................................................21

            5.    1Q23 Results (Issued on May 23, 2023) ........................................21

      E.    Defendants Reveal Further Margin Decline in 2Q23 Instead of the
            Improvement They Led Investors to Expect ..............................................23

      F.    Defendants Mislead Investors by Concealing a "Lump" of Excess
            Inventory Created by Waning Demand for "Pandemic Winner" Products ...........27

            1.    Retail Industry Terms Regarding Inventory ..................................28

            2.    Defendants Give Investors a Misleading Impression Regarding
                  DSG's Inventory ............................................................................29

            3.    Former Employees Recount "Jaw-Dropping," "Shocking,"
                  "Astronomical," and "Dangerous" Amounts of Inventory at Stores
                  and Distribution Centers Throughout the Country ........................33

            4.    Defendants (Later) Admit That DSG Had a Lump of Outdoor
                  Inventory Related to the "COVID Buys" During the Class Period ...........39

G.    Defendants Mislead Investors Regarding a Trend of Elevated Shrink Throughout the Class Period...................................................................40

        1.     DSG's Accounting for Shrink...................................................41

        2.     DSG Experienced a Trend of Elevated Shrink Throughout the Class Period ..........................................................................43

        3.     Defendants Knew About the Trend of Elevated Shrink ............45

        4.     The SEC Warns Defendants About Their Inadequate Disclosures Concerning Shrink ......................................................................47

        5.     Defendants Disclose Disappointing Profits Due to Shrink and Finally Disclose Required Information Regarding the Shrink Trend........48

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..............................................................................................51

    A.    Statements Regarding Inventory and Demand for Outdoor Products Misrepresented the True State of DSG's Excess Inventory....................51

    B.    Statements Regarding Risk Factors Misleadingly Warned of Risks That Had Already Materialized.....................................................................58

    C.    Statements Regarding Shrink Were Misleading Half-Truths That Failed to Comply with Item 303 .......................................................................61

VI.   CORROBORATING CONFIDENTIAL WITNESS ACCOUNTS SUPPORT FALSITY AND STRENGTHEN THE INFERENCE OF SCIENTER ...........................65

    A.    CW-1 – Manager of Strategy in Coraopolis, Pennsylvania ....................66

    B.    CW-2 – District Manager in Arizona and Nevada..................................69

    C.    CW-3 – Store Manager in New England .................................................73

    D.    CW-4 – Planning, Allocation, and Replenishment in Coraopolis, Pennsylvania ..........................................................................................75

    E.    CW-5 – Store Manager in Maryland ......................................................76

    F.    CW-6 – Assistant Store Manager in Minnesota ....................................77

    G.    CW-7 – Warehouse Supervisor in Georgia ...........................................77

    H.    CW-8 – Merchandise Planner in Coraopolis, Pennsylvania...................78

    I.    CW-9 – Assistant Buyer in Coraopolis, Pennsylvania ..........................79

    J.    CW-10 – District Manager in Pennsylvania ..........................................79

VII.    DEFENDANTS ACTED WITH SCIENTER ....................................................80

    A.    Defendants Were Hands-On, High-Level Executives Who Closely and
          Frequently Tracked and Spoke About DSG's Margins and Inventory................80

          1.    Defendants' "Hands-On" Management Style ............................................81

          2.    Defendants Utilized Highly Detailed, Real-Time Reporting and
                Tracking Systems ....................................................................................82

          3.    Defendants Admitted They Regularly "Monitor[ed] Sell-Throughs,
                Inventory Turns, Gross Margins, and Markdown Rates" and More..........85

          4.    Hobart and Stack Regularly Visited DSG Stores and Distribution
                Centers Throughout the Country .............................................................87

    B.    The Temporal Proximity Between Defendants' Misleading Statements and
          the Disclosure of Corrective Information Supports the Strong Inference of
          Scienter .............................................................................................................103

    C.    Hobart and Gupta Signed Sarbanes-Oxley Certifications Attesting That
          They Personally Supervised DSG's Controls and Procedures ...........................104

    D.    Suspicious Insider Stock Sales Provide Strong Indicia of Scienter....................105

          1.    Stack's Class Period Insider Stock Sales .................................................106

          2.    Hobart's Class Period Insider Stock Sales...............................................107

          3.    Gupta's Class Period Insider Stock Sales ................................................108

VIII.    LOSS CAUSATION...................................................................................................109

IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE ...................................112

X.    CLASS ACTION ALLEGATIONS ............................................................................113

XI.    CAUSES OF ACTION ...............................................................................................115

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated
    Thereunder Against All Defendants ....................................................................115

COUNT II For Violation of §20(a) of the Exchange Act Against All Defendants ....................117

XII.    PRAYER FOR RELIEF .............................................................................................119

XIII.    JURY DEMAND........................................................................................................119

Plaintiffs State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island, and Western Pennsylvania Teamsters and Employers Pension Fund ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' consolidated complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Dick's Sporting Goods, Inc. ("DSG" or the "Company"), analysts' reports and advisories about the Company, statements by percipient witnesses, and other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION AND OVERVIEW

1.    This securities class action is brought on behalf of those who purchased or otherwise acquired DSG common stock between August 23, 2022 and August 21, 2023, inclusive (the "Class Period"). This action is brought against DSG and three of its senior executives: Executive Chairman Edward W. Stack ("Stack"); President and Chief Executive Officer ("CEO") Lauren R. Hobart ("Hobart"); and Chief Financial Officer ("CFO") Navdeep Gupta ("Gupta"). Plaintiffs seek remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    DSG is a leading sporting goods retailer operating stores across the United States. The Company also offers products to customers online and through mobile apps. DSG sells hardlines (*i.e.*, physically "hard" goods, such as sports or outdoor recreation equipment), apparel,

footwear, and other products, and, in addition to its primary DICK'S Sporting Goods stores, operates several other specialty sporting goods stores (*e.g.*, outlet centers and golf stores).

3.      DSG's business was profoundly – and positively – impacted by trends related to the COVID-19 pandemic that hit the United States in 2020.  First, demand for the Company's outdoor recreation and fitness products surged in 2020 and 2021 because of lockdowns, gym closures, and other conditions precipitated by the pandemic.  Second, nationwide economic recovery efforts, including individual stimulus payments, drove increased discretionary spending by consumers in 2021 and early 2022.  These trends led to dramatic sales and profitability growth for DSG from 2Q20[1] through 1Q22, with sales and margins up on a quarter-over-quarter basis in every single quarter.

4.      By 2Q22, these pandemic-era trends had receded and DSG's profitability growth streak came to an end.  In particular, merchandise margin – defined as retail sales revenue less the cost of merchandise sold, and a key metric by which investors tracked DSG's profitability – began contracting on a quarter-over-quarter basis, and continued to do so throughout the Class Period. Defendants, however, claimed that much of the pandemic-era margin gains were sustainable because they were purportedly due in large part to fundamental, structural changes that Defendants had begun making to the Company long before the pandemic.  Throughout the Class Period, Defendants continually assured investors that margins would not sink back to their pre-pandemic levels.

---

[1]    Specific quarters in a fiscal year ("FY") are designated by the quarter number followed by the letter Q.  Thus, 2Q20 indicates DSG's second quarter in the fiscal year 2020, and FY20 indicates the full fiscal year 2020.  DSG's fiscal year runs from February to January, such that the first quarter ends around the end of April, the second quarter ends around the end of July, the third quarter ends around the end of October, and the fiscal year ends around the end of January.

5.     To maintain this narrative, Defendants engaged in a scheme to defraud and made numerous materially false and misleading statements and omissions to investors regarding two significant issues that threatened DSG's merchandise margins throughout the Class Period: (i) excess inventory, particularly in the "pandemic winner" outdoor and fitness categories, that was building up in the Company's stores, distribution centers, and warehouses throughout the country and would need to be cleared through at low, margin-compressing prices; and (ii) a trend of elevated inventory shrinkage, or "shrink," related to retail theft, which became rampant in 2022 and 2023 and negatively affected DSG's merchandise margins throughout the Class Period.

6.     Defendants claimed throughout the Class Period that inventory levels were "***clean***," "***healthy***," and "***well-positioned***."  Defendants did acknowledge one exception – a glut of excess apparel inventory that DSG cleared through in the second half of FY22 – but misleadingly claimed that this apparel glut was the "***only lump***."  Further, Defendants even spoke directly to the topic of outdoor and fitness inventory, tepidly acknowledging that DSG had "a lot" of this product, but insisted that inventory levels were in line with demand, stating the Company was experiencing "***no issues with flow there***."[2]

7.     In reality, outdoor and fitness inventory was piling up to shocking degrees, as DSG brought in new inventory faster than the merchandise could be sold to customers.  Stores and distribution centers around the country were forced to rent additional trailers and even whole warehouses to meet the Company's excess storage needs.  Storage areas were overstuffed with precarious towers of bikes, kayaks, weight sets, and other products, and DSG facilities were so crowded with inventory that it became a safety hazard due to blocked fire exits and other safety

---

[2]    All emphasis added and citations omitted unless otherwise noted

code violations.  Indeed, after the Class Period, Defendants admitted that there was, in fact, "*a lump in outdoor equipment related to the pandemic*" dating back to 2022.

8.      Additionally, increased retail theft dogged DSG's facilities throughout the Class Period – in each quarter, retail theft elevated shrink by millions of dollars year-over-year.  This trend of elevated shrink had a material negative impact on the Company's margins in each quarter, contributing significantly to declines in both merchandise and gross margins.  Defendants knew about the problem because they accessed real-time data about theft incidents and conducted physical inventories throughout the year.  Yet Defendants misled investors regarding the trend of elevated shrink by issuing a series of anodyne disclosures in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") sections of DSG's quarterly filings with the SEC throughout the Class Period, which merely stated that DSG's merchandise margin declines were driven, in part, by an unspecified amount of "higher inventory shrink due to increased theft."  These half-truths violated Defendants' disclosure obligations under Item 303 of SEC Regulation S-K, 17 C.F.R. §299.303 ("Item 303"), which provides requirements and guidance for public company disclosures in the MD&A section of quarterly filings.  Notably, by letter dated August 9, 2023, the SEC referred Defendants to Item 303 and instructed them to supplement their disclosures by "describ[ing] to us and disclos[ing] in quantitative terms the extent to which" shrink impacted DSG's income and margins.

9.      Defendants knew or were reckless in not knowing that their Class Period statements concerning inventory and shrink were misleading when made.  The fraud alleged herein involved topics that were central to DSG's operations – *e.g.*, inventories, merchandise margins, consumer demand, and profitability – and, in addition to demonstrating their intimate knowledge of these topics and the current state of DSG's operations by discussing them in detail throughout the Class Period, Defendants explicitly stated: "*[W]e monitor sell-throughs, inventory turns, gross margins*

*and markdown rates at the department and style level*."  In fact, according to their own admissions and corroborating accounts from former employees, Stack and Hobart visited DSG stores around the country throughout the Class Period, witnessing the inventory issues firsthand and discussing problems related to the alleged fraud with employees.  As Hobart touted during the Class Period, "***it's go to the stores and you'll find the truth***.  ***That's what Ed [Stack] and the management team have always believed***."  Moreover, while the price of DSG common stock was artificially inflated by the fraud alleged herein, the three Individual Defendants (defined below) realized more than ***$47 million*** in insider trading proceeds by dumping large portions of their personally-held DSG shares.  Suspiciously, all of these insider trades were executed ***outside of Rule 10b5-1 plans***, which are commonly used by corporate executives to shield their trades from possible influence by material nonpublic information.  What is more, most of the trades occurred on a single day in March 2023, when shares of DSG common stock were trading near their Class Period high – just days after Defendants issued misleading statements that maintained the artificial inflation in the Company's stock price.

10.    The true state of affairs began to be revealed on May 19, 2023, when an analyst lowered their sales and earnings per share estimates for DSG for both 1Q23 and FY23, predicting that DSG's merchandise margins would drag down the Company's profitability as the favorable pandemic-era trends receded.  On this news, the price of DSG stock declined 6.8% on volume of more than 3.9 million shares, closing at $126.67 per share on May 19, 2023.

11.    On August 22, 2023, Defendants revealed continued margin declines and disappointing profitability results due to the issues obfuscated by Defendants' fraud throughout the Class Period: markdowns to move through excess inventory, "particularly in the outdoor category," and elevated shrink.  Defendants also lowered profitability guidance for the remainder of FY23 due to the same problems.  One analyst noted that the revelation of these issues "shocked

- 5 -

investors," stating Defendants should have "telegraphed to investors more effectively both the need to write-down outdoor-related products and reserve more aggressively to elevated shrink." On the news, the price of DSG stock declined ***over 24%*** on volume of more than 19 million shares, closing at $111.53 per share on August 22, 2023.

12.     These declines in the price of DSG stock caused hundreds of millions of dollars in losses to DSG investors, who suffered damages when the truth began to be revealed.  Plaintiffs seek to recover these losses on behalf of investors who purchased or otherwise acquired DSG stock during the Class Period.

## II.    JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

4895-9028-0940.v3

### III.    PARTIES

17.    Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island ("Rhode Island") was appointed to serve as Lead Plaintiff in this action by the Court on July 30, 2024.  ECF 46.  During the Class Period, Rhode Island purchased DSG common stock as set forth in the certification previously filed (*see* ECF 23-3) and incorporated herein, and was damaged thereby.

18.    Plaintiff Western Pennsylvania Teamsters and Employers Pension Fund ("Western PA Teamsters Fund") was appointed to serve as Lead Plaintiff in this action by the Court on July 30, 2024.  ECF 46.  During the Class Period, Western PA Teamsters Fund purchased DSG common stock as set forth in the certification previously filed (*see* ECF 19-2) and incorporated herein, and was damaged thereby.

19.    Defendant Dick's Sporting Goods, Inc. is a Delaware corporation with its principal executive offices located in Coraopolis, Pennsylvania.  DSG common stock trades on the New York Stock Exchange ("NYSE") under the symbol "DKS."

20.    Defendant Edward W. Stack served as Executive Chairman of DSG during the Class Period.  During the Class Period, Stack made materially false and misleading statements and omissions in SEC filings and during investor conferences, as alleged herein.

21.    Defendant Lauren R. Hobart served as President and CEO of DSG during the Class Period.  During the Class Period, Hobart made materially false and misleading statements and omissions in SEC filings and during investor conferences, as alleged herein.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. §1350, Hobart signed and certified the Company's Forms 10-Q and 10-K filed with the SEC.

22.    Defendant Navdeep Gupta served as CFO of DSG during the Class Period.  During the Class Period, Gupta made materially false and misleading statements and omissions in SEC

filings and during investor conferences, as alleged herein.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Gupta signed and certified the Company's Forms 10-Q and 10-K filed with the SEC.

23.    Defendants Stack, Hobart, and Gupta are referred to herein as the "Individual Defendants."   DSG and the Individual Defendants are referred to herein, collectively, as "Defendants."

## IV.    BACKGROUND TO DEFENDANTS' FRAUDULENT STATEMENTS AND COURSE OF CONDUCT

### A.    About the Company

24.    DSG is a leading sporting goods retailer that sells sports equipment, apparel, footwear, and accessories to retail consumers throughout the United States.  DSG is an "omni-channel" retailer, meaning it offers products to consumers in physical store locations as well as online and through mobile apps.  The Company has over 700 physical locations across the United States.

25.    DSG was founded in Binghamton, New York by Richard "Dick" Stack in 1948. His son, defendant Stack, became President, CEO, and Chairman of the Board of Directors in 1984, when the Company had only two stores.  Stack grew the business substantially and moved its headquarters to Pittsburgh, Pennsylvania in 1994.  The Company went public through an initial public offering in 2002.  Hobart became President in 2017 and joined the Board of Directors in 2018.  Stack stepped down as CEO in January 2021 and was succeeded by Hobart in February 2021. Stack remains the Company's Executive Chairman and Chairman of the Board of Directors. Gupta became CFO in October 2021.

26.    The Company divides its product offerings into four categories: hardlines (40% of sales as of 2022), apparel (34%), footwear (24%), and other (2%).  It operates several different types of physical locations in addition to the primary DICK'S Sporting Goods stores: Golf Galaxy,

Public Lands, Going, Going, Gone!, and DICK'S House of Sport. The Company operates "store-within-a-store" concepts at its DICK'S Sporting Goods physical locations, which typically contain the following specialty shops: Team Sports, Athletic Apparel, Outdoor, Golf, Fitness, and Footwear.

**B.      Pandemic-Era Conditions Drive Dramatic Sales and Profitability Improvements**

27.     The COVID-19 pandemic began severely affecting the U.S. economy in March 2020, precipitating unprecedented economic recovery efforts by the federal government over the next 12 months. Policies such as interest rate cuts, expanded unemployment benefits, direct stimulus payments, small business loans and grants, mortgage and student loan forbearance, and others put more money into the pockets of U.S. consumers and boosted the economy. In December 2020, COVID-19 vaccines became available, and hundreds of millions of doses were distributed to Americans over the next several months. As the country slowly emerged from the pandemic, the economic recovery efforts led to increased discretionary spending. According to recently-released data from the Visa Spending Momentum Index, published in the Federal Reserve Bank of St. Louis's *FRED Blog* on July 8, 2024: "During March and April of 2020, discretionary spending markedly slowed down. It remained very close to its trend value for the next 12 months and surged above trend for almost a whole year afterward," *i.e.*, discretionary spending surged from early 2021 to early 2022:



28.    In addition, the social distancing measures undertaken during the pandemic largely prevented U.S. consumers from participating in indoor social activities or exercising at gyms, leading to an increased focus on outdoor recreation and home fitness options throughout 2020 and 2021.  For example, *Forbes* published an article on February 28, 2023 titled "Outdoor Recreation Industry Sees Significant Growth With Changes In Consumer Behavior Sparked By COVID-19": "After lockdowns kept people indoors for much of the spring and summer in 2020, Americans got outside in droves," and in 2021, "a confluence of factors led to a surge in growth on the retail sector of the industry, which continued into 2022."  Specifically, *Forbes* reported: "The industry has grown 6.7% per year on average in the U.S. between 2018 and 2023, with a marked jump from 2020 to 2021.  In fact, the sporting goods industry in the U.S. has increased faster than the economy overall."

29.    Similarly, on January 7, 2021, *The Washington Post* published an article titled, "The pandemic's home-workout revolution may be here to stay": "Sales of fitness gear, gadgets and apparel have skyrocketed during the pandemic as homebound consumers have scrambled to build home gyms, loaded up on sneakers and downloaded fitness apps by the millions."  The article noted a "surge in bicycle and kayak purchases," and reported that "retail data showed massive sales spikes for an array of recreational and fitness merchandise, from dumbbells and roller skates to surfboards and golf clubs."

30.    DSG benefitted enormously from the macroeconomic tailwinds and shift towards outdoor recreation and home fitness.  As discussed below, DSG's sales and profitability skyrocketed during 2020 and 2021.  And, consistent with the national trends described above, the conditions caused by the pandemic benefitted certain categories of DSG's products in particular – the "pandemic winners" – among them, products in the Company's fitness and outdoor segments. During the 2Q22 earnings call on August 23, 2022, at the start of the Class Period, Hobart

identified "some of the more specific pandemic winners" as "fitness or outdoor equipment [and] bikes."

31.    With the exception of 1Q20, when DSG stores were abruptly closed during the initial months of the pandemic, DSG's net sales grew dramatically throughout 2020 and 2021:



32.    DSG's profitability also benefitted.   Along with sales, gross margins increased significantly in each quarter after 1Q20:



33.    In particular, merchandise margins (defined as net revenues from sales less the cost of merchandise sold) improved on a year-over-year basis starting in 2Q20.  These improvements continued throughout FY21 and into 1Q22, even on top of the already-elevated 2020 results:[3]



C.    **Merchandise Margins Are a Critical Metric for Investors**

34.    Investors paid close attention to DSG's merchandise margins because they are a key driver of profitability.  DSG stated in its SEC Form 10-K for FY22 (filed March 23, 2023):

> Our profitability is primarily influenced by growth in comparable store sales, the strength of our merchandise margins and ability to manage operating expenses.  In addition to the structurally higher sales compared to pre-COVID levels, our merchandise margins increased over 300 basis points as a percentage of net sales in fiscal 2022 as compared to fiscal 2019, as we've maintained the majority of the merchandise expansion that we drove over the prior two years with our differentiated product assortment, combined with our disciplined pricing strategy and favorable sales mix.

35.    Merchandise margin simply reflects DSG's retail sales revenue less the cost of merchandise sold.  Thus, merchandise margin excludes other costs that factor into gross margin, such as store occupancy costs, freight, distribution, and shipping.  Accordingly, the metric allows

---

[3]    DSG does not disclose an absolute value for merchandise margins, only the change from the prior year.

investors to track DSG's promotional activity (*e.g.*, discounts).  For example, on February 16, 2023, Barclays published an analysis of DSG's promotional cadence based on field research, noting: "We use this analysis as a proxy for the direction of merchandise margin."

36.    Reflecting the importance of merchandise margins to investors, analysts commented on DSG's merchandise margins throughout the Class Period.  In addition to consistent remarks on the metric – in nearly every report throughout the Class Period – and various in-depth analyses, analysts often explicitly called out merchandise margins as a "key driver" that investors were "keenly focused on."  For example:

(a)    On August 23, 2022, Morgan Stanley maintained its "Overweight" rating for DSG, writing: "We see a positive risk/reward skew based on our view the earnings power of the business is underappreciated.  Key drivers include merchandise margin expansion . . . ."

(b)    On September 28, 2022, Guggenheim Securities wrote: "[W]e expect investors to remain keenly focused on the company's ability to withhold the majority of the ~600 basis points of merchandise margin expansion captured since 2019."

(c)    On November 22, 2022, Telsey Advisory Group included an entire section in their report titled "Key Highlights: Merchandise Margin and Promotions," noting: "There were many questions on the earnings call about the direction of the merchandise margin from here."

(d)    On February 13, 2023, Guggenheim Securities wrote: "[W]e expect the company's 4Q merchandise margin performance to be in focus."

(e)    On March 7, 2023, Morgan Stanley wrote: "We will be listening on the call for what is driving this confidence in y/y merchandise margin expansion."

(f)    On March 8, 2023, Telsey Advisory Group wrote: "Many questions on the earnings call related to the direction of merchandise margin from here."

(g)    On May 23, 2023, Barclays wrote: "[W]e believe merchandise margin recapture is the far more visible and reliable piece of the P&L given . . . anniversary of a highly promotional 2H22 last year as inventory becomes increasingly leaner."

(h)    On May 23, 2023, Evercore ISI characterized "merch margin" as a "key fundamental metric," along with sales, gross margin, and inventories.

(i)    On May 24, 2023, Telsey Advisory Group wrote: "Many questions on the earnings call related to the direction of merchandise margin from here."

37.    Despite the influence of pandemic-related factors on DSG's stellar performance in 2020 and 2021, Defendants claimed much of the credit, attributing pandemic-era sales and profitability growth to structural changes in the business that they had initiated as far back as 2017, and promised that the margin gains were sustainable.

38.    Thus, going into the Class Period, investors queried: how much of the merchandise margin and profitability gains would DSG be able to sustain in the post-pandemic world as conditions changed from the beneficial environment that obtained from 2Q20 through 1Q22? Analyst commentary throughout the Class Period highlighted the importance of this issue.  For example:

(a)    On August 23, 2022, Cowen wrote: "The debate around the durability of omni-channel productivity and merch margin will continue."

(b)    On September 29, 2022, Evercore ISI discussed DSG's gross margins, writing: "The question we get most often on DKS: how can this be sustainable?"

(c)    On November 22, 2022, Evercore ISI characterized the issue as "the most controversial margin question," writing: "The majority of our q's on DKS continue to be on the sustainability of sales and merch margin re-rate vs. pre-pandemic."

(d)    On November 22, 2022, Wells Fargo wrote, "LT [long term] Merch Margin Trajectory Debate Continues," noting "persisting market questions on LT merch margin sustainability."

(e)    On November 23, 2022, Cowen noted: "Merchandise Margin Durability A Point of Contention."

(f)    On March 7, 2023, D.A. Davidson wrote: "The debate on DKS is if margins continue to fall from pandemic era highs and towards 2019 levels, or if profitability is now structurally higher such that after giving back some of the 2021 froth, we are no[w] at a new baseline."

(g)    On May 19, 2023, TD Cowen wrote: "Debates on [DSG] remain firmly centered on durability of margin expansion since 2019."

(h)    On May 23, 2023, J.P. Morgan wrote, "the degree of margin expansion since COVID [is] the biggest question."

### D.    Margins Contract During the Class Period but Defendants Maintain a Positive Narrative on DSG's Profitability

39.    DSG's merchandise margin growth slowed in 1Q22 and merchandise margins began contracting in 2Q22, as the macroeconomic climate cooled and the pandemic-era conditions that led to unprecedented demand for outdoor recreation and home fitness products waned.  Indeed, in stark contrast to the eight straight quarters of merchandise margin expansion from 2Q20 through 1Q22, merchandise margins contracted in every quarter during the Class Period (2Q22 through 2Q23):

4895-9028-0940.v3



40.    DSG's gross margins followed a similar trajectory, beginning to contract even before the start of the Class Period:



41.    Defendants offered a host of excuses and benign explanations for this trend, maintaining that despite setbacks, much of the pandemic-era margin improvement was sustainable.

**1.    2Q22 Results (Issued on August 23, 2022)**

42.    In 2Q22, analysts expected some margin reversion after the heady gains over the previous two years, and DSG actually beat consensus estimates for gross margin.  Capitalizing on

the market's tempered expectations, Defendants repeatedly referred to 2019 on the August 23, 2022 2Q22 call to demonstrate that DSG's performance, though slowing, was still stronger than "pre-COVID levels." Thus, although Defendants claimed that DSG's improved performance during the uniquely beneficial pandemic-era environment was largely of their own making, they also strategically emphasized that 2019, not 2021, was the appropriate comparator for 2022's results.

43.    For example, Hobart noted in her prepared remarks: "It's important to highlight that our sales continued to run substantially above pre-COVID levels, up 38% versus Q2 2019"; "Our merchandise margin rate was up 439 basis points versus Q2 2019"; and, "we achieved double-digit EBT margin of nearly 14%, approximately 2x our Q2 2019 EBT margin."

44.    In addition, Defendants conditioned the market for forthcoming increased promotions in the apparel category, emphasizing that these promotions were the benign – and temporary – result of late-arriving inventory and not a sign of full-scale margin reversion. Hobart commented, "[a]thletic apparel was the only business that was slightly challenged in Q2 of our core businesses, and that was really because there were some [late] shipments in apparel, where some of the spring products came in on top of back-to-school products." Gupta added:

> There are, like Lauren [Hobart] indicated, there are certain categories where we are a bit heavier like, say, in apparel, and we will be appropriately activating around those products as we go into the back half. However, even that impact has been contemplated into our guidance, and so we feel really strongly about the guidance that we have given for the full year.

45.    Notably, over the next two days (August 24-25, 2022), Hobart sold over ***$7 million*** worth of her personally-held DSG shares – her first sales in over a year. Suspiciously, these sales were made ***outside of a Rule 10b5-1 trading plan***.

### 2.    3Q22 Results (Issued on November 22, 2022)

46.    Given Defendants' messaging on the 2Q22 call, the market was unfazed when, on November 22, 2022, DSG announced continued merchandise margin contraction in 3Q22 but blamed it on the one-off need to "clean[] up some targeted inventory overages due to late arriving spring products."  During Hobart's prepared remarks on the conference call, she stated:

> Additionally, we also mentioned that we have pockets of apparel inventory to address and we have addressed much of that overage this quarter.  As a result, and as expected, we saw a merchandise margin decline of 438 basis points versus last year.
>
> Importantly, our merchandise margin remained elevated compared to 2019.  And looking ahead, we continue to be very confident that our merchandise margin will remain meaningfully higher than pre-COVID levels on an annual basis.

47.    Gupta emphasized that the 3Q22 merchandise margin decline was tied directly to the apparel promotions, stating: "[T]he vast majority of the [merchandise margin] decline that we saw here in third quarter came from the activation that we had around the apparel overages that Lauren [Hobart] indicated at the end of Q2."  Similarly, Hobart stressed that the promotions – and thus, the merchandise margin decline – were simply a blip:

> This particular quarter, if you look back at Q2, we had indicated that we had gotten a lot of late receipts in from spring that came in on top of our back-to-school inventory, and we were heavy in apparel, and we aggressively took care of that this quarter to clean up our inventory so that we could maintain – so we've taken holiday merchandise and start 2023 clean.

48.    Defendants signaled that the apparel liquidations would only continue into the next quarter, with Gupta stating in his prepared remarks: "We moved excess apparel inventory to our value chain concept and have been very successful in liquidating much of this product.  We intend to continue addressing this overage in Q4 in order to start 2023 clean."

49.    The market accepted Defendants' explanations of the 3Q22 margin declines.  Telsey Advisory Group noted in its November 22, 2022 report, for example: "While the merchandise margin was down 438 bps YoY, most of the pressure seems ***transitory*** and due to

- 18 -

4895-9028-0940.v3

managing excess apparel inventory that retailers and brands like Nike and Adidas are keen to clear through in 2H22." Similarly, BofA Securities wrote in its November 22, 2022 report, "DKS should not see the same level of merchandise margin pressure as F3Q as elevated apparel inventory has largely been worked through."

### 3.    4Q22 Results (Issued on March 7, 2023)

50.    The next quarter, however, DSG's merchandise margin decline was even more pronounced. During the March 7, 2023 conference call for 4Q22, Defendants again compared the results to 2019 to put the decline in a more favorable light. Hobart stated near the beginning of the call: "Our merchandise margin increased more than 300 basis points. Our non-GAAP EBT margin more than doubled and our non-GAAP EPS is more than 3x higher than 2019."

51.    In fact, as Defendants admitted later in the call, DSG's 4Q22 merchandise margin was down 640 basis points when compared to 4Q21, and FY22 merchandise margin was down 303 basis points compared to FY21. Defendants continued to assure investors that, as in 3Q22, the declines were the result of discrete promotional activity and not a sign of full-scale reversion. Gupta emphasized that merchandise margins declined only "[a]s expected," and stated: "As planned, during the holiday season, we provided our athletes [*i.e.*, customers] with a series of compelling item level deals. Additionally, we continue to address targeted inventory overages due to the late arriving Sprin[g] product."

52.    Analysts were assuaged by Defendants' benign explanations. Telsey Advisory Group, for example, noted on March 8, 2023: "Although the company saw meaningful pressure of 640 bps on the merchandise margin, this is mostly *temporary* as it worked with vendors to clear through excess apparel inventory." Similarly, Barclays reported on March 7, 2023: "Promos during the quarter were well documented, even from our checks, but we believe these were largely *one-time* in nature, and the GM impact is likely contained in 4Q22." Further, on March 8, 2023,

- 19 -

Guggenheim Securities wrote, "although DKS' 2H 2022 merchandise margin was up only 140-210 basis points over 2019 levels, we still see the potential for the company to retain 300-325 basis points of permanent gains on a go-forward basis *now that inventory has been cleansed*."

53.    Notably, Defendants also declared on the 4Q22 call that going forward into 2023, comparisons to 2019 would no longer be relevant.  Hobart stated: "[O]ur fiscal '22 level . . . is indeed a new baseline," and clarified, "[w]e have been talking in 2019 just due to all the ups and downs of the past few years, but we will not be doing that going forward.  And '22 is the new base from which we're going to grow."  Gupta echoed, "like we have said 2022 is the new baseline foundation upon which we will grow our sales and earnings over the long term."

54.    In addition, Defendants issued aggressive guidance, with Hobart promising "higher merchandise margin" in 2023 after the disappointments in the second half of 2022: "We are planning to grow our merch margin going forward."   Gupta detailed the Company's FY23 profitability guidance: "At the midpoint, EBT margin is expected to be approximately 11.7%, driven by increase in gross margins.  This includes an expected improvement in merchandise margin and lower supply chain costs."

55.    At the same time, Defendants carefully managed expectations for margins in 1Q23.  Gupta stated: "Q1 gross margin is expected to meaningfully improve versus Q4, but be modestly down year-over-year primarily due to lower merchandise margins," though, "[w]e expect both gross margins and merchandise margins to sequentially improve throughout the year."  Defendants attributed the tempered expectations for 1Q23 to the difficulty of improving on DSG's stellar performance in 1Q22.  Gupta reiterated that "merch margin and gross margins will improve into 2023," and commented:

> In terms of a little bit of more cadence around gross – merch margin itself, as you can imagine, the inventory positions in Q1 [2022], both for us as well as the – in the industry was pretty lean and was pretty constrained.  So as we are annualizing

- 20 -

that, we expect some level of normalization of the pricing in the first half and that's what we gave in our kind of a cadence for the merch margin expansion.

56.     Defendants' statements on March 7, 2023 maintained the artificial inflation in DSG's stock price – indeed, the stock traded near its Class Period high – and the Individual Defendants took full advantage.  Remarkably, both Stack and Hobart sold stock on March 13, 2023, with Hobart earning proceeds of over ***$12 million*** and Stack earning proceeds of over ***$23 million*** on that single day, just days after issuing aggressive guidance and misleading statements about inventory and shrink.  *See infra* §V.  Similarly, Gupta sold over ***$2.5 million*** worth of his personally-held DSG shares shortly thereafter, on March 24, 2023.  All of these insider sales were made ***outside of a Rule 10b5-1 trading plan***.

### 4.     First Cracks in the Façade

57.     Shortly before DSG released its results for 1Q23 – expected on May 23, 2023 – an analyst released a report that undercut Defendants' positive statements regarding DSG's post-pandemic profitability and partially revealed the relevant truth.  Specifically, on May 19, 2023, TD Cowen lowered its sales and earnings per share estimates for DSG for both 1Q23 and FY23.  The TD Cowen report stated, in relevant part: "We are lowering estimates for comps and EPS for . . . Dick's. . . .  Debates on [the] stock[] remain firmly centered on durability of margin expansion since 2019.  Positioning/Sentiment in our view already suggests investor caution on Q1."  The report continued: "We're cautious on DKS going into the Q1 print . . . .  We expect Q1 gross margin down -100bps, as lower merchandise margins are partially offset by freight tailwinds."  The price of DSG common stock declined on this news.

### 5.     1Q23 Results (Issued on May 23, 2023)

58.     On May 23, 2023, DSG published results for 1Q23 and held a conference call on the same day.  DSG reported continued declines in both merchandise margin and gross margin, but Gupta stated in his prepared remarks that gross margin had only declined "[a]s planned," and

referenced the tough comparison to 1Q22, noting the 1Q23 "decline was driven by lower merchandise margin of 136 basis points due to the normalization of pricing activity relative to Q1 of 2022 when our inventory was quite lean."

59.     Further, Defendants reaffirmed their aggressive FY23 guidance on the call. Hobart stated near the beginning of the call: "Today, we are reaffirming our guidance for 2023," and added that DSG's 1Q23 "gross margin represented a meaningful improvement from Q4 of 2022." Gupta stated, in his prepared remarks: "At the midpoint, EBT margin is expected to be approximately 11.6%. We continue to expect improvement in gross margin, which will sequentially improve throughout the year."[4] He added, "we believe that the merch margin will continue to improve as we go through the year," and then "reiterated, we expect merch margin to continue to improve and build as we go into the year."

60.     Defendants again invoked their purported structural changes as support for their statements regarding merchandise margin growth, with Hobart commenting:

> I think what's very important for – to realize is that our inventory and our products now are very narrowly distributed. So we have more of a moat against any industry-level promotion that might have affected us in a – time ago when there was just wide distribution of similar products. So we are not expecting to have – to go into a major promotional cycle here.

61.     Similarly, in response to an analyst's question about "maintaining these merch margin gains you've achieved through COVID" in the face of a possible "downside scenario where things get a lot more competitive [and] more promotional over the summer or over the fall," Gupta stated: "I would again reiterate what we have consistently said. First of all, it all goes back to

---

[4]     An analyst noted that the guidance midpoint of 11.6% shared on the 1Q23 call represented a 10 basis point reduction from the 11.7% midpoint offered on the 4Q22 call. Gupta confirmed the reduction and stated, "the 10 basis points reduction in the EBT guidance for full year is because of the Moosejaw [acquisition]. It is slightly EBT-dilutive on a full year basis, and it will add about $100 million of top line sales in 2023."

having a very differentiated assortment, a differentiated assortment that is not only narrowly distributed but also is in really, really high demand when we look from the athletes."  Hobart added:

> Our value chain and Warehouse stores are a really great tool for us to clear out the product, be able to bring in fresh product to the DICK'S store but also make more product size runs, color runs available to the value-conscious consumer.  So we have a tool now that helps us manage through this significantly.

62.    Analysts reacted positively to Defendants' remarks on the 1Q23 call.  For example, J.P. Morgan wrote on May 23, 2023, "DKS again called out expanding gross and merch margins in 2023 (with sequential improvement throughout the year)."  Similarly, TD Cowen noted on May 23, 2023, "[m]erchandise margin is expected to improve through FY23."  On May 24, 2023, Telsey Advisory Group issued a report stating:

> Many questions on the earnings call related to the direction of the merchandise margin from here.  While the merchandise margin was down 136 bps YoY in 1Q23, much of the pressure seems transitory. . . .  Overall, the company does not expect to enter a new cycle of increasing promotions in the near term, which, combined with falling supply chain costs, is expected to result in improvement to the merchandise margin over the course of 2023.

63.    Just two weeks later, on June 7, 2023, Gupta sold another **$2.2 million** worth of his personally-held DSG shares.  Like all of the Individual Defendants' insider sales, Gupta's sales were made **outside of a Rule 10b5-1 trading plan**.

### E.    Defendants Reveal Further Margin Decline in 2Q23 Instead of the Improvement They Led Investors to Expect

64.    Throughout the Class Period, two major – undisclosed – issues cut against Defendants' assurances that margins would remain elevated after the beneficial pandemic-era conditions passed: (i) a "lump" of excess inventory that needed to be liquidated, including inventory in the Company's outdoor segment; and (ii) a trend of elevated inventory shrinkage, or "shrink," due to theft.  As explained below, Defendants created a misleading impression of DSG's profitability throughout the Class Period through misrepresentations and anodyne half-truths

- 23 -

regarding these issues – obscuring the problems and the extent of their impact, despite electing to speak on the subjects, in order to maintain a positive narrative about margins.

65.     The truth was finally revealed when DSG disclosed its results for 2Q23 in a press release and earnings call on August 22, 2023.  The press release, issued before the market opened, revealed that profitability in 2Q23 was significantly lower than Defendants had led investors to expect.  Specifically, the Company's gross margin was 34.4% (a more than 5% reduction from the analyst consensus estimate of 36.3%), and earnings per diluted share ("EPS") were $2.82 (a 26% reduction from the analyst consensus estimate of $3.81).  The Company also lowered its EPS guidance for the rest of FY23, "to reflect second quarter results and gross margin expectations for the second half of the year."

66.     On the earnings call, Gupta disclosed that, in contrast to the merchandise margin growth Defendants had promised, DSG's profitability "decline was driven by lower merchandise margin of 254 basis points."  Hobart revealed:

> Two key factors impacted our second quarter gross margin relative to our original expectations.  ***The first was the impact of higher inventory shrink***.
>
> *            *            *
>
> ***And second, beyond shrink, we also took decisive action on excess products, particularly in the outdoor category***, to allow us to bring in new receipts and ensure our inventory remains vibrant and well positioned.

67.     Gupta later elaborated, in response to an analyst question, that the liquidation of outdoor products represented "[t]he largest driver of the decline" – around two thirds – with shrink driving "[one third] of our merchandise margin decline."

68.     Gupta commented on Defendants' reduced guidance, explaining that both issues – shrink and promotions to clear excess inventory – were expected to continue to pressure DSG's margins through FY23:

- 24 -

At the midpoint, non-GAAP EBT margin is expected to be approximately 10.2% compared to our prior expectation of 11.6% [a 12% reduction]. . . . This now includes an expectation of higher [shrink], which will reduce our full year gross margins by approximately 50 basis points compared to 2022 as well as our continued emphasis to keep inventory vibrant and fresh.

69.    An analyst asked Defendants "to clarify the margin change in the guidance," noting: "I think the EBT guidance is down about – I think it's 140 basis points.  50 of that is because of the higher shrink.  What's the rest of it?"  Gupta responded:

The change besides shrink is coming from just we're flowing through the Q2 results as well as keeping our – we moderated our merchandise margin expectations in the back half, in line with the actions that we discussed here in Q2. We are just wanting to make sure that we are keeping our inventory fresh and vibrant and want to make sure that we are positioning our growth opportunities and bringing – the ability to bring in the innovation that we see in the marketplace are coming down, including some of the exciting brands that are available to us now.

70.    These revelations shocked investors and drove the price of DSG's common stock down more than 24%.  Analyst reports reflected investors' surprise and dismay at the profitability miss and guidance cut:

(a)    On August 22, 2023, in a report titled "What Happened?" D.A. Davidson wrote, "the shrink issue means that 2023 will be another down year as we try to find where the margins will ultimately settle out," and, "[m]anagement believes margins will rebase at this year's 10.2% level, which means margins improve in 2024.  We submit that this will need to be proven as that was also the thought relative to the original 2023 EBT guidance of 11.7%."

(b)    On August 22, 2023, Evercore ISI published a report stating: "DKS shares traded off 24% today on the back of a shrink and inventory-clearance-driven margin guide-down. DKS shares are ultra-sensitive to downward margin revisions given its massive (700 bps from 2019->2022) EBIT margin gains through the pandemic."

(c)    On August 22, 2023, Morningstar published a report stating:

No-moat Dick's Sporting Goods suffered a second-quarter profit miss and cut its full-year non-GAAP EPS guidance to $11.50-$12.30 from $12.90-$13.80

previously. While the firm stressed that consumer demand for its products remains strong, investors viewed the report very negatively, sending its shares down about 24%. We think investors and analysts had overestimated Dick's competitive position after three years of strong results, leading to overvaluation.

(d)    On August 22, 2023, Telsey Advisory Group published a report stating:

Dick's ~10% cut to its 2023 guidance came as a surprise after the company reiterated its outlook in May when most of its peers lowered. Higher markdowns and inventory shrink – not lower sales or less demand – were the cause of the cut. Dick's had not mentioned shrink as a negative factor in recent earnings calls, magnifying the impact. . . . While the markdowns seem contained to outdoor, they also point to Dick's not being immune to the promotional activity that is prevalent across the sector, as sporting goods brands and retailers look to bring inventory in line with demand.

(e)    On August 22, 2023, Wells Fargo published a report titled "2Q Disappoints as Reversion Fears May Be Coming to Roost," noting: "After dodging reversion worries for the last 18 mo., we are beginning to see some softness in the model driven by a choppy consumer backdrop, elevated inventory in the channel (driving promos), along w/ the newest headwind: shrinkage." The analyst published an additional report on the same day, noting: "Expectation[s] were elevated heading into the 2Q print & DKS could not hurdle the high bar. . . . This is DKS' first hiccup in a number of qtrs. and puts them in the penalty box."

(f)    On August 23, 2023, Oppenheimer published a report stating: "Yesterday (Aug. 22nd), DKS shocked investors, reporting much messier-than-expected Q2 (Jul.) trends and lowering meaningfully guidance for FY23 (Jan. 2024), sending shares down by about 25%." The report further stated: "[W]e are disappointed with the 'abruptness' of gross margin dislocations at DKS," and: "In our view, management should have recognized sooner and telegraphed to investors more effectively both the need to write-down outdoor-related products and reserve more aggressively to elevated shrink. To a certain extent, DKS is now a 'show me' story until management re-establishes credibility with investors."

F.    **Defendants Mislead Investors by Concealing a "Lump" of Excess Inventory Created by Waning Demand for "Pandemic Winner" Products**

71.    The pandemic-induced macroeconomic tailwinds and consumer preferences that drove much of DSG's pre-Class Period margin gains did not benefit all of the Company's products equally.  Rather, as noted above, certain "pandemic winners," such as outdoor and fitness equipment, surged, and DSG scrambled to find enough of this product to meet demand.  But, as the unique conditions that spurred that demand waned, the Company was left with what Hobart would characterize – after the Class Period – as "a lump in outdoor equipment related to the pandemic."  Indeed, accounts from former employees confirm that DSG had a shocking amount of excess inventory, particularly in the outdoor and fitness categories, even before the beginning of the Class Period, and that the Company was required to sell this inventory at clearance prices.

72.    Yet externally, Defendants minimized the problem, knowing it would cut against their narrative that much of DSG's pandemic-era margin gains were sustainable.  For example, at the beginning of the Class Period, during the August 23, 2022 conference call discussing the Company's 2Q22 results, Hobart stated: "When it comes to some of our hardline categories, say, fitness and outdoor equipment, we have bought – that is – we have a lot of inventory there that we just – we're buying around for next year.  ***So no issues with flow there***."  And, throughout the Class Period, Defendants consistently described DSG's inventory as "***healthy***," "***clean***," and "***well-positioned***."

73.    These statements – and others like them, as detailed below – misled investors by masking the true state of DSG's inventory, and, concomitantly, the Company's profitability.  In fact, there were issues with inventory flow, and far from being "clean," DSG stores and distribution centers had shocking amounts of excess outdoor and fitness equipment – kayaks, bikes, weight sets, and more – stacked up to the rafters, blocking fire exits, and piling up in increasing numbers

- 27 -

of storage trailers across the country.  Thus, on August 22, 2023, when Defendants announced continued margin declines in 2Q23 related to "decisive action on excess products, particularly in the outdoor category," just one quarter after declaring that DSG's inventory was clean, the news shocked the market and contributed to the large decline in DSG's stock price, causing Plaintiffs and the Class to suffer significant monetary damages.

### 1.    Retail Industry Terms Regarding Inventory

74.    Throughout the Class Period, Defendants offered investors detailed commentary on the state of DSG's inventory.  Much of this commentary was couched in retail industry terms of art, and understanding the meaning of these terms in the context in which Defendants used them is key to understanding what Defendants' statements communicated to investors.

75.    In the retail industry, "healthy," "clean," and "well-positioned" inventory refers to well-balanced inventory levels – enough inventory to meet customer demand, without excess inventory.

76.    A retailer has excess inventory when it has more product than necessary to meet customer demand.  Similarly, "toxicity" in inventory refers to assets in inventory that have fallen in value significantly such that they can no longer be sold at satisfactory prices.  Excess or toxic inventory is problematic because the inventory must be sold for lower prices to stimulate demand, resulting in lower profit margins.  In addition, these types of inventory can lead to other issues, like expensive storage and holding costs and a higher risk of lost or damaged product.  An inventory "overage," "overhang," or "lump" refers to a specific accumulation of excess product.

77.    Inventory management in the retail industry is dynamic.  Retailers constantly monitor inventory levels and sell-through rates – the percentage of inventory sold to customers in a given period – to stay on top of customer demand trends and predict how much inventory will be needed to meet demand going forward.  "Buying around" inventory refers to this process,

suggesting that the retailer does not need to buy more of a given product to meet demand, but also that the retailer's current inventory of that product can be sold without lowering prices, *i.e.*, there is no excess inventory.

78.     Inventory "flow" refers to the movement of product through a retailer's supply chain, from the retailer's vendors (*e.g.*, manufacturers) through distribution channels (*e.g.*, stores) and eventually to customers.  Thus, if demand for certain product falls and the retailer is no longer able to sell the product at satisfactory prices, that creates a flow issue – the retailer must lower prices to stimulate demand, or the inventory will fail to sell through to customers, and instead will accumulate and become excess inventory.

### 2.     Defendants Give Investors a Misleading Impression Regarding DSG's Inventory

79.     From the beginning of the Class Period, Defendants spoke positively about DSG's inventory levels, indicating that the Company had enough inventory to meet demand, but no problematic, excess inventory that would need to be sold at lower – less profitable – prices to stimulate demand.  Moreover, although Defendants acknowledged that DSG had "a lot" of fitness and outdoor inventory, they assured investors that this inventory was not problematic, but rather was appropriate to meet demand.  In reality, DSG had a "shocking" amount of excess inventory, particularly outdoor and fitness products, that vastly exceeded customer demand and could only be sold at lower, margin-compressing prices.  *See infra* §§IV.F.3-4.

80.     At the start of the Class Period, on the August 23, 2022 conference call discussing 2Q22 results, both Hobart and Gupta stated that DSG's inventory was "***healthy***" and "***well-positioned***."  Hobart added, "***we are not concerned that there's toxicity in our inventory***."  Moreover, Hobart went into more detail regarding "some of our hardline categories, say, fitness and outdoor equipment," stating: "[W]e have a lot of inventory there that we just – we're buying around for next year.  So ***no issues with flow there***."

81.     Relatedly, on the same call, Hobart commented on demand for "some of the more specific pandemic winners like fitness or outdoor equipment[,] bikes," stating: "[T]hose are acting in line with our expectations and, in fact, are still significantly above 2019 levels.  So while there is some adjustment going on year-to-year due to the surge in those businesses, they are significantly higher than they were pre-pandemic."  Despite electing to comment on demand for DSG's fitness and outdoor products, however, Defendants failed to disclose that the "adjustment" in the level of demand for these products left DSG with excess inventory that would need to be sold at lower prices to stimulate demand.

82.     During the November 22, 2022 conference call discussing DSG's 3Q22 results, Defendants continued to assure investors that inventory was "***healthy and well-positioned***," with one caveat – as Gupta stated: "During the quarter, we focused on cleaning up some targeted inventory overages due to late arriving spring products.  We moved excess apparel inventory to our value chain concept and have been very successful in liquidating much of this product."  He added: "We intend to continue addressing this overage in Q4 in order to start 2023 clean."  And, later in the call, Gupta indicated that this apparel inventory was the only excess in DSG's inventory: "I would say our inventory is ***very healthy*** and ***very well-positioned*** for the holiday season.  ***The only lump that we called out was on the athletic apparel side*** and we are – much of that has been already activated here in third quarter, and we'll continue to work through that."

83.     At the December 6, 2022 Morgan Stanley Global Consumer & Retail Conference, Defendants offered additional commentary on demand for DSG's outdoor products, with Hobart stating: "[A]ll of the pandemic categories, which are, again, smaller pieces of our business, so bikes, outdoor equipment, generally fitness, all have rebaselined bigger."  She clarified, "[b]ecause the sales are significantly – so if they were 'x' in 2018 or '19, and they spiked in '20 and '21, they are here now.  So . . . they're not receding to the levels that they were before."  Again, although

- 30 -

Hobart acknowledged that demand for DSG's outdoor products was down from 2020 and 2021 levels, she omitted that DSG had been left with an "overhang" of this product that would need to be sold at lower prices to stimulate demand.

84.     When Defendants discussed DSG's 4Q22 results at a conference call on March 7, 2023, they offered an update on the apparel inventory overages flagged on the November 22, 2022 call.  Gupta noted that DSG had "provided our athletes with a series of compelling item level deals" and stated, "we continue to address target inventory overages due to the late arriving Sprin[g] product," but assured investors: "***As a result of these actions, our inventory is in great shape as we start 2023. . . .  Our inventory is healthy and well-positioned***."

85.     A week later, at the March 14, 2023 Bank of America Consumer & Retail Conference, both Hobart and Stack commented on demand for DSG's outdoor inventory but continued to omit that DSG currently had excess inventory of this product.  Stack even discussed the impact of this category on DSG's margins, but failed to disclose that excess outdoor inventory would need to be sold at lower margins, stating DSG's private brands are "really an important aspect of our – of the outdoor category that we have, and these are all hard lines that, again, margin rates that are meaningfully higher than what the company as a whole is."

86.     On the May 23, 2023 conference call for DSG's 1Q23 results – less than three months before clearance sales of outdoor inventory significantly impacted DSG's merchandise margins, contributing to the Company missing market expectations for 2Q23 EPS by 26% – Defendants continued to tout DSG's inventory as "***clean***" and "***well-positioned***."  On the 1Q23 call, Hobart even stated: "[W]e are not expecting to have – to go into a major promotional cycle here.  We're very proud and happy with the inventory levels that we have, and the assortment is a real asset here."

87.    Thus, Defendants' statements throughout the Class Period communicated to investors that, other than the disclosed apparel overage in the second half of FY22, DSG did not have excess inventory, and that demand for the Company's outdoor and fitness products was sufficient to keep inventory for those products flowing and avoid lower-priced, margin-compressing sales.  Moreover, Defendants' statements had their intended effect, as reflected by analyst commentary throughout the Class Period:

(a)    On October 26, 2022, Evercore ISI referenced Defendants' statements on the August 23, 2022 call that "'[w]e feel really, really good about where inventory right now is,'" and noted as a "key finding[]" that "'Pandemic-Winner' categories (like golf, home gym, camping, fishing, outdoors, etc.) are **surprisingly clean**" (emphasis in original).

(b)    On November 22, 2022, Telsey Advisory Group published a report stating: "The company noted apparel was the one category were [sic] there is still some excess inventory, which should be cleared by the end of 4Q22."

(c)    On November 23, 2022, Oppenheimer published a report stating: "Management indicates that efforts to clear excess inventory in Q3 are now largely complete, with only pockets remaining to clear in Q4 (ending Jan.)."

(d)    On March 7, 2023, before the conference call, Evercore ISI published a report characterizing DSG's inventory growth as "benign" and noting the "gluts are mostly in apparel."

(e)    On March 7, 2023, J.P. Morgan published a report stating: "[G]ross margin missed as DKS cleared inventory (and exited clean)."

(f)    On March 7, 2023, Barclays published a report noting that "excess inventory pressure is likely contained in 2022."

(g)    On March 7, 2023, Morgan Stanley published a report stating: "With a healthier inventory complexion coming out of '22, along with its 'Going Going Gone!' and warehouse store concepts, DKS appears to be in a better position to manage markdowns/promotional activity in '23."

### 3.    Former Employees Recount "Jaw-Dropping," "Shocking," "Astronomical," and "Dangerous" Amounts of Inventory at Stores and Distribution Centers Throughout the Country

88.    Former employees[5] who worked for DSG in various positions and locations around the country throughout the Class Period tell a very different story regarding DSG's inventory than the positive descriptions Defendants gave investors.    These former employee accounts independently corroborate each other, substantiate other facts alleged herein, and provide a coherent and credible narrative regarding the true state of DSG's inventory throughout the Class Period.

89.    The former employees collectively reported that demand for and sales of DSG's outdoor products and exercise equipment increased precipitously in the later part of 2020 and into 2021.  CW-2, a District Manager ("DM") in the West, reported that DSG aggressively purchased product in these categories, and even began to "sourc[e] brands that they did not previously carry" to meet the demand.  CW-3, a Store Manager in New England, similarly recalled the Company aggressively purchasing this product, estimating that demand for fishing equipment and bikes was up by 30%, demand for kayaks was up by 40%, and demand for exercise and fitness equipment was up by 1,000%.

90.    The surge in demand for product in these categories slowed substantially by early 2022, however.  CW-2 reported seeing a reduction in sales of these products in their district in

---

[5]    The former employees are referred to herein as confidential witnesses, or "CWs."

early 2022, and said the inventory started piling up because the Company had "overbought" outdoor and fitness products and the inventory kept arriving at stores even though it was no longer selling. CW-2 further reported that this excess outdoor inventory would not sell even at the markdowns of up to 10% that they were allowed to offer without approval from corporate (anything above 10% had to be approved by corporate headquarters), and that there were issues flowing through the product starting in early 2022, causing it to accumulate in storage. CW-2 was trying to move through this product in their stores but the markdowns corporate allowed in 2022 and the first half of 2023 were not aggressive enough to lower the inventory levels. CW-2 specifically recalled continuing to receive 300-pound weight sets and boats even though they had no place to store them, and that during a conference call with their Regional Vice President ("RVP"), they were instructed not to store the overstocked weight sets upstairs on the second floor of the stores because they were too heavy and would create a safety issue. CW-2 also explained that DSG's "Score Card Reports" – which tracked sales data for DSG stores nationwide – included lists of the worst performing categories, and that boats and other outdoor product were always at the bottom throughout 2022 and 2023. CW-2 stated that it was clear DSG would need to more aggressively mark down this excess inventory to move through it.

91.     CW-3 also stated that demand for outdoor and fitness products slowed in early 2022, and that DSG had overbought these products, causing excess inventory to pile up in their district in New England. CW-3 said they reviewed sales reports in 2022 and 2023 that listed kayaks and fitness products among the Company's bottom-performing categories, and concluded that DSG was having trouble flowing these products out of stores to customers because the COVID-era demand was over. CW-3 also said the outdoor products were not selling and "these products were now obsolete." They added that during inventory counts, obsolete items elicited a

longer beep on the handheld inventory scanners, while current updated products elicited a shorter beeping sound.

92.    CW-4, who worked in DSG's Planning, Allocation, and Replenishment group, with responsibility for inventory positioning, including outdoor inventory, reported that the outdoor category was not performing after the pandemic and that the Company "got themselves into an at risk, overbought inventory position." CW-4 explained that DSG ordered a lot of outdoor goods during the pandemic because that was a busy time, but demand dropped after the pandemic and the Company got stuck with a lot of inventory. Similarly, CW-7, a Warehouse Supervisor in the South, reported that DSG was unable to buy around the existing outdoor inventory and kept purchasing products, leading to excess inventory. CW-8, a Merchandise Planner in the outdoor-adjacent Public Lands division, noted that during their tenure, the Company "had bought so much inventory, to the point that the stores couldn't handle it. The stockrooms were packed to the bone." And CW-1, a Strategy Manager in charge of fitness products, reported that as part of their job they closely tracked the performance of fitness products, and to some extent the broader outdoor category, and that in 2022 and 2023 these categories were lagging. CW-1 summed up the issue, stating that DSG overbought fitness and outdoor products, leaving it with lots of inventory on hand it was unable to sell, and that it then had to liquidate the inventory.

93.    The former employees provided considerable detail regarding the state of DSG's inventory, particularly in the outdoor and fitness categories, as it accumulated throughout 2022 and into 2023. CW-2 advised that storage areas in their district were overflowing with inventory that was over a year old. Specifically, CW-2 reported that the west coast distribution center located in Arizona had "yards and yards of hardline products" by early 2022. Moreover, they stated that it was "jaw dropping" how the items were piled up on top one another, with "rows of boats and treadmills" and outdoor product "in the aisles, in the rafters" because "there was so much stuff,

they didn't know what to do with it." CW-2 said the amount of inventory at this distribution center became "shocking," "dangerous," and "scary" by 2022 and into 2023. Moreover, DSG had to secure additional space by renting 50,000 square foot warehouses, and use trucking and shipping containers located outside the Arizona distribution center to store overstocked items.

94. CW-2 reported that the stores in their district were also overrun with excess inventory. For example, the DSG store in Gilbert, Arizona had six new trailers of fitness equipment in that period, and CW-2 recalled taking photos of the incredible amount of excess inventory because it was so notable. CW-2 stated that because there was no more room in the storage areas throughout their district, the outdoor and fitness inventory had to be placed in areas where customers shopped in the stores. As a result, numerous safety compliance rules were broken, and stores in CW-2's district sometimes failed to adhere to the Occupational Safety and Health Administration ("OSHA") regulations, even receiving summonses from different governmental agencies for non-compliance. CW-2 reported that the inventory at DSG stores sometimes blocked fire exits, fire extinguishers and other fire escape outlets, citing an example where the Company's Dublin, California store was shut down for a day or two to address safety violations issued by the local fire marshal. CW-2 said that DSG's Executive Vice President ("EVP") of stores and supply chain was so concerned about these safety issues companywide that, around the holiday season in 2022, he circulated a list of stores that had excess inventory that was posing safety concerns.

95. CW-4 recounted that the Company had so many boats and canoes that it had to lease additional space to store the inventory; there was not enough room in the stores or distribution centers to accommodate these items. They explained that DSG had a total of five distribution centers, including in Pennsylvania, Arizona, Georgia, and Indiana. As part of their job – in the Planning, Allocation, and Replenishment group at the Company's headquarters – CW-4 dealt with

all the distribution centers, and they noted that by early 2022, the distribution centers' capacities were well into the 90% range. CW-4 stated that the fact that these distribution centers were getting overloaded was always a big part of the conversation at the Company.

96.    CW-5, a Store Manager on the east coast, reported that by the time they left the Company in mid-2022, outdoor inventory had accumulated to the point that they had to work through a third party to obtain additional trailers for excess storage. For example, one of the new stores CW-5 managed in the Annapolis, Maryland area in 2022 had 11 trailers filled with outdoor products such as fitness equipment and bikes. CW-5 communicated with other store managers who were all in a similar situation. CW-5 recounted conversations with fellow store managers in which they would lament, "we're swimming in this or swimming in that." A lot of the build-up was outdoor products like bicycles, kayaks, and fitness equipment. Similarly, CW-6, an Assistant Store Manager in the upper Midwest, reported that inventory at their stores was "astronomical" and "hanging from the rafters."

97.    CW-7 was a Warehouse Supervisor in the South. Their warehouse was approximately 1.5 million square feet. When CW-7 arrived in the summer of 2022, there was a massive amount of inventory and multiple trailers full of product outside of the warehouse holding items such as boats and exercise equipment. CW-7 reported that they observed anywhere from 30 to 60 trucks with outdoor equipment backlogged at any given time due to space constraints in the warehouse. CW-7 also reported that there were safety concerns in the warehouse they supervised caused by the excess inventory, and that "mountains of outdoor equipment, boats, kayaks, firepits, grills" were piled up in the overflow section of the warehouse. And CW-10, a DM in Pennsylvania, recalled that one of the stores they managed in Lancaster had enough at-home gym equipment to cover the entire state of Pennsylvania. CW-10 had to rent trailers to store overflowing outdoor products because there was not enough room in the building. CW-10 described the trailers as full-

- 37 -

size storage pods.  Some of CW-10's stores had up to eight pods, all of which were tractor-trailer size.  Most of CW-10's stores had trailers that stored excess outdoor merchandise.  CW-10 explained that by the time they left DSG in May 2022, levels of outdoor inventory such as bikes, fitness, and kayaks were "incredibly high."  CW-10 explained that kayak sales might typically be 10 to 20 per week, but they had stores that had 600 or 700 kayaks in inventory.

98.  Remarkably, CW-2 stated that they listened to the Company's quarterly earnings calls during which Hobart, Gupta, and Stack spoke with investors and analysts, and recalled that Hobart stated things like "inventory is clean and well positioned" and "we are not taking a lot of discounts and promotions."  According to CW-2, they and the store managers in their district discussed these statements, saying things like, "what is she talking about?"  They concluded that "she was lying," given the amount of inventory in storage that was not moving.  CW-2 also said Hobart was lying when she told investors there were no problems with inventory flow.

99.  CW-3 similarly reported that when the pandemic-era surge in demand for outdoor and fitness products receded, stores in their district still had hardline products coming in even though they had no place to store them.  Because of the storage issues, CW-3 received a directive from their DM that corporate wanted the inventory shifted to certain "hub stores" in the district that had more storage space.  CW-3 recalled that one of the hub stores in their district was located in Salem, New Hampshire.  This store had a massive storage site that was better able to handle the overstocked outdoor products such as paddles, kayaks, and outdoor apparel.  CW-3 added that they spent time at the hub store and recalled that it was non-stop unloading daily deliveries of excess inventory, with numerous truckloads of product continuously arriving, even though the site was already overflowing with inventory.  They recalled that there were more than ten lanes of kayaks with nine items per lane piled up on each other, and that in the second half of 2022, storage problems surrounding hardline inventory storage became a huge issue.  CW-3 recalled that by July

- 38 -

2022 the excess inventory even became a safety issue for the employees and a violation of state fire safety regulations because stores had to pile the inventory up in front of fire exits and fire extinguishers. Both the Manchester, New Hampshire and Portsmouth, New Hampshire locations had no more room in their storage areas, and were in violation of OSHA safety laws due to the piled-up inventory. They even had to place inventory in the areas where customers shopped, and numerous safety compliance rules were broken. In fact, CW-3 was injured on the job when they were trying to retrieve some inventory and piled-up kayaks fell on them. They sustained bruising and pain from this incident.

> **4. Defendants (Later) Admit That DSG Had a Lump of Outdoor Inventory Related to the "COVID Buys" During the Class Period**

100. Defendants' own statements confirm the reality that during the Class Period, DSG had excess fitness and outdoor inventory that dated back to purchases made to fuel the pandemic-era surge in demand for these products. Notably, at the August 22, 2023 conference call discussing DSG's 2Q23 results – just three months after assuring the Company's inventory was "clean" at the 1Q23 call – Hobart stated that Defendants "took decisive action on excess products, particularly in the outdoor category to allow us to bring in new receipts and ensure our inventory remains vibrant and well positioned." Later on the call, Hobart admitted that "[w]e had – there was excess inventory in the marketplace," and that the markdown activity in 2Q23 "does make our inventory cleaner." Gupta added, "the decisive actions that we took in Q2 actually positioned us well to be able to bring in the innovation and bring in the right product for the back-to-school season as well as the holiday season that is upon us," and "that was the purpose – purposeful decision that we made to keep our inventory clean and be decisive about the outdoor category."

101. Moreover, the necessity of additional inventory markdowns to continue to work through the excess inventory was a material driver of DSG's lowered profitability guidance for the

rest of FY23.  In response to an analyst question, Gupta stated that one of the "driver[s]" of the lowered guidance was "the decisive action that we took to keep our inventory cl[ean], the example you gave of the outdoor.  And we have assumed some of this moderation in – some of this activity in the back half expectation as well to continue to keep our inventory fresh and well positioned . . . ."  He later added, in response to yet another analyst question on the subject: "[W]e moderated our merchandise margin expectations in the back half, in line with the actions that we discussed here in Q2.  We are just wanting to make sure that we are keeping our inventory fresh and vibrant."

102.    Defendants' admissions in later calls were damning.  At the November 21, 2023 call for DSG's 3Q23 results, Hobart admitted that the Company had excess outdoor inventory as far back as 2022, stating in response to an analyst question: "*Last year*, what you're mentioning, there were a few unusual events.  ***There was a lump in outdoor equipment related to the pandemic***.  There was a lump in like apparel related to the pandemic."  And, on a December 5, 2023 call at the Morgan Stanley Global Consumer & Retail Conference, an analyst asked Gupta about DSG's margins, given "we've had two gross margin snafus, hiccups.  It was a year ago when a vendor was clearing [apparel] product and then this year with outdoor."  Regarding the apparel inventory overage, Gupta stated that DSG was "decisive," in "address[ing] that in the last part of 2022," and then stated: "***We saw there was a similar situation with a little bit of the overhang of the outdoor category in terms of the COVID buys***."  Thus, Gupta, too, tied the margin-compressing outdoor inventory markdowns in 2Q23 to an "overhang" of inventory that dated back to the 2020-2021 pandemic-driven surge in demand for these products.

**G.    Defendants Mislead Investors Regarding a Trend of Elevated Shrink Throughout the Class Period**

103.    Throughout the Class Period, DSG experienced a trend of elevated shrink compared to the previous year.  Indeed, in each quarter during the Class Period, DSG's losses from shrink

were materially elevated above the prior year's levels, causing a consistent drag on DSG's margins.

104.    SEC regulations set forth in Item 303 required Defendants to describe the extent of this trend and disclose its reasonably likely material impact on the Company's financial condition. But, instead of complying with these disclosure requirements, Defendants issued a series of anodyne disclosures throughout the Class Period, stating that shrink contributed an unspecified amount to the Company's merchandise margin declines but omitting that shrink was materially elevated – and significantly impacting margins. Defendants' half-truths, in violation of Item 303, obscured the extent and reasonably likely impact of the consistent trend of elevated shrink, thereby misleading investors.

105.    Notably, it was not until a few weeks after the SEC submitted a letter to Defendants – explaining that DSG's disclosures regarding shrink appeared to have failed to comply with Item 303 and requesting additional information – that Defendants finally revealed the extent of the issue, shocking the market and contributing to the significant decline in the price for DSG stock on August 22, 2023. Thereafter, DSG began making compliant disclosures about the shrink trend and its reasonably likely impact.

### 1.    DSG's Accounting for Shrink

106.    Inventory shrinkage, or "shrink," is an accounting term that describes the difference between inventory that is recorded and what is actually in physical inventory. Thus, shrink refers to the loss of inventory due to factors other than sales, such as theft.

107.    Shrink levels affect margins. For example, the Company's quarterly filings with the SEC prior to and during the Class Period explained that shrink is included in the cost of merchandise, and therefore factors into merchandise margin (and, consequently, gross margin):

> Cost of goods sold includes: the cost of merchandise (inclusive of vendor allowances, inventory shrinkage and inventory write-downs for the lower of cost or

net realizable value); freight; distribution; shipping; and store occupancy costs.  ***We define merchandise margin as net sales less the cost of merchandise sold***.

108.    DSG accounted for shrink by recording a shrink reserve based on historical shrink trends, updated each quarter with results from physical inventory counts that had been conducted that quarter.  The Company included the following information regarding its accounting for shrink in the MD&A section of the SEC Form 10-K for FY21 (filed on March 24, 2022), and, verbatim, in the SEC Form 10-K for FY22 (filed on March 23, 2023):

> Shrink expense is accrued as a percentage of merchandise sales based on historical shrink trends.  We perform physical inventories at our stores and distribution centers throughout the year.  The shrink reserve represents the cumulative loss estimate for each of our locations since the last physical inventory date through the reporting date.  Estimates by location and in the aggregate are impacted by internal and external factors and may vary significantly from actual results.

109.    Thus, each quarter during the Class Period, DSG reserved a certain amount of money to account for shrink.  The amount was based on historical shrink trends (measured as a percentage of sales) at particular locations inventoried during that quarter.  The Company used an average of shrink trends at those locations over the prior three years to estimate the reserve.  This resulted in a quarterly shrink expense, with a corresponding addition to the reserve.

110.    When the Company performed physical inventories at its locations during a given quarter, the shrink reserve that had been built up over the last year was supposed to match the amount of shrink discovered in the physical inventories.  If this were the case, the Company would simply apply the reserve and reduce inventory by the same amount, with no expense effect.  However, because the amount of shrink discovered in the physical inventories consistently exceeded the reserve, shrink affected the cost of merchandise, leading to corresponding negative impacts on merchandise margin and gross margin throughout the Class Period.

## 2. DSG Experienced a Trend of Elevated Shrink Throughout the Class Period

111.     Shrink became an increasingly serious problem for the retail industry in general in 2022. The National Retail Federation published a report in April 2023 detailing the results of its annual National Retail Security Survey, which found that the average shrink rate had increased from 1.4% in 2021 to 1.6% in 2022, representing "$112.1 billion in losses, up from $93.9 billion in 2021." The report focused on the impact of retail theft, noting:

> Retail continues to be plagued by growing levels of retail theft, from individuals who steal a few items for personal use to more violent "smash-and-grab" incidents. Then there are the organized retail crime groups that aid and direct individuals to commit theft for the resale of stolen merchandise to fund other illicit activities.

112.     The trend continued in 2023 and became increasingly salient – news outlets across the country reported on rising theft levels, and increasing numbers of retailers blamed shrink trends for lowered profitability. For example, *CNN Business* published an article on May 23, 2023 titled: "Why retail theft is soaring: inflation, the economy – and opportunity." According to the article, "[r]etailers large and small say they're struggling to contain an escalation in store crimes – petty shoplifting to organized sprees of large-scale theft that clear entire shelves of products." The article further noted that multiple nationwide retailers, including Target and Walmart, had reported "losing profit" due to rising theft.

113.     As the nation's largest sporting goods retailer, DSG was squarely in the path of this growing problem. Indeed, the Company faced a trend of elevated shrink prior to and during the Class Period. Former employees at DSG stores across the country consistently reported that shrink and theft were increasing in 2022 and 2023. For example, CW-2, a DM in the West, reported that shrink had been very light during the pandemic, but that the situation worsened dramatically in 2022 and 2023. They noted that the Company based its reserves on the prior three years' data, but the trend was getting so much worse that they had to have the shrink budget for their district

- 43 -

adjusted to account for the trend.  Further, they reported that they and other DMs were very concerned about their stores because inventory shrinkage from theft was aggressively growing, and that they worked closely with RVPs and other DMs to address the problem, including by issuing "BOLA" (Be On Lookout Alerts) that were compiled and tracked by the Loss Prevention department.  Similarly, CW-3, a Store Manager who worked with several different stores in New England, reported that shrink was relatively light during the pandemic, but started increasing in the years following (*i.e.*, 2022 and 2023) and became much worse than it had been before.

114.    Although shrink was a known issue for all retailers, including DSG, investors did not know the extent of the trend of elevated shrink or its impact on margins.  And although Defendants disclosed – starting in the SEC Form 10-Q for 2Q22 (filed August 24, 2022), and continuing in DSG's quarterly reporting for each quarter through the remainder of the Class Period – that merchandise margins decreased in part because of shrink, these bland half-truths obscured and concealed the extent of the shrink trend.  *See infra* §V.C.

115.    Defendants' post-Class Period statements confirm what was omitted by Defendants' Class Period half-truths – the existence of a trend of elevated shrink throughout the Class Period that was having a material impact on margins.  In an SEC filing on August 23, 2023 (responding to the SEC's August 9, 2023 letter, *see infra* §IV.G.4), Defendants admitted that, in FY22, the Company experienced an "increase in inventory shrink compared to fiscal 2021" and that "its impact within the total merchandise margin decline for fiscal 2022 was ***41 basis points***, as a percentage of net sales."

116.    Similarly, DSG's SEC Form 10-Q for 2Q23 (filed on the same day, August 23, 2023) disclosed: "As a result of higher markdowns from our decisive actions on excess product and a 57 basis point increase in inventory shrink due to increased theft, merchandise margins decreased 198 basis points" for the first half of FY23.

- 44 -

117.    Based on these disclosures, the following table reflects the estimated amounts by which shrink was elevated over the prior year's levels in each quarter of the Class Period, and the corresponding impact to margins:

| | 2Q22 | 3Q22 | 4Q22 | 1Q23 | 2Q23 |
|---|---|---|---|---|---|
| **Shrink (y/y increase)** | $16.3M[6] | $15.5M[6] | $18.9M[6] | $7.5M | $27.1M |
| **as a % of y/y decline in merchandise margin** | 26.6% | 12.0% | 8.2% | 19.4% | 33.1% |
| **as a % of y/y decline in gross margin** | 13.5% | 12.4% | 10.2% | 95.2% | 52.1% |

### 3.    Defendants Knew About the Trend of Elevated Shrink

118.    Defendants, who meticulously tracked inventory and key metrics affected by shrink, including merchandise margin and gross margin, were contemporaneously aware of the trend of elevated shrink throughout the Class Period.  In fact, Hobart and Grupta personally reported up-to-date information regarding inventory, gross margin, and changes in merchandise margin every quarter.

119.    Defendants' limited disclosures regarding shrink and its effect on merchandise margin throughout the Class Period reveal their knowledge of the problem.  In every quarter during the Class Period, DSG's SEC filings (Forms 10-Q and 10-K) discussed shrink generally, but did not disclose the trend of elevated shrink or its specific impact on margins.  Thus, Defendants were attuned to the issue of shrink, and knew that it was adversely affecting DSG's profitability – yet obscured the trend by failing to disclose the extent of the issue or its reasonably likely prospective impact on the Company's financial condition.

---

[6]    In FY22, shrink increased $50.7 million year-over-year.  The Company did not quantify quarterly shrink during FY22 but did reference "higher inventory shrink" as a driver of merchandise margins during the periods 2Q22 through 4Q22.  *See infra* §V.C.  The quarterly amounts depicted in the chart are based on the annual FY22 shrink increase applied on a pro-rata basis, based on net sales, to 2Q22 through 4Q22.

120.    Further, DSG's SEC Forms 10-K prior to and during the Class Period stated that the Company "perform[ed] physical inventories at [its] stores and distribution centers **_throughout the year_**," and based its quarterly shrink accrual on these inventory counts.  The results from these physical inventories provided Defendants with up-to-date information regarding the state of shrink at the Company throughout the Class Period.

121.    Corroborating Defendants' disclosure in the Company's SEC Forms 10-K that physical inventories were performed throughout the year, former employees from across the country reported that physical inventories were taken at their stores at different times throughout the year.  CW-2, a DM in the West, reported that a physical inventory count was conducted at the stores in their district every January.  CW-3, a Store Manager who worked at several different stores in their district in New England, recalled conducting physical inventory counts at different times of year in different years, including in July, the early fall, and January.  CW-3 also reported that in January 2023, the physical inventory was conducted twice because corporate executives wanted to identify the location of certain items.

122.    CW-3 detailed the process for taking physical inventories.  They advised that prior to a physical inventory count, headquarters sent the store managers a packet with labels that had to be placed on all of the items in the store.  Inventory counts were conducted overnight by store employees and store management from other stores in the district.  The District Manager of Loss Prevention directed and managed the inventory count process.  Handheld scanners were used to scan the items, and any discrepancies or unreconciled missing items were addressed by a supplemental team; counts had to be continued until any issues were resolved and missing items recorded.  The data was instantly uploaded into the inventory system, which CW-3 described as the "Cisco inventory system."

123.    In addition to the physical inventories, former employees also reported that the Company contemporaneously tracked theft incidents, and that the Loss Prevention department – an entire department dedicated to tracking and mitigating theft incidents – compiled this theft incident data into reports for DSG executive leadership.  The Loss Prevention department included employees throughout the country at the regional, district, and even store levels, as well as employees in DSG's corporate headquarters in Coraopolis, Pennsylvania.

124.    CW-2 said the stores were required to report every shoplifting incident that took place, and the information was recorded in Loss Prevention System reports.  These reports were available throughout the year and provided information about theft trends.  CW-1, a Strategy Manager who worked at DSG's headquarters in Coraopolis, reported that the Company employed an analyst whose entire role was to compile theft data.  CW-1 reviewed DSG's performance reporting for their job and recalled that theft losses were included in that reporting.

125.    Notably, on the 2Q23 earnings call on August 22, 2023, Gupta admitted to reviewing the Company's theft tracking reports and noticing a trend of elevated theft: "***We had been seeing the number of incidents go up***."

126.    Collectively, the facts alleged above corroborate each other and support a strong inference that Defendants knew of the trend of elevated shrink throughout the Class Period.

### 4.    The SEC Warns Defendants About Their Inadequate Disclosures Concerning Shrink

127.    On August 9, 2023, the SEC sent the Company a letter (addressed to Gupta) regarding its SEC Form 10-K for FY22 (filed March 23, 2023) and its SEC Form 10-Q for 1Q23 (filed May 24, 2023), in which the SEC noted potential deficiencies with DSG's disclosures in these filings and requested additional information.  Specifically, regarding the Form 10-K for FY22, the SEC stated:

You disclose your merchandise margins decreased by 304 basis points as a result of actions to reduce targeted apparel inventory overages, item-level deals provided to athletes during the holiday season and *higher inventory shrink due to increased theft*. The results of these events and pricing actions taken by you *appear to have caused a material change in the relationship between cost of goods sold and revenues*. Please describe to us and *disclose in quantitative terms the extent to which these factors and your actions impacted your income from operations as well as your gross profit margin for the year ended January 28, 2023*. In your discussion of these factors, consider explaining the changes in the key components of cost of goods sold impacted. *Refer to the introductory paragraph of Item 303(b) of Regulation S-K and paragraphs (2)(i) and (ii) therein*.

128.    The SEC suggested that Defendants' limited disclosures regarding shrink – *i.e.*, that it impacted merchandise margins, without additional information regarding the extent or context – were inadequate under Item 303.

### 5.    Defendants Disclose Disappointing Profits Due to Shrink and Finally Disclose Required Information Regarding the Shrink Trend

129.    Before the market opened on August 22, 2023, DSG issued a press release announcing financial results for 2Q23. In the release, Hobart stated: "While we posted another double-digit EBT margin, our Q2 profitability was short of our expectations due in large part to the impact of elevated inventory shrink, an increasingly serious issue for many retailers." The Company also revised its FY23 EPS guidance downwards, "to reflect second quarter results and gross margin expectations for the second half of the year."

130.    On the earnings call the same day, Hobart and Gupta elaborated on the profitability miss, revealing that the Company had recorded a "catch-up" adjustment to the shrink reserve to account for elevated shrink in the quarter and establish a reserve for remaining locations to be counted throughout the remainder of the year. Specifically, in her prepared remarks, Hobart disclosed that:

Organized retail crime and theft in general, an increasingly serious issue impacting many retailers. Based on the results from our most recent physical inventory cycle, the impact of theft on our shrink was meaningful to both our Q2 results and our go-

forward expectations for the balance of the year.  We are doing everything we can to address the problem and keep our stores, teammates, and athletes safe.

131.    Also in her prepared remarks, Hobart stated: "Our revised 2023 non-GAAP EPS guidance of $11.50 to $12.30 takes into account our Q2 results as well as our latest views on gross margin for the back half of the year, including higher levels of shrink."  Gupta commented on shrink in his prepared remarks as well, stating: "[W]e experienced a meaningful headwind from higher-than-expected shrink, which represents 1/3 of our merchandise margin decline."

132.    Reflecting the shocking nature of the disclosure, analysts on the call repeatedly asked for additional information about shrink – of the 14 analysts who asked questions on the call, 10 asked directly about shrink.

133.    Throughout the call, Hobart and Gupta painted the elevated impact from shrink as a "surprise" that DSG, along with the rest of the retail industry, had suddenly fallen victim to.  For example, Gupta stated:

> The biggest impact in terms of the surprise for Q2 primarily came from shrink.  We thought we had adequately reserved for it.  However, the number of incidents and the organized retail crime impact came in significantly higher than we anticipated, and that impacted our Q2 results as well.

134.    Later, in response to an analyst's question, Gupta said:

> In terms of answering your question around the physical inventory count, so we conduct our physical inventory once a year.  We do that right ahead of the back-to-school season, and that's when – the elevated levels of shrink, we actually quantified the impact of that, and we booked that in our Q2 results.  And like I said in my prepared remarks, we are assuming that this is a trend that is going to remain with us for a longer time.

135.    Defendants' feigned "surprise" does not hold water.  In fact, Gupta himself contradicted this "right ahead of the back-to-school season" narrative later in the call, noting: "It is significantly elevated versus the pre-pandemic level, the shrink.  I would say we had kind of baseline closer to the pre-pandemic level *late last year when we did the physical inventory of our stores*."  Moreover, Gupta's explanation that DSG purportedly discovered the issue during its

- 49 -

"once a year" physical inventories is belied by the Company's repeated disclosures in its SEC Forms 10-K prior to and during the Class Period that physical inventories were taken "***throughout the year***."  Nor does it make sense for Defendants to suddenly report, as they did on the call, that the issue was a "trend" that they "continue[d] to see elevate" if, in truth, Defendants' knowledge of the issue was based on a single physical inventory count conducted at some point during 2Q23. In fact, given the attention paid to the issue internally in prior quarters, and the Company's theft reporting systems and rotating physical inventories throughout the year, CW-2 declared that the notion that the Company's executive leadership was "surprised" by the shrink trend in 2Q23 was "laughable."  Rather, as explained above, Defendants had contemporaneous knowledge of the trend throughout the Class Period.  *See supra* §IV.G.3.

136.    The day after the earnings call, August 23, 2023, Defendants filed an SEC Form 10-Q for 2Q23, which included additional information about the elevated shrink.  For example, Defendants identified "[o]rganized retail crime and our ability to effectively manage inventory shrink" as a factor, "among others, [that] in some cases have affected, and in the future, could affect our financial performance and actual results."

137.    The Form 10-Q for 2Q23 also included a section titled "Overview of current trends affecting 2023."  Notably, this section was omitted from any SEC Form 10-Q or Form 10-K filed during the Class Period.  In this new section in the Form 10-Q for 2Q23, Defendants finally disclosed:

> Within merchandise margin, we are experiencing higher inventory shrink relative to historical levels, which has been noted throughout the retail industry.  As a percentage of net sales, we expect inventory shrink to be approximately 50 basis points higher than fiscal 2022 on a full year basis.

138.    Additionally, in the same filing, Defendants disclosed a new risk factor, added for the first time after the Class Period:

4895-9028-0940.v3

Except as identified below, there have been no material changes to the risk factors affecting the Company from those disclosed in Part I, Item 1A. "Risk Factors" of the Company's 2022 Annual Report. The discussion of risk factors sets forth the material risks that could affect the Company's financial condition and operations.

***If we are unable to protect against inventory shrink, our results of operations and financial condition could be adversely affected***.

Our business depends on our ability to effectively manage our inventory. We have historically experienced loss of inventory (also referred to as inventory shrinkage) due to damage, theft (including from organized retail crime), and other causes. We are experiencing elevated levels of inventory shrink relative to historical levels, which have adversely affected, and could continue to adversely affect, our results of operation and financial condition. In addition, sustained high rates of inventory shrink at certain stores could impact the profitability of those stores and result in the impairment of long-term assets.

139.    Thus, the inference is strong that Defendants, knowing the market was sensitive to news about DSG's margins, concealed and obfuscated the extent of this unfavorable trend until the SEC specifically requested additional disclosure.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Statements Regarding Inventory and Demand for Outdoor Products Misrepresented the True State of DSG's Excess Inventory

140.    On August 23, 2022, DSG filed with the SEC a Form 8-K signed by Gupta, attaching a press release announcing the Company's financial results for 2Q22, the period ended July 30, 2022, and Defendants held a conference call to discuss the results. The press release contained the following statement from Hobart: "'***Our inventory is healthy and well-positioned***, and we are excited about our assortment for the back-to-school season.'"

141.    During the conference call, Hobart stated: "***Our inventory is healthy and well positioned*** . . . ." Similarly, Gupta stated: "As Lauren [Hobart] said, ***our inventory is healthy and well positioned***." Gupta also stated: "We feel really, really good about where our inventory right now is, especially as we head into the important back-to-school season. ***We feel good about the***

*inventory levels and our overall composition of the inventory itself. It's very well positioned and very healthy*."

142.    Later in the call, an analyst asked:

Can you dig in and give us some color on how the pandemic win[n]er categories, in particular, have performed the last few quarters? Are they still normalizing and dragging on that overall comp? Or has that started to normalize and stabilize? Just trying to think through kind of how those categories are going to drag or not drag on comps from here.

143.    Hobart responded:

Warren, so the "pandemic-winning" categories, and by the way, there were a lot of pandemic-winning categories, including footwear and apparel, which remained incredibly strong, *some of the more specific pandemic winners like fitness or outdoor equipment[,] bikes, those are acting in line with our expectations and, in fact, are still significantly above 2019 levels. So while there is some adjustment going on year-to-year due to the surge in those businesses, they are significantly higher than they were pre-pandemic*.

144.    Another analyst asked:

In terms of the inventory, how is the flow of goods these days in apparel versus footwear versus hardware? Like are you seeing – I mean, hardlines. Are you seeing differences among the categories and the flow of goods and are you getting things on time? Are you still finding you need to kind of accelerate orders or order more than you anticipate getting because you won't get the full order fulfilled?

145.    Hobart responded:

Our inventory, overall, I think it's important just to restate that *our inventory is very healthy and we do not – we are not concerned that there's toxicity in our inventory*. Our flow of goods has improved significantly category by category throughout the last 2.5 years. It's been a series of different challenges. The most recent challenge was apparel, as I mentioned, but we are – that is moving now, and we are working through the backlog that was there and clearing that through, and it is affecting our sales as well.

When it comes to some of our hardline categories, say, fitness and outdoor equipment, we have bought – that is – *we have a lot of inventory there that we just – we're buying around for next year. So no issues with flow there*.

146.    On November 22, 2022, DSG filed with the SEC a Form 8-K signed by Gupta, attaching a press release announcing the Company's financial results for 3Q22, the period ended October 29, 2022, and Defendants held a conference call to discuss the results.

147.    In her opening remarks on the call, Hobart stated: "Looking ahead, ***our inventory is healthy and well-positioned***, and we are excited about the assortment we have in place for the holiday season.   Because of our continued strong performance, quality of inventory and the confidence we have in our business, we are raising our full year outlook."  Later in the call, Gupta stated: "Overall, we feel ***our inventory is healthy and is very well-positioned for the holiday season***."  An analyst asked for more detail on DSG's inventory:

> And then I think just to dig in on the inventory a little more detail or asked a different way.  Is your inventory equally strong or healthy across maybe vertical brands and national brands?  Or are you more exposed?  Just thinking about if there was a trade down, could you get stuck with more national brand inventory that maybe the consumer is opting out of?  Or how is your inventory held across the different kind of subsets of inventory?

148.    Gupta responded:

> Overall, I would say ***our inventory is very healthy and very well-positioned for the holiday season.  The only lump that we called out was on the athletic apparel side*** and we are – much of that has been already activated here in third quarter, and we'll continue to work through that.  But overall, like I said, we feel really strong about our in-stock levels going into this important holiday season.

149.    On December 6, 2022, Hobart and Gupta participated in a conference call with analysts and investors at the Morgan Stanley Global Consumer & Retail Conference.  During the call, an analyst asked:

> First on top line, which categories over the next few years, do you think grow the most or least?  And then with respect to durables, I guess some of the big ticket durables were the torchbearers of the pandemic, what do we – what's the outlook there?  And what do you see in those categories going forward?

150.    Hobart responded:

> Golf is maybe the one that if you're talking about a hardline durable, that still has some pandemic hangover, so to speak.

But even that has rebaselined significantly higher than it was in 2019. In fact, ***all of the pandemic categories, which are, again, smaller pieces of our business, so bikes, outdoor equipment, generally fitness, all have rebaselined bigger***. So you put that aside, and that's great.

151.    The analyst followed up with another question: "You mentioned rebaseline. So what gives you that confidence that these durables have rebaselined? How do we know it's done. . ." (ellipsis in original).

152.    Hobart responded:

Because the sales are significantly – so if they were "x" in 2018 or '19, and they spiked in '20 and '21, they are here now. So ***if they're not receding to the levels that they were before***. So I think what that speaks to is that a lot of people took up outdoor activities even walking, running, biking. So – but the behaviors have changed so much. ***So there was a surge, but it's come back at a higher level***.

153.    On March 7, 2023, DSG filed with the SEC a Form 8-K signed by Gupta, attaching a press release announcing the Company's financial results for 4Q22 and FY22, the period ended January 28, 2023, and Defendants held a conference call to discuss the results. The press release contained the following statement from Hobart: "'As planned, we continued to address targeted inventory overages, and as a result ***our inventory is in great shape as we start 2023***.'"

154.    In his opening remarks on the conference call, Gupta stated:

As planned, during the holiday season, we provided our athletes with a series of compelling item level deals. Additionally, ***we continue to address targeted inventory overages due to the late arriving Sprin[g] product. As a result of these actions, our inventory is in great shape as we start 2023*** . . . .

Quarter inventory levels increased 23% compared to Q4 of last year. As a reminder, we were chasing inventory last year amidst industry-wide supply chain disruptions. Therefore, the more useful comparison is against 2019. Compared to Q4 of 2019, a 38% increase in sales was well ahead of our 29% increase in inventory. ***Our inventory is healthy and well positioned***.

155.    On March 14, 2023, Stack, Hobart, and Gupta participated in a conference call with analysts and investors at the Bank of America Consumer & Retail Conference. During the call, an analyst asked: "And then just a follow-up, what is sort of the expectation for cells and maybe

- 54 -

the nonpriority categories, maybe the more COVID beneficiaries like bikes, camping, fishing, home fitness?  Are those categories still challenged?  Or should they grow this year?"

156.    Hobart responded:

So again, they are a smaller piece of our business.  And ***each one of them had big surges, but has landed at levels that are above 2019, and we expect that to continue***.  So there are strong pieces of our business.  They're just going through a cycle right now overall, not impacting the total as much as the other categories are.

157.    Later in the call, an analyst asked Stack about DSG's vertical brands, *i.e.*, brands that the Company itself owns.  Stack responded:

But what we have – I think, has lost at times, we have a really robust and profitable hardline side of the business from a private brand standpoint.  So whether it's in Maxfli from a golf ball standpoint, what we're doing in fitness, what we're doing in the outdoor category, so I mean our #1 brand in golf are our own brands.  Our #1 brand in fitness are our own brands.  ***It's really an important aspect of our – of the outdoor category we have, and these are all hard lines that, again, margin rates that are meaningfully higher than what the company as a whole is***.

158.    On May 23, 2023, DSG filed with the SEC a Form 8-K signed by Gupta, attaching a press release announcing the Company's financial results for 1Q23, the period ended April 29, 2023, and Defendants held a conference call to discuss the results.

159.    In his opening remarks on the call, Gupta stated: "***Our inventory is clean and well positioned***."  Later in the call, an analyst stated: "Thinking of reversion, we've talked a lot about some of the big-ticket items, ones even that were COVID winners.  Curious if there's any change in underlying unit consumption there or any other – some of the COVID winning categories and how they're behaving."

160.    Hobart responded:

Yes, Simeon, I think the story for us is really about our core categories.  So we saw strong growth in footwear, in team sports, in apparel throughout the quarter. Some of ***those COVID categories you talked about, maybe bikes or fitness, they are all – while they have retrenched, they're well above where they were in 2019, golf included***.  And we think they have long-term growth.  So we've been dealing

with the pandemic quote/unquote – pandemic surging categories for some time. Our core businesses are doing very well and driving our growth.

161.    Another analyst asked:

[My] questions basically, just kind of level set here with what you're seeing versus maybe some of the noise that we – that's been taking place within your broader space.  But – so as you look at the sector now, how do you view inventories?  And I know this is a follow-up to some of the prior questions, but these inventories, it seems like DICK'S is managing them well.  I mean is there an inventory issue beyond DICK's, something you have to – give you worry about or you think about?

162.    Hobart responded:

So starting with inventories, we are managing our inventory well.  ***Our inventory is clean.  It's well positioned***.  And I think what's very important for – to realize is that our inventory and our products now are very narrowly distributed.  So we have more of a moat against any industry-level promotion that might have affected us in a – time ago when there was just wide distribution of similar products.  So ***we are not expecting to have – to go into a major promotional cycle here.  We're very proud and happy with the inventory levels that we have, and the assortment is a real asset here***.

163.    Gupta also stated: "Clearance was not a major factor in Q1.  Our inventory was pretty clean at the end of 2022, and we continue to feel really optimistic about our inventory on hand at the end of Q1."  Additionally, later in the call Gupta reiterated: "Right now, we feel that ***the inventory is clean and well positioned***."

164.    The statements detailed in ¶¶140-163 above were materially false or misleading and omitted material facts necessary to render the statements made not misleading for the following reasons:

(a)    Contrary to Hobart's and Gupta's statements that there were "no issues with flow" related to fitness and outdoor inventory; that DSG was able to "buy[] around" this inventory; that there was no "toxicity" in DSG's inventory; that the "only lump . . . was on the athletic apparel side"; that Defendants were "not expecting . . . to go into a major promotional cycle"; and that "the assortment is a real asset here," in reality, demand, particularly for fitness and outdoor products, had slowed from the pandemic-era surge to the point that DSG's inventory exceeded demand and

products were no longer selling through to customers at a rate sufficient to keep up with DSG's inventory, causing excess inventory, particularly fitness and outdoor products, to accumulate in DSG's stores, distribution centers, warehouses, and other facilities across the country. Rather, as Hobart admitted in 2023 after the close of the Class Period: "Last year . . . [t]here was a lump in outdoor equipment related to the pandemic." Similarly, Gupta admitted after the Class Period that DSG faced "a little bit of the overhang of the outdoor category in terms of the COVID-buys." Defendants, who admitted to "monitor[ing] sell-throughs, inventory turns, gross margins and markdown rates at the department and style level" and accessed the Company's highly detailed, real-time reporting and tracking systems to "make sure that the inventory in the marketplace is at the levels that we all want it to be," knew that this excess inventory posed a material risk to DSG's margins and profitability because it would need to be sold at clearance prices to stimulate demand – which is exactly what happened in the middle of 2Q23 (just weeks after Defendants claimed, on May 23, 2023, that DSG's inventory was "clean and well positioned" and that Defendants were "not expecting . . . to go into a major promotional cycle here"), when Defendants finally took "decisive actions on excess product, particularly in the outdoor category," to "make our inventory cleaner," leading to disappointing margins and profitability in 2Q23 and to lower guidance for profitability metrics for the rest of FY23. *See also infra* ¶164(b).

(b)     Contrary to DSG's, Hobart's, and Gupta's statements that DSG's inventory was "healthy" and "clean," and contrary to Gupta's positive description of the "overall composition of the inventory itself," Defendants – including Hobart, who personally visited stores across the country throughout the Class Period to "find the truth" about the Company – were aware of DSG's excess inventory, particularly in the fitness and outdoor categories, and that DSG was facing a "jaw-dropping," "shocking," "astronomical," "dangerous," and "scary" accumulation of excess inventory – much of it over a year old – that necessitated exponential increases in storage

trailers at stores, distribution centers, and other facilities around the country, and even additional warehouses and "offsite" storage facilities in many areas.  Further, as CW-4 (in DSG's Planning, Allocation, and Replenishment group at the Company's headquarters in Coraopolis, Pennsylvania, with responsibility for DSG's inventory positioning, including outdoor inventory) reported, DSG's inventory was not "well positioned"; rather, Defendants "got themselves into an at risk, overbought inventory position."  In fact, excess inventory was so piled up in DSG facilities that it caused safety issues, including OSHA and fire code violations – leading DSG's EVP of stores, around the 2022 holiday season (*i.e.*, just as Defendants claimed, on November 22, 2022, that DSG's inventory was "very healthy and very well-positioned"), to circulate a companywide list of stores that were so over-inventoried that they posed safety concerns.

(c)     Stack's and Hobart's statements regarding the performance of "pandemic winners," "pandemic categories," "COVID beneficiaries," and "COVID categories" like "fitness or outdoor equipment," "bikes, outdoor equipment, generally fitness," and "bikes, camping, fishing, home fitness" were materially misleading because they addressed the topics of demand for and sales of fitness and outdoor products but omitted that demand for these products had receded to the point that DSG's supply of these products exceeded demand and the products were no longer selling through to customers at a rate sufficient to keep up with DSG's inventory, causing a "lump" of excess inventory.

### B.     Statements Regarding Risk Factors Misleadingly Warned of Risks That Had Already Materialized

165.    On August 24, 2022, DSG issued its 2Q22 financial results on SEC Form 10-Q, signed by Hobart and Gupta.  The Form 10-Q referred investors to the risk factors previously published in DSG's Annual Report on SEC Form 10-K for FY21, including the following:

> We often make advance commitments to purchase products, which may make it more difficult for us to adapt to rapidly-evolving changes in consumer preferences.  Furthermore, supply chain challenges due to the COVID-19 pandemic

and other factors have made it more difficult to obtain certain in-demand products. *Our sales could decline significantly if we misjudge the market for our new merchandise, which may result in significant merchandise markdowns and lower margins, missed opportunities for other products, or inventory write-downs, and could have a negative impact on our reputation, profitability and demand*. Failure to meet stockholder expectations, particularly with respect to earnings, sales, and operating margins, could also result in volatility in the market value of our stock.

166.    On November 23, 2022, DSG issued its 3Q22 financial results on SEC Form 10-Q, signed by Hobart and Gupta. The Form 10-Q referred investors to the same risk factors previously published in DSG's Annual Report on SEC Form 10-K for FY21, as reflected above in ¶165.

167.    On March 23, 2023, DSG issued its Annual Report for FY22 on SEC Form 10-K, signed by Stack, Hobart, and Gupta. The Form 10-K included the following risk factor:

> We often make advanced commitments to purchase products, which may make it more difficult for us to adapt to rapidly-evolving changes in consumer preferences and trends. The COVID-19 pandemic created a shift in consumer demand, resulting in an increase in demand in certain categories due to the renewed interest and perceived importance of health and fitness, participation in socially-distant and outdoor activities, and a shift toward athletic apparel and active lifestyle products. It is uncertain whether or the extent to which these trends will continue now that the COVID-19 pandemic has subsided or if another pandemic or similar public health event would have the same positive or negative impact.
>
> Furthermore, ongoing supply chain challenges as a result of the COVID-19 pandemic, the conflict in Ukraine, and other factors have made it more difficult to obtain certain in-demand products. *Our sales could decline significantly if we misjudge the market for our new merchandise, which may result in significant merchandise markdowns and lower margins, missed opportunities for other products, and inventory write-downs*.

168.    On May 24, 2023, DSG issued its 1Q23 financial results on SEC Form 10-Q, signed by Hobart and Gupta. The Form 10-Q referred investors to the risk factors previously published in DSG's Annual Report on SEC Form 10-K for FY22, as reflected above in ¶167.

169.    The statements detailed in ¶¶165-168 above were materially misleading and omitted material facts necessary to render the statements made not misleading because, contrary to DSG's statements that "*if*" Defendants misjudged the market for new merchandise, sales "*could*" decline, in reality, demand, particularly for fitness and outdoor products, had *already*

- 59 -

slowed from the pandemic-era surge to the point that DSG's inventory exceeded demand and products were no longer selling through to customers at a rate sufficient to keep up with DSG's inventory, causing excess inventory, particularly fitness and outdoor products, to accumulate in DSG's stores, distribution centers, warehouses, and other facilities across the country. Rather, as Hobart admitted in 2023 after the close of the Class Period: "Last year . . . [t]here was a lump in outdoor equipment related to the pandemic." Similarly, Gupta admitted after the Class Period that DSG faced "a little bit of the overhang of the outdoor category in terms of the COVID-buys." In fact, Defendants were aware that DSG was facing a "jaw-dropping," "shocking," "astronomical," "dangerous," and "scary" accumulation of excess inventory, particularly in the fitness and outdoor categories – much of it over a year old – that necessitated exponential increases in storage trailers at stores, distribution centers, and other facilities around the country, and even additional warehouses and "offsite" storage facilities in many areas. This excess inventory was so piled up in DSG facilities that it caused safety issues, including OSHA and fire code violations – leading DSG's EVP of stores, around the 2022 holiday season, to circulate a companywide list of stores that were so over-inventoried that they posed safety concerns. Defendants, who admitted to "monitor[ing] sell-throughs, inventory turns, gross margins and markdown rates at the department and style level" and accessed the Company's highly detailed, real-time reporting and tracking systems to "make sure that the inventory in the marketplace is at the levels that we all want it to be," knew that "significant merchandise markdowns and lower margins" not only "*may* result," but that in fact this excess inventory posed a material risk to DSG's margins and profitability because it *would* need to be sold at clearance prices to stimulate demand – which is exactly what happened in the middle of 2Q23, when Defendants finally took "decisive actions on excess product, particularly in the outdoor category," leading to disappointing margins and profitability in 2Q23 and to lower guidance for profitability metrics for the rest of FY23. Accordingly, at the

time Defendants warned about these risks, Defendants were aware that these purported potentialities had already come to fruition.

### C. Statements Regarding Shrink Were Misleading Half-Truths That Failed to Comply with Item 303

170. The Company's SEC filings, including the Forms 10-Q and Form 10-K filed during the Class Period, failed to disclose information required to be disclosed therein under Item 303. Item 303 requires certain disclosures in the MD&A section of a public company's SEC filings. The SEC created specific rules governing the content of MD&A disclosures to provide material historical and prospective disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future. The SEC has stated:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

> \*      \*      \*

> It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

171. Among other things, Item 303(a) and (b)(2) required DSG to disclose the following in the MD&A of its Class Period SEC filings:

(a) "[M]aterial events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition";

(b)    "[A]ny known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and

(c)    "If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues . . . the change in the relationship must be disclosed."

172.    DSG experienced elevated shrink during the Class Period, which constituted (i) a material event and/or uncertainty known to management that was reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition; (ii) a known trend and/or uncertainty that had already had and/or was reasonably likely to have a material unfavorable impact on income; and (iii) an event that was reasonably likely to cause a material change in the relationship between costs and revenues. Accordingly, Defendants had an affirmative obligation to disclose information required by Item 303 related to shrink in its SEC filings during the Class Period. They failed to do so.

173.    A reasonable investor would have expected Defendants to comply with Item 303 by making all required disclosures in the MD&A section of the Company's SEC filings. Thus, Defendants misled investors by making certain limited disclosures regarding shrink in the Company's SEC filings during the Class Period without disclosing additional material information required by Item 303, such as the extent of shrink's impact on the Company's operating results and the reasonably likely prospective impact of this extant trend on the Company's future operating results and financial condition.

174.    Indeed, as the SEC explained in its August 9, 2023 letter to Gupta, certain factors, including shrink, constituted "events" that "appear to have caused a material change in the relationship between cost of goods sold and revenues." Demonstrating the inadequacy of

Defendants' limited disclosures related to shrink throughout the Class Period, the SEC referred Defendants to Item 303 and directed Defendants to "describe to us and disclose in quantitative terms the extent to which these factors . . . impacted your income from operations as well as your gross profit margin."

175.    Defendants' omissions, in violation of Item 303, rendered the following statements in the Company's Class Period SEC filings materially misleading:

(a)    On August 24, 2022, DSG filed a Form 10-Q with the SEC in which the Company disclosed that in 2Q22: "Merchandise margins decreased 197 basis points, as we strategically introduced some item level pricing offerings, and higher inventory shrink due to increased theft."

(b)    On November 23, 2022, DSG filed a Form 10-Q with the SEC in which the Company disclosed that in 3Q22: "Merchandise margins decreased 438 basis points, as a result of our actions to reduce targeted apparel inventory overages, and higher inventory shrink due to increased theft."  The Company concomitantly disclosed that for FY22 to date: "Merchandise margins decreased 167 basis points as a result of our actions to reduce targeted apparel inventory overages, and higher inventory shrink due to increased theft."

(c)    On March 23, 2023, DSG filed a Form 10-K with the SEC in which the Company disclosed that, comparing FY22 to FY21: "Merchandise margin decreased 304 basis points as a result of our actions to reduce targeted apparel inventory overages, item-level deals provided to our athletes during the holiday season and higher inventory shrink due to increased theft."

(d)    On May 24, 2023, DSG filed a Form 10-Q with the SEC in which the Company disclosed that in 1Q23: "Merchandise margins decreased 136 basis points, as a result of

normalization of pricing activity relative to last year, and higher inventory shrink due to increased theft."

176.    The statements detailed in ¶175(a)-(d) above were materially misleading and omitted material facts necessary to render the statements made not misleading for the following reasons:

(a)    In each quarter during the Class Period, shrink was materially and significantly elevated over the same period of the prior year.  Based on Defendants' disclosures after the Class Period, Plaintiffs estimate that shrink increased by the following amounts for each quarter during the Class Period:

| | 2Q22 | 3Q22 | 4Q22 | 1Q23 | 2Q23 |
|---|---|---|---|---|---|
| **Shrink (y/y increase)** | $16.3M | $15.5M | $18.9M | $7.5M | $27.1M |

(b)    Shrink had a material unfavorable impact on the Company's financial condition and caused a material change in the relationship between costs and revenues throughout the Class Period.  Indeed, Defendants described the "catch-up" adjustment for shrink reported at the end of the Class Period as "meaningful to both our Q2 results and our go-forward expectations for the balance of the year," and as a "meaningful headwind."  In fact, the estimated impact of shrink on DSG's merchandise margin declines throughout the Class Period ranged from 8.2% to 33.1%, and the estimated impact of shrink on the Company's gross margin declines throughout the Class Period ranged from 10.2% to as much as ***95.2%***:

| | 2Q22 | 3Q22 | 4Q22 | 1Q23 | 2Q23 |
|---|---|---|---|---|---|
| **Increase in shrink as a % of y/y decline in merchandise margin** | 26.6% | 12.0% | 8.2% | 19.4% | 33.1% |
| **Increase in shrink as a % of y/y decline in gross margin** | 13.5% | 12.4% | 10.2% | 95.2% | 52.1% |

- 64 -

(c)     Defendants were contemporaneously aware of the extent of elevated shrink, its reasonably likely materially unfavorable impact on the Company's financial condition, and the resulting material change in the relationship between costs and revenues. *See supra* §IV.G.3. Notably, Defendants:

(i)     disclosed in each quarter during the Class Period that shrink had an (unspecified) impact on the Company's merchandise margins;

(ii)     admitted on the August 22, 2023 earnings call to tracking theft incidents in real time: "We had been seeing the number of incidents go up";

(iii)     employed an entire department of Loss Prevention specialists to manage physical inventories and to track and mitigate theft incidents, including an analyst solely assigned to compile theft data for the Company;

(iv)     disclosed, in the Company's SEC Forms 10-K for FY21 (filed March 24, 2022) and FY22 (filed March 23, 2023), that "[w]e perform physical inventories at our stores and distribution centers throughout the year" and that the Company's shrink reserve was based on "the cumulative loss estimate for each of our locations since the last physical inventory date through the reporting date" each quarter; and

(v)     admitted, in Gupta's August 23, 2023 response to the SEC's August 9, 2023 letter, to knowing that FY22 saw an "increase in inventory shrink compared to fiscal 2021" with an "impact within the total merchandise margin decline for fiscal 2022 [of] 41 basis points, as a percentage of net sales," and did not claim that Defendants failed to disclose this information because they were unaware of it at the time.

## VI.    CORROBORATING CONFIDENTIAL WITNESS ACCOUNTS SUPPORT FALSITY AND STRENGTHEN THE INFERENCE OF SCIENTER

177.    Former DSG employees have provided information demonstrating that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly

disregarded the falsity or misleading nature of their statements. The CWs include individuals formerly employed at DSG during the Class Period, whose accounts corroborate one another, other sources set forth herein, and facts now admitted by DSG. The CWs are particularly described by job description, responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge. As set forth below, the information provided by the CWs supports an inference that Defendants' Class Period statements were false and misleading and that Defendants acted with scienter.

### A.    CW-1 – Manager of Strategy in Coraopolis, Pennsylvania

178. CW-1 worked as a Manager of Strategy at DSG from December 2019 until August 2023. CW-1 was the leader for projects overseeing cross-functional team members and executing assigned projects' vision. In that position, CW-1 engaged with internal partners and led problem solving sessions, creating strategies to overcome project challenges. CW-1 presented findings to senior leadership and organizational stakeholders. CW-1 managed "key high level strategies" for DSG's fitness, baseball, and soccer groups.

179. Concerning the performance of DSG's outdoor products in 2022 and 2023, CW-1 explained that the lockdown and stimulus conditions during COVID led to increased demand for outdoor products. CW-1 stated, however, that this demand was not sustainable and was benefitting from the economic stimulus monies issued by the government during the pandemic. CW-1 stated that DSG overbought outdoor inventory items and that demand for these items slowed down after COVID. Thus, DSG was stuck with large amounts of outdoor inventory it was unable to sell, which then required liquidation.

180. CW-1 was familiar with the performance of the outdoor segment through the Company's performance reporting systems. Specifically, CW-1 noted that they would review performance reports and look at each category to see if, for example, sales events were moving

- 66 -

goods and how various products were doing.  CW-1 noticed the outdoor segment's performance was lagging in 2022 and 2023.  They paid attention to this category because fitness, which was one of their categories, had a similar trajectory.

181.    CW-1 recounted that, during 2022 and 2023, DSG had excess outdoor inventory on hand that it was unable to sell.  CW-1 stated the performance reporting systems included an: (i) "executive update" email, which was distributed every Monday morning; and (ii) DSG's key performance indicators ("KPI") reporting on an internal website, which was available at any time. The first type of performance reporting was in the form of a PDF.  CW-1 explained that every Monday morning, the reports were forwarded by email to the executive management ("EM") team and other management leaders.  CW-1 stated that the EM team included Stack, Hobart, and Gupta, along with other C-level executives.  CW-1 was copied on these emails.  CW-1 specifically recalled that the reports annotated and memorialized DSG's sales performance, inventory groups/categories that were driving the business (such as footwear, apparel, golf, outdoor, baseball, fitness, tennis, etc.), detailed data for each category, a comment section for remarks/analysis, gross margin amounts, inventory activities/movements, and year-over-year lookback numbers for each groups' performances, including 2-3 years of comparables.  According to CW-1, the reports sent to EM for examination were prepared by the finance team and other management personnel.  The finance team (including Peter Zander, the Manager of Financial Analysis) utilized data from merchandising partners.

182.    CW-1 recounted that every Monday morning, between the hours of 8:00 a.m. through 12:00 p.m., different product groups were required to respond to EM's and other executives' detailed inquiries concerning matters and changes that occurred in their units and were reported in that week's executive update.  These inquiries were thorough and exhaustive because EM required complete in-depth answers to their questions.  CW-1's practice was to reach out to

groups on Fridays in order to get their concerns addressed because they knew their group partners were usually busy handling inquiries and follow-ups from EM on Mondays.

183.    CW-1 indicated that the second version of performance reporting they used were digital reports, which showed KPIs and which were "carved up by different groups, brands, vendors, etc. as well as displaying YOY [year-over-year] and MOM [month-over-month] figures." CW-1 utilized these reports to create different analyses for their assessment of the Company.  CW-1 advised that these reports were accessed through a DSG internal website and that there was a "reporting" tab that brought them to a website where they could access up-to-date information on the Company's performance.  CW-1 said this information would have been available to anyone who received the executive update reports, which included EM.  CW-1 added that margins discussions were always a "hot topic" at the Company.

184.    CW-1 emphasized that the individuals on the management team were very hands-on and strictly adhered to the chain of command principle.  CW-1 underscored that "information had to be shared with the command chain."  CW-1 noted that although Stack was no longer the CEO of DSG, he was extremely hands-on and very actively involved in the day-to-day operations of the Company.  Stack went as far as wanting to know how products were being displayed at the stores. CW-1 revealed that Stack had at least four Senior Vice Presidents reporting directly to him and they were allowed to circumvent CEO Hobart.  CW-1 also remarked that Stack (usually with Hobart) would personally reveal new floor sets or new products at the "lab store" in the Company's headquarters.

185.    CW-1 also noted that there were regularly scheduled meetings at the Company conducted through Zoom calls, in person, or emails to discuss internal matters.  For example, quarterly town hall meetings were conducted over Microsoft Teams and were usually led by Stack and Hobart, sometimes with Gupta.  These gatherings were sometimes feel-good meetings;

- 68 -

however, most were "pretty honest" and gave a detailed overview regarding different aspects of the Company. EM occasionally gave hurrah speeches to the employees and insisted that "we'll be taking action" to find resolutions to problems.

**B.    CW-2 – District Manager in Arizona and Nevada**

186.    CW-2 worked as a DM (District Manager) at DSG from approximately mid-2016 until April 2023. CW-2 was the DM for 16 stores and supervised 1,500 employees. They were responsible for the day-to day operations of stores in their district, including merchandising and invoicing, and liaised between the store managers for each of the stores in their district and corporate representatives from DSG's headquarters in Coraopolis. CW-2 supervised all of DSG's stores in the Arizona and southern Nevada area. Their stores were among the highest-volume DSG stores west of the Mississippi River.

187.    Regarding the performance of DSG's outdoor products in 2022 and 2023, CW-2 explained that the COVID lockdown and stimulus conditions led to increased demand for DSG's outdoor products, including exercise equipment, especially in the later part of 2020 and in 2021. During that time, DSG was aggressively purchasing these items and even started selling brands that were never utilized by DSG in the past. Many of these hardline products were boats, paddles, and exercise/fitness items. Like CW-1, CW-2 remarked that the sales of outdoor inventory items were not sustainable after COVID ended, and the Company was stuck with excessive amounts of outdoor products.

188.    CW-2 stated that when the demand for these items slowed down after COVID, DSG's sales were negatively impacted and CW-2 saw a reduction in sales of these products. According to CW-2, DSG had a lot of hardline outdoor inventory that it was unable to sell starting in early 2022 and continuing until CW-2 left the company in April 2023. CW-2 recounted that this type of inventory was not selling and would have to be liquidated through higher promotions,

discounts, and clearance sales. CW-2 stated that the West Coast distribution center was located in Arizona and by early 2022 it had "yards and yards of hardline products." It was "jaw-dropping" to see so many items piled up on top of one another. For example, CW-2 said, there were "rows of boats and treadmills." The excess inventory required DSG to secure an additional 50,000 square feet of warehouse space. Similarly, DSG was required to utilize trucking and shipping containers located outside the distribution center to store overstocked items. CW-2 stated that they visited the distribution center often and noted the amount of inventory became "shocking," "dangerous," and "scary" by 2022 and until their departure from DSG. Similarly, CW-2 reported that DSG's store in Gilbert, Arizona went from one to seven trailers of fitness equipment in 2022, an increase of 600%.

189.    CW-2 reiterated that DSG was "aggressive and over bought products." The demand precipitated by COVID was over and the stores were still receiving hardline products. CW-2 specifically recalled continuing to receive 300-pound weight sets and boats even though there was no place to store them. CW-2 recalled that during a conference call with their RVP (Regional Vice President), they were instructed not to store the overstocked weight sets upstairs on the second floor of the stores because they were too heavy and would create a safety issue.

190.    CW-2 recounted that there was a problematic amount of excess inventory (particularly outdoor inventory, like boats and fitness equipment) and no more room in the storage areas; hence, merchandise had to be placed in areas of the stores where customers shopped. As a result, numerous safety compliance rules were broken. Therefore, CW-2's store sometimes failed to adhere to OSHA safety regulations and received summonses from different governmental agencies for non-compliance. CW-2 disclosed that inventory at DSG stores sometimes blocked fire exits and fire extinguishers. CW-2 cited an example where the Dublin, California store was shut down for a day or two to address safety violations issued by the local fire marshal. CW-2

underscored that in the second half of 2022, "piling" problems surrounding hardline inventory storage became a huge issue. According to CW-2, EVP Don Germano was so concerned about the safety issue Company-wide that, around the holiday season in 2022, he circulated a list of stores that were so over-inventoried that they posed safety concerns. CW-2 reiterated that DSG had to rent more warehouse space and additional containers to store the overstocked outdoor inventory items.

191.    CW-2 also explained how information about sales, inventory, and other metrics was kept and accessed inside DSG. CW-2 stated that there was a nationwide inventory management system that recorded the stores' daily, weekly, and monthly inventory operational activities. There was also a trailer log report that showed trailer and shipping containers' locations at the warehouses. CW-2 noted that a "Score Card Report" showed the sales activities for the stores' operations on a nationwide basis. This report annotated categories, sales, units, discounts, and costs. It also showed nationwide transactions and costs associated with the transactions. The Score Card Reports also listed top and bottom performing categories, and CW-2 said boats and other outdoor equipment were always at the bottom, so much so that CW-2 basically ignored those items and worked on other categories because they knew they could not sell the boats with the markdowns permitted by headquarters (only headquarters was allowed to issue discounts beyond roughly 10%). CW-2 saw in these reporting systems that the outdoor sales were declining year-over-year. CW-2 explained that the excess outdoor inventory would not sell even marked down to 10% and that there were issues flowing through this product starting in early 2022, which is why there was so much in storage.

192.    According to CW-2, there were other reports that were accessed through DSG's internal website (the "intranet" or "DSGN") for manager-level employees and above, and EM had access to up-to-date information on the Company's performance. CW-2 advised that the P&L,

Shrinkage (in the Loss Prevention System or "LPS" section of the software), Margin Rate, and Inventory Reports were available to anyone who received reports, including EM. EM included Hobart, the EVP of Stores and Supply Chain (Don Germano), and the RVP for CW-2's region (these were the "chain of command above" CW-2), as well as CFO Gupta and Executive Chairman Stack.

193.    CW-2 was certain that EM was aware of the inventory issues, and CW-2 noted that they knew for a fact that Germano, a senior-level EVP at DSG's Coraopolis headquarters, was aware of the issues because of communications they received from Germano, and that Germano worked closely with CEO Hobart. CW-2 also noted that EM were very hands-on and strictly adhered to and shared information through the chain of command. CW-2 stated that although Stack was no longer the CEO, he was extremely hands-on and very actively involved in the day-to-day operations of the company. CW-2 understood from their discussions with their superiors that the Monday meetings included the EM team.

194.    CW-2 listened to the Company's quarterly earnings calls at which the EM team spoke with investors and analysts. CW-2 cited an example of a call where CEO Hobart stated things like "inventory is clean and well positioned." CW-2 and their store managers said "she [Hobart] was lying," as DSG facilities were overflowing with inventory over a year old that was not moving. CW-2 watched this play out in the inventory tracking systems, and CW-2 could also see it by the sheer amount of inventory filling their stores. CW-2 stated that EM visited the stores to check the stores' performance. The EM team used a corporate jet to take them to the different stores. CW-2 was usually informed that "a jet is going to land/a jet is coming in" when the EM team was going to visit their stores. CW-2 recounted that EM visited their area at least three times – once in May 2021 and two times post-COVID: in the first half of 2022 and sometime in 2023. CW-2 cited an example where Stack, Hobart, and Germano flew in to visit CW-2's stores.

- 72 -

C.    **CW-3 – Store Manager in New England**

195.    CW-3 began their employment at DSG in early 2018 as an Area Retail Sales Manager and became a Store Manager in mid-2022.  CW-3 spent a lot of their time travelling to the eleven DSG stores located in their New England district.  Among other things, CW-3 was tasked with monitoring inventory, handling physical inventories, managing budgets, and training both store employees and newly hired managers.  CW-3 explained that shrinkage was very light before and during the COVID lockdowns, and that the shrink issue went from nothing in early 2020 to much worse than it had been before in 2022.  CW-3 stated that thefts started increasing right after COVID.  CW-3 stated that inventories were conducted using labels sent by headquarters and handheld scanners that imaged items and then instantly uploaded them into the inventory system.  CW-3 explained that the "Cisco inventory system" annotated the movements of inventory activities throughout the Company.  CW-3 stated that inventory counts were conducted at different periods during certain years, including in January, before back-to-school season, and after back-to-school season.  CW-3 recounted that the lockdown and stimulus conditions during COVID led to an increased demand for outdoor products, particularly in the later part of 2020 and in 2021.  CW-3 estimated that demand for fishing equipment and bikes increased by 30%, demand for kayaks increased by 40%, and demand for exercise and fitness items increased by 1000%, and stated that the Company was aggressively purchasing products like kayaks and paddles.  CW-3 remarked that the sales of outdoor inventory were "unsustainable" as demand for outdoor products slowed down after COVID reached its peak.  CW-3 reported that accordingly, DSG was stuck with excess outdoor inventory that it was unable to sell starting in early 2022 and continuing into 2023.

196.    CW-3 revealed that outdoor inventory was not selling and was "obsolete," they were directed by headquarters to ship excess inventory to "hub stores" in the district that had more space.  CW-3 spent time at the hub store and witnessed non-stop unloading of daily deliveries of

excess inventory.  There were numerous truckloads of items continuously arriving and the site was exceedingly full and overflowing with inventory that had become obsolete.

197.    CW-3 recalled that by July 2022, the excess inventory became a safety issue for the employees and a violation of state fire safety regulations because stores had to pile it up in front of fire exits and fire extinguishers.  Both the Manchester, New Hampshire and Portsmouth, New Hampshire locations had no more room in their storage areas, experienced a problematic amount of excess inventory (particularly outdoor inventory, like boats and fitness equipment), and were in violation of OSHA safety laws due to the piled-up inventory.  CW-3 stated that they were injured on the job when piled-up kayaks fell on them, causing bruising and pain.

198.    CW-3 explained that the EM team conducted visits into the field to monitor how the stores were performing.  For example, Stack visited CW-3's store several times and Hobart visited once.  CW-3 personally communicated the difficulties they were experiencing with excess inventory directly to Stack during his visit to CW-3's store in the summer of 2022.  CW-3 walked around the hub store with Stack, showed him the basement of the store, and informed him that it was full to capacity with excess inventory.  CW-3 stated that "he [Stack] brushed me off and just wanted to talk about opening the House of Sports [other stores] to make more money."

199.    Aside from personal store visits, which permitted Stack and Hobart to witness the excess inventory firsthand, CW-3 explained that the EM team could access up-to-date information on the Company's performance, such as reports available through DSG's internal website (the intranet or DSGN).  CW-3 explained that DSG had a nationwide "Sell-Through Report" that recorded each store's daily, weekly, and monthly sales activities.  In 2022 and 2023, boats and other outdoor equipment were always noted at the bottom of the report because the Company had trouble flowing these products after COVID.  According to CW-3, DSG also had an internal "Clearance Report/Markdown Report" that annotated and tracked products that were placed on the

discounted and promotional listings. This report was assembled over the weekends by personnel at DSG headquarters and CW-3 "pulled it on Mondays." According to CW-3, discounts and promotions were strictly controlled by personnel at headquarters.

200.    Every Monday morning, CW-3 held a conference call with the RVP and DM for their district to discuss operational matters, and CW-3 was given instructions and updates to pass on to their employees. Based on discussions CW-3 had with their superiors, CW-3 understood that the chain of Monday meetings included the EM team. When CW-3 met with their supervisors, the supervisors had already met with their superiors and passed down directives and information from EM. CW-3 described Stack as extremely hands-on and very actively involved in the day-to-day operations of the Company.

### D.    CW-4 – Planning, Allocation, and Replenishment in Coraopolis, Pennsylvania

201.    CW-4 worked at DSG from early 2019 until August 2023. CW-4 was an employee at the Company's headquarters in Coraopolis, Pennsylvania in the Planning, Allocation, and Replenishment group, with responsibility for inventory positioning, including outdoor inventory. CW-4 said outdoor was not performing as expected after the pandemic and that the Company "got themselves into an at risk, overbought inventory position." CW-4 explained DSG ordered a lot of outdoor goods during COVID and that was a fairly busy time, but demand dropped after the pandemic and the Company got stuck with a lot of inventory. CW-4 recounted that the Company had so many boats and canoes that it had to lease space to store the inventory; there was not enough room in the stores or distribution centers to accommodate these items. CW-4 explained that DSG had a total of five distribution centers, including in Pennsylvania, Arizona, Georgia, and Indiana. CW-4 stated that they dealt with all the distribution centers, and that the fact that these distribution centers were getting overloaded was always a big part of the conversation at the Company. CW-4 stated that by 2022, the distribution centers' capacities were well into the 90% range.

202.    CW-4 indicated that while DSG did not publicly talk about being over inventoried in outdoors until August 2023, they had actually been in that position before that time, including in 2022.  The principal components of this inventory overload were outdoor, camping, and fitness. According to CW-4, around January 2023, DSG planned to reduce the number of stores carrying outdoor goods.

### E.    CW-5 – Store Manager in Maryland

203.    CW-5 worked as a Store Manager from April 2002 until February 2015 and again from February 2020 until mid-2022.  CW-5 managed approximately 10 stores during their tenure at DSG.  CW-5 recounted that by the time they left the Company in mid-2022, outdoor inventory had accumulated to the point that they had to work through a third party to obtain additional trailers for excess storage.  For example, one of the new stores CW-5 managed in the Annapolis, Maryland area in 2022 had 11 trailers filled with outdoor products such as fitness equipment and bikes.  CW-5 communicated with other store managers who were all in a similar situation.  CW-5 recounted conversations with fellow store managers where they would lament, "we're swimming in this or swimming in that."  A lot of the build-up was outdoor products like bicycles, kayaks, and fitness equipment.

204.    CW-5 advised that they saw Stack and Hobart make store visits, with Hobart visiting CW-5's Annapolis store in 1Q22, and that Stack and Hobart could have seen the trailers full of excess inventory in the parking lot.

205.    CW-5 explained that inventory numbers were readily accessible inside DSG.  At any time, CW-5 could look up their inventory in terms of units and dollars in an internal inventory system, which was tied to the point-of-sale system and auto-populated.  The information was retrieved from DSG's internal system that showed inventory levels in terms of dollars and units, and also compared these levels to the same period the previous year.  CW-5 stated that outgoing

inventory (*i.e.*, sales) was tracked at the stores through point-of-sale transactions tied to registers. CW-5 also reported that they had weekly conference calls with their DM, which were normally done on Monday.  At these meetings, the DM and store managers would go over performance and relay instructions from higher up the corporate hierarchy.

### F.    CW-6 – Assistant Store Manager in Minnesota

206.    CW-6 was an Assistant Store Manager in Minnesota from October 2021 until May 2023.  CW-6 advised that the inventory at their stores was "astronomical" and "hanging from the rafters."  CW-6 stated that reports showing the inventory levels at each store were routinely passed up the chain of command.  Indeed, inventory levels could be accessed by anyone at DSG who held the position of an Assistant Store Manager and higher, all the way up to the CEO.  CW-6 explained that CEO Hobart visited their store in or around April 2023, during which visit Hobart observed the buildup of inventory and engaged in discussions regarding how to maximize storage space.

### G.    CW-7 – Warehouse Supervisor in Georgia

207.    CW-7 was a Warehouse Supervisor at a large distribution center in East Point, outside of Atlanta, Georgia, from mid-2022 to mid-2023.  The warehouse was approximately 1.5 million square feet.  When CW-7 arrived in the summer of 2022, there was a massive amount of inventory and multiple trailers full of product, which contained items such as boats and exercise equipment.  CW-7 advised that they observed anywhere from 30 to 60 trucks with outdoor equipment backlogged at any given time.  CW-7 remarked that DSG kept purchasing products, leading to the excess inventory.

208.    CW-7 recounted that there were safety concerns in the warehouse they supervised caused by the excess inventory.  "Mountains of outdoor equipment, boats, kayaks, firepits, grills" piled up in the overflow section of the warehouse.

209. With respect to how inventory levels are recorded in DSG's internal systems, CW-7 explained that access to that data was taken directly from the computerized inventory management system. Incoming freight was scanned into the warehouse. Shipments arriving by trailer was not scanned until unloaded, but there were bills of lading showing what was on the trucks. CW-7 stated that supervisors and those above supervisor-level had access to and could see the inventory levels.

### H.   CW-8 – Merchandise Planner in Coraopolis, Pennsylvania

210. CW-8 worked in the Public Lands division of DSG as a Merchandise Planner at the Company's headquarters in Coraopolis from July 2021 until July 2022. CW-8 noted that during their tenure, the Company "had bought so much inventory, to the point that the stores couldn't handle it. The stockrooms were packed to the bone." CW-8 stated that when the first Public Lands store opened around September 2021 they had so much inventory that they had to rent an empty location for storage because "the store couldn't handle it."

211. The first Public Lands store was in Cranberry Township, Pennsylvania, near Pittsburgh. By the end of October 2021, CW-8 was asked to go to that location and pick out inventory that could be transferred over to the Dick's Sporting Goods side or sent to an outlet center. "The overstock situation was there from the beginning," CW-8 recalled. According to CW-8, shortly after Cranberry Township, a second Public Lands store was opened in Columbus, Ohio and that store also was overstocked. CW-8 and their colleagues had to travel to that store to try to deal with the inventory issue. CW-8 noted that the buyers who were part of upper management went to the new Public Land stores and walked the floors and the storerooms, and that they were able to physically see how bad the inventory situation was. CW-8 learned from a colleague that both Stack and Hobart visited the Cranberry Township location shortly after the opening. CW-8 explained that inventory information from distribution centers was fed into an

- 78 -

SAS system.  CW-8 stated that DSG also had a system called Q-Link which allowed users to pull inventory data from the distribution centers and the stores.

### I.    CW-9 – Assistant Buyer in Coraopolis, Pennsylvania

212.    CW-9 worked at the Company's headquarters in Coraopolis, Pennsylvania as an Assistant Buyer for footwear, from August 2021 until May 2024.  CW-9 explained that the inventory (including inventory buildup) and sales at DSG were reflected in weekly reports.  The reports indicated the amount of inventory in DSG's stores and warehouses.  CW-9 explained that the amount of sales was reflected through numbers generated at the checkout registers.  CW-9 noted that anyone at DSG holding the position of Assistant Manager and above could access these weekly inventory and sales reports.  CW-9 explained that the reports were generally reviewed on Mondays, but the system was updated daily.  CW-9 reiterated that all the senior executives at the Company had access to these reports.  Asked if C-Suite personnel would have been aware of excess inventory levels other than by looking at reports or being briefed about the content of the reports, CW-9 advised that CEO Hobart visited stores, went to grand openings, and posted about store visits on LinkedIn.

### J.    CW-10 – District Manager in Pennsylvania

213.    CW-10 worked as a DM in Pennsylvania from mid-2011 to mid-2022.  CW-10 noted that each district would typically have anywhere from nine to fifteen stores.  According to CW-10, inventory problems worsened after COVID, as demand for outdoor products such as exercise equipment and bikes waned, but inventory was still being sent to stores.  CW-10 recalled that one of the stores they managed in Lancaster, Pennsylvania had enough at-home gym equipment to cover the entire state of Pennsylvania.  CW-10 had to rent trailers to store overflowing outdoor products because there was not enough room in the building.  CW-10 described the trailers as full-size storage pods.  Some of CW-10's stores had up to eight pods, all

of which were tractor-trailer size.  Most of CW-10's stores had trailers that stored excess outdoor merchandise.

214.    CW-10 explained that by the time they left DSG in May 2022, levels of outdoor inventory such as bikes, fitness, and kayaks were "incredibly high."  Kayak sales might typically be 10 to 20 per week, but CW-10 had stores that had 600 or 700 kayaks in inventory.

215.    CW-10 remarked that DSG's senior management had access to information reflecting the inventory problems through DSG's KPI reports.  CW-10 explained that these reports provided important metrics such as inventory levels.  CW-10 emphasized that any senior manager at DSG had access to this data.  Additionally, CW-10 reported that senior management could also see the excessive outdoor inventory levels "because they're in the stores."  CW-10 explained that Stack and Hobart visited DSG's stores, and CW-10 observed Hobart at the Allentown, Pennsylvania location at least a couple of times annually.

## VII.    DEFENDANTS ACTED WITH SCIENTER

### A.    Defendants Were Hands-On, High-Level Executives Who Closely and Frequently Tracked and Spoke About DSG's Margins and Inventory

216.    Throughout the Class Period, Defendants routinely monitored DSG's inventory levels using the Company's sophisticated internal reporting systems, and made specific statements about the Company's inventory health and margins, demonstrating their exceptional familiarity with these critical DSG metrics.  Moreover, prior to, during, and after the Class Period, analysts were laser-focused on DSG's inventory levels and margins, and repeatedly discussed these topics with Hobart and Gupta on every single quarterly earnings call, demonstrating that these topics were high on Defendants' and the market's radar.  Thus, Defendants knew or were reckless in not knowing that DSG's profitability, including factors such as merchandise margins, excess inventory, and shrink, were not as represented.  Defendants' hands-on management style and their roles as spokespeople for the subjects of the alleged fraud support a strong inference of scienter.

### 1.    Defendants' "Hands-On" Management Style

217.    The Individual Defendants were, by their own admissions and from descriptions provided by former employees, hands-on executives who were intimately involved in DSG's operations and aware of the current state of the Company's inventory, flow/sell-through, demand, shrink, and margins.  For example, CW-1, a Manager of Strategy for the fitness group, recounted that every Monday morning, between the hours of 8:00 a.m. through 12:00 p.m., different product groups were required to respond to the Individual Defendants' and other executives' detailed inquiries concerning matters and changes that occurred in their units and were reported in that week's executive update.  These inquiries were thorough and exhaustive because the EM team, including the Individual Defendants, required complete in-depth answers to questions about inventory.  CW-1 emphasized that the Individual Defendants were very hands-on and strictly adhered to the chain of command principle.  CW-1 underscored that "information had to be shared with the command chain."  CW-1 noted that although Stack was no longer the CEO, he was extremely hands-on and very actively involved in the day-to-day operations of the Company. Stack went so far as wanting to know how products were being displayed at the stores.  CW-1 revealed that Stack had at least four Senior Vice Presidents reporting directly to him and they were allowed to circumvent CEO Hobart.  CW-1 remarked that Stack (usually with Hobart) would personally reveal new floor sets or new products at the "lab store" in the Company's headquarters. CW-1 also noted that there were regularly scheduled meetings at the Company conducted through Zoom calls, in person, or emails to discuss internal matters.  For example, quarterly town hall meetings were conducted over Microsoft Teams and were usually led by Stack and Hobart, sometimes with Gupta.  These gatherings were sometimes feel-good meetings; however, most were "pretty honest" and gave a detailed overview regarding different aspects of the Company.

The Individual Defendants occasionally gave hurrah speeches to the employees and insisted that "we'll be taking action" to find resolutions to problems.

218.    CW-2, a DM, also noted that the Individual Defendants were very hands-on and strictly adhered to and shared information through the chain of command.  CW-2 also stated that although Stack was no longer the CEO, he was extremely hands-on and very actively involved in the day-to-day operations of the company.  CW-2 understood from their discussions with their superiors that regular Monday meetings included the Individual Defendants.  Additionally, CW-3, a Store Manager who spoke with Stack on one of his visits to their store, described Stack as extremely hands on and very actively involved in the day-to-day operations of the Company.  The Individual Defendants' frequent visits to stores around the country further demonstrate their hands-on management style and access to critical information regarding DSG's ballooning inventory. *See infra* §VII.A.4.

## 2.    Defendants Utilized Highly Detailed, Real-Time Reporting and Tracking Systems

219.    Prior to and throughout the Class Period, DSG maintained highly detailed reporting and tracking systems that allowed executives within the Company – including the Individual Defendants – to access real-time data and analyses regarding KPIs, including inventory levels, sell-through, sales, margins, shrinkage, and more.  Defendants' access to and use of these systems supports the strong inference that they were aware of or were reckless in not knowing the true state of DSG's inventory, flow/sell-through, demand, shrink, and margins.

220.    On May 10, 2024, the SEC filed a civil complaint against an individual named Frank T. Poerio, Jr., accusing Poerio of "unlawful insider trading in the securities of Dick's Sporting Goods, Inc. . . . between November 2019 and May 2021."  *SEC v. Poerio*, No. 2:24-cv-00700, ECF 1 (W.D. Pa. May 10, 2024).  According to the complaint, a DSG employee named

"Individual A" passed material, nonpublic information ("MNPI") obtained from DSG's internal reporting systems to Poerio, who realized over $800,000 in profits by trading on the information.

221.    The SEC complaint details the internal reporting systems accessed by Individual A, which provided "material nonpublic information about Dick's Sporting Goods's financial results":

> Individual A received a ***"Daily Sales Report," which provided up-to-date statistics for each of Dick's Sporting Goods's store locations***.
>
> In addition to receiving the daily report described above, Individual A had access to multiple databases that included MNPI about the company's sales and revenue. The Dick's Sporting Goods database that he accessed most frequently was the ***"ERA – KPI 2.0" database***, which, ***according to Dick's Sporting Goods***, provided audited sales for two full years, plus the current year, viewable by time buckets of day, week to date, month to date, quarter to date, season to date, and year to date. It also ***included the prior day's inventory, the prior weeks' inventory, and corresponding previous year's inventory***.
>
> The second most frequently accessed database was the ***"OPS – Sales Analysis" database. According to Dick's Sporting Goods, this database provided a summary of the total company audited sales for brick-and-mortar stores, web, and omni sales for the current year and the previous year***. Sales could be viewed at a store and ***sub-class level***. The application also had reports that showed sales by geographic location, services-specific sales, fast sellers, and zero sales. The application also showed sales against budget.

222.    A Consent Judgment in favor of the SEC was entered on May 15, 2024. *SEC v. Poerio*, No. 2:24-cv-00700, ECF 11 (W.D. Pa. May 15, 2024).

223.    Accounts from former DSG employees corroborate and supplement the SEC's allegations in the *Poerio* case regarding DSG's reporting and tracking systems. CWs 1, 2, 3, 5, 6, 7, 8, and 10 all described DSG's KPI reporting system, which was accessible on an internal company intranet site. The KPI site had various tabs for data and analyses of different metrics, including inventory, margins, and shrinkage. CW-3 said the site was often referred to as DSGN. CW-8 described is as an "SAS" – *i.e.*, statistical analysis system – meaning the site allowed users to perform a variety of data management and analytical tasks, including analyzing data statistically

- 83 -

and creating reports and graphical representations of trends. CW-1 added that this site allowed users to view KPIs "carved up by different groups, brands, vendors, etc. as well as displaying YOY [year-over-year] and MOM [month-over-month] figures." Several former employees (including CWs 1, 2, and 3) reported that they knew sales and sell-through of outdoor and fitness inventory were declining throughout the Class Period from using this system.

224.    Many of the former employees (including CWs 1, 2, 3, and 9) also reported that every Monday, they received an executive update email attaching a PDF with data and analysis of current trends. CW-2 called this the "Score Card Report." CW-1 stated that they were copied on these emails, as were the Individual Defendants. CW-3 added that this report included data and analysis regarding inventory "sell-through" and clearance/markdowns. CW-1 said the report also included information regarding sales performance, inventory groups/categories that were driving the business, detailed data for each category, a comment section for remarks/analysis, gross margin data, inventory activities/movements, and year-over-year lookback numbers for each group's performance, including 2-3 years of comparables. According to CW-1, the reports were prepared by the finance team and other management personnel using data from merchandising partners. CWs 2 and 3 both commented that these reports included lists of bottom performing categories, and that outdoor and fitness equipment were often listed as bottom performing categories in these reports. Further, these former employees stated that they knew from these reports that lower demand for fitness and outdoor products was causing flow/sell-through problems, leading to excess inventory accumulation. In addition, CWs 1, 2, 3, 5, and 9 all reported that meetings up and down the chain of command were typically held on Mondays. The meetings were held in a top-down fashion, with instructions relayed from the Individual Defendants down through the layers of the hierarchy throughout the day. Information from the executive update email was discussed in these meetings.

- 84 -

**3.     Defendants Admitted They Regularly "Monitor[ed] Sell-Throughs, Inventory Turns, Gross Margins, and Markdown Rates" and More**

225.     The Individual Defendants' own public statements prior to, during, and after the Class Period evidence that they personally accessed and used the DSG reporting and tracking systems described above to monitor DSG's inventory levels, margin, and other key metrics that impacted the Company's business and profitability, such that they were contemporaneously aware of, or were reckless in not knowing, the true state of DSG's excess inventory and shrink.

226.     DSG's SEC Form 10-K for FY22 (filed March 23, 2023) stated: "Senior management focuses on certain key indicators to monitor our performance including . . . [e]arnings before taxes *and the related operating margin* [and] *[q]uality of merchandise offerings*." Specifically, regarding "[q]uality of merchandise offerings," the Form 10-K stated:

> To measure the effectiveness of our merchandise offerings, *we monitor sell-throughs, inventory turns, gross margins and markdown rates at the department and style level*. This analysis helps us manage inventory levels to reduce working capital requirements and *deliver optimal gross margins by improving merchandise flow and establishing appropriate price points to minimize markdowns*.

227.     The SEC Form 10-K for FY22 also stated: "*We regularly review inventories* to determine if the carrying value of the inventory exceeds net realizable value and, when determined necessary, record a reserve to reduce the carrying value to net realizable value." The Form 10-K stated that DSG's "senior management" would "monitor various indicators, including new store productivity, sales per square foot, store operating contribution margin and store cash flow," and "[w]e monitor and evaluate store performance on an ongoing basis and reallocate space in our stores to categories and products that we believe can drive sales growth . . . ." Further, the Form 10-K stated that Stack "continues to oversee our merchandising group" and that "Mr. Stack possesses detailed and in-depth knowledge of the issues, opportunities and challenges that we and the industry face."

228.     Additionally, during a May 25, 2022 call announcing DSG's results for the 1Q22, an analyst noted with concern that "inventory is clearly trending above sales trends at this point" "across the industry."  The analyst pointedly asked, given that industry trend, "what gives you such confidence that we're not going to be over-inventoried into the back half of the year right now?" Gupta responded that "we" have "overall confidence" in "our inventory position," which is "not toxic."  Hobart insisted: "We don't plan to create any level of risk with toxicity, and we can manage through and buy around any inventory we have.  So that does not concern us."  Gupta stated that his confidence in DSG's inventory position stemmed from information the Individual Defendants received from the Company's merchandising and supply chain teams, which cover inventory, adding that DSG's merchandising and supply chain teams "*have a very good pulse on the business, and we have perfected this art*."

229.     Hobart likewise acknowledged her deep, up-to-date knowledge of DSG's inventory levels, and repeatedly touted the inventory's purported "health."  For example, during the same May 25, 2022 earnings call, an analyst inquired: "What's changing as we speak?  Sales, gross margin, can you talk about the inventory balance?" because "It looks like you're carrying a good amount going into the year.  Are you already seeing that elevated promotion?"  Hobart responded, "I want to be very clear that we are not seeing any meaningful trends that are different from what we saw in Q1 and we believe our inventory at plus 40% [v. 1Q21] actually is very healthy . . . .  In fact, there are areas where if we could have more, we would have more."  She emphasized that "we are not seeing a change in the promotional environment" and stated: "*We will obviously continue to monitor that* . . . ."

230.     On August 23, 2022 Stack gave an interview to *CNBC* in connection with DSG's 2Q22 earnings release in which he demonstrated his in-depth knowledge of DSG's inventory position, stating: "We had some trailers that were backed up and our system got clogged up . . . .

We've worked through the vast majority of that and it'll be all cleaned up by the end of this month, maybe the second week of September."

231.    On the November 22, 2022 earnings call for 3Q22, Hobart stated: "[W]e work very closely with our vendor partners, as always, to make sure that the inventory in the marketplace is at the levels that we all want it to be.  We continue to move product when it needs to be moved, and that's in every category."  Hobart also touted the Company's use of technology to monitor demand trends: "[O]ur database and our knowledge of our athletes is at an all-time high, and we continue to have, what I would say, is the best data set in sports, and I'm not the only person saying that.  We have an amazing data set."

232.    At the March 14, 2023 Bank of America Consumer & Retail conference, Hobart highlighted the importance of the outdoor category to Defendants, stating (regarding DSG's acquisition of an outdoor company called Moosejaw): "***Our main goal, we've been trying to really excel in the outdoor category***."

233.    On the May 23, 2023 earnings call for 4Q22 and FY22, Gupta stated: "Right now, we feel that the inventory is clean and well positioned.  So ***we'll continue to monitor that expectation as we go through the balance of the year***."

234.    On the November 21, 2023 earnings call for 3Q23, Hobart stated: "We saw strength as back-to-school has different cycles throughout the country, early, mid and late back-to-school, and ***we could literally see the comps follow those trends***."

### 4.    Hobart and Stack Regularly Visited DSG Stores and Distribution Centers Throughout the Country

235.    Throughout the Class Period, Stack and Hobart frequently visited DSG stores and distribution centers around the country.  Hobart posted about some of these visits on her LinkedIn

account.[7]  An analysis of her LinkedIn posts shows that between 2022 and August 2023 alone,[8] she visited over 100 of DSG's 853 stores and 4 of the 5 distribution centers – in 26 different states. These visits evidence Stack's and Hobart's intricate involvement in DSG's operations, down to the store level.  Indeed, as Hobart stated on December 6, 2022 at the Morgan Stanley Global Consumer & Retail Conference: "So even for decades now, it's *go to the stores and you'll find the truth*.  *That's what Ed [Stack] and the management team have always believed*."

236.    Accounts from former employees confirm Stack's and Hobart's visits around the country throughout the Class Period, with several former employees reporting that they met and spoke with Stack and Hobart at their stores during the Class Period.  For example, CW-2 recounted that Stack and/or Hobart visited their area at least three times: once in May 2021 and two times post-COVID, in the first half of 2022 and sometime in 2023.  CW-3 reported that Stack and Hobart conducted visits into the field to monitor how the stores were performing.  According to CW-3, Stack visited CW-3's store several times and Hobart visited once.  *CW-3 personally communicated the difficulties they were experiencing with excess outdoor inventory directly to Stack during his visit to CW-3's store in the summer of 2022*.  CW-3 walked around the hub store (*see supra* §IV.F.3) with Stack, showed him the basement of the store, and informed him that it was full to capacity with excess inventory.  CW-3 stated that Stack "brushed me off and just wanted to talk about opening the House of Sports [a new store concept] to make more money."  Similarly, CW-5 reported that they saw Stack and Hobart make store visits, with Hobart visiting their Annapolis, Maryland store in 1Q22, and that Hobart could have seen the trailers full of excess inventory in the parking lot on this trip.  And, CW-10 reported that the Individual Defendants

---

[7]    https://www.linkedin.com/in/lauren-hobart-0656893/.

[8]    These numbers do not include repeat visits to the same locations and do not account for visits that Hobart did not document on social media.

could also see the excessive outdoor inventory levels "because they're in the stores." CW-6 reported that *Hobart visited their store in or around April 2023 and that during the visit, Hobart observed the buildup of inventory and engaged in discussions regarding how to maximize storage space*. CW-8 stated that both Stack and Hobart visited the Public Lands location in Cranberry Township shortly after its opening in late 2021. CW-8 added that the overstock situation was there from the beginning and that anyone could physically see how bad the inventory situation was. CW-10 explained that Stack and Hobart visited DSG's stores, and CW-10 observed Hobart at the Allentown, Pennsylvania location at least a couple of times annually. Thus, these personal store visits gave Stack and Hobart firsthand knowledge of the excess inventory.

237.    According to her LinkedIn profile, Hobart visited at least four of the five DSG distribution centers during this time period: Atlanta, Georgia; Plainfield, Indiana; Smithton, Pennsylvania; and Goodyear, Arizona. CW-4, who worked in the Planning, Allocation, and Replenishment group at DSG's Coraopolis headquarters and had responsibility for inventory positioning, stated that they dealt with all the distribution centers, and that the fact that these distribution centers were getting overloaded was always a big part of the conversation at the Company. By 2022, the distribution centers' capacities were well into the 90% range. CW-2, a DM, mentioned that by early 2022, the distribution center located in Arizona had "yards and yards of hardline products" with "rows of boats and treadmills." CW-7, a warehouse supervisor at the distribution center near Atlanta, said that by the time they arrived in the summer of 2022, there was a massive amount of inventory and tons of trailers full of product such as boats and exercise equipment, and advised that they would see anywhere from 30 to 60 trucks with outdoor equipment backlogged at any given time. They also recounted that there were safety concerns in the warehouse caused by the excess inventory. There were "mountains of outdoor equipment, boats,

kayaks, firepits, grills" just piled up in the overflow section of the warehouse. Accordingly, Hobart witnessed this excess inventory firsthand.

238.    During her visits, Hobart walked through the stores and met with management to discuss the Company's performance. For example, while visiting stores in North Carolina, Hobart posted that she "walk[ed]" the stores and met with the "teams" of employees there:



239.    In another visit to a Texas store, Hobart again posted that she "walk[ed]" the store and met with the store's "team":



240.    Visiting another store in Pennsylvania, Hobart said the "executive team walked"

the store, and photos show Hobart meeting with employees there:



241.    In a joint visit to Indiana's Going, Going, Gone! and Dick's stores, Hobart again "walk[ed]" the stores and met with "knowledgeable teammates":



242.    While visiting stores in Virginia, Hobart met with several store managers and thanked them for the "dialogue, feedback and ideas":





243.    During her visit to another store in California, Hobart posted how much her team

learned from the employees in the stores:

4895-9028-0940.v3



244.    In yet another visit, this time to a store in Massachusetts, Hobart posted that she

met with the store manager there:



245.    When visiting multiple stores in Ohio, Hobart said "[i]t was great to hear directly"

from the employees at the stores:



246.    When visiting stores in Michigan, Virginia, and Maryland with Stack, Hobart

thanked the employees for "sharing [their] insights":



247.    During her visit to the Atlanta distribution center in Georgia, Hobart said the team

"shar[ed] [their] ideas" with her and provided "feedback":





Lauren Hobart · 3rd+
President and CEO; Member of Board of Directors at DICK'S ...
2yr · 🌐

Follow  ···

Just finished a great few days of travel with an energizing visit with our Atlanta Distribution Center team. Thank you to Jim and everyone at the DC for spending time with us and sharing your ideas. Your team's feedback over the years has had an incredible impact on our company and culture. #dsglife #dsgproud

😀😍👏 231                                    2 comments

248.    During her visit to another distribution center in Pennsylvania, Hobart posted that the "leadership team" there, including the Senior Director of Operations, shared "thoughts, ideas and perspective" with her:



249.    Thus, during her store visits, Hobart was visually exposed to the excess inventory, and learned about the inventory issues from her in-person meetings with the store managers and other employees.   Indeed, when Hobart visited stores in Virginia and Pennsylvania, she even posted about "diving into our Outdoor Equipment and Fitness categories":



250.    As part of her visit to multiple Florida stores, Hobart mentioned attending "Outdoor events," where outdoor products such as "bikes" and "boats" were tested by customers:



251.    Thus, Hobart's numerous visits to stores and distribution centers demonstrate her firsthand knowledge of the Company's inventory issues and overall performance.  Hobart utilized the Company's corporate jet to inspect stores and distribution centers throughout the country.

From 2022 to August 2023, Hobart visited over 100 DSG locations in at least 26 states, and inspected 4 of the 5 distribution centers, meeting with employees to discuss DSG's performance.

      **B.    The Temporal Proximity Between Defendants' Misleading Statements and the Disclosure of Corrective Information Supports the Strong Inference of Scienter**

      252.    Defendants' scienter is further evidenced by the temporal proximity between their misleading statements and omissions and the disclosure of information correcting them. In particular, on the May 23, 2023 conference call, Hobart and Gupta repeatedly stated that DSG's inventory was "clean" and "well positioned." On the same call, Hobart commented: "[W]e are not expecting to have – to go into a major promotional cycle here." Yet just three months later, on August 22, 2023, Defendants shocked investors by announcing disappointing profitability results due to promotions to "make our inventory cleaner," with Hobart admitting, "[w]e had – there was excess inventory in the marketplace."

      253.    Moreover, Gupta stated on the same call: "[T]here is an outdoor peak that happens, right, around the mid part of Q2. And that was the purpose – purposeful decision that we made to keep our inventory clean and be decisive about the outdoor category." Later on the same call, Hobart made clear that the majority of DSG's margin-compressing outdoor sales were made in this "peak" "around the mid part of Q2," stating: "[T]here's 7 peak selling weeks in the outdoor category. Obviously, the whole business is a full year business. But for the sub categories that we're talking about, there's 7 peak weeks. And so you have to strike while the iron is hot, and that's exactly what we decided to do." Given that DSG's second fiscal quarter is from May to July, this seven-week peak in the middle of the quarter is likely in June. Thus, Defendants likely made the decision to clean out DSG's excess outdoor inventory in *June*, less than *one month* after stating on May 23, 2023 that DSG's inventory was "clean."

254.    The close proximity of Defendants' May 23, 2023 statements to the related disclosures strengthens the inference that Defendants were aware of, or recklessly disregarded, that DSG had a glut of inventory, including outdoor and fitness products, that would need to be liquidated while they assured investors otherwise throughout the Class Period.

## C.    Hobart and Gupta Signed Sarbanes-Oxley Certifications Attesting That They Personally Supervised DSG's Controls and Procedures

255.    The SOX certifications[9] signed by Hobart and Gupta further evidence scienter. Hobart and Gupta signed SOX certifications filed with DSG's SEC Forms 10-Q and Form 10-K throughout the Class Period representing that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Further, DSG's SEC Form 10-K for FY22 (filed March 23, 2023) stated, under the heading "Disclosure Controls and Procedures":

> The Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act.  Based upon that evaluation, the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer concluded that, as of January 28, 2023, the Company's disclosure controls and procedures were effective in ensuring that material information for the Company, including its consolidated subsidiaries, required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's ("SEC") rules and forms, and that it is accumulated and communicated to management, including our principal executive and financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

---

[9]    Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted pursuant to §302 of SOX, require an issuer's principal executive and financial officers to certify that: (a) the information contained in the issuer's annual reports is accurate and reliable; and (b) they have taken certain actions with respect to establishing and maintaining disclosure controls and procedures for the collection and reporting of financial and other information.

256.    Similarly, DSG's SEC Forms 10-Q filed throughout the Class Period stated in the "Controls and Procedures" section:

> During the quarter, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based upon that evaluation, the Company's management, including the Chief Executive Officer and the Chief Financial Officer, concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this Quarterly Report on Form 10-Q, [end of quarter date].

257.    Certifications pursuant to SOX are not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices, and any interpretation restricting the statute's scope to these purposes would be artificially narrow and inconsistent with the remedial purpose of the statute. The SEC interprets the fair presentation of companies' financial results to include any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition. Here, the inference of Hobart's and Gupta's scienter is enhanced by the SOX-mandated certifications they signed, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about DSG was made known to them and that the Company's disclosure related controls were operating effectively.

### D.    Suspicious Insider Stock Sales Provide Strong Indicia of Scienter

258.    Defendants' scienter is further evidenced by their insider sales of DSG stock during the Class Period, which were suspicious in both timing and amount, permitting the Individual Defendants to accumulate more than *$47 million* total in ill-gotten gains before the alleged fraud was disclosed.

1.      **Stack's Class Period Insider Stock Sales**

259.    During the comparison period preceding the Class Period, Stack sold ***zero*** shares of DSG common stock.[10]  During the Class Period, Stack sold 159,461 DSG shares for proceeds of ***$23,023,636*** on a ***single day*** – which accounted for 6.4% of Stack's massive holdings of DSG common stock during the Class Period.[11]  Prior to this Class Period insider sale, Stack had not sold any DSG stock since January 2021.  Thus, Stack's Class Period sale of DSG common stock was patently out of line with his prior trading history.

260.    Stack's sale of DSG stock was also suspicious.  First, Stack's sale was ***executed outside of a Rule 10b5-1 trading plan***.  Second, as depicted in the graphic below, Stack's Class Period sale was made on March 13, 2023, when the price of DSG stock traded near its Class Period high due to inflation caused by Defendants' misleading statements alleged herein.[12]  Critically, Stack executed his sale just days after Defendants issued misleading statements on March 7, 2023, just weeks before the first partial disclosure of the fraud alleged herein on May 19, 2023, and shortly before the Class Period-ending disclosure on August 22, 2023, when the artificial inflation created by Defendants' fraud dissipated from the price of DSG common stock:

---

[10]    The "comparison period" is August 24, 2021 through August 22, 2022, which is the 12-month period preceding the 12-month Class Period.

[11]    Stack's holdings of DSG Class B shares are excluded from this percentage analysis.  Stack had an incentive to maintain his holdings of DSG Class B shares in order to maintain his voting power.

[12]    Stack sold DSG shares at $144.19 per share and $145.05 per share on March 13, 2023.  During the Class Period, the price of DSG common stock traded at a low of $99.03 per share and a high of $149.73 per share.



261.    Conspicuously, Stack did not sell any shares of DSG common stock after the first partial corrective disclosure, when artificial inflation began to exit DSG's stock price.

### 2.    Hobart's Class Period Insider Stock Sales

262.    During the comparison period preceding the Class Period, Hobart sold *zero* shares of DSG common stock.  During the Class Period, Hobart sold 147,462 DSG shares for proceeds of *$19,166,062*, which accounted for 26.6% of Hobart's outstanding shares during the Class Period.  Prior to this Class Period insider sale, Hobart had not sold any DSG stock since May 2021.  Thus, Hobart's Class Period sales of DSG common stock were patently out of line with her prior trading history.

263.    Hobart's sales of DSG stock were also suspicious.  First, like Stack, Hobart's sales were *executed outside of a Rule 10b5-1 trading plan*.  Second, as depicted in the graphic below, like Stack, Hobart's insider sales occurred when the price of DSG stock traded near Class Period highs due to inflation caused by Defendants' misleading statements alleged herein.  Hobart's first Class Period sale occurred in August 2022, while Defendants issued alleged misrepresentations and half-truths.  Like Stack, Hobart made her largest Class Period sale – $12.1 million, or 63% of her total Class Period sales – on March 13, 2023, just days after Defendants issued misleading

statements on March 7, 2023, and just weeks before the first partial disclosure of the fraud alleged herein on May 19, 2023:



264.    Like Stack, Hobart conspicuously did not sell any shares of DSG common stock after the first partial corrective disclosure, when artificial inflation began to exit DSG's stock price.

### 3.    Gupta's Class Period Insider Stock Sales

265.    During the comparison period preceding the Class Period, Gupta sold 14,314 shares of DSG common stock for proceeds of $1,539,538, which accounted for 10.8% of Gupta's outstanding shares during that period.  During the Class Period, Gupta sold 35,524 DSG shares for proceeds of $4,876,944, which accounted for 24% of Gupta's outstanding shares during the Class Period.  In other words, Gupta reaped ***320% more*** in proceeds from the sale of DSG stock during the Class Period than he did in the comparison period preceding the Class Period.

266.    Gupta's sales of DSG stock were also suspicious.  First, like Stack and Hobart, Gupta's sales were ***executed outside of a Rule 10b5-1 trading plan***.  Second, as depicted in the graphic below, like Stack and Hobart, Gupta's insider sales occurred when the price of DSG stock traded near Class Period highs due to inflation caused by Defendants' misleading statements alleged herein.  Gupta's Class Period sales occurred in March and June 2023, while Defendants

- 108 -

issued the alleged misrepresentations and half-truths. Gupta's June 2023 sales were particularly suspicious because they **coincided** with Defendants' margin-compressing "decisive actions on excess products, particularly in the outdoor category." *See supra* §VII.B. And, like Stack and Hobart, Gupta made his largest Class Period sale – $2.65 million, more than half of his total Class Period sales – in March 2023, just two weeks after Defendants issued misleading statements and a few weeks before the first partial disclosure of the fraud alleged herein on May 19, 2023:



## VIII. LOSS CAUSATION

267.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. Plaintiffs' claims for securities fraud are asserted under the fraud-on-the-market theory of reliance. The markets for DSG's common stock were open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made misleading statements and omissions regarding inventory, shrink, and key financial metrics. Defendants' conduct artificially inflated the price of DSG common stock and operated as a fraud or deceit on the Class.

268.    The Class Period inflation in DSG's stock price was removed when information concealed by Defendants' misleading statements and omissions was revealed to the market. The

information was disseminated through partial disclosures that revealed the nature and effect of Defendants' alleged conduct. These disclosures, as more particularly described below, removed artificial inflation from DSG common stock, causing economic injury to Plaintiffs and other members of the Class.

269. Each partial disclosure did not on its own fully remove the inflation from DSG's stock price, because it only partially revealed the nature and extent of the fallout caused by Defendants' misrepresentations and omissions. Defendants' continued misrepresentations and omissions maintained the price of DSG common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in DSG even after Defendants' partial disclosure.

270. The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below. These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors. The following stock price declines and descriptions thereof are not necessarily comprehensive since fact and expert discovery are not complete.

271. A partial disclosure entered the market on May 19, 2023, when TD Cowen issued an analyst report lowering its sales and earnings per share estimates for DSG for both 1Q23 and FY23. The TD Cowen report stated, in relevant part: "We are lowering estimates for comps and EPS for . . . Dick's. . . . Debates on [the] stock[] remain firmly centered on durability of margin expansion since 2019. Positioning/Sentiment in our view already suggests investor caution on Q1." The report continued: "We're cautious on DKS going into the Q1 print . . . . We expect Q1 gross margin down -100bps, as lower merchandise margins are partially offset by freight tailwinds." As a result of this partial disclosure, the price of DSG stock declined 6.8% on volume of more than 3.9 million shares to close at $126.67 per share on May 19, 2023. In contrast to the

sharp decline in DSG common stock, the S&P 500 Specialty Retail Industry Index decreased only 1%.[13]

272.    On August 22, 2023, DSG issued a press release announcing financial results for 2Q23, the period ended July 29, 2023, and discussed the results on an accompanying earnings call on the same day.  In the press release, DSG revealed that profitability for 2Q23 was significantly lower than previously represented.  Specifically, the Company's net income was $244 million (compared to the analyst consensus estimate of $338 million), earnings per share were $2.82 (compared to the analyst consensus estimate of $3.81 per share), and gross margin was 34.4% (compared to the analyst consensus estimate of 36.3%).  Hobart was quoted in the press release stating: "'[O]ur Q2 profitability was short of our expectations due in large part to the impact of elevated inventory shrink [*i.e.*, theft], an increasingly serious issue impacting many retailers.'"  On the earnings call, Hobart explained that, "beyond shrink, we also took decisive action on excess products, particularly in the outdoor category, to allow us to bring in new receipts and ensure our inventory remains vibrant and well positioned."  Gupta added that the profitability "decline was driven by lower merchandise margin of 254 basis points.  As Lauren [Hobart] discussed, we took decisive actions on excess product, particularly in the outdoor category to keep our inventory well positioned."  Gupta revealed that "shrink" represented "[a third] of our merchandise margin decline," with the remainder attributed to promotional sales of excess inventory.  In response to a request for clarification from an analyst, Gupta confirmed that "[t]he largest driver of the decline . . . was around the fact that we continue to be decisive in keeping our inventory clean.  Outdoor was a perfect example of that."

---

[13]    For purposes of comparing its stock price performance vis-à-vis its peers and relevant market, DSG referred investors to the S&P 500 Specialty Retail Industry Index.

273.    Also on August 22, 2023, DSG issued lowered guidance for EPS and margins for FY23.  Specifically, Defendants issued new guidance for EPS of $11.50 to $12.30, compared to previous guidance of $12.90 to $13.80 (an 11% decrease from the midpoint), and new guidance for EBT margin of 10.2%, down from previous guidance of 11.6% (a 12% decrease).  Hobart commented that DSG expected elevated levels of shrink to continue, and to be "meaningful" to "go-forward expectations for the balance of the year."  Gupta added that the new guidance "now includes an expectation of higher [shrink], which will reduce our full year gross margins by approximately 50 basis points compared to 2022."  Gupta commented further on the Company's reduced guidance going forward, explaining that DSG would likely need to resort to additional promotions in the future:

> And the second driver was the decisive action that we took to keep our inventory claims, the example you gave of the outdoor.  And we have assumed some of this moderation – some of this activity in the back half expectation as well to continue to keep our inventory fresh and well positioned.

Another analyst asked for additional clarification on the reduced guidance, noting: "I think it's 140 basis points.  50 of that is because of the higher shrink.  What's the rest of it?"  Gupta responded: "[W]e moderated our merchandise margin expectations in the back half, in line with the actions that we discussed here in Q2.  We are just wanting to make sure that we are keeping our inventory fresh and vibrant."

274.    As a result of these disclosures, the price of DSG stock declined more than 24% on volume of more than 19 million shares to close at $111.53 per share on August 22, 2023.  In contrast to the sharp decline in DSG common stock during this period, the S&P 500 Specialty Retail Index was essentially flat during this period.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

275.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- DSG common stock traded in an efficient market;

- shares of DSG common stock are liquid and were heavily traded during the Class Period;

- DSG common stock was traded on the NYSE and was covered by multiple analysts throughout the Class Period; and

- Plaintiffs and members of the Class purchased, acquired, and/or sold DSG common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

276.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

277.    Plaintiff and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.    CLASS ACTION ALLEGATIONS

278.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired DSG common stock during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants, officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

279.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DSG common stock was actively traded on the

NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DSG or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

280.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

281.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

282.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, prospects, and/or management of the Company;

- whether statements made by Defendants to the investing public during the Class Period omitted material facts necessary to make the statements made neither false nor misleading;

- whether Defendants acted knowingly or with reckless disregard for the truth;

- whether the prices of DSG common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

283.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CAUSES OF ACTION

### COUNT I
### For Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

284.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

285.    This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

286.    Pursuant to the above wrongful course of conduct, DSG, Stack, Hobart, and Gupta participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other documents described above, such as statements made to securities analysts and the media that were designed to influence the market for DSG common stock.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DSG's finances and business prospects.

287.    By virtue of their ownership of and/or positions at DSG, Stack, Hobart, and Gupta had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Stack, Hobart, and Gupta acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading

4895-9028-0940.v3

nature of the statements made, although such facts were readily available to Stack, Hobart, and Gupta. Said acts and omissions were committed willfully or with reckless disregard for the truth.

288. Information showing that Stack, Hobart, and Gupta acted knowingly or with reckless disregard for the truth is peculiarly within Stack's, Hobart's, and Gupta's knowledge and control. As executive officers of DSG, Stack, Hobart, and Gupta had knowledge of the details of DSG's internal affairs.

289. DSG, Stack, Hobart, and Gupta are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, Stack, Hobart, and Gupta were able to and did, directly or indirectly, control the content of the statements of DSG. As officers of a publicly held company, Stack, Hobart, and Gupta had a duty to disseminate timely, accurate, and truthful information with respect to DSG's business, operations, future financial condition, and future prospects. As a result of DSG's, Stack's, Hobart's, and Gupta's misconduct, the market price of DSG common stock was artificially inflated throughout the Class Period. Unaware of the adverse facts concerning DSG's business and financial condition which were concealed by DSG, Stack, Hobart, and Gupta, Plaintiffs and other members of the Class purchased or otherwise acquired DSG common stock at artificially inflated prices and in doing so relied upon the price of the common stock, the integrity of the market for the common stock, and/or upon statements disseminated by DSG, Stack, Hobart, and Gupta, and were damaged thereby.

290. During the Class Period, DSG common stock traded in an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which DSG, Stack, Hobart, and Gupta made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired DSG common stock at prices artificially inflated by DSG's, Stack's, Hobart's, and Gupta's wrongful conduct. Had Plaintiffs and the other members of the Class known the truth,

- 116 -

they would not have purchased or otherwise acquired said DSG common stock, or would not have purchased or otherwise acquired them at the inflated prices paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of DSG common stock was substantially lower than the prices paid by members of the Class.  The market price of DSG common stock declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and other Class members.

291.    By reason of the conduct alleged herein, DSG, Stack, Hobart, and Gupta, knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

292.    As a direct and proximate result of DSG's, Stack's, Hobart's, and Gupta's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and/or sales of DSG common stock during the Class Period, as the truth about DSG's operations and prospects began to be disclosed to the investing public.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

293.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

294.    During the Class Period, the Individual Defendants participated in and oversaw the operation and management of DSG, and conducted and participated, directly and indirectly, in the conduct of DSG's business affairs.  The Individual Defendants exercised control over DSG's operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

295.    The Individual Defendants acted as controlling persons of DSG within the meaning of §20(a) of the Exchange Act.  By virtue of their senior management positions as officers and/or directors of DSG, their participation in and awareness of the Company's operations, and their personal knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, DSG's decision-making, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

296.    In particular, as DSG's Executive Chairman (Stack), CEO (Hobart), and CFO (Gupta), each of the Individual Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular business and/or operating practices and expenditures and deficient control environment giving rise to the securities violations alleged in Count I, and exercised that power.

297.    DSG had the power to control and influence the Individual Defendants and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, DSG had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants including the content of their public statements.

298.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisitions of DSG common stock during the Class Period when the relevant truth was revealed.

299.    By reason of the foregoing, Defendants violated §20(a) of the Exchange Act.

4895-9028-0940.v3

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that this action is a proper class action, certifying Lead Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiffs' counsel as Class Counsel;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XIII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  October 15, 2024             SAXTON & STUMP
                                     LAWRENCE F. STENGEL (P.A. Bar # 32809)


                                             s/ LAWRENCE F. STENGEL
                                     _____
                                         LAWRENCE F. STENGEL

                                     280 Granite Run Drive, Suite 300
                                     Lancaster, PA  17601
                                     Telephone:  717/556-1000
                                     717/441-3810 (fax)
                                     lfs@saxtonstump.com

                                     Liaison Counsel for Western Pennsylvania
                                     Teamsters

4895-9028-0940.v3

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARRYL J. ALVARADO (admitted *pro hac vice*)
T. ALEX B. FOLKERTH (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dalvarado@rgrdlaw.com
afolkerth@rgrdlaw.com

Counsel for Western Pennsylvania Teamsters and
Lead Counsel for the Class

POMERANTZ LLP
JEREMY A. LIEBERMAN
EMMA GILMORE
VILLI SHTEYN
600 Third Avenue, 20th Floor
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

Counsel for Rhode Island and Lead Counsel for the
Class

LAW OFFICE OF ALFRED G. YATES, JR., P.C.
ALFRED G. YATES, JR. (PA17419)
GERALD L. RUTLEDGE (PA62027)
1575 McFarland Road, Suite 305
Pittsburgh., PA  15216
Telephone:  412/391-5164
412/471-1033 (fax)
yateslaw@aol.com

Liaison Counsel for Rhode Island

4895-9028-0940.v3