IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PLUMBERS AND PIPEFITTERS
LOCAL UNION NO. 719 PENSION
TRUST FUND, on Behalf of          Civil Action No. 24-cv-196
Itself and All Others
Similarly Situated,

                Plaintiff,

    vs.

DICKS SPORTING GOODS, INC.,
et al.,

                Defendants.

                        - - -

Transcript of Oral Argument on July 8, 2025, in the
United States District Court, Pittsburgh, Pennsylvania,
before Judge Kezia O. L. Taylor, Magistrate Judge.

 APPEARANCES:

For the Plaintiff:        Jeremy A. Lieberman, Esquire
                          Alfred G. Yates, Jr., Esquire
                          Timothy Alex Folkerth, Esquire

For the Defendants:       Lauren M. Kofke, Esquire
                          Margaret C. Gleason, Esquire
                          Alison Blythe Brockman, Esquire
                          Deborah Anna Sparks, Esquire

Court Reporter:           Sharon Siatkowski, RDR, CRR, CRC, CRI
                          700 Grant Street, Suite 6260
                          Pittsburgh, Pennsylvania 15219

        Proceedings recorded by mechanical stenography;
 transcript produced by computer-aided transcription.

2

P R O C E E D I N G S

(10:03 a.m.)

THE COURT:  Good morning.  Please be seated.  It's funny, I see a familiar face from Pepper Hamilton days, I see a familiar face from the U.S. attorneys days, and a former intern.  So many people.

So here's a pop quiz:  What is DICK's Sporting Goods trading at today?

(No response.)

THE COURT:  Oh, tsk, tsk, no one?

MS. KOFKE:  I think it's over 200 --

THE COURT:  It is over 200.

MS. KOFKE:  -- if I had to hazard a guess.

THE COURT:  Yes, it is over 200.  It's 206.90, I believe, something of that nature.

Let me get signed in and we'll get underway with this academic exercise.

So without further delay, today we are scheduled for an oral argument on the Motion to Dismiss the plaintiffs' amended complaint in the matter of Plumbers and Pipefitters Local Union Number 719 Pension Trust Fund vs. DICK's Sporting Goods at Civil Docket Number 24-cv-196.

So the counsel who will be speaking on behalf of the plaintiff, please identify yourself for the record.

MR. LIEBERMAN:  Good morning, Your Honor.  Jeremy

3

Lieberman, Pomerantz LLP.

THE COURT: Okay. You're at the back counsel table, fine. I appreciate you're not the movant.

And then counsel on behalf -- oh, you have other counsel you'd like to identify?

MR. LIEBERMAN: I do, Your Honor. They'll introduce themselves.

MR. YATES: Al Yates, from Pittsburgh, Your Honor.

THE COURT: Provide me with your name again.

MR. YATES: Alfred Yates.

THE COURT: Okay.

MR. FOLKERTH: Timothy Alex Folkerth, from Robbins Geller, Your Honor.

THE COURT: Got it. Thank you.

And then, lead counsel who intends to represent the defendants?

MS. KOFKE: Good morning. Lauren Kofke, from Wachtell, Lipton, Rosen and Katz. And I have other counsel with me as well. I have Meg Gleason from Jones Day. I also have my colleagues from Wachtell: Alison Brockton and Deb Sparks. And we also have in-house counsel from DICK's Sporting Goods in the courthouse as well, that's Baron and Matt Irvin.

THE COURT: Okay. Wonderful. So the Court understands from the briefing what the issues are, right? The

plaintiffs believe that the defendants misled investors regarding its inventory, as well as the shrink issue, and that during that Class Period the misrepresentation, omission, or what have you resulted in economic harm to the investors.

Defendants, of course, take a different position. They say, we essentially -- and I'm summarizing, I'm giving you the AI version, okay?  I have your copious briefing.  But the defendants essentially say, you know, we made responsible business judgments on the basis of the data that we had, and we made forecasts, projections, and when it became clear that the data suggested otherwise, we informed the investors.

That's the sum and substance of the arguments.  And I provide that because what I'm looking from you today is not to rehash or to provide the exact same information you've already provided and the detail that you've already provided.  I'm kind of looking to you to give me your kind of five-minute, ten-minute elevator pitch about what do I need to know in order to rule in your client's favor.

And so, if you need -- honestly, if you need two minutes, a brief moment, even while I'm on the bench, to think critically about what it is that I need to know that turns the tide in your client's favor, that's what I would like to know. I do have some questions, but it's all possible that you may answer the questions before I get to them.  But I wanted to be fair to allow you to have the floor to tell me what I need to

know before I pepper you -- and perhaps maybe it won't be a peppering -- with questions regarding your briefing.

And the reason why I have these questions, and I don't want you to draw any conclusions about how I'm leaning with the questions that I ask, I'm just looking to have the benefit of your answer so that when I go back and take a more critical look at your briefing, I will, again, just have the benefit of your answers.

And so with that said, again, I can give you a couple of minutes if you want to think about it. I would imagine you probably do have an elevator pitch. But in the event you want to take a moment, and of course, this is -- the defendant will lead because the defendant is -- the defendants, excuse me, are the movant here. So that is counsel -- you don't have to remind me -- Lieberman. Oh, I apologize. I said -- no. Sorry. I may need to be reminded. Oh, Kofke.

MS. KOFKE: Kofke.

THE COURT: I apologize. Would you like a couple of moments to just -- no?

MS. KOFKE: No, I think we're good. We've got the elevator pitch.

So actually, we have some slides in aid of argument. Could I hand those up? And, of course, we'll give them to the other side. I'm not going through them all. I heard what you said, but they might be useful.

THE COURT:  You can see I'm a tad bit hesitant.  But I'm sure someone at your firm did a wonderful job in putting together this PowerPoint presentation.

MS. KOFKE:  Here you go.

THE COURT:  Thank you.

MS. KOFKE:  Okay.  May it please the Court.  There's a lot to cover here.  I'm going to try to do it efficiently and as Your Honor instructed.

So I'll start with the statements about inventory health and demand, which is the first category of statements that the plaintiffs challenge.  There's three categories of statements:  there's inventory health and demand, risk factors, and retail shrink.  So I'll start with the statements regarding inventory health and demand.

THE COURT REPORTER:  I'm sorry, but would you please speak a little slower?

THE COURT:  Let me first say, I apologize if my direction to have a five-minute elevator pitch caused you to speak faster than the court reporter can take down --

MS. KOFKE:  I was trying to be efficient.

THE COURT:  So let's all take into consideration that this is being transcribed.  So with that said, please proceed.

MS. KOFKE:  Gotcha.  So with respect to the statements about inventory health and demand, there's three reasons that they're inactionable.  One, they're inactionable

opinions; two, they're inactionable forward-looking statements; and three, they're immaterial statements of general optimism.

So starting with opinions. The Supreme Court laid out the factors that are used to evaluate whether an opinion is actionable, and here, these opinions are not actionable under any of those three standards. And actually, I'll just take a step back and say that it's our view that there's really no question that the statements here about inventory health and demand were opinions because they did involve subjective business judgments that rely on a lot of different factors. That's clear from plaintiffs' own alleged definitions of terms, like, inventory health and excess inventory.

The key issue for all of those terms is, can DICK's sell its inventory over time at satisfactory prices without having a material impact on the company's overall profitability? And the inputs into that kind of an assessment are: What are the products in inventory? What is demand going to look like? How long can I hold these products before they go obsolete, lose value? What are competitive conditions and pricing going to look like whenever these products are sold?

So it's our view that, under the case law, it's very clear that those kinds of judgments are opinions, which means

in order for them to be actionable, they have to meet one of the three prongs under the Supreme Court's *Omnicare* case.

So if you look at the first prong, it's do the defendants sincerely believe in the opinions?  And we think that the plaintiffs have not pled particularized facts showing that the defendants did not sincerely believe that inventory was healthy and well-positioned at the time they made these statements.

And the issue really is that even crediting the plaintiffs' allegations, even if you credit that DICK's had a significant volume of inventory, even if you credit that demand had slowed down, that doesn't mean that the inventory was not healthy.  In order to make that assessment, as I just mentioned, you need to know what was the expectation for demand, what was the expectation for pricing, and competition?

And the critical problem with plaintiffs' allegations, and really the reason why they have failed to plead particularized facts raising an inference that the defendants did not sincerely believe their opinions, is that they allege nothing.  There is absolutely nothing in the complaint that goes to what did the defendants expect with respect to any of those factors that are key inputs, according to their own definitions, into an assessment of inventory health.

And actually, if you look at the record, it shows

that while the defendants recognized that demand had slowed for outdoor and fitness products, and they disclosed that, they were also optimistic about that category in growth for the future. So, for example, as plaintiffs allege, they purchased an outdoor retailer called Moosejaw in March of 2023, which would make absolutely no economic sense if they weren't confident in the outdoor category.

Also, they disclosed that demand had declined but in those same statements, they also expressed optimism about future growth in the category because they believed that consumers had made lasting lifestyle changes during the pandemic to focus more on health and fitness. So they were actually optimistic in the long run about this category.

They also specifically disclosed to investors that they had a lot of outdoor and fitness inventory. They told investors that multiple times at the beginning of the Class Period and even before the Class Period.

THE COURT: Let's be clear: Just to make a distinction, you're saying that defendants provided investors that the outdoor products, they had an excessive amount of inventory in outdoor and it wasn't -- they weren't speaking about apparel --

MS. KOFKE: That's correct.

THE COURT: -- exclusively?

MS. KOFKE: That's correct, Your Honor. Maybe the

slides will come in handy here, because we've actually excerpted some of those statements.  Let me just flip to the right slide.

If you look at slide 9.  Oh, actually no, sorry, slide 10.  So you can see here, for example, in the middle box, at the very beginning of the Class Period, Ms. Hobart explained that:  "With respect to some of our hardline categories, say, fitness and outdoor equipment, we have a lot of inventory there that we just -- we're buying around for next year.  So no issues with flow there."

You can see in Mr. Gupta's statement on the right, he explains that:  "The good thing is those products don't go obsolete, that you can always buy around them."

THE COURT:  Well, let me ask you this question.  Sticking with where it says the second quarter of 2022, Ms. Hobart's statement, when she states, "We have a lot of inventory there," so one -- I guess it is referencing back to fitness and outdoor equipment.  But it says, "So no issues with flow there."  Wouldn't that otherwise instill confidence in the hearer of that statement, that there's no issue there?  You know, the internal data suggests that there's no issue there.  Not that it's an opinion, but that it's based upon facts.

MS. KOFKE:  I don't think so, Your Honor.

THE COURT:  Okay.

MS. KOFKE:  I think two things.  I think when you talk about flow, and even if you look at plaintiffs' definitions, what you're talking about is, can these products be sold in the future, not at discounted prices to such an extent that it affects profitability.  So that's an assessment as to whether those products will be able to flow at satisfactory prices.

And two, I think it's very clear from her statement here, she's really talking about flow over a year-long time frame.  Because you may recall, Your Honor, from the briefing that, as plaintiffs allege, this is a seasonal -- outdoor and fitness is a seasonal business.  So this is right after the peak season in August of 2022.  Most of the Class Period is the off-season.  And then there's the next peak season in summer of 2023, and this statement needs to be interpreted in that context.  So when she's saying there's no issues with flow here, she's saying we think we can buy around this inventory, we can hold onto it, we can sell it over time, take our time, and it's not going to impact the company's profitability.

And Mr. Gupta provides more detail around that with the reason why that makes sense for this kind of inventory is because it's not, like, you know, apparel or, you know, technological devices like iPhones, it's not the kind of thing that goes obsolete very quickly.  Kayaks, boat paddles, weight

sets are the kind of goods you can hang onto for a long time, take your time, sell them over time.

And so that's really -- she's explaining that there is this issue with outdoor inventory, but this is the how they plan to manage it. And plaintiffs have not pled any facts indicating that they did not sincerely believe that this plan would work. As I pointed out, there's actually facts in the record that they've alleged that they indicate that they did believe it would work, and they're actually optimistic about this business in the long run.

And I would just point out two cases that are very instructive on this point, which we cite in our briefs. The first is the *Pier 1* case, where the court -- the plaintiffs in that case made very similar allegations, that there were statements about clean and healthy inventory, but in fact, there were inventory backlogs and a need for additional storage. And what the court ended up holding in that case is that, you know, just because there's knowledge of high inventory, that doesn't equate to knowledge of markdown risk. And the reason why is because, as we were just discussing, markdown risk in the health of inventory depends on more than just the amount of inventory you have. It depends on a lot of other factors. So just alleging that the defendants knew there was high inventory, in that case the court found that alone is not sufficient to raise a strong inference of

scienter.

And also the *Crocs* case, which we cite from the District of Colorado, similarly held that, you know, an inventory write-down, whether the defendants knew that inventory needed to be written down, that depends on expectations for demand. And because the plaintiffs in that case didn't plead anything about expectations for demand, there was no way to infer scienter. And that's exactly the problem here, that's sort of the big gaping hole in plaintiffs' allegations that prevents them from getting anywhere close to alleging with particularity that defendants did not sincerely believe their opinions or that they had scienter with respect to these statements.

One final thing. Just on the inventory in the stores, a lot of plaintiffs' allegations boiled down are that DICK's had a lot of inventory in the stores, they needed more storage space. It was sort of bursting at the seams, I think one of the confidential witnesses says, something along those lines. That does not mean that there was excess inventory. That's actually entirely consistent with plaintiffs' allegations that DICK's business actually dramatically expanded during this time period. So from 2019 to 2023, their reported revenues, they went up 50 percent, or $4 billion. So there's $4 billion more stuff moving through basically the same number of stores and distribution centers because the

stores and distribution centers stay the same.

So it's no surprise that the stores were bursting at the seams. That doesn't say anything about whether that inventory was excess, whether it would need to be discounted. In order to make that evaluation, you need to know what do you expect about demand, what do you expect about that key peak selling season. And they allege nothing, nothing about anytime -- nothing about the peak selling season.

So that's prong one of Omnicare, the sincere belief, and it overlaps very significantly with the scienter element as well.

Now, prong two, it has to do with express embedded untrue statements. They haven't actually identified any, like, express embedded inside the opinions, untrue statements. So prong two is not what their theory is.

Prong three, an opinion can be actionable if it omits facts that conflict with what a reasonable investor would take from the opinion. And there, this court in *Mylan* actually provided guidance about how to apply that factor whenever there's an opinion about business prospects and business strategy going forward. And what the court in *Mylan* said is that investors understand that whenever you have an opinion, it involves a weighing of competing factors. There's going to be things cutting the other way. Just because there's a problem that might undermine the opinion, that doesn't mean it

has to be disclosed.  It only needs to be disclosed if there's something that makes the achievement of that business objective impossible.  And here, plaintiffs haven't --

THE COURT:  How would you know if it makes it impossible?

MS. KOFKE:  Well, I think that's something that, you know, the Court would have to assess, if the plaintiffs have alleged some factor that makes it impossible for the business outlook to be achieved.  I mean, for example, in that case, the business outlook was about a pharmaceutical company, would it be able to manufacture a broad portfolio of products and thereby gain market share.  And the allegation was that that company had a lot of quality issues and regulatory issues in manufacturing that it didn't disclose.  And the Court said, well, okay, quality issues and manufacturing, that might make it harder to manufacture those products and gain market share, but plaintiffs haven't alleged enough to show that it was impossible to achieve that outcome.

THE COURT:  So I would imagine that the plaintiffs here -- and I don't actually have to imagine it because they as much wrote it -- they're saying here that it's the fact that there was this excess inventory, and I appreciate your analysis that it's not technically excess if there's a demand for it, which makes sense, right?  That's a reasonable explanation.  But if you will, the plaintiffs say, in fact,

perhaps there wasn't a reasonable demand for it, perhaps -- and we don't know that. And in fact, I guess because there is this Class Period, perhaps there wasn't in fact a reasonable demand for it because by August of 2023, the tune changed, if you will, you know, the CFO, the CEO, and et cetera kind of changed the tune and reported differently: Well, in fact, we aren't able to unload this inventory as we thought.

So I guess the question I'm asking is: How come in this particular scenario the plaintiffs haven't pled enough to suggest that perhaps it was impossible, perhaps these were in fact misstatements because the data, the internal data that was available to the defendants, suggested contrary to the statements they were making?

MS. KOFKE: Yes. Well, Your Honor, I think it's really important here to keep in mind the heightened pleading standards that this complaint is subject to.

So if plaintiffs have pled that it's possible that there was securities fraud here, that doesn't even pass Rule 8. That's not even enough for *Twombly*. *Twombly* requires reasonable and plausible. And here, we have an even higher standard. They need to plead particularized facts showing the falsity of the statements and particularized facts raising a strong inference of scienter that is more compelling than nonculpable explanations.

So here, I think what Your Honor was getting at is

that maybe there's enough there that perhaps, maybe it's possible. But they have not alleged particularized facts showing that demand fell to such an extent that at the time these statements were made, the defendants didn't sincerely believe their opinions or that it was certain that discounting would have to occur.

And I also would like to mention the concept of fraud-by-hindsight. The Third Circuit and courts consistently reject the idea that just because something bad happens at the end, just because a business's expectations are not met, that alone is not particularized -- that is not a particularized allegation that shows that it was certain to happen or that people knew that all along.

And that's part of what the PSLRA, actually, was passed to prevent: lawsuits that would just be brought anytime a company announced something disappointing, the stock would drop, a lawsuit might be filed. The PSLRA is designed to weed out those lawsuits by making that burden much higher. So perhaps, possible, that comes nowhere close to their pleading burden.

And actually, if you look at the record, they haven't pled that the individual defendants had access to, you know, any data showing that their opinions were impossible to achieve, and a big part of that is because they completely omit the part of the equation about expectations and the key

18

peak selling season that was a year away from many of these statements. It's just a black hole; there's nothing there. So it's just impossible to conclude, based on what they allege, that this was a case of securities fraud.

I'd also like to mention it's important to keep in mind in thinking about, you know, could the opinions be considered misleading, that the defendants disclosed a lot, and they disclosed a lot of risks related to these assessments.

So, you know, for example, as I mentioned, it's in the slide deck, they disclosed that demand had fallen throughout fitness products, they recognized that. But they also disclosed that it was still above pre-pandemic levels and they believed -- they were optimistic overall, but it was no secret, you know, that demand had fallen. It was no secret that they had a lot of outdoor and fitness inventory; we just saw that.

DICK's also specifically identified these statements as forward-looking statements. That's in its SEC filings. It says specifically: "Comments about inventory health, comments about inventory positioning, we're using those as forward-looking statements." So no reasonable investor could have understood them as anything other than forward-looking. And along with those forward-looking statements, DICK's -- they released and disclosed many, many risk factors as to why those

kinds of assessments might not ultimately be achieved.  So these opinions were offered in a context of many other disclosures that are just another reason why they are not actionable in this case.  And I actually --

THE COURT:  Well, tell me why no reasonable investor could have saw those statements as something other than forward-looking?

MS. KOFKE:  I think this case is a bit unique in the sense -- I mean, DICK's really did -- actually, let me -- we have a slide that has disclosures so you can see it.  If you turn to slide -- what is it that -- 15.  So in the left-hand column, this is excerpts from some of DICK's SEC filings.  And they would include a section called forward-looking statements, and it would list what the company considered to be forward-looking statements, and among those, they included "the belief that our inventory is healthy and well-positioned, the health and positioning of inventory."

So DICK's defined how it was using these terms for investors and investors would be aware of this and take this into account.  And in light of this, I don't think any reasonable investor could have thought that these weren't forward-looking statements.  These disclosures were made multiple times.  So, you know, if some other company or some other industry or if in some other situation someone could use some of these terms possibly, hypothetically, in a nonforward-

looking way, here DICK's explained to investors, we are using them in a forward-looking way.

And then on the right here, you have all the risk factors that they disclosed as to why, you know, these types of statements might not end up coming to pass.

But I would also say, it's not just that DICK's disclosed that they were forward-looking statements. I mean, if you look at plaintiffs' own alleged definitions of these terms, you know, as we talked about, what they really all turn on is, can the company sell this inventory over time at satisfactory prices such that there is not going to be an impact on profitability, and that's inherently a forward-looking assessment.

We think that the Third Circuit's case in *Aetna*, which we talk about in our briefs, is actually directly on point because in that case, the statement at issue had to do with an insurance company's disciplined pricing policy which meant setting health insurance premiums above the costs of medical costs. And what the Court said in that case is, you can't really tell the truth or falsity of those statements at the moment they're made. You need to look to the future. You need to see, well, what do the medical costs, what do they end up being so then you can compare the costs, the premiums, and you can see if they were setting prices above costs, you know, or not.

21

THE COURT:  Let me ask you this question:  This cautionary language that you refer to on page 15, when did an investor know that this was forward-looking statements?  At what point would an investor know this?

MS. KOFKE:  From the very beginning of the Class Period.  Actually, it's in very, very tiny font.  But we have underneath the boxes, the cites.  These cites are also in our brief, we cite these, and then we have exactly where it is.

So, for example, there is the first quarter of '23 10Q, and the 10K for 2022 for the health and well-positioned.  And then the bottom box, second quarter 2022, so that's the beginning of the Class Period.  That's August 2022.  Basically, throughout the Class Period, this identification, this forward-looking statement was made repeatedly in SEC filings.

Coming back to *Aetna*.  The concept here, the analogy would be hat you can't really tell if DICK's inventory is healthy or not until it's actually sold at some point in the future, maybe even in the peak season a year away.  Remember, some of these comments were made a year before the next peak selling season.  You won't really know until you see what are the prices that the inventory ultimately is sold at.  That's the only way to really tell if those assessments end up proving true or not because, especially if you have inventory

you can hold for a long time, just because you have a lot of it and just because there's, you know, low demand in the moment, that doesn't mean that you're not ultimately going to be able to hold onto that inventory, execute the plan, the defendants explained, of buying around for the following year.

And one other thing I'd like to mention about -- given the fact that these are forward-looking statements, it's actually important for the pleading standards because forward-looking statements require actual knowledge as scienter. Recklessness is not enough for a forward-looking statement to be actionable, which makes it harder for -- and since essentially all of these statements are forward-looking, except for, I think, maybe one, all of those statements in order to be actionable, the plaintiffs can't just plead recklessness. They have to plead actual knowledge that the defendants actually knew that these statements were false, that it was impossible for them to achieve their goal at the time that they made these statements.

THE COURT: So what's the one statement that you're, I guess, conceding that might not have been forward-looking?

MS. KOFKE: Yes. With our brief, we had an Appendix A that listed all statements, and there's -- we listed what applied to each one. And one of them doesn't say forward-looking. And actually, I can just grab -- I don't know if you have Appendix A handy?

THE COURT:  I do not.

MS. KOFKE:  Here we go.  I can tell you which one it is.  Right, it's number 17 in our chart of Appendix A.  It's not forward-looking.  And that's a statement about -- it's about margins.  It's comparing margins in DICK's, what's called its private brands versus brands from other companies.  And it's talking about the fact that margins in its private brands are higher than the margins in other companies' brands.  So it's talking about historical, that margins are higher in that one segment of the business.

It's not -- we're not arguing that's a forward-looking statement.  We are arguing it wasn't -- it's not actionable, though, because, you know, it wasn't misleading, for all of the reasons that I've already talked about, that all these allegations about inventory not being healthy and whatnot haven't been adequately pled.

Plus, there is the fact that this statement is really about the present and backward-looking, what are margins in our private brands versus margins in products that we sell from other brands.  And it's saying margins in our own brand of products are higher.  So, I mean, it has nothing to do with inventory.  It's just not -- it's also not actionable because it's -- the omission did not have anything to do with what that statement was about or make it misleading in any way.

But other than that one statement, all of the other

24

statements, we believe, are forward-looking, and therefore, would have the actual knowledge scienter requirement.

We also argue in our briefs that a lot of the statements are just too generalized and high-level to be actionable.  There are statements of corporate optimism, so things like, you know, inventory is in good shape, inventory is healthy, inventory's well-positioned, this is such a broad-based statement, it's not really talking about a specific business that, you know, we think that it's just too high-level for investors to have really relied on that as something that's material.

THE COURT:  What do you mean when you say it's not talking about a specific business?

MS. KOFKE:  So, as we argued in our briefs, and I think the plaintiffs don't dispute this, when DICK's would say that our inventory is healthy and well-positioned, they were talking about the company's overall nationwide inventory across all of its businesses.

THE COURT:  Sure.

MS. KOFKE:  So it's really a broad-based statement. And if you look at cases having to do with puffery or immaterial statements, when those statements are more specific and granular, that's whenever investors start to rely on them more.  When you have a more broad-based, general, optimistic statement, that's when investors are not going to look at that

25

statement and think, Oh, that's saying anything particular about the outdoor and fitness business.  They're going to take that as a general statement of optimistic outlook for the company.

For example, back to the *Aetna* case.  In that case the company said it had a disciplined pricing policy.  And the court said, Oh, that's just a high-level, you know, generalized statement that's too immaterial to be actionable.  And we think that many of these statements could fall in that category as well.

So the next type of statements that they challenge are the risk factors.  And we think there the Third Circuit's case in *Williams*, which is discussed in our briefs, is really just directly on point for how to interpret the risk factor in this case.  And in terms of identifying what are the risks that are actually warned of, and if you look at the language in *Williams* and you look at the language here, the risks that are warned of are a significant decline in DICK's overall sales or significant merchandise markdowns and lower margins coming from misjudging the market.  And we don't think there was a misjudgment of the market, for all of the reasons that I've already talked about, but importantly, none of those risks had actually materialized at the time that these risk factors were issued.

And so DICK's overall sales, they have not alleged a

significant decline in DICK's overall sales.  They allege that demand went down in outdoor and fitness products, which the defendants disclosed, but they don't allege DICK's overall sales suffered a significant decline, which is what the risk factor warns of.  They also don't allege that there were markdowns or lower margin until the end of the Class Period, when DICK's actually started marking down products, but that's after all of these statements were made.  So at the time that the risk factors were being issued, you know, none of those risks had actually materialized, according to the analysis under the *Williams* case.

And also, you know, it's important to note that the defendants did disclose repeatedly that demand had fallen for outdoor and fitness products.  So there's no way -- no investor could have looked at that risk factor and thought that it meant that demand had not declined at all from the pandemic highs for those products because that was said repeatedly by defendants.

The third category has to do with statements about inventory shrink due to retail theft.  And here, I think there's a bit of a side issue, which is Item 303, regulation SK.  So the plaintiffs spend a lot of time arguing that DICK's violated Item 303.  That is completely irrelevant to whether they've pled a Section 10(b) claim.  The Supreme Court in its *Macquarie* case made that crystal clear, that a violation of

Item 303 does not support a Section 10(b) claim unless it makes a statement misleading under Section 10(b). And the Third Circuit in the *Oran v. Stafford* case said exactly the same thing.

The plaintiffs here, there's no prior right of action under Item 303. They can't bring an Item 303 claim. Their claim is securities fraud under Section 10(b), so they need to meet the standards of Section 10(b) and the PSLRA, and they haven't. And the reason why is because defendants' statements, they didn't create any misleading impression. The defendants disclosed every quarter that retail shrink had increased. They disclosed that every single quarter during the Class Period. And that it was impacting merchandise margins. Actually, there was only one of two or three things that were impacting negatively merchandise margins. So defendants disclosed that over and over again. The plaintiffs now say, Well, they should have disclosed actually more detail than they disclosed and they should have disclosed what their prospective estimates of shrink were.

Now in terms of the more detail, Section 10(b) doesn't require more detail. Section 10(b), you know, it's very clear under the case law that it doesn't require the disclosure of every material fact. It only requires disclosure of facts that are necessary to make the statement not so incomplete that it misleads. The statement can't

create a misleading impression that's different from what is the reality.  These statements didn't create a misleading impression; they disclosed that shrink, due to retail theft, had increased and that it was impacting negatively merchandise margins.

THE COURT:  I'm sure you're going to get to the SEC letter.

MS. KOFKE:  Yes.  It's irrelevant.  It's completely irrelevant.  First of all, the SEC in that letter did not -- I mean, the letter is an exhibit, Your Honor can review it.  The SEC in that letter did not conclude that there was an Item 303 violation.  It certainly didn't conclude that there was a Section 10(b) violation.  And ultimately, Item 303, like I said, is totally irrelevant to whether plaintiffs have pled the elements of Section 10(b) and met the pleading standards under the PSLRA, which they haven't.

Now, DICK's responded to that SEC letter.  It explained why it did not believe it had an Item 303 violation.  The SEC never sent another letter.  But all of that can be completely disregarded.  It's really completely irrelevant to whether they have pled facts in this complaint showing securities fraud under Section 10(b), which they haven't.

Now, the plaintiffs in the complaint, there are some statistics that they allege show that the statements were misleading, and we've actually included them in the deck.  Let

me just find them.

On slide 22, so the plaintiffs -- so they calculated these statistics based on data that was released after the Class Period ended, and they say that this is what the levels of shrink during the Class Period were, and what impact it was having, and that this shows that the statements were misleading.

And actually, if you look at this, it doesn't show that at all because, you know, what it shows is that the impact of shrink on merchandise margins was between 8 percent and 26 percent until the very end of the Class Period, when it jumped up, when there was a big increase in shrink, right before it was -- which was disclosed.

But prior to that, it's completely consistent with defendants' statements, which is that shrink is one of a small number of factors that are impacting merchandise margins. This doesn't make those statements misleading.  They point to the one quarter, the first quarter of 2023, where it had an outlier, kind of an outlier impact on gross margins, you can see there.  But if you look at that quarter, shrink that quarter actually declined very significantly by 60 percent from the prior quarter.  It was only $7.5 million.  It was less than 20 percent of merchandise margins.

So the only reasonable inference from this is that it's not that shrink got worse that quarter; it's that the

30

other factors that affect gross margin, which there's a lot that push up it, push it down, other costs, other negative factors, had less of an impact.  So this quarter is not showing that shrink somehow jumped up or dramatically increased.  It's showing that it was pretty consistent, but other business factors were affecting gross margin.

So there's nothing here in these statistics that is inconsistent with what DICK's disclosed or made those statements in any way misleading.

In terms of the prospective impact, they're saying that DICK's should have disclosed projections of what the impact of retail theft would be in the future.  But they don't allege that DICK's ever created those kinds of prospective estimates.  And they don't allege anything about even if they were created, what did they say.  So it's absolutely impossible to conclude that it was a misleading omission when we don't -- they haven't particularly alleged that that information existed.  They haven't particularly alleged what it said.  So there's absolutely no way to conclude that that was some kind of a misleading omission.

So next, I'll move on from the falsity element to the scienter element.  And there, the plaintiffs, they focus significantly on motive and they focus on the defendants' stock sales.  And we actually have some slides on that where we've tried to distill the key points.

So if you start, for example, on slide 23, a really, really key point here is that, as a group, the individual defendants retained over 98 percent of their stock holdings. And they retained over 99 percent, if you include vested options. And this alone refutes any inference of motive here. I'd point the Court, for example, to the *Party City* case where the Court found that even though one of the defendants had sold 100 percent of its shares, the other had only sold 5 percent, and because they, together, had only sold 8 percent, that undermined an inference of scienter. Here, we have a group of defendants that retained -- I mean, they retained 99 percent and 98 percent, you know, of their holdings.

And the next few slides just go through the individual defendants, you know, one by one. So if you look at slide 24, Mr. Stack's transactions, he retained over 99 percent of his stock. He actually increased his holdings if you count vested options. And his only challenged sales on March 13th were options that were about to expire. So there's absolutely nothing here that indicates that Mr. Stack's sales were suspicious. And that's very significant because he had, by far, the largest holdings of stock. So if there was a conspiracy here to inflate the price of DICK's stock, you'd expect to see suspicious sales by Mr. Stack and you don't see that at all.

It's a similar story with the other defendants. I don't want to belabor the point. You know, it's here and it's in our briefs. Ms. Hobart, she retained over 85 percent of her holdings. All her sales were far in advance of the corrective disclosure. They were consistent with her sales in prior years. If you look at Mr. Gupta, again, he increased his holdings by 3.4 percent just looking at stock, retained 84 percent looking at vested objections. If you compare his sales in the plaintiffs' comparison period, they have a period 12 months before the Class Period and then the Class Period, he sold the same number of shares in a comparison period and the Class Period if you count the sales consistently.

And I don't know if you recall from our briefs but there was a bit of back-and-forth about what sales should be counted for Mr. Gupta. The plaintiffs acknowledged that they had actually left out some sales from the comparison period. He put those back in. He sold essentially the same amount in both periods. So by their own methodology, those sales were not suspicious.

So we think they haven't pled motive, and that's very significant because it means that the other allegations of scienter have to be correspondingly greater. There's even a bit of a higher standard for them to plead scienter since they haven't alleged motive.

So in terms of their other allegations, we

don't believe that -- you know, if you look at their confidential witness allegations, if you look at their other allegations for scienter, we don't think that they show actual knowledge as they're required to do.

So if you look at what they've alleged, the confidential witnesses, it's really four things. One, there was a lot of outdoor and fitness inventory and DICK's needed more space. Two, the individual defendants, they received weekly emails, Score Card Report emails, that had metrics like sales and markdowns. There was slowing demand for outdoor and fitness. And certain of the confidential witnesses expressed opinions to plaintiffs' counsel, of course now with hindsight, that DICK's had excess inventory or had overbought inventory. But none of those allegations show or raise any strong inference of scienter, primarily for the reason we already discussed, which is that none of those allegations go to defendants' expectations for the future. So it's impossible to assess that they didn't believe their opinions, that they didn't think their plan to buy around the inventory for the next year was one that could succeed.

And actually all of the allegations are consistent with what the defendants disclosed: That demand had declined from pandemic highs but was still above pre-pandemic levels and that DICK's had a lot of outdoor and fitness inventory and it had a plan, a going-forward plan, to manage that. And the

very fact that the defendants actually made those disclosures undercuts an inference that they were trying to deceive investors, because they were actually providing investors with information.

So just a moment on the confidential witnesses. So none of the allegations of the confidential witnesses cure those fundamental deficiencies with plaintiffs' complaint. So none of them, for example, interacted directly with the individual defendants during the Class Period. So none of the confidential witnesses can actually speak to what were the defendants' views, what were they thinking? And certainly, none of the confidential witnesses have any allegations that any individual defendants ever said or did anything that indicated they didn't believe in their opinions and their plan. There's no allegation whatsoever of that in the complaint.

There's some allegations from the confidential witnesses that the defendants had access to different reports or received that Score Card Report, as I mentioned. But actually, other than that Score Card Report, there's no allegation that the defendants actually accessed any information. But even more importantly, there aren't any allegations showing that the information contradicted the defendants' opinions because, at most, in that Score Card Report, all the plaintiffs allege in it was sales and, you

know, markdowns and historical-looking information.  None of it had to do with expectations.  There was no actual analysis of inventory health.  They don't allege that it had anything about, you know, future profitability in those reports.  And so there's nothing there to indicate, from what they allege, that the plaintiffs actually -- that the defendants actually received any data contradicting their opinions.

Now, some of the confidential witnesses express contrary personal views about inventory health.  They say that DICK's had excess inventory, it was overbought.  But if you look at the allegations, there's no basis to conclude that those confidential witnesses had access to the necessary information, company-wide information, and information about the future, to make those kinds of assessments.  They're just not there to substantiate that they can make reliable assessments on those subjects or that they had the business expertise to make those kinds of judgments.

So the bottom line is that these allegations are far too conclusory.  And most importantly, they don't show that the individual defendants actually learned any information that showed that their opinions were impossible to achieve, or false or misleading at the time they were made.

THE COURT:  Okay.  Counsel, you've been speaking for about 40 minutes.

MS. KOFKE:  Oh, gosh.

THE COURT:  Time flies when you're having fun.  Do you have a bottom line or a summation that you'd like to present to the Court as it relates to your clients' position that plaintiffs' complaint doesn't meet the pleadings standard or the PSLRA and should be dismissed?

MS. KOFKE:  Yes, I do.  I would say that, as the Supreme Court instructed in *Tellabs*, what the Court needs to undertake is a comparative evaluation of everything in front of it:  The allegations, you know, the record, documents of which it can take judicial notice, all of that.  And it needs to consider the nonculpable explanations for the defendants' conduct, that's part of it.  It's different than a normal Motion to Dismiss.

The Court has to consider inferences in the defendants' favor, as well as the inferences that favor the plaintiffs, and decide if the plaintiffs have alleged a compelling inference of scienter.  And we submit that here they have not.  The more compelling inference on these facts is that the defendants, we're talking post-COVID, truly unprecedented circumstances, they're trying to predict and navigate business, prospects in that environment, and they sincerely believed that consumers had changed their behaviors, they were focusing more on fitness and health.  They believed that although demand had declined in that segment, it was going to remain above pre-pandemic levels and have growth in

the future.  And they underscored that confidence by buying Moosejaw, as well as --

THE COURT:  I have Moose Lodge.  Did I misread it?

MS. KOFKE:  Moosejaw.

THE COURT:  My apologies.

MS. KOFKE:  Yeah, yeah.  And so, if you look at the big picture here, the more -- really, the only compelling inference is that these were sincere expectations; they happen to not be met and the stock price happened to fall.  But the plaintiffs hasn't alleged particularized facts showing that, you know, this was securities fraud.

And actually, businesspeople have to make these kinds of assessments every single day and sometimes those sincere expectations are not met.  That's not securities fraud.  And the PSLRA is designed to weed out exactly this type of case, which ultimately is fraud-by-hindsight.  Yes, they discounted at end of the Class Period.  Yes, at the end of the Class Period, they disclosed that shrink went up a lot.  But there's nothing in the record that indicates that that was certain, that they didn't believe their opinions, or that they knew any of that in advance.

So I'd stop there.  I think the rest of it -- there's more, but it's all laid out very clearly, I think, in the briefs.

THE COURT:  Sure.  Thank you.

38

Plaintiffs' counsel, I imagine you have a rebuttal, and a difference of opinion.

MR. LIEBERMAN: We do, Your Honor. Thank you.

THE COURT: Counsel had roughly 43 minutes as an elevator pitch. I will grant you the same.

But before you begin, I do want to turn your attention to the issue of whether or not the statements that plaintiffs allege were misleading, misrepresentative of the internal data, and otherwise really what led us here today. I would like to turn your attention to what defense counsel raised about it being cautionary language. And I'm looking for the deck slide. Let's see, I thought I wrote down the page. Oh, here we are, page 15. These forward-looking statements and what they mean, the cautionary language and when plaintiffs would have -- the investors would have been aware that it was otherwise forward-looking statements and cautionary language. What do you have to say to that point?

MR. LIEBERMAN: Your Honor, just because the defendants or a company says, categorizes in very fine print as we saw, that something is forward-looking, cautionary language does not mean it's the case. A company could then say, Well, our statements regarding our sales are forward-looking or our ability to meet profits are forward-looking, or any aspect of a business and say that they're forward-looking. It wouldn't mean that any case regarding inventory is

somewhat -- is protected from a securities fraud lawsuit.

You do have cases like *Novak*, *Urban Outfitters*, which we cite in our brief, which said that those statements about current inventory positions -- these are statements about current conditions at the company and saying that, currently, we do not have excess inventory, we have sufficient inventory that we can sell our products without liquidating, without making any promotions. And that's the statement of the current situation of the company and their current status. And that's simply not a forward-looking statement.

And analysts are asking very specific, pointed questions. That's the key question for analysts throughout the Class Period is, Do you have too much inventory? Are you going to have to do some markdowns? Is the demand here going to be sufficient to keep up to the post -- what was going on in COVID, and is it going to be sufficient to keep your inventory well-positioned? That was all that the -- that was the key question that was asked by analysts. Merchandise margins, were those going to remain elevated or were they going to go down? So it's not a forward-looking statement.

*Novak*, Second Circuit seminal case in 2001, says it was not -- that those are not forward-looking statements, those are statements regarding current conditions. It means looking at your inventory right now, looking at your demands, can you sell this product, is the flow sufficient enough that

you don't need to make discounts?  That's not a forward-looking statement, Your Honor.  We contend it is not.  And even if it would be a forward-looking statement or a cautionary statement, the statements that were cautioned were simply so generic that they didn't give investors the wherewithal to actually adequately assess the risk.

And what you have is the company is saying, Well, there's a problem with apparel, we have got a lump in apparel.  When it comes to outdoor, yeah, we've got a lot of inventory but we can buy around.  The buy-around is a very specific statement.  It means we can buy more inventory but it's not going to hurt the flow.  We can still sell this inventory without discounting and going into promotions.  That's a very specific statement that buying around means.

And we have CW after CW not just saying that there was a lot of inventory.  There was a huge amount of inventory.  And over -- a scary amount of inventory, according to CWs.  But from CW1 to CW2, CW3, and even CW4 saying, There was too much inventory, we were going to need to liquidate.  We couldn't sell these products without doing promotions, not in the future.  To do these promotions, there needs to be promotions now.  CW says that they could not sell the inventory that was in current conditions as of early 2022, they could not sell that inventory without doing -- without going more than the 10 percent markdown that was allowed by

41

corporate, other than getting corporate permission.

CW1 says this inventory needs to be liquidated.  CW4 says also that the inventory needs to be liquidated, not in the future, not a year from now, not in 2023 or 2024, today, in 2022.  And that is the heart of the case, Your Honor.

THE COURT:  Sure.  Let me ask you this question.  Defense counsel raised this.  The fact that none of your CWs, confidential witnesses, had any interaction with the individual defendants.  Is that relevant?  Does that matter?

MR. LIEBERMAN:  Your Honor, first of all, there was interaction.  CW5 and actually CW8 discussed with the executives when they visited the stores that there was an over -- excess inventory and where to store it, it was just way too much.  You would think at that stage that the executives would go and look into the matter and see, Do we have too much inventory, or not?

But it doesn't matter, Your Honor, because the CWs all specifically allege that you had the Score Card Reports, you had the Monday PDF s, you had the KPI reports, all of which indicated how much inventory there was and which were the well-performing products or not.  Each of them say -- CW1, CW2, CW3 -- they all say that at the bottom of the list is outdoor.  And so while the company is admitting that there is a lot of outdoor inventory, they're seeing that the worst-performing product is outdoor.

And so that's the report that's sent to the executives. It was sent not just to the analyst executives, to Hobart, to Stack, to Gupta. All of them got these reports on a weekly basis, the executive Monday morning reports, and all that showed was which were the best-performing items and which were the worst, and outdoor is at the bottom. And not only is it the worst-performing item, but these things are coming into the storehouses and into the stores and they're going through the rafters. It's dangerous, there's so much outside product.

And so when you have an historical amount of product coming in and yet this is your worst-performing category, Houston, we have a problem. That's exactly when you have an inventory issue. Not in the future, Your Honor, not two years from now, they had to liquidate at that time.

And that's why you have -- at the most jarring is at the end of the Class Period, May 2023, Hobart gets up and says, I don't see a need for any major promotional issues here. I don't think we have to go into a promotional cycle. Yet six weeks later, or four weeks later, in June, at the peak, they don't just make a decision to slash prices. They slash prices, they go into promotion. They assure the market that they don't need to go into promotion. Analysts buy that line. And yet four weeks later, they go into promotion. Your Honor, that doesn't -- these promotions go into -- don't come

in a vacuum.

And all our CWs tell the same story, that there was a huge amount of not just -- there was dangerous levels of inventory, literally dangerous levels of inventory.  These were reported to the executives at the company.  It wasn't just that we have a lot.  They needed to liquidate them, they needed to mark them down.  This is what we had, numerous CWs saying this.

The market's not learning that, Your Honor.  All the market knows, they know one thing:  We have a problem with apparel, we have a lump in apparel.  The market does not know there's any problem with outdoor inventory.  And the market wanted to know that.

Analysts are asking those questions.  It's not just, Oh, there is some issue.  Analysts are asking pointed questions:  Do you see any problem with outdoor, with inventory?  Do you see any issues regarding flow?  Is it healthy?  They are not asking what's going to be in two years from now.  They're asking what is the current state of affairs right now.

THE COURT:  Well, let me ask you this:  Even though the analysts are asking the questions that you're saying they were asking, why is it unreasonable for the defendants to look at the same data and come up with a different conclusion?  They're thinking they'll be able to sell it over time, they'll

stay competitive in the market, that their competitors won't be reducing the pricing.  Why is that unreasonable?

MR. LIEBERMAN:  Your Honor, if they wanted to tell the market the assessments and the assumptions that they're making, they can.  They certainly can.  They can say we've had a lot -- we have too much inventory at dangerous levels, and we're seeing actually this is our worst-performing item in the marketplace.  And actually, if you look at the -- and there's numerous store managers and the managerial level that are saying we need to liquidate, but we think we're going to be okay.  Your Honor, that's something you can tell the market.

THE COURT:  Didn't they say at the investor meeting they had certain structural improvements that they had put into place that otherwise were going to help them with respect to selling the inventory and things of that nature, some pricing index?  They said improvements, plural, but my memory only recalls one that they shared.

MR. LIEBERMAN:  They said that they perfected the art of dealing with inventory.  They say they created a moat. They can deal with these inventory problems and these issues. They created this moat, but yet moats are being actually made of rafters in the distribution centers because there's just way too much inventory.  They told them that.  This is exactly what analysts -- analysts were hanging on every word about inventory.  That's exactly the story in the Class Period.

And we had the CWs saying -- a plethora of CWs saying that there's huge amounts of inventory coming in.  And, Your Honor, maybe a little credit when defendants say, Maybe you can have a lot of inventory and it's not such a problem.  But demand had plummeted as well.  That's what happens, you get a lot of inventory when your demand plummets.  So inventory is raising at historical levels.  Demand has gone down; it's one of the worst-performing categories in the company.  And CW after CW says what actually the company ultimately had to admit at the end of the Class Period:  They needed to liquidate, they needed to mark this down, they needed to do it in 2022.  And the company's not admitting to that.

When do they admit to it, Your Honor?  They admit to it after the Class Period.  Finally in November of 2023, they say the words that they wouldn't say during the Class Period. They said, We had a lump.  Now, a lump means something.  It's a specific term that they admitted during the Class Period regarding apparel.  A lump means you've got too much inventory, you are going to need to discount.

They admit to having a lump at the end -- after the Class Period.  They never said they had a lump during the Class Period.  They don't say why, what happened, what changed that all of a sudden there was a lump during the Class Period they acknowledged and there's no lump later on.  They don't say what changed, what change in the marketplace there was.

And there's nothing -- why they, all of a sudden, acknowledged a lump only in 2023. But all the CWs acknowledged that there's a need for a write-down in early 2022, in mid-2022.

So, Your Honor, that's what we believe does give the compelling inference. All that information does go by the reports, weekly reports, KPI reports, a plethora of reports showing huge amounts of inventory, historically low demands, and you have the CWs saying, Hey, we're going to have to write this down. And then you combine that with store visitations by the executives coming to the stores, discussing -- I forget if it's CW5 or CW3, I have to look at my notes -- but discussing is alleged in the complaint, discussing the problems regarding too much inventory.

And so if the defendants wanted to be transparent and let the market know, they could have said, Hey, we have a huge amount of inventory, demand is low on these products, it's one of our worst-performing products, somehow we're going to work around this situation. That's not what they're telling the market. They're telling the market there's no problem here; flow is good, it's very healthy. This is a very healthy -- we're very proud of our inventory health. Yet the end of the day, there's nothing to substantiate those comments.

THE COURT: Well, let me ask you this question. So I will admit as a layperson, not familiar with the industry terms, I would have thought that the statements that they were

making regarding the health of DICK's Sporting Goods were present-day statements not so much forward-looking. That's again with having no appreciation for industry terms and things of that nature and what they may mean and without any cautionary language, understanding what that means. But let me ask you this question:

So plaintiffs are saying that at all times essentially, defendants knew they were otherwise misleading, mischaracterizing their internal data, and they were making decisions personally on the basis of that data with selling certain stock to the tune of $47 million. But what do the plaintiffs say in response to the fact that they did buy Moosejaw from Walmart and there are 12 stores and this is outdoor equipment? How does that -- I mean, what is plaintiffs' response? Because wouldn't that go to support defendants' position, that we did not think we had a problem? I get looking backwards, having the -- you know, hindsight is 20/20, as they say. I get looking in the rearview mirror, why someone would have thought we could have detailed what we were looking at differently, but we saw it the way we saw it, which is why we went and bought this other company.

MR. LIEBERMAN: Your Honor, they might have thought Moosejaw was a good buy for 2030. It's irrelevant. You know, Moosejaw doesn't tell you what their inventory is now, what their flow is now. They might have thought Moosejaw is a

steal and it's going to be a great performer 15 years from now.  The analysts don't care about that.  It has nothing to do with their inventory levels and what they thought was appropriate.  It's a fact thrown in.  That's not in the four corners of the complaint.  That's quite simply irrelevant.

And I want to say, Your Honor, is that Your Honor is -- you characterize yourself as a layperson.  Your Honor's actually a reasonable investor.  And that's exactly how --

THE COURT:  I think I am.  I think defendants would disagree.

MR. LIEBERMAN:  Well, Your Honor, actually, you are the reasonable investor.  Your Honor, that's exactly how the lens of this complaint has to be viewed from.  Not some analyst, not some fine print, Your Honor.  It's exactly what does an investor, the average investor, a reasonable investor, look at these terms and look at what's being said, how do they capture it.  Not how defendants, in hindsight, want to twist it, but what does the actual reasonable investor say?  And, your Honor, that's precisely the standard of the Supreme Court in *Tellabs* and others as to how these cases are analyzed.

I think the story, Well, it was going to be good for peak season one year from now, it's nice for defendants to say that, you know, post hoc.  There's nothing in their statements during the Class Period saying, We think we've got a good inventory flow for now because I think peak season a year from

now, it's going to work out, we're going to have a good thing. What I'm telling you is good inventory, I mean, peak season a year from now.  It's nice commentary and it's nice to say. It's not in any statement made, it's not in any statement made by two analysts or by analysts.  They're talking about their inventory and their inventory now.

So that type of inference, well, there was hope that we are going to be able to sell a year from now or in peak season 2023, that's outside the four corners of the complaint. It's simply irrelevant to what's going on in 2022.  And it's defendants' theory of the case, and they can certainly promote that theory on summary judgment or at trial, but it's certainly at the pleadings, it's our complaint that has to be judged upon its allegations.

Your Honor, so that's the very, we think, consistent and detailed story that's told through allegations, is that -- I'm sorry.

THE COURT:  No, you don't have to apologize.  I'm interrupting you.

MR. LIEBERMAN:  Good.

THE COURT:  But let me ask you about this because the Supreme Court *Omnicare* court case did say that opinion can be based on weighing competing factors.  So help me how to square plaintiffs' position with that statement by the Supreme Court.

MR. LIEBERMAN:  Sure.  First of all, Your Honor, Your

Honor would have to categorize it, and we think it would be mistakenly so, as an opinion. Defendants don't say, We believe that we have good inventory. They don't say, In our opinion, the flow is good. They actually say, very strongly, you know, inventory is healthy, we're proud of the inventory, there is no problem with the flow, it's well-positioned. All the adjectives that say a statement. These statements are terms of art, and that's the pleading and the complaint, not that they're opinions. These are statements regarding, Can you sell your product without discounting? That's not an opinion; it's a fact. Can you sell it now without discounting? That's a statement regarding present-day facts.

And so it's not forward-looking and it's not an opinion. It's something that is something that is an objectionable fact. And we do have the *Novak* case and the *Urban Outfitters* that talk about whether or not inventory is an opinion or not. And there's certainly substantial case law, Second Circuit, saying that these are not opinions. So these don't even go into the *Omnicare* basket, as it were.

But let's for a second put it into the *Omnicare* basket. I really think if you take defendants' logic to the extreme, they would say that inventory cases on their own as a matter of law are simply close to inactionable. You'd have -- they're opinions or they are forward-looking. And so you just have this category of inventory statements that are always

51

forward-looking, they are cautionary, they are opinions. And therefore, they are virtually inactionable, is the type of law the defendants are asking this Court to craft. And the Second Circuit and other circuits and district courts throughout the country don't hold that. *Urban Outfitters* and the Second Circuit have said, These are present-day facts regarding present-day current situations that are verifiable. Objectively verifiable statements. That's A.

If we do somehow put these statements in the *Omnicare* basket, then the question is -- *Omnicare* has three prongs as to how these statements are analyzed and one is whether or not defendants, you know, disbelieve them. We think we do have -- you know, we do have an allegation showing that these were -- based upon all the reports that are available and the data that's available, they were disbelieved. But most --

THE COURT: Just to be clear: So when you say that you believe that the defendants disbelieved them, the position that plaintiffs have taken is that because the internal data suggests so strongly otherwise, that that data, in and of itself, supports the position that plaintiffs take? Like, there's no way you could have reasonably believed the statements you were making on the basis of the data that you had available to you.

MR. LIEBERMAN: 100 percent, Your Honor, yes. But more critically, Your Honor, we don't -- I think the more

52

critical factor in *Omnicare* articulated by the Supreme Court is that, if there are critical facts that undercut the basis for that belief that are not disclosed, then those statements are actionable.

And here, you do have critical facts, the inventory that's hanging through the rafters, that's dangerous, the inventory reports showing excess inventory, and the fact that this is the worst-performing product, and the statements and the assessments by numerous managerial personnel saying that these categories need to be liquidated, all showing that there's information that undercuts those statements and beliefs.

So like I said earlier, if defendants had said:  In our opinion, inventory is healthy, inventory is well-positioned, there's no problem with flow;

And they had said, Nevertheless, I want to let you know we're having historical levels of inventory in our distribution centers, really throughout the country, of outdoor products.  It's actually quite dangerous, we're getting cited by OSHA;

And by the way, this is our worst-performing product. Our lowest-performing product is the outdoor categories.  So we have got this huge amount of inventory and this lower product;

But we have this opinion:  We think that we're going

to be able to work through it and we don't need to go into promotional cycle;

I think it would be a much different case.  And maybe they -- maybe they pass the *Omnicare* test.  But they didn't give those undercutting facts.  And the Supreme Court's made clear that that's required in *Omnicare*.  So even if we put this in the opinion basket, that's sufficiently pled.

THE COURT:  Well, you started going through the *Omnicare* test before I cut you off and you were talking about first the defendants' disbelief.  Did you want to continue?

MR. LIEBERMAN:  Second was omitting facts that cut against that belief.

THE COURT:  Okay.

MR. LIEBERMAN:  The example given by the Supreme Court is if someone says, We've gotten legal opinion or we think our activities are illegal and they don't disclose it, it was actually some junior associate at a, you know, not recognized law firm that provide a legal opinion, that's something that would then have to be disclosed to investors, that that would be actionable under *Omnicare*, Your Honor.

Your Honor, for the moment, I forget the third prong.  I'm sure I'll remember.  But we think those two prongs on their own are met.  Clearly, the second prong regarding the omitting the information that cuts the other way, we think that clearly is something that needs to be disclosed to

54

investors.

And so there was a way for defendants to inform investors -- analysts were really, you know, hanging on every word regarding inventory -- is to tell them the real facts on the ground:  To tell them the historical levels of inventory that's going on in distribution centers; tell them that this is the worst-performing product; and tell them the assessments of numerous managerial employees at the company, that these need to be liquidated and they couldn't be sold without being liquidated.

And when we look at that inference, then we look at the inference, well, what happened at the end where in May of 2023, let's just say Your Honor would focus just on that time period, there's a statement made:  We don't see a need for promotions.  Our inventory is very well-positioned.  They talk again about apparel.  They kind of contrast apparel to outdoor and they say, Apparel, we had this problem.  You know, we have had to mark down apparel way too much.  You know, apparel inventory, we need to promote.  But they say, We don't have that problem with outdoor.  Outdoor, they actually talk about as being one of their best-performing products.  And then, really literally four to five weeks later, in their peak season, they slash and they do this major promotional activity without any warning to investors.

Your Honor, how does such promotional activity not

get, you know, assessed well in advanced?  How during the season all of a sudden -- you know, the defendants, the inference, they all of a sudden decided to do these promotions on the fly after reassuring investors really a mere four or five weeks beforehand that it wasn't necessary?  We think the inference clearly there is that the defendants knowingly misled investors.

And, Your Honor, they had a reason to, there is a reason to mislead investors because there is $47 million on the table that they made in illicit profits.  And so they had a reason to pump up this stock and sell it on investors.  Defendants have a lot of excuses for these --

THE COURT:  Well, let me ask you about that --

MR. LIEBERMAN:  Sure.

THE COURT:  -- because, you know, when you say they had 47 million reasons to mislead the reasonable investor, what about the fact that they still maintained significant holdings at the time that they made those sales?

MR. LIEBERMAN:  They were required to by corporate charter.  They needed to keep those.  There's no inference whatsoever on that.  First of all, it's outside of the pleadings of the complaint.  And that's something for -- that is certainly something that could be judged by a jury as to whether or not that cuts against the inference as far as a ruling under the PSLRA.

But, Your Honor, they are required to keep significant holdings. And we do plead the percentage of holdings that these sales represented after accounting for these -- for their requirements. Hobart sold 34 percent of her available holdings, excluding self-cover, and 41 percent of her available holdings as well. And Stack, excuse me, sold 41 percent of his available holdings, excluding sales-to-cover.

We have the pleadings in our motion, and, once the defendants raised it in opposition to the Motion to Dismiss, showing that, you know, it actually was a significant amount of the available holdings. There's a lot of information thrown in regarding stock sales from defendants. They try to get Your Honor to look at the 2020 to 2021 period as a comparison period.

Now, let me talk about options. There's a lot of information thrown at this Court, but let's unpack it. When it comes to the options, these are options that you -- to buy stock. It doesn't tell you that you have to actually sell the stock you buy. So there's no reason -- you have the option to purchase it, but it doesn't tell you that you have the option to buy and that you need to sell the stock in order to -- during that period. You could hold on to the stock for ten years if you wanted. So the fact is, is that the defendant -- the fact that you got stock -- that you needed to exercise

options in order to purchase the stock tells you nothing of that need to sell.  It's irrelevant.

In addition, Your Honor, the fact that you have here, that you have these sales that were not pursuant to 10b5-1 trading plans.  And defendants' attempt regarding the comparable period is, you had both Hobart and Stack, they both didn't sell in the prior year and then all of a sudden, they're selling $23 million for Stack and $19 million for Hobart.  So Your Honor, again, this is a matter of inference. It doesn't mean for sure they're guilty.  It doesn't mean that, you know -- it doesn't mean even that's the whole case. But when we weigh the inferences and we weigh the information available to the defendants, and we weigh that, all of a sudden after two years they all of a sudden decide to start selling stock a week after making the March 7th false and misleading statements, that does provide inference, that does get us to, under *Tellabs*, of a pleading inference.

And so defendants do throw in the sales.  The bottom line of the sales are, that there was $47 million of stock sold during the Class Period, well above historical periods for these -- for Hobart and Stack.  Well above their compensation levels.  They almost doubled or exceeded their actual, you know, non -- their actual salaries.  So you have all of a sudden, the inference, we believe, Your Honor, is that defendants saw an opportunity to pump up the stock.  They

58

were riding high from the pandemic and they saw an opportunity to pump up the stock and got out while things were high to the tune of $47 million but where they for two years never had such activity before.

And all of the statements regarding the defendants want to put in, Well, these were pursuant to options, sell-to-cover, or they held on to most of the their stock, we have answers to all of that, Your Honor.  But, Your Honor, we think at any kind of a pleading stage, the inference is simple:  They sold a lot of stock and made a lot of money while misleading the market as -- well, misleading the reasonable investor as to the status of the inventory situation.  So that's regarding the stock sales, Your Honor.

And we do think the company's statements afterwards in November of 2023, Well, there was a lump, you know, that's exactly what they said there wasn't.  They said there was a lump in apparel.  And they said there wasn't a lump with regard to outdoor.  Again, why all of a sudden they admit to the lump is not quite clear.  But clearly, investors would have wanted to know about that lump beforehand, and CWs 1 through 11 testified that there was a lump throughout the Class Period.

Going on to the shrink, Your Honor.  The shrink, just to clarify, you know, regarding the law, *Moab Partners*, the *Macquarie* case makes clear that once you make a statement

regarding an issue regarding a trend or other issues that may impact the company's finances, then you have to make a full disclosure.

And the company did make statements saying, Well, there's elevated shrink. But the SEC -- the SEC is not going to say that you violated this provision. And so to say that the government is going to come -- without filing a lawsuit, that's not what the SEC does. The SEC says, You need to make a more detailed explanation. And they cited the provision that was relevant, which is Item 303.

So they cited the provision. And then at the end of the Class Period, the defendants come clean. They say 41 percent of the, you know, of the merchandise margin -- 41 basis points, excuse me, of the merchandise margin, you know, a disappointment in 2022, was a result of shrink. And then the next year, 2023, there's another 50 basis points that's the result of the shrink.

We set up a chart based upon those numbers that set out quarter of quarter. But clearly, it's material. Clearly, defendants, you know, they clearly knew there was a way for them to admit it. And when they do admit, it's material. And the market, most importantly analysts, finally say, Well, there is a shrink problem. At the end of the Class Period they say, We didn't realize the level of shrink. This is something that we didn't realize was such an impact.

So clearly, there is an obligation to give quantitative and substantive information to investors. They have that information available from the loss prevention reports that was also provided every week on the Monday morning PDFs. And yet they failed to do so. And analysts cared about it. Analysts said, We didn't know about this. We didn't know that this shrink was such an issue. When they learned that they missed the -- the merch margin went down 150 basis points and that a third of that is as a result of shrink, that's something that analysts were surprised about. And we do think that clearly is covered by Item 303.

The *Coinbase* case, Your Honor, which we cited in the brief, does talk about it. It's not enough just to say shrink is higher. It doesn't cut it under Item 303. You have to provide analysis. And simply that analysis wasn't provided. It was provided at the end of the Class Period to the disappointment of the reasonable investor, and that's what caused the stock price to go down.

Let's see if I have any other comments, Your Honor. I see how my adversary can get caught up in this. I've been going for a while as well. I think if Your Honor doesn't have any other questions, I'll --

THE COURT: Well, I guess, what's your summary regarding how you vault over the PSLRA and survive their motion for dismissal?

MR. LIEBERMAN: Okay. The real elevator pitch. Your Honor, simply put, defendants made critical statements to investors, objective statements to investors, during the Class Period that a reasonable investor relied upon. Knowing that there was material information available that undercut those facts, that information was easily available to defendants, and defendants had knowledge of that by store visits and by the reports. They sold a whole lot of stock and made a lot of money while making these misrepresentations. And when the market learned about it, investors suffered significantly.

THE COURT: Got it. Thank you.

MR. LIEBERMAN: Thank you, Your Honor.

THE COURT: I imagine there's a brief reply. And the operative word being "brief."

MS. KOFKE: Okay. I will be short. So just to hit some points. So on forward-looking statements, we think that investors do read SEC filings, they do understand what they say, and they would have understood that DICK's had defined these statements as forward-looking. But even putting that aside --

THE COURT: I don't know how reasonable that is to think that the average investor, who is not a stockbroker or investing on behalf of others, reads SEC filings. I just don't -- I know plenty of investors; I just don't know if that's reasonable.

MS. KOFKE:  I think under the securities laws, the assumption is that the reasonable investor, and especially -- I mean, they allege it's an efficient market.  They allege DICK's trades in an efficient market.  That means any material information that's disclosed to the market gets incorporated into the stock price and investors take note of it.  And so even the stuff that's in SEC filings, in the risk factors and the warnings, all of that stuff is actually really important under the securities laws because they do assume that investors are paying attention to it.  Although, I take your point that the average investor --

THE COURT:  I would imagine it's important to otherwise preclude a lot of lawsuits.

MS. KOFKE:  Well, hopefully this one.  But in any case, it doesn't matter because their own definitions show these were forward-looking statements because they depend on, as we discussed, the prices when these products are ultimately sold, the future demand, future expectations.  And I point the Court to the *Aetna* case, the case I mentioned about disciplined pricing policy because it's really directly on point to this circumstance.

And also the *Avaya* case, where there were statements about -- the company made statements that current results put us on track to meet our goals.  And what the Third Circuit said in that case is that, Okay, there is a present sense to

this but it can't be distinguished from the forward-looking aspect. Because the only thing the statement is really saying is that whatever exists currently, it allows the forward-looking statement to be realized. And that's really -- to the extent there was any present sense to these statements, it was that management assesses that whatever the circumstances are right now, it will be able to sell this inventory over time at satisfactory prices, and discounting won't be required.

So I think those two cases support the idea clearly that these were forward-looking statements.

And then just to hit on the confidential witnesses and the allegations that they made about inventory needs to be liquidated. Actually, if you look at those statements, it's really hard to tell if those witnesses are speaking in hindsight. Of course, now they know that inventory did need to be -- ultimately, there was discounting at the end of the Class Period. And to the extent they're just offering personal opinions, that doesn't show anything about what the defendants believed.

As I mentioned, there's no allegations showing that those witnesses were placed to make that kind of an assessment on a company-wide basis as compared to the executives which have been trusted with running the entire corporation and making those kinds of assessments. So we don't think that that shows that the defendants didn't believe their views and

64

didn't think that they'd be able to sell the inventory over time.

Then, in terms of the Score Card Report and this idea that outdoor and fitness was the worst-performing business, this is a perfect example of how the allegations here are not particularized. What does that mean that it was the worst-performing business? On what metric? Is it possible that it was one of the smaller businesses and that's why, if we're talking about absolute sales, maybe it was at the bottom because it was a smaller business? There's no detail as to on what metrics it was the worst-performing business, or when.

These allegations also completely allied the fact that this is a seasonable business. As I mentioned, for most of the Class Period it was the off-season. So is it normal for the outdoor and fitness business to be a lower performing category during the off-season? None of these questions are answered by the complaint. And it's a lack of particularized pleading that makes it impossible to reach any reasonable inferences that raise any kind of strong inference of scienter.

Similarly, with the statements in May that Ms. Hobart made that the company didn't expect to go into a promotional environment, that actually undermines scienter. Because what would be the possible motivation if one knows that one's about to engage in massive discounting that's going to have to be

announced three months later? Why not just disclose it in May? Really, what could be the possible reason that somebody would have to not just disclose it at that time?

And particularly, you know, what really explains it is that peak selling season, which is basically, it starts in the beginning of June, it's in the second quarter there. So the explanation is that the company went into that peak selling season and learned new information. That's when they saw what the demand was, that's whenever they saw what the competitors were doing. That's the important time for this business. That statement was made before that time started. And then it was once they got into that period and they started to observe and get more information that they recalibrated their assessments and that's when they decided to discount the inventory.

They were basically faced with a choice: If they're not going to be able to move a significant amount of it, as they had hoped and planned, as they expected, then they could pack it away for next year or they could strike while the iron's hot and get rid of it then. And they decided to strike while the iron's hot and to discount then. It doesn't show they didn't -- that they knew that was going to happen from the beginning and it doesn't show that they didn't believe their assessments.

Moosejaw. So the plaintiffs mentioned that that's

outside the four corners of the complaint. It's absolutely not. Actually, if you look at the -- we have a slide in the slide deck. Slide 8.

THE COURT: They mentioned that, at least per my recollection, Moosejaw, as well as the alternative position that defendants have taken on the sale of the stock, is also outside of the four corners of the complaint. So if you could speak to both.

MS. KOFKE: Yes, absolutely.

THE COURT: Which page are you going to refer me to?

MS. KOFKE: Page 8 is -- to answer your question about Moosejaw. So the complaint alleges that Moosejaw was in the outdoor category and it was an outdoor company. And in fact, the plaintiffs argue that the statements Ms. Hobart made about Moosejaw, they claimed support scienter because they show the importance of the outdoor category where the supposed excess products were. So they very clearly allege they -- Moosejaw's in the complaint and what Moosejaw is is in the complaint. That's not at all outside the four corners of the complaint.

In terms of the stock sales. The Form 4s that we attached as exhibits, those are incorporated by reference in the complaint. That's where the plaintiffs got their sale data from. And it's absolutely routine for courts to consider Form 4s when analyzing stock sales in these circumstances.

The Third Circuit did it in *Oran V. Stafford*, the Third Circuit did it in *Advanta*.  I believe the Court did it in *Party City* as well.  It's just absolutely routine; it's not outside the four corners of the complaint at all.

But to pause for a moment there on the subject of stock sales.  So they also mentioned this idea that there are these corporate guidelines that require them to have large stock holdings.  First off, those corporate guidelines they attached as an exhibit to their brief.  They're not pled in the complaint.  It's not part of their pleadings.  They can't amend their complaint with these guidelines.

But even more importantly, if you look at those guidelines and you look at the securities held by the defendants, at the end of the Class Period they had 500 percent of the guideline amount, 600 percent of the guideline amount, we calculated, for Mr. Gupta and Ms. Hobart.  And Stack, even way, way above the guidelines.

Plus, you have the fact that the guidelines, they didn't actually apply to Mr. Gupta at this time because he only became CFO in 2021 and the guidelines don't kick in for three years.  Plus, you have the fact that if you read those guidelines that they attached, they're supposed to count not just stock invested options but also unvested options, which they haven't included at all to measure what the holdings had to be.  So the guidelines don't -- we think do not undermine

at all.  They certainly do not compel the individual defendants to retain 99 percent of their holdings, which is what they did here.

And the sales were consistent with historical sales. We have that laid out in the brief for Ms. Hobart.  You know, they say, Oh, well, you only have to look at our comparison period.  But there's no case law that says the Court in assessing these sales has to look at a specific or arbitrary period.  And actually, in the *Advanta* case, the Third Circuit, it went back and looked at 28 months back for an 8-month Class Period.  So the Court can absolutely consider the annual sales going back longer than just the plaintiffs' comparison period.

They also keep mentioning $47 million --

THE COURT:  Remind me, as it relates to the *Advanta, Party City*, those were all a Motion to Dismiss stage?

MS. KOFKE:  Yes.  And they keep mentioning this figure, $47 million.  That's proceeds, Your Honor.  That's not profit.  It's not appropriate to compare that to their annual compensation, that's not what the cases do.  They say the thing to look at is profit.

And they totally ignore taxes.  Of course, there's going to be taxes whenever you sell stock.  There's going to be taxes whenever you're granted stock.  There's going to be fees.  For options, there's going to be an exercise price.  So it's obvious that that number needs to be slashed

significantly.  And they don't plead, they don't attempt to make that calculation to actually plead profits.  And so that's a lack of particularized pleading again.

And then just, you know, briefly on shrink.  They talk about how investors were surprised by the fact that the company announced that shrink increased at the end of the Class Period.  And the company explained, it explained in its public statements what happened, which is that, yes, they had been seeing the number of incidents go up.  And what they thought was that, We've come out of the pandemic, retail theft is going back to where it was pre-pandemic.  It's coming back to sort of normal levels.  Then they conducted physical inventories ahead of the back-to-school season and that's whenever they realized that it actually jumped.  This was something new.  It was higher than it was pre-pandemic.  And then they immediately disclosed that at the end of the Class Period, that they had this information.

The more compelling inference here is that that's what happened, not that they knew the whole time that shrink was elevating, it was going to have this impact.  Because why not disclose that?  I mean, if you look at the pattern here, like, for example, when they had that lump in apparel, even though it had impact on margins and earnings, they disclosed that promptly.

They did the same thing here.  When they realized

discounting was going to happen after -- during the peak selling season, they disclosed that promptly.  When they realized shrink was now something new and different, they disclosed that promptly as well.

I think that about covers it, unless Your Honor had, you know, any other points that you wanted me to address in response to plaintiff.

THE COURT:  I don't believe so.  You can actually have a seat at counsel's table.

I guess I do have a question for you.  As it relates to the statements that were being made and the fact that the statements that were being made at these meetings where you otherwise disclosed the health of the business, such that investors are informed as to what's transpiring, you know, the statements that the company was healthy or well-positioned and things of that nature, plaintiffs of course have alleged that they're misleading, they're misrepresentations.

I guess my question to you is -- I'm trying figure out how to ask this, about, you know -- tell me the interplay, I guess, of the internal data.  When could these statements be characterized as misstatements, misrepresentations, misleading?  I'm imagining it's the data that you're looking at that otherwise would shore up a plaintiffs' lawsuit against the defendants; is that correct?

MS. KOFKE:  Yeah.  I think what you're going to is

what is missing from this complaint.  And what's missing is any interaction with the defendants where they said they had a doubt about these forecasts, or any information that was provided to them at any time indicating that their assessments were impossible to achieve because there was an internal forecast of profitability or discounting that showed that that was likely to happen.

None of that is in the complaint and that's exactly why they have failed to plead with particularity.  All they have is that demand went down, there was a lot of inventory.  We have talked a lot about how that was disclosed and how that's actually consistent with the dramatic expansion of the business.  And none of that shows that they had access to any data that actually made their assessments impossible to achieve or indicated that they didn't believe them, which exists in other cases.

Plaintiffs mentioned, for example, the *Novak* case from the Second Circuit.  That case actually involved a company that issued misleading financial statements, misleading earnings.  And the allegations in that case were that the defendants attended meetings where they talked about the fact that the financial statements were misstated.  The defendants were in the meetings; they knew it.  And that's the kind of thing that it takes to plead scienter, not what we have here.

72

THE COURT: Well, I'd like to hear from plaintiffs' counsel on that point. I mean, you know, if the internal data can be read in the way in which the defendants did read it and for purposes of reporting about the health of the DICK's Sporting Goods, big business at that time, help me understand why the position that defendants have taken is completely incorrect. It's not as if we have the internal data for a comparison to know, in fact, that what they were stating were misstatements. Are you going to tell me that all you need at this stage is an inference? You don't, in fact, need the data to support the position that plaintiffs have taken?

MR. LIEBERMAN: Your Honor, we would say that, first of all, the standard that defendants are articulating are that I would need an admission, a statement to an employee. By defendants saying, Well, I don't -- I think we're, you know, directly saying, or you'll have to write down, I mean, the statement I'm making to investors is false. A specific admission by a company as to the falsity of the statement is the smoking gun. *Tellabs* tells us directly that a smoking gun is not required. It is. At the PSLRA level, this is a collection of inferences, Your Honor. It is data. There's facts pled. And do they lead to a strong inference of scienter that defendants normally or recklessly mislead investors, that's what we're talking about here.

We don't have the benefit of discovery. I don't have

an email from Stack to Hobart saying, I think we are going to have to discount, we have got way too much inventory. I'm not required to have that. Defendants would like to say that when it comes to an inventory case, there are always opinions. They are also always forward-looking. They are also puffery. And by the way, in order to plead an inference of scienter, I need that email or a statement from Stack to somebody saying, We are going to have discount soon. That's not what the PSLRA says. The PSLRA says that you can collect inferences from well-pled facts, from a number of sources. And the question at the end of the day is: Is it more likely than not that defendants knowingly and recklessly misled investors?

And we think all of the allegations from CW1 to CW11, the insider sales of $47 million, the time disparity between the company making their false statements and four weeks later taking exactly contrary actions, all of that collectively do lead to the inference. And the tie goes to plaintiffs, Your Honor, that this was at least likely that defendants were knowingly or recklessly misleading investors. That is all we need. Defendants would like a different standard on many of these facts. I commend them for their wishful thinking. That's not what *Tellabs* adjures and that's not what is required here.

THE COURT: Well, thank you, both, for your presentations this morning, as well as your briefings. Now,

we have to go back and continue this academic exercise of trying to get to the heart of what is proper pursuant to the relevant case law.  And so we'll do that.

Of course, we'll write our R&R for Judge Ranjan, who wrote the *Mylan* opinion -- and I think plaintiffs referenced -- actually, it may have been defense counsel, my apologies -- for him to review.  And of course, for you all to opine via objections in the interim on said R&R.

So with that, I am going to adjourn.  Thank you all for your time this morning.

(Proceedings concluded at 11:42 a.m.)

- - -

C E R T I F I C A T E

I, SHARON SIATKOWSKI, RDR, CRR, CRC, CRI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

    \s\ Sharon Siatkowski__                    July 11, 2025
SHARON SIATKOWSKI, RDR, CRR, CRC, CRI    Date of Certification
    Official Court Reporter