**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS | ) | |
| LOCAL UNION NO. 719 PENSION | ) | Civil Action No. 24-00196 |
| TRUST FUND, *on Behalf of Itself and* | ) | |
| *All Others Similarly Situated,* | ) | |
| | ) | |
| Plaintiffs, | ) | District Judge J. Nicholas Ranjan |
| | ) | Magistrate Judge Kezia O. L. Taylor |
| v. | ) | |
| | ) | |
| DICK'S SPORTING GOODS, INC., et al., | ) | ECF No. 58 |
| | ) | |
| Defendants. | ) | |

<u>**REPORT AND RECOMMENDATION**</u>

I.    <u>**RECOMMENDATION**</u>

For the reasons that follow, it is respectfully recommended that Defendants' Motion to Dismiss, ECF No. 58, be granted in part and denied in part.  Specifically, it is recommended that the Motion seeking dismissal of Count I be denied as to the actionable statements related to inventory, only.  The Motion should be granted as to Count I, insofar as the 10(b) claim is predicated on the identified risk factors and statements related to shrink.  Count I based on these statements should be dismissed, and Plaintiffs should not be granted leave to amend as to the scope of the actionable statements, "because the defects in the amended complaint (*i.e.*, whether certain statements are actionable) are purely legal issues, and so amendment would be futile.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002)."  *In re Mylan N.V. Sec. Litig.*, No. 2:20-CV-955-NR, 2023 WL 3539371, at *20 (W.D. Pa. May 18, 2023) (Ranjan, D.J.).

It is further recommended that Defendants' Motion to Dismiss the Section 20(a) claim in Count II be denied as to the individual Defendants, as they relate to the actionable statements, but granted as to Defendant Dick's Sporting Goods.

II.    **REPORT**

    A.    **Procedural Background**

In this putative securities class action, Lead Plaintiffs State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island, and Western Pennsylvania Teamsters and Employers Pension Fund Public Employees ("Plaintiffs") are suing Defendants Dick's Sporting Goods, Inc., hereinafter referred to as "DSG," and the following individuals: Executive Chairman Edward W. Stack ("Stack"), President and Chief Executive Officer Lauren R. Hobart ("Hobart"), and Chief Financial Officer Navdeep Gupta ("Gupta"), collectively referred to as "Defendants," under Section 10(b) and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Plaintiffs assert that Defendants made false and misleading statements between August 23, 2022 and August 21, 2023 ("Class Period") when they concealed material information regarding DSG's inventory levels, margin pressures, and shrink-related losses. Defendants filed a motion to dismiss, Plaintiffs submitted a response in opposition thereto, and Defendants filed a reply. ECF Nos. 58, 63, 64. On July 8, 2025, the Court heard oral argument on the pending motion. ECF No. 69. Defendants' motion is ripe for review.

    B.    **Factual Background**

DSG is a well-known sports retailer, with stores located throughout the United States. ECF No. 51 ¶¶ 2, 24. During the COVID-19 pandemic, with gyms closed, DSG experienced a surge in sales as people looked for alternative ways and locations to stay active. *Id*. ¶¶ 3, 28-33. The increase in sales slowed down as COVID restrictions were being lifted, and by the second quarter of 2022, "DSG's profitability growth streak came to an end." *Id*. ¶¶ 4, 39, 40. At the beginning of the Class Period, DSG reported strong financial results and attributed its success to what it

described as a "structural change" in profitability. *Id.* ¶¶ 4, 37. Throughout the Class Period, Defendants continued to represent that DSG maintained "healthy" and "well-positioned" inventory, citing successful management of supply chains and consumer demand. *Id.* ¶¶ 6, 140–163. However, confidential witness ("CW") accounts revealed that excess inventory had to be stored off-site, in rented trailers and warehouses, due to lack of space in retail locations, where excess inventory was presenting a safety hazard, and that Defendants were aware of this problem. *Id.* ¶¶ 7, 90-99, 164(b). Plaintiffs assert that similar misrepresentations were made throughout the Class Period relative to the level of shrink[1], which resulted in millions of dollars of losses to DSG, but which were downplayed by Defendants. *Id.* ¶¶ 8, 103-126.

During the Class Period, despite diminishing merchandise margins, Defendants relayed confidence to investors during quarterly earnings calls as well as in their SEC filings.[2] *Id.* ¶¶ 140-163. During their August 2022 earnings release and call, Defendants compared their 2022 results to their pre-COVID sales in 2019, describing their inventory as "healthy" and "well positioned." *Id.* ¶¶ 42, 140, 141. During their November 2022 earnings call, Defendants acknowledged a decline in merchandise margin, but attributed it to a delay in Spring merchandise arrival, and reiterated that the merchandise margin continued to be higher than in 2019. *Id.* ¶ 46. They described their inventory outlook for the holiday season as "healthy and well positioned." *Id.* ¶ 147. During the next earnings call, in March 2023, while Defendants conceded that merchandise margin was lower than the prior year, they explained that the downward trend was not unexpected given the promotional sales during the holiday season and excess inventory resulting from the late

---

[1] Term of art related to inventory shrinkage due to retail theft. ECF No. 51 ¶ 5.

[2] Merchandise margin is defined as net revenues from sales less cost of merchandise sold. ECF No. 51 ¶ 33.

arrival of Spring product.  *Id*. ¶ 51.  It was also during this call that the comparator moving forward shifted to the 2022 fiscal year, and not 2019 as it had been prior.  Defendants described the inventory as being "in great shape as we start 2023."  *Id*. ¶¶ 51, 152-154.  In May 2023, the first quarter earnings call for 2023, Defendants continued to channel optimism and calm, despite declining merchandise margin, again referring to inventory as "healthy and well positioned," and expressing no concerns related to profitability.  *Id*. ¶¶ 59-61, 159-163.  Plaintiffs allege that these public statements were materially false or misleading because contrary to Defendants' statements, DSG was, in fact, facing significant challenges due to excess inventory.  *Id*. ¶ 164.

In addition to misleading statements about excess inventory, Plaintiffs contend that Defendants failed to adequately disclose the impact of shrink – retail theft – on DSG's margins.  *Id*. ¶¶ 64, 103-128.  Plaintiffs assert that, "Defendants issued a series of anodyne disclosures throughout the Class Period, stating that shrink contributed an unspecified amount to the Company's merchandise margin declines but omitting that shrink was materially elevated – and significantly impacting margins."  *Id*. ¶ 104.  On May 19, 2023, just days before DSG's earnings release for the first quarter of 2023, TD Cowen released a report wherein "it lowered its sales and earnings per share estimate for DSG for both 1Q23 and FY23."  *Id*. ¶ 57.  Following the release of this report, DSG stock declined.  *Id*.  The final earnings call of the Class Period was in August 2023, during which Defendants, for the first time, acknowledged that shrink and excess inventory had a material financial impact on DSG.  *Id*. ¶¶ 65-68.  Following the release of this information, DSG stock dropped by more than 24%.  *Id*. ¶ 70.

Finally, Plaintiffs allege that Defendants had a motive to mislead investors, citing insider stock sales totaling over $47 million during the Class Period.  *Id*.  ¶¶ 258-266.  Plaintiffs focus on

the timing of these sales, claiming that Defendants sold when stock prices were artificially inflated due to Defendants' misleading statements. *Id.*

### C.    <u>Legal Standard</u>

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a Rule 12(b)(6) motion to dismiss, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  Because Plaintiff is proceeding *pro se*, the allegations in the complaint must be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972).  The "court[] generally consider[s] only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim" when considering a motion to dismiss. *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)).

Under Fed. R. Civ. P. 9(b), where a party alleges fraud, they "must state with particularity the circumstances constituting fraud" and "[m]alice, intent, knowledge and other conditions of mind of a person may be averred generally."  To meet this standard, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

Actions brought under Section 10(b) and Rule 10b-5 are subject to the heightened pleading requirements of both Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act, 15

U.S.C. § 78u-4 *et seq.* ("PSLRA"). *See e.g.*, *Alberici v. Recro Pharma, Inc.*, 2020 WL 806719, at

*4 (E.D. Pa. Feb. 14, 2020).

The PSLRA's pleading requirements are twofold: first it requires that "the complaint ...

specify each statement alleged to have been misleading, the reason or reasons why the statement

is misleading, and, if an allegation regarding the statement or omission is made on information and

belief, the complaint [must] state with particularity all facts on which that belief is formed." 15

U.S.C. § 78u-4(b)(1). The PSLRA further requires that "the complaint ... state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind." 15

U.S.C. § 78u-4(b)(2)(A). The PSLRA's first pleading requirement – particularity – "effectively

subsumed" the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Institutional Inv'rs Grp.*

*v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

The Supreme Court has prescribed a three-step process for considering a motion to dismiss

in a Section 10(b) case. *See Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23

(2007). First, as with any motion to dismiss, the court must "accept all factual allegations in the

complaint as true." *Id.* at 322. Second, the court must "consider the complaint in its entirety, as

well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,

in particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Id.* On this point, the inquiry is "whether *all* of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard." *Id.* at 323. Third, "in determining whether the

pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible

opposing inferences." *Id.*

### D. <u>DISCUSSION</u>

#### a. **Violation of § 10(b) of the Securities Exchange Act**

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 was promulgated under section 10(b) and provides that it is in violation of the Exchange Act "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

As this Court previously explained,

> To state a claim under Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (cleaned up).

*In re Mylan*, 2023 WL 3539371, at *8. In the pending Motion, Defendants argue that Plaintiffs failed to plead actionable misstatements (or omissions), scienter, or loss causation. *See* ECF No. 59. Each of these three arguments will be addressed in turn.

#### 1. **Actionable Misstatements or Omissions**

The heightened pleading standard of the PSLRA requires that complaints alleging securities fraud "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Moreover, the misleading or omitted statements at issue must relate to a material fact. *Matrixx Initiatives, Inc. v. Siracusano*,

563 U.S. 27, 38 (2011) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). A misrepresentation or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

The Third Circuit has held that the question of materiality "typically presents a mixed question of law and fact," which has traditionally been viewed as appropriate for the trier of fact. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000). But "complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The Court determines materiality as of the date of the alleged misstatement or omission, not with the benefit of hindsight. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

The PSLRA contains a "Safe Harbor" provision, 15 U.S.C. § 78u-5(c), that "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya, Inc.*, 564 F.3d at 254. Under the Safe Harbor statute, a "forward-looking statement" includes, "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," as well as "any statement of the assumptions underlying or relating to any" forward-looking statement. 15 U.S.C. § 78u–5(i)(1)(B),(D).

Here, the allegedly misleading statements pertain to three categories: (1) excess inventory; (2) risk factors; and (3) shrink.

*Excess Inventory*

Plaintiffs assert that Defendants made numerous statements related to inventory, which allegedly misled investors.  These statements set forth in Plaintiffs' Amended Complaint ("AC") are summarized below.  ECF No. 51.

| **Date and Event** | **Statement** | **AC Citation** |
|---|---|---|
| **August 23, 2022 – Earnings Release and Q2 2022 Call** | (1) "Our inventory is healthy and well-positioned, and we are excited about our assortment for the back-to-school season." – Hobart | ¶ 140 |
| | (2) "As Lauren [Hobart] said, our inventory is healthy and well positioned." – Gupta | ¶ 141 |
| | (3) "We feel really, really good about where our inventory right now is, especially as we head into the important back-to-school season. We feel good about the inventory levels and our overall composition of the inventory itself. It's very well positioned and very healthy." – Gupta | ¶ 141 |
| | (4) ". . . Some of the more specific pandemic winners like fitness or outdoor equipment[,] bikes, those are acting in line with our expectations and, in fact, are still significantly above 2019 levels. So while there is some adjustment going on year-to-year due to the surge in those businesses, they are significantly higher than they were pre-pandemic." – Hobart | ¶ 143 |
| | (5) "Our inventory, overall, I think it's important just to restate that our inventory is very healthy and we do not — we are not concerned that there's toxicity in our inventory. Our flow of goods has improved significantly category by category throughout the last 2.5 years. It's been a series of different challenges. The most recent challenge was apparel, as I mentioned, but we are — that is moving now, and we are working through the backlog that was there and clearing that through, and it is affecting our sales as well." – Hobart | ¶ 145 |
| | | ¶ 145 |

| Date and Event | Statement | AC Citation |
|---|---|---|
| | (6) "When it comes to some of our hardline categories, say, fitness and outdoor equipment, we have bought – that is – we have a lot of inventory there that we just – we're buying around for next year. So no issues with flow there." – Hobart | |
| **November 22, 2022 Q3 2022 Call** | (7) "Looking ahead, our inventory is healthy and well positioned, and we are excited about the assortment we have in place for the holiday season. Because of our continued strong performance, quality of inventory and the confidence we have in our business, we are raising our full year outlook." – Hobart | ¶ 147 |
| | (8) "Overall, we feel our inventory is healthy and is very well-positioned for the holiday season." – Gupta | ¶ 147 |
| | (9) "Overall, I would say our inventory is very healthy and very well-positioned for the holiday season. The only lump that we called out was on the athletic apparel side and we are – much of that has been already activated here in third quarter, and we'll continue to work through that. But overall, like I said, we feel really strong about our in-stock levels going into this important holiday season." – Gupta | ¶ 148 |
| **December 6, 2022 Morgan Stanley Global Consumer & Retail Conference** | (10)    "In fact, all of the pandemic categories, which are, again, smaller pieces of our business, so bikes, outdoor equipment, generally fitness, all have rebaselined bigger." – Hobart | ¶ 150 |
| | (11)    "Because the sales are significantly – so if they were "x" in 2018 or '19, and they spiked in '20 and '21. They are here now. So if they're not receding to the levels that they were before.  So I think what that speaks to is that a lot of people took up outdoor activities even walking, running, biking. So – but the behaviors have changed so much.  So | ¶ 152 |

| Date and Event | Statement | AC Citation |
|---|---|---|
| | there was a surge, but it's come back at a higher level." – Hobart | |
| **March 7, 2023 Earnings Release and Q4 2022 Call** | (12)　"As planned, we continued to address targeted inventory overages, and as a result our inventory is in great shape as we start 2023." – Hobart | ¶ 153 |
| | (13)　"As planned, during the holiday season, we provided our athletes with a series of compelling item level deals.　Additionally, we continue to address targeted inventory overages due to the late arriving Sprin[g] product. As a result of these actions, our inventory is in great shape as we start 2023 . . . . Our inventory is healthy and well positioned." – Gupta | ¶ 154 |
| **March 14, 2023 Bank of America Consumer & Retail Conference** | (14)　"So again, they [nonpriority categories, maybe the more COVID beneficiaries like bikes, camping, fishing, home fitness] are a smaller piece of our business. And each one of them had big surges, but has landed at levels that are above 2019, and we expect that to continue. So there are strong pieces of our business. They're just going through a cycle right now overall, not impacting the total as much as the other categories are." – Hobart | ¶ 156 |
| | (15)　"But what we have – I think, has lost at times, we have a really robust and profitable hardline side of the business from a private brand standpoint. So whether it's in Maxfli from a golf ball standpoint, what we're doing in fitness, what we're doing in the outdoor category, so I mean our #1 brand in golf are our own brands. Our #1 brand in fitness are our own brands. It's really an important aspect of our – of the outdoor category we have, and these are all hard lines that, again, margin rates that are meaningfully higher than what the company as a whole is." – Stack | ¶ 157 |
| **May 23, 2023 Earnings Release and Q1 2023 Call** | (16)　"Our inventory is clean and well positioned." – Gupta | ¶ 159 |

| **Date and Event** | **Statement** | **AC Citation** |
|---|---|---|
| | (17)　　　"So we saw strong growth in footwear, in team sports, in apparel throughout the quarter. Some of those COVID categories you talked about, maybe bikes or fitness, they are all – while they have retrenched, they're well above where they were in 2019, golf included. And we think they have long-term growth. So we've been dealing with the pandemic quote/unquote – pandemic surging categories for some time. Our core businesses are doing very well and driving our growth." – Hobart | ¶ 160 |
| | (18)　　　"So starting with inventories, we are managing our inventory well. Our inventory is clean. It's well positioned. And I think what's very important for – to realize is that our inventory and our products now are very narrowly distributed. So we have more of a moat against any industry-level promotion that might have affected us in a – time ago when there was just wide distribution of similar products. So we are not expecting to have – to go into a major promotional cycle here. We're very proud and happy with the inventory levels that we have, and the assortment is a real asset here. We're not experiencing any inventory flow issues." – Hobart | ¶ 162 |
| | (19)　　　"Clearance was not a major factor in Q1. Our inventory was pretty clean at the end of 2022, and we continue to feel really optimistic about our inventory on hand at the end of Q1 . . . Right now, we feel that the inventory is clean and well positioned." – Gupta | ¶ 163 |

Defendants submit that none of the above statements give rise to a securities fraud claim because the statements "are inactionable opinions, protected forward-looking statements, and statements of general corporate optimism, and because Plaintiffs have failed to allege with particularity that any of the statements were false or misleading when made."  ECF No. 59 at 19; ECF No. 59-1 at 2-11.  The Court disagrees.

Statements (1), (2), (4), (5), (6), (10)-(13), (15), (16), and (18) are all present tense, factual statements that fall outside of the safe harbor protections.  Additionally, these statements are

contradicted by allegations in Plaintiffs' AC. Specifically, accounts of the CWs reflect existence of excess inventory, of which Defendants were aware from seeing it firsthand, as well as having access to "weekly inventory and sales reports" related to inventory. ECF No. 51 ¶¶ 88-99, 178-215. These accounts are sufficient for purposes of specificity and plausibility because Plaintiffs have sufficiently "demonstrate[d] that discovery would be reasonably likely to reveal evidence of the falsity of the[se] . . . statements." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 682 (3d Cir. 2023) (internal citations omitted).

Statements (3), (8), (9), (17) and (19) are not actionable because, as Defendants accurately submit, they are statements of corporate optimism. ECF No. 59 at 28-29. Vague and non-specific statements of corporate optimism have been held to be not actionable because they constitute mere puffery "on which reasonable investors would not have relied." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010). "Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (citing *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013)).

Statements (7) and (14) are forward-looking statements. Forward-looking statements are protected if they are "either accompanied by 'substantive and tailored' cautionary statements or if the plaintiff fails to show actual knowledge of falsehood." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016) (cleaned up). "A cautionary statement must be "'extensive yet specific' to prevent a reasonable investor from relying on specific projections." *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 554 (W.D. Pa. 2019) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000))." *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 490

(W.D. Pa. 2020). Here, at the beginning of the November 22, 2022 earnings call, the Senior Director of Investor Relations cautioned:

> As a reminder, we will be making forward-looking statements which are subject to various risks and uncertainties that could cause our actual results to differ materially from these statements. Any such statements should be considered in conjunction with cautionary statements in our earnings release and risk factor discussions in our filings with the SEC including our last annual report on Form 10-K and cautionary statements made during this call. We assume no obligation to update any of these forward-looking statements or information.

ECF No. 60-8 at 5. The above cautionary language suffices for purposes of the safe harbor provision, rendering statement (7) inactionable. As for statement (14), the cautionary language was limited to: "We'll do a quick housekeeping. There is a safe harbor statement that is posted. The legal team has told me that I need to mention at the beginning. So with that out of the way, I'll turn it back to Robby." ECF No. 60-35 at 5. This is insufficient to bring this statement within the protections of the safe harbor provision, and so this statement is therefore actionable.

Accordingly, at this stage of the proceedings, statements (1), (2), (4), (5), (6), (10)-(14), (15), (16), and (18) are plausibly actionable. It is respectfully recommended that any securities fraud claim based on the statements (3), (7), (8), (9), (17), and (19) be dismissed.

### Risk Factors

Plaintiffs allege that four times during the Class Period, Defendants disclosed risk factors after they had materialized. ECF No. 51 ¶¶ 165-167. Relying heavily on *Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017), Defendants submit that any claim predicated on these risk factors must be dismissed because Plaintiffs failed to "plead with particularity that the disclosed risks—a "significant[]" sales decline, "significant merchandise markdowns," or "lower margins"—had "already come to fruition." *Williams*, 869 F.3d at 242." ECF No. 59 at 32.

In *Williams*, 869 F.3d at 244, Plaintiffs argued that Globus misled investors when its risk disclosures warned that the loss of an independent distributor could diminish sales – but it omitted to inform investors that Globus had *in fact* lost an independent distributor. *Id*. at 241 (emphasis in original). The Third Circuit determined that "plaintiffs rel[ied] on conjecture based upon subsequent events." *Id.* at 245. Further, the Third Circuit stated that, even if defendant Globus "knew or should have known that ending its relationship with [the terminated distributor] could have some effect on its sales … Plaintiffs have not pleaded any facts to support their claim that Globus incorporated anticipated revenue from [the distributor] in its projections." *Id.* at 246.

Here, while Plaintiffs' allegations are numerous, they nevertheless fail to satisfactorily plead that the risk factors identified had already come to fruition. Defendants alerted investors to the possibility of not just a decline in sales, but a "*significant* decline in sales." ECF No. 51 ¶¶ 165-168 (emphasis added). Similarly, investors were alerted to the possibility of not just merchandise markdowns, but "*significant* merchandise markdowns." *Id*. While it appears to be undisputed that throughout the Class Period there was a decline in demand and sales of outdoor and fitness equipment, Plaintiffs have not pled that, at the time of these disclosures, this decline was "significant." In accordance with Third Circuit precedent, these risk factors do not give rise to a securities fraud claim and it is respectfully recommended any claim based on these disclosures be dismissed.

***Shrink***

Plaintiffs allege that Defendants' SEC disclosures relative to the level of inventory shrink were misleading because they "failed to disclose information required to be disclosed therein under Item 303." ECF No. 51 ¶ 170. Defendants argue that Plaintiffs' reliance on Item 303 is misplaced considering the recent Supreme Court decision in *Macquarie Infra. Corp. v. Moab Partners, L.P.*,

601 U.S. 257 (2024), where the High Court held "the failure to disclose information required by Item 303" is actionable "*only* if the omission renders affirmative statements made misleading." *Id.* at 265 (emphasis added).

Plaintiffs do not dispute that Defendants repeatedly disclosed decreasing merchandise margins because of "higher inventory shrink due to increased theft." ECF No. 51 ¶ 175(a)-(d). However, they submit that this information was not enough, and material facts were omitted such that the statements made were misleading. *See* ECF No. 59 at 33-35. The Court disagrees. Defendants' disclosures relative to the level of shrink, that included acknowledgements of "increased theft," were not misleading such that including additional detail was necessary.

As such, it is respectfully recommended that any fraud claim based on statements relative to shrink be dismissed.

### 2. Scienter

This Court previously stated that,

> "Scienter is a mental state embracing intent to deceive, manipulate, or defraud." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (cleaned up). A plaintiff alleging scienter must assert facts giving rise to a strong inference of reckless or conscious behavior. *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 153-54 (3d Cir. 2018) (citation omitted). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42 (citation omitted).

*In re Mylan*, 2023 WL 3539371, at *16.

Here, to determine whether Plaintiffs' allegations satisfy the scienter requirement, the Court must accept all of the facts in the Amended Complaint as true and consider whether all the facts, taken collectively, give rise to a strong inference of scienter, and "not whether any individual

allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 323. Finally, "in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences." *Id.*

> In other words, on this last part, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* (cleaned up). "A securities fraud complaint will therefore only survive a 12(b)(6) motion to dismiss if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (cleaned up).

*In Re Mylan*, 2023 WL 3539371, at *16. A plaintiff can plead a strong inference of scienter where the complaint sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018) (internal quotations omitted).

Here, Plaintiffs have met their burden of pleading scienter.[3] Initially, corroborating accounts of ten (10) CWs[4] related to excess inventory during the Class Period, along with their assertions that Defendants had access to this information via tracking and reporting systems, support Plaintiffs' position that Defendants were aware of excess inventory. ECF No. 51 ¶¶ 178-215, 219, 223-224. *See In re Mylan*, 2023 WL 3539371, at *6 ("mutual consistency of the former employees' accounts reinforces their reliability").

---

[3] Having previously recommended that any fraud claim based on Defendants' risk factors and statements regarding shrink be dismissed, this scienter section will only focus on misleading statements relating to inventory.

[4] The CWs include – but are not limited to – the Manager of Strategy; a District Manager in the West responsible for 16 stores and 1,500 employees; a District Manager in the East responsible for at least nine and up to 15 stores; an employee at DSG's headquarters in the Planning, Allocation, and Replenishment group; a Warehouse Supervisor overseeing a 1.5 million square foot facility; a Merchandise Planner; and an Assistant Buyer based at headquarters. ECF No. 51 ¶¶ 178-215.

Next, the timing of Defendants' stock sales also supports a strong inference of scienter. "[S]ales of company stock by insiders that are "unusual in scope or timing ... may support an inference of scienter." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006). Here, on August 23, 2022, Defendants released DSG's financial results for 2Q22, and during the earnings call on the same day, Defendant Hobart described the inventory as being "healthy" and "well-positioned." *See* ECF No. 51 ¶¶ 140-145. Plaintiffs allege that in the days following the release of these financial results, Defendant Hobart sold DSG shares for approximately $7 million. *Id.* ¶ 263. In a similar vein, during the earnings call related to the March 7, 2023 release of DSG's financial results for 4Q22, Defendant Gupta described DSG's inventory as being "in great shape as we start 2023." *Id.* ¶ 153. Within a week of this release, all three Defendants sold shares resulting in nearly $23 million in proceeds for Defendant Stack, over $12 million in proceeds for Defendant Hobart, and over $2.5 million in proceeds for Defendant Gupta. *Id.* ¶¶ 260-266. During the Class Period, Defendants sold stock resulting in approximately $47 million in gains. ECF No. 51 ¶ 258.

The final step in the scienter analysis requires the Court to weigh Defendants' proposed competing inferences. *In re Mylan*, 2023 WL 3539371, at *19. On this point, Defendants assert that they were simply optimistic and believed that "consumers have made lasting lifestyle changes" with "an increased focus on health and fitness, sports, and outdoor activities." ECF No. 59 at 49. They further point to DSG's March 2023 purchase of Moosejaw, and outdoor retailer, as evidence of that confidence. *Id.*; *see also* ECF No. 51 ¶ 232. During oral argument, defense counsel argued that the purchase "would make absolutely no economic sense if [Defendants] weren't confident in the outdoor category." ECF No. 69, Oral Arg. Tr. at 9, *see also* ECF 59 at 11, 39 (same).

Defendants also contend that DSG implemented "structural changes in its business to support higher sales and margins."[5]  ECF No. 59 at 49.

Yet, at this stage, Defendants' narrative of optimism and structural transformation is belied by the reality confronting the company, of which the individual Defendants were aware based on their visits to the overloaded stores and/or their access to detailed weekly reports on inventory levels.  These facts render Defendants' explanation doubtful and, at a minimum, insufficient to overcome the competing inference of scienter.  For similar reasons, the Court is unpersuaded by the Moosejaw purchase, in part because Plaintiffs offer an equally plausible explanation – that is, that acquisition of Moosejaw could have been made to sell or conceal excess inventory, and there are no facts showing that Moosejaw's inventory and DSG's excess inventory were the same.  ECF No. 63 at 41 n.31.  Thus, while DSG's acquisition of Moosejaw could indicate confidence, the inference of scienter is at least compelling – if not more so – than Defendants' innocent explanation.

Accordingly, since the determination of whether Plaintiffs have sufficiently pled scienter "rest[s] not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter," *Avaya*, 564 F.3d at 269, at this stage of the proceedings, Plaintiffs have met their burden.[6]

---

[5] In their brief, Defendants describe the "structural changes" as offering "more differentiated and premium product," "ma[king] our stores more experiential," and "invest[ing] in technology and data science."  ECF No. 59 at 13-14.  Yet Defendants admit these "structural changes" predate the COVID pandemic – raising doubt that they could serve as a basis for optimism when, despite those changes, the company was confronting ongoing and mounting excess inventory during the class period.  *Id*. .

[6] Since Plaintiffs have adequately pled scienter as to the individual Defendants, their scienter is imputed to DSG.  *Mylan*, 2023 WL 3539371, at *18.  ("The scienter of Defendants Malik, Bresch,

### 3. Loss Causation

This Court recently wrote that,

> Loss causation is the "causal connection between the material
> misrepresentation and the loss[.]" *Dura Pharms., Inc. v. Broudo*,
> 544 U.S. 336, 342 (2005). "[T]he loss causation inquiry typically
> examines how directly the subject of the fraudulent statement
> caused the loss, and whether the resulting loss was a foreseeable
> outcome of the fraudulent statement." *Berckeley Inv. Grp., Ltd. v.
> Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006) (cleaned up). To satisfy
> this element, "the misstated or omitted facts [must be] a substantial
> factor in causing an economic loss actually incurred by the
> plaintiffs." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 436 (3d
> Cir. 2007).

*In re Mylan v. N.V. Sec. Litig.*, No. 2:20-CV-955-NR, 2025 WL 1874621, at *2 (W.D. Pa. July 8,

2025) (Ranjan, D.J.).

Plaintiffs need not plead loss causation with particularity. *Dura*, 544 U.S. at 346. A short

and plain statement showing that they are entitled to relief that will satisfy Rule 8 standards will

suffice. *Id*. While the burden on Plaintiffs to plead loss causation is not great, Plaintiffs still must

plead "some indication of the loss and the causal connection" to put Defendants on notice of such

loss. *Id*. at 347.

Here, Plaintiffs' securities fraud claims are brought pursuant to the fraud-on-the-market

theory. ECF No. 51 ¶ 267.

> The Third Circuit has directed that "to satisfy the loss causation
> requirement" in a "typical 'fraud-on-the-market' § 10(b) action, [in
> which] the plaintiff shareholder alleges that a fraudulent
> misrepresentation or omission has artificially inflated the price of a
> publicly-traded security,...the plaintiff must show that the revelation
> of that misrepresentation or omission was a substantial factor in
> causing a decline in the security's price[.]" *McCabe*, 494 F.3d at
> 425-26 (emphasis added); *see also Pure Earth, Inc. v. Call*, 531 F.

---

and Parks may be imputed to Mylan because each is a 'high managerial agent …who ratified,
recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance.'").
(citation omitted).

App'x 256, 260 (3d Cir. 2013) ("[T]o prove loss causation in a typical § 10(b) case, the plaintiff must show that his losses are related specifically to the market's discovery of the misrepresentation and the corresponding decrease in price due to that misrepresentation." (emphasis added)). Thus, while "there is no requirement that the disclosure mirror the earlier misrepresentation[,] . . . the disclosure must still reveal at least part of the falsity of the alleged misrepresentation." *Howard*, 2021 WL 2561895, at *17 (cleaned up).

*In re Mylan*, 2025 WL 1874621, at *3.

Here, Plaintiffs appear to identify two corrective disclosures during the Class Period: May 19, 2023 and August 23, 2023.  ECF No. 51 ¶¶ 260, 267-274.  Defendants challenge the May 19th disclosure, arguing that the TD Cowen report, upon which Plaintiffs rely to plead their loss causation as to this disclosure, "did not reveal anything about the alleged fraud."  ECF No. 59 at 52.  Plaintiffs counter by explaining that the TD Cowen report relied on DSG's own financial data when lowering the sales and earnings per share estimates for the first quarter of 2023 as well as for the 2023 fiscal year, and "specifically linked the decision to lower its sales and EPS estimates of DSG to concerns about the "*durability of [DSG's] margin expansion since 2019*," particularly "*lower merchandise margins*." ¶271."  ECF No. 63 at 55.  Following the publication of this report, DSG's stock prices declined by 6.8%.  ECF No. 51 ¶ 271.

Given that Plaintiffs need not plead loss causation with particularity, the averments in their AC sufficiently allege loss causation for the May 19, 2023 disclosure.  Plaintiffs have pled that following the publication of the TD Cowen report, DSG stock price decreased, resulting in financial loss.  This is all that is required at this stage of the litigation.

### b.  Violation of Section 20(a) of the Securities Exchange Act

Section 20(a) provides that, persons who directly or indirectly control any person liable under the Exchange Act or rules promulgated under it, are jointly and severally liable with the

controlled person for violations of the act, unless the controlling person "acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  "[L]iability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya,* 564 F.3d at 252.  Having recommended that Plaintiffs' Section 10(b) claim as to at least some of the statements survive Defendants' pending Motion, it is therefore also recommended that the Section 20(a) claim be permitted to proceed.[7]

## III.    <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully recommended that Defendants' Motion to Dismiss, ECF No. 58, be granted in part and denied in part.  Specifically, it is recommended that the Motion seeking dismissal of Count I be denied as to the actionable statements related to inventory, only.  The Motion should be granted as to Count I, insofar as the 10(b) claim is predicated on the identified risk factors and statements related to shrink.  Count I based on these statements should be dismissed, and Plaintiffs should not be granted leave to amend as to the scope of the actionable statements, "because the defects in the amended complaint (*i.e.*, whether certain statements are actionable) are purely legal issues, and so amendment would be futile.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002)." *In re Mylan*, 2023 WL 3539371, at *20.

It is further recommended that Defendants' Motion to Dismiss the Section 20(a) claim in Count II be denied as to the individual Defendants, as they relate to the actionable statements, but granted as to Defendant Dick's Sporting Goods.

---

[7]  Defendants are correct that DSG cannot be liable for a Section 20(a) violation.  As such, to the extent Plaintiffs are pursuing a Section 20(a) claim against DSG, it is respectfully recommended that Defendants' Motion be granted in this regard and that DSG be dismissed.

In accordance with the Magistrate Judges Act, 28 U.S.C. §636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections will constitute a waiver of any appellate rights.

Dated:  August 12, 2025.

BY THE COURT

/s/ Kezia O. L. Taylor
KEZIA O. L. TAYLOR
United States Magistrate Judge