# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE DICK'S SPORTING GOODS, INC. SECURITIES LITIGATION | Civ. Action No. 2:24-cv-00196-NR-KT <br><br> <u>CLASS ACTION</u> <br><br> **<u>DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT & RECOMMENDATION</u>** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................3

ARGUMENT............................................................................................................................5

    I.      PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE
           MISSTATEMENTS. ..........................................................................................6

           A.      The statements are forward-looking statements protected by the
                      safe harbor.....................................................................................6

           B.      The statements are inactionable opinions under *Omnicare*. .......................10

           C.      The statements are immaterial statements of corporate optimism.............13

           D.      The statements were not false or misleading when made.........................14

    II.     PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF
           SCIENTER. ......................................................................................................15

            A.      The alleged stock sales do not support a strong inference of
                      scienter. ........................................................................................15

            B.      Plaintiffs' other allegations fail to raise a strong inference of
                      scienter. ........................................................................................19

            C.      The more compelling inference is that there was no securities
                      fraud. ...........................................................................................22

    III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION AS TO THE TD
           COWEN REPORT.............................................................................................24

    IV.    PLAINTIFFS FAIL TO ALLEGE A SECTION 20(A) CLAIM. ........................25

CONCLUSION........................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004).....................................................................................................15

*Chapman* v. *Mueller Water Prods., Inc.*,
    466 F.Supp.3d 382 (S.D.N.Y. 2020).....................................................................................17

*City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*,
    540 F.Supp.2d 464 (S.D.N.Y. 2008).....................................................................................17

*City of Warren Police & Fire Ret. Sys.* v. *Prudential Fin., Inc.*,
    70 F.4th 668 (3d Cir. 2023) ...........................................................................................5, 10, 12

*Deutschman* v. *Beneficial Corp.*,
    841 F.2d 502 (3d Cir. 1988)...................................................................................................16

*GSC Partners CDO Fund* v. *Washington*,
    368 F.3d 228 (3d Cir. 2004).....................................................................................................9

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)........................................................................................... 14-17

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)...............................................................................................7, 14

*In re Audible Inc. Sec. Litig.*,
    2007 WL 1062986 (D.N.J. Apr. 3, 2007) .....................................................................18 n.16

*In re Aurora Cannabis Inc. Sec. Litig.*,
    2023 WL 5508831 (D.N.J. Aug. 24, 2023) ...........................................................................25

*In re Crocs, Inc. Sec. Litig.*,
    774 F.Supp.2d 1122 (D. Colo. 2011),
    *aff'd*, 667 F.App'x 710 (10th Cir. 2016)..........................................................................11, 21

*In re Hertz Glob. Holdings, Inc.*,
    905 F.3d 106 (3d Cir. 2018)...................................................................................................24

*In re Keyspan Corp. Sec. Litig.*,
    383 F.Supp.2d 358 (E.D.N.Y. 2003) .....................................................................................17

*In re Lexar Media, Inc. Sec. Litig.*,
    2005 WL 1566534 (N.D. Cal. July 5, 2005)..................................................................21 n.18

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005)........................................................................................9

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 3539371 (W.D. Pa. May 18, 2023)............................................... 13-14, 19

*In re Party City Sec. Litig.*,
  147 F.Supp.2d 282 (D.N.J. 2001) ........................................................... 16-17

*In re Radian Sec. Litig.*,
  612 F.Supp.2d 594 (E.D. Pa. 2009) .......................................................................18

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
  2006 WL 648683 (N.D. Cal. Mar. 10, 2006)...........................................................15

*Inst'l Invs. Grp.* v. *Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)................................................................................... 6-8

*Johnson* v. *Siemens AG*,
  2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011).........................................................18

*Katyle* v. *Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ........................................................................... 24-25

*Lipton* v. *Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ................................................................................16

*Martin* v. *Quartermain*,
  732 F.App'x 37 (2d Cir. 2018) ...............................................................................10

*Mun. Emps.' Ret. Sys. of Michigan* v. *Pier 1 Imps., Inc.*,
  935 F.3d 424 (5th Cir. 2019) .............................................................................11, 21

*Nat'l Junior Baseball League* v. *PharmaNet Dev. Grp. Inc.*,
  720 F.Supp.2d 517 (D.N.J. 2010) ................................................................... 24-25

*OFI Asset Mgmt.* v. *Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016)................................................................................2, 10

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................. 10, 12-13

*Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ..................................................................................24

*Pure Earth, Inc.* v. *Call*,
  531 F.App'x 256 (3d Cir. 2013) ..............................................................................24

*Rahman* v. *Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013)........................................................................................19

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)....................................................................................................22

*Town of Davie Police Pension Plan* v. *Pier 1 Imps., Inc.*,
    273 F.Supp.3d 650 (N.D. Tex. 2017) .........................................................................22

*United States* v. *Raddatz*,
    447 U.S. 667 (1980)......................................................................................................5

*Waswick* v. *Torrid Holdings, Inc.*,
    2024 WL 3740052 (C.D. Cal. July 23, 2024)............................................................14

*Winer Fam. Tr.* v. *Queen*,
    503 F.3d 319 (3d Cir. 2007)................................................................................... 14-15

**Statutes and Rules**

15 U.S.C. § 78u-4 ................................................................................................... 5-6

15 U.S.C. § 78u-5 .....................................................................................................6, 8

28 U.S.C. § 636.............................................................................................................5

Fed. R. Civ. P. 8..........................................................................................................24

Fed. R. Civ. P. 9.......................................................................................................5, 24

## PRELIMINARY STATEMENT

In this federal securities action, Plaintiffs challenged three categories of public statements made during the Class Period by senior executives of DICK'S Sporting Goods, Inc. ("DSG"). In a Report and Recommendation on Defendants' motion to dismiss, the Magistrate Judge correctly recommended dismissal of the second and third categories in full and with prejudice. The R&R also correctly recommended dismissal of several statements in the first category—on the grounds that those statements regarding DSG's inventory health and demand for outdoor and fitness products were inactionable statements of corporate optimism and a protected forward-looking statement—but recommended against dismissal for certain other statements in that category. Defendants respectfully object to the R&R's recommendation that Plaintiffs' claims based on any statements regarding inventory health and demand be permitted to proceed, as well as the conclusion that Plaintiffs pled loss causation as to a May 19, 2023 analyst report.

This is a classic case of impermissible "fraud by hindsight." During the COVID-19 pandemic, DSG experienced a dramatic increase in demand, including for outdoor and fitness products. After demand began to decline from pandemic highs, DSG disclosed that it had "a lot of inventory" in these categories. But DSG also explained that outdoor and fitness products do not go obsolete quickly (and thus could be held for a long period before being sold), and its belief that consumers had made lasting lifestyle changes that supported long-term higher demand. During the Class Period, Defendants assessed that DSG's overall, nationwide inventory across all businesses was "healthy and well-positioned," and expected that DSG could sell its outdoor and fitness inventory over time, including in the next year's "peak" summer selling season.

Plaintiffs' theory is that because DSG later determined to discount outdoor products during 2Q23 at the end of the Class Period, which impacted profitability and earnings, this discounting

must have been "a certainty" all along, and Defendants must have known that this would happen all along.  On this basis, Plaintiffs seek to recover from the temporary decline in stock price that followed DSG's announcement of 2Q23 results.[1]  Such "fraud by hindsight" has been "long rejected" by the Third Circuit (and other courts), and it should be rejected here.  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 497 (3d Cir. 2016).

Plaintiffs' allegations fall far short of the PSLRA's heightened pleading requirements. *First*, Plaintiffs fail to allege any actionable misstatements.  Most of the statements convey Defendants' subjective judgment, based on years of business and DSG-specific experience, that DSG would be able to sell its outdoor and fitness inventory over time without a material impact on its profitability.  Plaintiffs' own alleged definitions of inventory-related terms and Third Circuit precedents show that the challenged statements are inactionable forward-looking statements and opinions.  The statements are also immaterial, generalized statements of corporate optimism, and Plaintiffs fail to particularly allege that any statements were false or misleading when made.

*Second*, Plaintiffs fail to raise any strong inference of scienter.  The challenged stock sales do not support motive, and the Confidential Witness allegations fail to support scienter.  All they allege in substance is that there was a large amount of inventory (which Defendants disclosed)— but that does not mean that any statements were false or misleading.  Critically, Plaintiffs do not dispute that ***even a very large amount of inventory may be healthy*** as long as management assesses that it can be sold at sufficient prices over time—particularly where a business experiences a seasonal "peak" in demand (as Plaintiffs allege for outdoor products) and where products can be held for a long period, potentially ***months or even years***, without going obsolete (as Defendants

---

[1] Following the Aug. 2Q23 release, DSG's stock declined from $147.04 to $111.53 per share.  By Dec. 2023, it rebounded to $147; by the time this suit was filed in Feb. 2024, it was over $160; and today it is over $230.  YAHOO! FINANCE, https://finance.yahoo.com/quote/DKS/history/.

disclosed for outdoor and fitness products).  Here, Plaintiffs allege nothing about Defendants'

expectations for demand and pricing over time or how long inventory could be held.  There is thus

no particularized basis to infer that Defendants did not sincerely assess that DSG would be able to

sell its outdoor and fitness products over time.  To the contrary, the only cogent inference is that

Defendants did believe their assessments and only determined at the end of the Class Period, after

entering the 2023 "peak" season, based on evolving market dynamics, that DSG would take actions

to discount inventory and this would impact profitability and earnings.  This is not fraud.

*Finally*, the TD Cowen analyst report released May 19, 2023 cannot support loss causation

because it did not reveal anything about the alleged fraud.

The Complaint should be dismissed in full and with prejudice.

## BACKGROUND[2]

During the COVID-19 pandemic, DSG's sales increased significantly, including from

increased demand for outdoor and fitness products.  ¶¶30-31.[3]  DSG explained that its success was

also driven by structural changes to its business, including "more differentiated and premium

product," "ma[king] our stores more experiential," and "invest[ing] in technology and data

science" to build its "omnichannel" sales platform.  Ex. 4 (3Q21 Tr.) at 5; ¶37.  DSG also expressed

optimism that "[c]onsumers have made lasting lifestyle changes, with an increased focus on health

and fitness and greater participation in sports and outdoor activities."  Ex. 5 (1Q22 Tr.) at 5.

---

[2] Defendants respectfully refer the Court to the detailed background in their Motion to Dismiss briefing and here provide an abbreviated summary of relevant allegations.  *See* Mot. 5-10.

[3] "¶__" citations refer to the Consolidated Complaint (ECF No. 51); "Mot. __" and "Reply __" refer to Defendants' Opening (ECF No. 59) and Reply (ECF No. 64) briefs in support of their Motion to Dismiss; "Opp. __" refers to Plaintiffs' Opposition (ECF No. 63); "R&R __" refers to the Report and Recommendation (ECF No. 70); "pp. __" and "Section __" refer to these Objections; and "Ex. __" refers to exhibits submitted with the Motion to Dismiss (ECF No. 60). The Court may consider all of these materials in evaluating the R&R.  *See* LCvR 72(D)(2).

Nonetheless, DSG cautioned that it was uncertain at what levels DSG's performance would normalize. *E.g.*, Ex. 3 (FY21 10-K) at 11 (while "the COVID-19 pandemic has driven an increase in demand," "[i]t is uncertain whether or the extent to which these trends will continue").

Starting in 2Q22, DSG's margins began contracting from pandemic highs. ¶39. DSG explained that it was optimistic that it would retain a significant portion of its margin expansion given the "foundational changes in our business." Ex. 7 (2Q22 Tr.) at 5; ¶¶4, 37. DSG also disclosed that demand for outdoor and fitness equipment had declined, though was still well above 2019 levels. *E.g.*, Ex. 9 (3Q22 10-Q) at 20 (sales increase "offset by anticipated sales normalization in … fitness and outdoor"); ¶¶151-52; 155-56; 159-60. Apart from an inventory issue due to late-arriving spring apparel, ¶¶46-48, DSG reported its overall, nationwide inventory (*i.e.*, across all businesses) was "healthy and well positioned." ¶141. DSG also reported that its inventory had increased substantially since 2019, consistent with its business growth. *E.g.*, Ex. 7 (2Q22 Tr.) at 7 ("inventory levels increased 49%," a "40% increase" from 2Q19).

Regarding outdoor and fitness, DSG disclosed that it had "a lot of inventory" in "fitness and outdoor equipment" and that it planned to "buy[] around" that inventory "for next year." *Id.* at 20; ¶145. As Mr. Gupta explained: "There are pockets of inventory like in outdoor categories like fitness and bike, where we have a little bit more of. The good thing is those products don't go obsolete," so "you can always buy around them." Ex. 11 (9/7/22 GS Conf.) at 10; Ex. 5 (1Q22 Tr.) at 14 ("[W]e are going to buy around healthy, good inventory."). Thus, given DSG's assessment that outdoor and fitness products would not quickly go obsolete (unlike, *e.g.*, apparel, which may quickly lose value due to fast-moving fashion trends and product innovation), DSG planned to keep these products until they could be sold. In March 2023, DSG also acquired Moosejaw, a retailer in the "outdoor category." ¶232; Ex. 12 (2/22/23 Release).

Significantly, DSG's outdoor business has "7 peak selling weeks" in the summer "around the mid part of Q2" in June, when there is a spike in demand. ¶253. While DSG had expected that it would be able to sell its outdoor inventory without impacting profitability, when DSG entered the 2023 "peak" season, DSG's leaders observed changes in the marketplace. They saw that demand was weaker, and competitor supply and promotions greater, than anticipated. *See* Ex. 14 (2Q23 Tr.) at 4, 8; ¶100. DSG now faced a choice: it could discount inventory during the high-demand season, or it could pack inventory away to sell later, potentially until the next year. As DSG disclosed, it determined to take "decisive action" to discount and clear out inventory during the 2Q23 peak season. Ex. 14 (2Q23 Tr.) at 4, 17. DSG reported the next quarter that it would close 10 of the 12 recently acquired Moosejaw stores. Ex. 15 (3Q23 10-Q) at 17 & n.3.

## ARGUMENT

Defendants respectfully object to the R&R to the extent it: (i) recommends Plaintiffs' Section 10(b) claim be permitted to proceed with respect to certain of the challenged statements regarding inventory health and demand; (ii) concludes Plaintiffs have pled scienter as to those statements; (iii) concludes Plaintiffs have alleged loss causation for the May 19, 2023 TD Cowen report; and (iv) recommends the Section 20(a) claim proceed as to the Individual Defendants.

The Court must make a *de novo* determination of those portions of the R&R to which objection is made. 28 U.S.C. § 636(b)(1)(C). The Court may accept, reject, or modify the recommended disposition. *Id.*; *United States* v. *Raddatz*, 447 U.S. 667, 676 (1980). Because the Complaint asserts securities fraud claims, it must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. *City of Warren Police & Fire Ret. Sys.* v. *Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023). To avoid dismissal, Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C.

§ 78u-4(b)(1), and "state with particularity facts giving rise to a strong inference" of scienter. *Inst'l Invs. Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (quoting § 78u-4(b)(2)).

## I.    PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS.

### A.    The statements are forward-looking statements protected by the safe harbor.

The R&R correctly concluded that statements (7) and (14) are forward-looking.[4] Respectfully, the R&R erred in finding that (i) statements (1), (2), (4)-(6), (10)-(13), (16), and (18) are "present tense" statements that are not forward-looking, and (ii) statement (14) was not accompanied by sufficient cautionary language.  R&R 12-14; *see* Mot. 16-20; Reply 4-5.

As the R&R recognized, the "[t]he PSLRA contains a 'Safe Harbor' provision, 15 U.S.C. § 78u-5(c), that 'immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language'" or the plaintiff fails to allege "actual knowledge" of falsity.  R&R 8.  Forward-looking statements include "projection[s]," statements about "future economic performance," and "any statement of the assumptions underlying or relating to" such statements.  15 U.S.C. § 78u-5(i)(1).

In reaching its conclusions, the R&R did not address Plaintiffs' alleged definitions of inventory-related terms or applicable Third Circuit precedents, which show that the challenged statements are forward-looking.  These statements include assessments that DSG's overall, nationwide inventory was "healthy" and "well-positioned" and there were "no issues with flow." *See* App. A.  Based on Plaintiffs' own definitions, these terms necessarily convey an assessment regarding whether current inventory can be sold ***in the future*** at sufficient prices without impacting profitability.  For example, "healthy" inventory is "enough inventory ***to meet*** customer demand";

---

[4] Statement numbers refer to the numbers assigned by the R&R.  R&R 9-12.  Appendix A ("App. A") submitted herewith is an index of the challenged statements indicating the number assigned by the R&R, the source of the statements, and the applicable sections of these Objections.

"excess inventory" is inventory that "***must be sold*** for lower prices"; "toxicity" is product that "can no longer ***be sold*** at satisfactory prices"; and a "flow" issue is when the retailer "must lower prices … or the inventory ***will fail to sell***."  *See* ¶¶74-78 (emphasis added).

Statements using these terms were necessarily forward-looking—they conveyed an assessment that current inventory could be sold at sufficient prices ***at the time when it was ultimately sold***.  Unless products like kayaks and weight sets go obsolete quickly (which Plaintiffs do not allege and is contrary to DSG's disclosures, p. 4), DSG could hold outdoor and fitness products for months or even years before they were sold.  Significantly, Plaintiffs allege that the outdoor business was seasonal, with a "peak" summer selling season.  ¶253.  Thus, even if there were low demand and a large amount of inventory when a statement was made, DSG's overall inventory would be "healthy" and "clean" as long as outdoor and fitness inventory ultimately could be sold at sufficient prices over time, including in the next "peak" season.

The Third Circuit's decision in *In re Aetna, Inc. Sec. Litig.* is directly on point.  617 F.3d 272 (3d Cir. 2010).  In that case, Aetna's assertion that it applied a "disciplined pricing policy" for insurance premiums was forward-looking because it "describe[d] a policy of setting prices in relation to future medical costs."  *Id.* at 275, 281.  Thus, "whether Aetna's pricing was, in fact, disciplined could not have been determined at the time defendants made the statements."  *Id.* at 281.  Similarly here, whether DSG's inventory was in fact "healthy" could only be determined later, based on the prices at which the products were ultimately sold.

*Avaya* supports the same conclusion.  The Third Circuit held that statements that "we are on track" and "first quarter results position us" to meet sales goals were forward-looking because the present aspects of the statements could not "meaningfully be distinguished from the future projection of which they are a part."  *Avaya*, 564 F.3d at 254-55.  The statements "sa[id] only that,

-7-

whatever [the current] situation is, it makes the future projection attainable." *Id.* at 255.  Similarly here, any hypothetical present aspect could not meaningfully be distinguished from the forward-looking assessment and does not transform the statements into non-forward-looking assertions. Any present aspect would also be a statutorily protected "assumption[] underlying or relating to" the forward-looking assessment.  15 U.S.C. § 78u-5(i)(1)(D).

With respect to the statement that DSG had "no issues with flow," the context underscores that it was forward-looking.  The full statement was:  "When it comes to some of our hardline categories, say, fitness and outdoor equipment, we have bought—that is—we have a lot of inventory there that we just—*we're buying around for next year.  So no issues with flow there*." Ex. 7 (2Q22 Tr.) at 20 (emphasis added); ¶145.  It thus explains that DSG had "a lot" of outdoor and fitness inventory, and that it planned to address the issue by "buying around" existing inventory until it could be sold the next year—referencing "flow" on at least a year-long time frame.  Similarly, the statement that demand had "rebaselined bigger" conveyed a view of forward-looking demand and was in response to questions about outlook "going forward."  ¶¶149-52.

The statements were also identified as forward-looking and accompanied by meaningful cautionary language.  DSG specifically identified statements addressing "the belief that our inventory is healthy and well-positioned" as forward-looking.[5]  Thus, even if it were possible to interpret the statements as "present-tense," DSG informed investors that it was using these terms to convey forward-looking assessments.  DSG also identified as forward-looking statements that "may predict, forecast, indicate or imply future results [or] performance"; concern DSG's "belief that consumers have made lasting lifestyle changes"; or address "the normalization of sales in …

---

[5] Ex. 23 (1Q23 10-Q) at 12; Ex. 1 (FY22 10-K) at 3; *see also* Ex. 24 (2Q22 Release) at Ex. 99.1, 4; Ex. 22 (3Q22 Release) at Ex. 99.1, 4; Ex. 25 (4Q22 Release) at Ex. 99.1, 5.

fitness and outdoor equipment," among others.[6]

As the R&R correctly concluded regarding statement (7), the forward-looking statements were accompanied by meaningful cautionary language, including a warning at the start of every earnings call,[7] as well as specific risk factors in DSG's SEC filings, including "inventory turn," "decreases in consumer demand," "our ability to predict or effectively react to changes in consumer demand," "the level of competitive promotional activity," and "whether or the extent to which [pandemic-era demand] trends will continue."[8] *See also* Mot. 18-20 (citing risk factors). For similar reasons, they are also protected by the bespeaks caution doctrine. *See* Mot. 16.

As to statement (14), the statement was made at an investor conference and prefaced by a statement directing investors to a "safe harbor statement that is posted," which the R&R found to be insufficient cautionary language. Ex. 35 (3.14.23 BoA Conf.) at 4; R&R 14. Because Plaintiffs never raised this argument, Defendants did not previously submit, and the Magistrate Judge did not have the opportunity to consider, the associated safe harbor statement, which includes cautionary language similar to that already cited and is thus sufficient. Obj. Ex. A at 2.[9] *See, e.g.*, *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005) (finding press release covered by safe harbor where it "incorporated by reference [] cautionary statements"). Regardless, DSG's other cautionary disclosures are sufficient even if they did not "actually accompany" the statement. *GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004).

---

[6] *E.g.*, Ex. 22 (3Q22 Release) at Ex. 99.1, 4; Ex. 26 (2Q22 10-Q) at 15; Ex. 9 (3Q22 10-Q) at 14; Ex. 1 (FY22 10-K) at 3; Ex. 23 (1Q23 10-Q) at 12; Mot. 17-18 (citing statements).

[7] *E.g.*, Ex. 7 (2Q22 Tr.) at 4; Ex. 8 (3Q22 Tr.) at 4; Ex. 13 (4Q22 Tr.) at 4.

[8] *E.g.*, Ex. 24 (2Q22 Release) at Ex. 99.1, 4; Ex. 22 (3Q22 Release) at Ex. 99.1, 4; Ex. 25 (4Q22 Release) at Ex. 99.1, 5; Ex. 29 (1Q23 Release) at Ex. 99.1, 4; Ex. 26 (2Q22 10-Q) at 15; Ex. 9 (3Q22 10-Q) at 14; Ex. 23 (1Q23 10-Q) at 12; Ex. 1 (FY22 10-K) at 11-12, 33; Ex. 3 (FY21 10-K) at 10-13, 36.

[9] Objections Exhibit A is submitted herewith with the Declaration of Alison B. Brockman.

Finally, all of these forward-looking statements are also inactionable because Plaintiffs fail to allege "actual knowledge" of their falsity. *OFI*, 834 F.3d at 490; *see also* pp. 19-24.

**B.      The statements are inactionable opinions under *Omnicare*.**

In recommending against dismissal, the R&R does not evaluate Defendants' argument that the statements are inactionable opinions. R&R 12; *see* Mot. 11-16; Reply 1-4. An opinion addresses "'a belief[,] a view,' or a 'sentiment which the mind forms[.]'" *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). Accordingly, statements that require subjective judgment or make predictions are opinions. *See, e.g.*, *Warren*, 70 F.4th at 684 (statements regarding adequacy of reserves "are opinions," since they "reflect[] … judgment, based on a variety of complex assumptions"); *Martin* v. *Quartermain*, 732 F.App'x 37, 40 n.1 (2d Cir. 2018) ("'[P]rojections about the future' are quintessential opinion[s].").

Here, statements that DSG's overall inventory was "healthy" or not "toxic," or related assessments, are opinions. *See* App. A. Plaintiffs' own definitions show that these terms reflect judgments concerning whether inventory can be sold at sufficient prices over time, which requires an assessment of product mix, expected demand and pricing, competitive environment, and how long products can be held without losing value. Likewise, statements concerning demand, such as that demand had "rebaselined bigger," ¶150, express a judgment regarding demand trends.

Under the securities laws, an opinion "is not misleading just because external facts show the opinion to be incorrect," since "[r]easonable investors do not understand such statements as guarantees." *Omnicare*, 575 U.S. at 188. Here, Plaintiffs fail to particularly allege that these statements are actionable under any of the three prongs in *Omnicare*. *See Warren*, 70 F.4th at 684-86 (describing *Omnicare*'s three circumstances where opinions may be actionable).

*First*, Plaintiffs fail to particularly allege that these opinions "w[ere] not sincerely believed when made." *Id.* at 686. Even crediting the CWs, Plaintiffs at most allege that (i) DSG had a large

amount of outdoor and fitness inventory at some stores and needed more storage, (ii) demand had declined, (iii) Defendants received reports with sales and inventory levels, and (iv) some Defendants visited stores.  But simply having a large amount of inventory and lower current demand does not mean that DSG's overall, nationwide inventory was not "healthy," or that there were issues with "flow," or that there would need to be discounting.  By Plaintiffs' own definitions, an assessment of inventory health depends critically on DSG's expectations for demand, pricing, and competitive conditions going forward and how long the inventory can be held.  Plaintiffs allege *nothing* about Defendants' expectations regarding these factors or impact on profitability when inventory would be sold.  There are thus no particularized facts from which to infer that Defendants did not sincerely assess that DSG could sell its outdoor and fitness inventory over time (including during the next "peak" selling period) without a material impact on DSG's profitability.

The Fifth Circuit rejected similar allegations in *Mun. Emps.' Ret. Sys. of Michigan* v. *Pier 1 Imps., Inc.*  935 F.3d 424 (5th Cir. 2019).  The plaintiffs claimed that defendants knew inventory was subject to "significant markdown risk" because the company had "large inventory backlogs" and "was resorting to temporary storage units."  *Id.* at 428-29, 431-32.  As the court explained: "*[k]nowledge of high inventory does not necessarily equate to knowledge of significant markdown risk*—an equally plausible inference is that [defendants] reasonably believed they could fix the excessive inventory problem without resorting to markdowns."  *Id.* at 432 (emphasis added); *see also, e.g.*, *In re Crocs, Inc. Sec. Litig.*, 774 F.Supp.2d 1122, 1150 (D. Colo. 2011), *aff'd*, 667 F.App'x 710 (10th Cir. 2016) (because "*any write-down of excess inventory depends on the company's prediction of future demand*," and "*the Complaint lack[ed] any allegations regarding Crocs' internal predictions of future demand*," no inference that defendants knew inventory valuations were incorrect) (emphasis added).  The same reasoning applies here.

-11-

Moreover, Defendants *disclosed* that DSG had "a lot of inventory" in outdoor and fitness, and that DSG planned to address this issue by "buying around" inventory for "next year." *See* p. 4. Plaintiffs do not plead any particularized facts showing that Defendants did not sincerely believe that this plan would be successful, or had any other intention. It is entirely consistent with this plan that DSG would have a lot of outdoor and fitness inventory in the period before the 2023 "peak" season. It is also not surprising that DSG would reevaluate its assessment after observing difficult market conditions during that "peak" period, and would take quick action, since once the seven "peak" weeks passed, DSG would potentially face lower demand until the next year.

Plaintiffs also do not dispute that many statements, including that inventory was "healthy," "clean," and "well-positioned," referred to DSG's *overall nationwide and enterprise-level inventory* across all business lines. Plaintiffs plead no particularized facts showing that Defendants believed at any time that issues concerning outdoor and fitness inventory—which Defendants described as "smaller categories," Ex. 20 (2Q21 Tr.) at 9—were so significant that they would affect DSG's overall inventory health, *see, e.g.*, *Warren*, 70 F.4th at 686 (allegations insufficient where plaintiffs failed to show that "the Hartford Block's problems had affected Individual Life to the point that the reserves for that entire business segment were deficient").[10]

*Second*, Plaintiffs do not identify any "expressly embedded, untrue factual assertion[s]" within the opinions (and did not raise this theory in previous briefing). *Warren*, 70 F.4th at 686.

*Third*, Plaintiffs fail to plead that the opinions "omit[ted] material facts about the [speaker's] inquiry [] or knowledge" that "conflict with what a reasonable investor would take from the statement." *Omnicare*, 575 U.S. at 189. To meet this prong, Plaintiffs must allege more

---

[10] The Complaint does not allege the size of the outdoor and fitness business; Plaintiffs suggested it could be 20% of DSG's total revenues, which is comparatively small. Opp. 11 & n.6.

than that the "issuer knows, but fails to disclose, some fact cutting the other way," since investors "understand that opinions sometimes rest on a weighing of competing facts." *Id.* at 189-90.

This Court's decision in *In re Mylan N.V. Sec. Litig.* is instructive. 2023 WL 3539371 (W.D. Pa. May 18, 2023). That case involved statements expressing optimism about a pharmaceutical company's outlook and ability to gain market share, without disclosing that the company allegedly was compromising manufacturing quality. *Id.* at \*13. As the Court explained, "when expressing an optimistic opinion about Mylan's future, [d]efendants didn't have to disclose every possible problem that could arise …. Rather, such an obligation could only arise if the undisclosed fact made it impossible for the speaker's opinion to be correct." *Id.*

Plaintiffs do not particularly allege any facts showing that it was impossible for Defendants' optimistic opinions about inventory health to be achieved. DSG could have significant outdoor and fitness inventory and still assess that its overall, nationwide inventory was "healthy," and there was no "flow" issue, because DSG also expected that it would be able to sell that inventory over time without material impact on profitability. At most, Plaintiffs have alleged "some fact cutting the other way," by focusing on the amount of inventory, not circumstances that made it impossible for the opinions to be correct. *Omnicare*, 575 U.S. at 189.

Finally, investors understand an opinion in light of the "full context," including "hedges, disclaimers, and apparently conflicting information." *Id.* at 190. Here, the opinions could not have been misleading given DSG's other disclosures and risk factors, including that demand for outdoor and fitness products had declined; that DSG had "a lot of inventory" in "fitness and outdoor equipment" and the plan to "buy[] around" for "next year"; and that statements about inventory health were forward-looking and subject to many risks. *See* pp. 4, 8-9; Mot. 6-8, 16-20.

**C.    The statements are immaterial statements of corporate optimism.**

The R&R correctly concluded that statements (3), (8), (9), (17) and (19) were immaterial

-13-

statements of corporate optimism. R&R 13.[11] The statements for which dismissal was not recommended are also inactionable because a reasonable investor cannot rely on such general optimistic statements. *See Mylan*, 2023 WL 3539371, at *10; App. A; Mot. 20-21; Reply 5-6. For example, statements that inventory was "in great shape," high-level optimistic statements that inventory was "healthy" or "clean" that do not reference any specific products, and subjective, unquantified references to "flow" or "rebaselined" demand are the type of generalized statements that have been held too vague to be verified and "puffery." *See, e.g.*, *Aetna*, 617 F.3d at 284 ("'disciplined' pricing"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537-39 (3d Cir. 1999) ("risk-adjusted pricing strategy" and "excellent" "credit quality"); *Waswick* v. *Torrid Holdings, Inc.*, 2024 WL 3740052, at *7 (C.D. Cal. July 23, 2024) (company "was 'comfortable with'" its inventory levels). Moreover, such generalized optimistic statements cannot have "meaningfully altered the total mix of information," *Aetna*, 617 F.3d at 284, given DSG's other disclosures and many cautionary statements, *see, e.g.*, pp. 4, 8-9; Mot. 6-8, 16-20.

**D.    The statements were not false or misleading when made.**

Plaintiffs fail to plead particularized facts showing that the statements regarding inventory health and demand were false or misleading when made. *See* App. A; Mot. 21-23; Reply 6-7. As discussed in Section II.B., the CWs' allegations should not be credited, and for the same reasons Plaintiffs' allegations do not support scienter, they also do not plead any material misstatements. Certain statements also did not purport to address inventory, and thus could not have been misleading (*e.g.*, (4), (10), (11), (14), (15)).[12] *See, e.g.*, *Winer Fam. Tr.* v. *Queen*, 503 F.3d 319,

---

[11] To the extent the R&R concluded these were also inactionable opinions, *see id.*, this was also correct; the statements not recommended for dismissal are equally so for the reasons herein.

[12] Statement (15) discussed comparative profitability of DSG's "private brands" and did not address inventory. Since this is the only statement attributed to Mr. Stack, ¶157, if the Court finds it inactionable, Mr. Stack should be dismissed as a defendant (even if other statements proceed).

330 (3d Cir. 2007) (statement must be "so 'incomplete as to mislead'"). That DSG ultimately engaged in discounting at the end of the Class Period is simply impermissible "fraud-by-hindsight." *See, e.g.*, *Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) ("[F]raud cannot be inferred merely because '[a]t one time the firm bathes itself in a favorable light' but 'later the firm discloses that things are less than rosy.'"); *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2006 WL 648683, at *7 (N.D. Cal. Mar. 10, 2006) (allegation that "because SST wrote down its inventory … the statements about inventory made prior to that time must have been false" was "fraud by hindsight"). The statements also could not have been misleading given DSG's other disclosures and cautionary statements. *See* pp. 4, 8-9; Mot. 6-8, 16-20.

## II.   PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER.

### A.   The alleged stock sales do not support a strong inference of scienter.

The R&R found "the timing of Defendants' stock sales [] supports a strong inference of scienter" only because certain sales took place following earnings calls during which alleged misstatements were made. R&R 18. Respectfully, the R&R erred in finding that this timing supported scienter, and by not considering that multiple other circumstances refute scienter or the trades of each Individual Defendant individually. *See* Mot. 28-32; Reply 10-12. As the Third Circuit has explained, "[a] large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course." *Advanta*, 180 F.3d at 541. Thus, stock sales may support scienter only when "unusual in scope or timing." *Id.* at 540. They are not suspicious on either front here.

The R&R failed to consider that the Individual Defendants each retained large holdings in DSG securities and, as a group, retained ***over 98%*** of their initial Class Period holdings, or ***over***

**99%** including vested options. *See* App. B, Tbls. 1(a)-(b).[13]  These large retained holdings refute

any inference of motive. *See, e.g.*, *Advanta*, 180 F.3d at 540-41 (no scienter where defendant

"continued to hold a sizable percentage"); *In re Party City Sec. Litig.*, 147 F.Supp.2d 282, 313-14

(D.N.J. 2001) ("[l]ow aggregate sales and large retained aggregate holdings" rebut motive; no

scienter where defendants in aggregate sold "only" 8%, even though one sold 100%).

Moreover, with respect to all three Individual Defendants, the R&R overlooked that

"[t]rading following public announcements simply evidences compliance with the securities

laws," and is to be expected and encouraged, since executives generally can trade only when not

in possession of material non-public information, which will often be after public announcements.

*Party City*, 147 F.Supp.2d at 312; *see also Deutschman* v. *Beneficial Corp.*, 841 F.2d 502, 506 (3d

Cir. 1988) (insiders must "abstain from trading" while possessing material non-public

information); *Lipton* v. *Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (executives

"commonly make stock transactions following the public release of quarterly earnings").  It was

therefore an error for the R&R to conclude that timing of trades occurring after earnings calls alone

supported an inference of scienter for any Defendant, particularly when the totality of the

circumstances for each individual fails to support an inference of motive for multiple reasons.

**Mr. Stack**.  The R&R failed to address that Mr. Stack's *only* challenged sales, on March

13, 2023, were in connection with the exercise of options expiring on April 3, 2023.  *See* App. B,

Tbl. 3(a) at 5 & n.6.  This impending expiration refutes any inference of scienter based on timing;

moreover, the Third Circuit has recognized that sales in connection with option exercises do not

support scienter because options are "an intended part of [executives'] overall compensation."

*Advanta*, 180 F.3d at 541; *see also, e.g.*, *Party City*, 147 F.Supp.2d at 313 (Third Circuit has

---

[13] Appendix B ("App. B") refers to App. B submitted with the Motion (ECF No. 59-2).

"refused to impute scienter" from option-related sales); *Chapman* v. *Mueller Water Prods., Inc.*, 466 F.Supp.3d 382, 411 (S.D.N.Y. 2020) (sales show defendants "wished to exercise their options before they expired, not that they were engaged in fraud"). The R&R also ignores that Mr. Stack retained over 99% of his stock holdings, and increased his holdings when including vested options. *See* App. B, Tbls. 1(a)-(b); *see, e.g.*, *In re Keyspan Corp. Sec. Litig.*, 383 F.Supp.2d 358, 383 (E.D.N.Y. 2003) ("net acquisition of shares" "inconsistent" with scienter).

**Ms. Hobart**. Ms. Hobart retained 80% of her stock holdings, and over 85% including vested options. *See* App. B, Tbls. 1(a)-(b). All of her challenged sales were many months or a year before the alleged corrective disclosure in August 2023. *See id.*, Tbl. 3(b) at 6-7; *see, e.g.*, *Advanta*, 180 F.3d at 540 (no scienter where trading was three months before disclosure); *Party City*, 147 F.Supp.2d at 313 (sales three, four, and 12 months before); *City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*, 540 F.Supp.2d 464, 475 (S.D.N.Y. 2008) (approximately 10-week gap). Two of the three sales were in connection with option exercises, and her trading volume was consistent with prior years. *See* App. B, Tbl. 3(b) at 6-7 & nn.8-10, Tbl. 2 at 3; *see, e.g.*, *Advanta*, 180 F.3d at 541 (no scienter where defendants "sold a total of 1,023,766 shares during the eight-month class period, as compared to 580,814 during the previous 28 months").

**Mr. Gupta**. Mr. Gupta increased his overall stock holdings, and retained 84% of his holdings including vested options. *See* App. B, Tbls. 1(a)-(b). As Plaintiffs acknowledged, although they counted "sales-to-cover" option exercises[14] in Mr. Gupta's Class Period sales, they failed to include a sale-to-cover of 18,947 shares in his alleged "Comparison Period" sales. Mot. 30 & n.20; Opp. 26 n.26; Reply 10-11 & n.18. If that sale is included, Mr. Gupta sold essentially the same number of shares in the Class Period and Comparison Period (35,524 and 33,261,

---

[14] "Sales-to-cover" involve the sale of shares to cover an option exercise price, fees, or taxes.

-17-

respectively).[15] *See* App. B, Tbl. 2 at 3.  The challenged sales also were over two months and five months before the August 2023 alleged corrective disclosure, *see* App. B, Tbl. 3(c) at 8-9, and several sales were in connection with option exercises, including sales to cover, which do not support scienter, *see, e.g.*, *In re Radian Sec. Litig.*, 612 F.Supp.2d 594, 611 (E.D. Pa. 2009) ("sales to cover tax liabilities … weigh[] against" scienter).[16]

**Stock Repurchases**.  DSG's repurchase of approximately 2.6 million shares of its own stock for $326 million further undermines scienter, since this would "def[y] economic reason" if Defendants "were engaged in a scheme to inflate the value of [DSG]'s securities." *Johnson* v. *Siemens AG*, 2011 WL 1304267, at *14 (E.D.N.Y. Mar. 31, 2011); App. B, Tbl. 4 at 11.

**Moosejaw Purchase**.  Respectfully, the R&R incorrectly concluded that DSG's purchase of Moosejaw in March 2023 did not undermine scienter.  R&R 19.  As Defendants argued, DSG's acquisition of an outdoor retailer makes no economic sense if Defendants secretly believed that DSG had too much outdoor inventory and did not expect strong demand for outdoor products.  *See* Ex. 12 (2/22/23 Release); ¶232.  The R&R, however, found that Plaintiffs offered "an equally plausible explanation" that the "acquisition of Moosejaw could have been made to sell or conceal excess inventory" and "there are no facts showing that Moosejaw's inventory and DSG's excess inventory were the same."  R&R 19.  But Plaintiffs' own allegations are that Moosejaw was an "outdoor company" in the "outdoor category," ¶232, which is the same category as the alleged excess products, *e.g.*, ¶¶5, 71.  Further, Plaintiffs alleged that Moosejaw supported an inference of scienter with respect to the alleged excess inventory because it "***highlighted the importance of the***

---

[15] Plaintiffs' "Comparison Period" is the 12 months before the Class Period.  ¶259 n.10.

[16] Plaintiffs' allegation that Defendants made $47 million of proceeds does not support scienter, particularly given that Plaintiffs allege nothing about profits, *see, e.g., In re Audible Inc. Sec. Litig.*, 2007 WL 1062986, at *12 (D.N.J. Apr. 3, 2007), which would require subtraction of option exercise prices, taxes, and fees and are thus inferably a much smaller amount.  *See* Mot. 31.

*outdoor category* to Defendants." ¶232 (emphasis added). Plaintiffs cannot claim that Moosejaw was only similar enough to support but not undermine scienter. There is also no basis from facts alleged in the Complaint for any inference that Moosejaw would enable DSG to "sell or conceal excess inventory." DSG already had over 850 stores, *see* Ex. 1 (FY22 10-K) at 22, and Plaintiffs allege excess inventory was caused by reduced demand, not a lack of sales locations. There is also no explanation for how inventory could be "concealed" (nor any allegation that it ever was).

**B.        Plaintiffs' other allegations fail to raise a strong inference of scienter.**

Respectfully, the R&R erred by concluding that any of (i) the alleged statements by the 10 CWs, (ii) alleged access to "tracking and reporting systems," and (iii) alleged store visits by certain Defendants support an inference of scienter. R&R 17, 19; *see* Mot. 32-40; Reply 12-15. When evaluating CW allegations, the Court must consider the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, [and] the coherence and plausibility of the allegations," and CW allegations must be "discount[ed] [] steeply" when "found wanting." *Rahman* v. *Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013). "The crucial aspect of this evaluation is whether the [CWs] 'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Mylan*, 2023 WL 3539371, at *4. Any "omissions and ambiguities count against inferring scienter." *Rahman*, 736 F.3d at 244.

Here, the CW allegations should be steeply discounted or rejected. Plaintiffs do not establish that any CWs had personal knowledge concerning DSG's enterprise-level inventory during the Class Period, either with respect to outdoor and fitness products or otherwise. Four CWs allegedly worked at headquarters and had no alleged basis for personal knowledge of nationwide inventory apart from alleged internal reporting (and one left before the Class Period). ¶¶178, 201, 210, 212. Plaintiffs do not dispute that the remaining six CWs had personal knowledge

related to less than 4% of DSG's over 850 stores nationwide (and at least two left before the Class Period, with no end date given for another, ¶¶195, 203, 213). *See* Mot. 33 & n.25. And none of the CWs allege that they personally interacted with the Individual Defendants during the Class Period, so have no knowledge of their views.

Nonetheless, the CWs allegedly expressed conclusory opinions to Plaintiffs' counsel (with the benefit of hindsight), such as that DSG had "overbought" and had "excess" or "obsolete" outdoor and fitness inventory that "it was unable to sell" and "would have to be liquidated." *E.g.*, ¶¶179, 181, 187-88, 194, 196, 201. There are no allegations that any CWs had the company-wide information or business expertise to make these assessments. For the CWs with alleged access to reporting, there are no allegations that these reports contained the information necessary to assess inventory health (which requires not just current inventory and sales levels, but also a strategic assessment of future market conditions and how long the inventory could be held).

Other CW allegations are too unparticularized to be credited. For example, several reports do not specify the type of inventory referenced or that it was only outdoor and fitness. *E.g.*, ¶¶194, 198, 201, 206, 212. Others are vague as to time period and fail to address the seasonal nature of the business—which is critical given that 10 months of the 12-month Class Period were the off-"peak" season, when demand would be lower and sales slower. *E.g.*, ¶¶179-81, 187-88, 191, 195-96, 206. The CWs also provide only generic, non-specific descriptions of internal reports that fail to show how any reports contradicted any specific public statements, particularly given DSG's repeated disclosures that demand for outdoor and fitness products had declined. *E.g.*, ¶¶180 ("performance [] lagging"), 191 ("at the bottom" of unspecific metric), 199 (similar).

Even crediting the CW allegations, they do not support scienter. To the extent the CWs reached different opinions about inventory health, there are no allegations that Defendants shared

these views. At most, the CWs had knowledge of a small number of stores that allegedly had a significant volume of inventory and needed storage. But having a lot of inventory and needing more storage is explained by the dramatic rise in DSG's sales since 2019, without a commensurate increase in stores or distribution centers—it does not mean inventory was "excess."[17] It is also consistent with Defendants' disclosed plan to "buy around" outdoor and fitness inventory for "next year," the disclosed decline in demand, and the business's seasonal nature.

And fundamentally, as discussed, even a large volume of inventory is "healthy" and "well-positioned" as long as management expects that it can be sold over time at satisfactory prices, particularly for products like outdoor and fitness that are not alleged to go obsolete quickly and could potentially be held over several yearly selling cycles (unlike trend-sensitive apparel). Because Plaintiffs allege nothing regarding Defendants' expectations for future demand and market conditions over time, there is no particularized basis to infer that Defendants did not sincerely assess that outdoor and fitness inventory could be sold over time, including during the upcoming 2023 "peak" season. *See, e.g., Pier 1*, 935 F.3d at 432 (refusing to infer scienter because "[k]nowledge of high inventory does not necessarily equate to knowledge of significant markdown risk"); *Crocs*, 774 F.Supp.2d at 1150 (where complaint lacked allegations concerning "internal predictions of future demand," inventory writedown "cannot support an inference of scienter").[18] Indeed, to the extent any inference can be drawn, it is that Defendants were optimistic about the outdoor and fitness business. Defendants repeatedly disclosed that demand for outdoor and fitness

---

[17] DSG's net sales increased by 48.3% from 2019 to 2023 (from $8.75 to $12.98 billion), while stores went from 850 to 855 and distribution centers remained at 5. Ex. 32 (FY19 10-K) at 7, 24; Ex. 31 (FY23 10-K) at 7, 23, 46.

[18] *See also In re Lexar Media, Inc. Sec. Litig.*, 2005 WL 1566534, at *5 (N.D. Cal. July 5, 2005) (declining to infer scienter because "[i]ncreased inventory levels would be exactly what one would expect if executives forecast strong demand").

-21-

products had declined—but also expressed optimism that consumers had made lasting lifestyle changes and that demand had "rebaselined" at a higher level. *E.g.*, ¶¶142-43; 149-52; 155-56; 159-60; Ex. 26 (2Q22 10-Q) at 15. And DSG underscored this confidence by acquiring outdoor retailer Moosejaw in March 2023.

The R&R's reliance on alleged access to "tracking and reporting systems" and store visits does not support any contrary inference. R&R 17, 19. The only report that the Individual Defendants allegedly received was a "Score Card Report" with metrics such as sales and inventory, but there are no particularized allegations as to what that report showed at any specific time or how its data contradicted the challenged statements. ¶224. For the large majority of alleged store visits there are no particularized allegations about what occurred. Even if any Defendants observed a lot of inventory, slowing sales, or a need for more storage, that would not support scienter as discussed. *Town of Davie Police Pension Plan* v. *Pier 1 Imps., Inc.*, 273 F.Supp.3d 650, 673 (N.D. Tex. 2017) (missing sales goals insufficient to allege awareness of "markdown risk").[19]

### C.    The more compelling inference is that there was no securities fraud.

A court evaluating scienter "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007). For an inference to be "strong," it must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference." *Id.* at 314. The R&R erred because Plaintiffs' allegations fail to meet this uniquely high standard. R&R 18-19; *see* Mot. 41-43; Reply 14-15.

One opposing inference is as follows: Defendants were attempting to predict business prospects in unprecedented circumstances following the COVID-19 pandemic and sincerely

---

[19] The deficiencies of Plaintiffs' other scienter allegations are addressed in prior briefing, and the R&R correctly did not rely upon them. *See* Mot. 36-40; Reply 12-15.

believed that they would succeed in the disclosed plan to "buy around" outdoor and fitness inventory "for next year." Given their disclosed assessment that outdoor and fitness inventory would not go "obsolete," and given their disclosed expectations that demand had "rebaselined" at a higher level, Defendants sincerely assessed that DSG would be able to sell its outdoor and fitness inventory over time without material impact on profitability, including during the next year's "peak" season. These assessments were unfortunately not borne out. After entering the 2023 "peak" period, Defendants encountered lower demand and greater market supply than expected. *See* ¶100; Ex. 14 (2Q23 Tr.) at 8. In response, DSG decided (also considering other business conditions, such as the disclosed decline in freight costs that now made it less expensive to replace inventory, *id.* at 7) that the best course was to discount and clear out inventory during the 2023 peak season, rather than pack it away for potentially another year, which DSG then disclosed.

Plaintiffs' proposed alternative inference is that Defendants, lacking any motive to commit fraud, intentionally misled investors as to their true assessment of the health of DSG's inventory while knowing for an entire year that DSG would discount outdoor products the following summer, thus impacting DSG's earnings and profitability, inevitably revealing the alleged fraud, and risking their personal reputations and credibility with DSG investors, as well as potential legal liability. And Defendants decided to mislead investors as to their true views of inventory health even though DSG promptly disclosed other inventory issues that arose with late-arriving apparel inventory, candidly discussed the declining demand for outdoor and fitness products, disclosed that DSG had "a lot of inventory" in outdoor and fitness products and DSG's plan to address the issue by "buying around" existing inventory for the "next year," invested more in the "outdoor category" by buying Moosejaw, and then promptly disclosed the 2Q23 discounting.

The ***only*** cogent inference from the allegations and statements as a whole is that Defendants

-23-

sincerely believed their assessments at the time they were expressed, and it was only at the end of the Class Period, based on information about demand and market conditions observed during the "peak" season, that Defendants determined that DSG would discount inventory and this would impact margins and earnings.  That is not securities fraud.  *See, e.g.*, *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 117 (3d Cir. 2018) ("[W]e have long held 'that an allegation of mismanagement … will not alone support' a securities fraud claim.").[20]

## III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION AS TO THE TD COWEN REPORT.

Respectfully, the R&R erred in finding that Plaintiffs pled loss causation with respect to the TD Cowen analyst report issued on May 19, 2023.  R&R 21; *see* Mot. 43-45; Reply 15.  While the Third Circuit has not decided the issue, other circuits have found that Rule 9 (not Rule 8) applies to loss causation.  *E.g.*, *Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014); *Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 n.5 (4th Cir. 2011). Regardless, Plaintiffs fail under either standard.

Loss causation requires that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Nat'l Junior Baseball League* v. *PharmaNet Dev. Grp. Inc.*, 720 F.Supp.2d 517, 559 (D.N.J. 2010); *see also, e.g.*, *Pure Earth, Inc.* v. *Call*, 531 F.App'x 256, 260 (3d Cir. 2013) ("[T]he plaintiff must show that his losses are related specifically to the market's discovery of the misrepresentation ….").  The TD Cowen report cannot support loss causation because it did not disclose any allegedly concealed information.  The report was based on a statistical correlation between DSG's historic same store sales and public data on U.S. Sporting Goods and Hobby sector sales.  Because that broader

---

[20] Because Plaintiffs have not alleged scienter as to any individual, there is no basis for a finding of corporate scienter by DSG.  *See also* Mot. 43.

measure had declined, and based on "weakening macro data," the analyst predicted that DSG's sales would decline. Ex. 28 (TD Cowen) at 1-2. The report said nothing about alleged "excess" inventory in outdoor and fitness. Nor was the reduction in estimates "linked" to a concern about merchandise margins. The report merely noted that there "remain" "[d]ebates" about the "durability of [DSG's] margin expansion," *id.* at 1, which Plaintiffs allege had been ongoing since August 2022, ¶38. And the TD Cowen analyst's conclusion on this "debate" was that ***DSG would retain its margin expansion***, predicting that "***merchandise margins have re-based higher***" and setting an "above Consensus" gross margin estimate. Ex. 28 (TD Cowen) at 2-3 (emphasis added).

The mere allegation that DSG's stock fell after the report is not sufficient to plead loss causation. *PharmaNet*, 720 F.Supp.2d at 559 (a plaintiff must "plead that the decline in the stock price was caused by the market's discovery of defendant's fraud"). The Court should therefore dismiss the claims as to this alleged corrective disclosure. *See, e.g.*, *In re Aurora Cannabis Inc. Sec. Litig.*, 2023 WL 5508831, at *5 (D.N.J. Aug. 24, 2023) (no loss causation where "disclosures did not reveal the subject or false nature of the alleged fraud"); *Katyle*, 637 F.3d at 475-77 (no loss causation where analyst report did not "reveal to the market the alleged fraudulent" scheme).[21]

## IV.    PLAINTIFFS FAIL TO ALLEGE A SECTION 20(A) CLAIM.

Because the Section 10(b) claims should be dismissed, the Section 20(a) claims should also be dismissed. In addition, Plaintiffs fail to allege "culpable participa[tion]." *See* Mot. 45.

### CONCLUSION

The Complaint should be dismissed in full with prejudice.

---

[21] Plaintiffs' claim that this single analyst report impacted DSG's stock is particularly implausible given that DSG competitor Foot Locker announced disappointing results that same day that were reported as weighing on the sector. Ex. 33 (*Foot Locker's 27% Plunge, Guidance Cut May Signal Trouble Ahead for Other Retailers*); Ex. 34 (*Foot Locker Slumps as Weak Demand, Heavy Discounts Drive Annual Outlook Cut*) at 2 ("Foot Locker's results … weighed on the sportswear sector ….").

Dated:  September 11, 2025                    Respectfully submitted,


                                             **JONES DAY**

                                             /s/ *Margaret C. Gleason*
                                             Rebekah B. Kcehowski  (PA 90219)
                                             Margaret C. Gleason  (PA 201742)
                                             500 Grant Street, Suite 4500
                                             Pittsburgh, Pennsylvania  15219
                                             Tel:  412-391-3939
                                             Fax:  412-394-7959
                                             rbkcehowski@jonesday.com
                                             mcgleason@jonesday.com

                                             **WACHTELL, LIPTON, ROSEN & KATZ**
                                             William Savitt  (*pro hac vice*)
                                             Lauren M. Kofke  (*pro hac vice*)
                                             Alison B. Brockman  (*pro hac vice*)
                                             51 West 52nd Street
                                             New York, New York  10019
                                             Tel:  212-403-1000
                                             Fax:  212-403-2000
                                             WDSavitt@wlrk.com
                                             LMKofke@wlrk.com
                                             ABBrockman@wlrk.com

                                             *Counsel for Defendants DICK'S Sporting
                                             Goods, Inc., Edward W. Stack, Lauren R.
                                             Hobart, and Navdeep Gupta*

**CERTIFICATE OF SERVICE**

I, Margaret C. Gleason, hereby certify that on September 11, 2025, I electronically submitted a true and correct copy of Defendants' Objections to Magistrate Judge's Report and Recommendation and supporting papers with the Clerk of Court for the United States District Court for the Western District of Pennsylvania, using the CM/ECF system, which will send notification of such filing to the attorneys entitled to notice who are registered users of ECF.

Respectfully submitted,

/s/ *Margaret C. Gleason*
Margaret C. Gleason

*Counsel for Defendants DICK'S Sporting Goods, Inc., Edward W. Stack, Lauren R. Hobart, and Navdeep Gupta*