UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re DICK'S SPORTING GOODS, INC. SECURITIES LITIGATION | ) ) ) ) | Civ. Action No. 2:24-cv-00196-JNR-KT |
| | | CLASS ACTION |
| This Document Relates To: | ) ) ) | LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' OBJECTIONS TO |
| ALL ACTIONS. | ) ) ) | MAGISTRATE JUDGE KEZIA O. L. TAYLOR'S REPORT AND RECOMMENDATION |

4900-3355-9665.v2

**TABLE OF CONTENTS**

<strong>Page</strong>

I.  INTRODUCTION ........................................................................................................1

II. STATEMENT OF FACTS ........................................................................................3

III. ARGUMENT ............................................................................................................6

    A.    The Court Should Overrule Defendants' Objections to the R&R's Falsity
Rulings ..........................................................................................................6

    B.    The Court Should Overrule Defendants' Objections to the R&R's Scienter
Rulings ..........................................................................................................9

        1.    Defendants' Stock Sales Support a Strong Inference of Scienter ...............9

        2.    Defendants' Knowledge of Facts Contradicting Their Statements
Supports a Strong Inference of Scienter ......................................................15

    C.    Loss Causation Is Sufficiently Pled for the May 19, 2023 Disclosure ..................23

IV. CONCLUSION ........................................................................................................25

4900-3355-9665.v2

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ...............................................................24

*Bullock v. Hice*,
2022 WL 4535378 (W.D. Pa. Sep. 28, 2022) (Ranjan, J.) ...........................................3, 4, 5, 6

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)......................................................................14

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)......................................................................10

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) .................................................................................3, 8, 9

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) .....................................................................9

*Dudley v. Haub*,
2013 WL 1845519 (D.N.J. Apr. 30, 2013) .................................................................23

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014) ........................................................................8

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017).......................................................................11

*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015)....................................................................................2

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020)....................................................................15

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999)..............................................................................10, 12, 13

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2014).................................................................................2, 7, 8

*In re Allergan Generic Drug Pricing Sec. Litig.*,
2019 WL 3562134 (D.N.J. Aug. 6, 2019) ..................................................................21

*In re Aphria, Inc. Sec. Litig.*,
2020 WL 5819548 (S.D.N.Y. Sep. 30, 2020)..............................................................20

4900-3355-9665.v2

**Page**

*In re Audible Inc. Sec. Litig.*,
2007 WL 1062986 (D.N.J. Apr. 3, 2007) ...............................................................................13

*In re Aurora Cannabis Inc. Sec. Litig.*,
2023 WL 5508831 (D.N.J. Aug. 24, 2023) ............................................................................24

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ........................................................................20

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) ........................................................................................24

*In re CommVault Sys., Inc. Sec. Litig.*,
2016 WL 5745100 (D.N.J. Sep. 30, 2016) ............................................................................14

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................................................17

*In re Crocs, Inc. Sec. Litig.*,
774 F. Supp. 2d 1122 (D. Colo. 2011), *aff'd sub nom.*
*Sanchez v. Crocs, Inc.*,
667 F. App'x 710 (10th Cir. 2016) ......................................................................................9, 23

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015) ............................................................................14

*In re Finisar Corp. Sec. Litig.*,
2017 WL 1549485 (N.D. Cal. May 1, 2017) ....................................................................15, 19

*In re Finisar Corp. Sec. Litig.*,
646 F. App'x 506 (9th Cir. 2016) .............................................................................................6

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018) ...................................................................................................23

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...................................................................................13

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ..........................................................................18

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
543 F.3d 150 (3d Cir. 2008), *aff'd sub nom.*
*Merck & Co., Inc. v. Reynolds*,
559 U.S. 633 (2010) .................................................................................................................9

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .....................................................................................12

4900-3355-9665.v2

**Page**

*In re Mylan N.V. Sec. Litig.*,
2023 WL 38539371 (W.D. Pa. May 18, 2025) (Ranjan, J.) .................................15, 17, 18, 21

*In re Mylan N.V. Sec. Litig.*,
2025 WL 1874621 (W.D. Pa. July 8, 2025) (Ranjan, J.)...................................................23, 25

*In re Party City Sec. Litig.*,
147 F. Supp. 2d 282 (D.N.J. 2001) .................................................................................10, 13

*In re Radian Sec. Litig.*,
612 F. Supp. 2d 594 (E.D. Pa. 2009) ....................................................................................13

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).........................................................................18

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) .................................................................................12

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
124 F. Supp. 2d 527 (S.D. Ohio 2000) ..................................................................................10

*In re STMicroelectronics N.V. Sec. Litig.*,
2025 WL 2644241 (S.D.N.Y. Sep. 15, 2025)...................................................................18, 19

*In re Stone & Webster, Inc., Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005)....................................................................................................7

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)..............................................................................................12, 13

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018)..........................................................................12, 17

*In re U.S. Interactive, Inc.*,
2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) .......................................................................10

*In re Urb. Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................................................................ *passim*

*In re Viropharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) .......................................................................................14

*In re Winstar Commc'ns*,
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).........................................................................24

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).........................................................................7, 9, 17, 20

4900-3355-9665.v2

**Page**

*Katyle v. Penn Nat'l Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ...................................................................................24

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2016 WL 3981236 (D.S.C. July 25, 2016) .................................................................6

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) .......................................................................20

*Lefkoe v. Jos. A. Bank Clothiers*,
2007 WL 6890353 (D. Md. Sep. 10, 2007) ........................................................15, 16

*Levon v. CorMedix Inc.*,
2025 WL 2400346 (D.N.J. Aug. 19, 2025) ...............................................................19

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ..................................................................................10

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
2011 WL 2444675 (D. Del. June 14, 2011) .........................................................11, 18

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006), *vacated in part on other grounds*,
551 U.S. 308 (2007)....................................................................................................8

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ....................................................................................23

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ...................................................................................8

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007)......................................................................................25

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
2018 WL 1558577 (N.D. Ga. Mar. 29, 2018)...........................................................20

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*,
935 F.3d 424 (5th Cir. 2019) .................................................................................9, 23

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*,
720 F. Supp. 2d 517 (D.N.J. 2010) ...........................................................................25

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ............................................................................15, 19

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)........................................................................................6

4900-3355-9665.v2

**Page**

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..................................................................................17

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020).........................................................23

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ..................................................................................21

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)......................................................................................8

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
    2018 WL 1587457 (D. Conn. Mar. 31, 2018) .........................................................20

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024).....................................................7, 13, 14

*Steamfitters Loc. 449 Pension Fund v. Alter*,
    2011 WL 4528385 (E.D. Pa. Sep. 30, 2011) ..........................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)........................................................................................1, 9, 10

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
    176 F. Supp. 3d 387 (D. Del. 2016)........................................................................21

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015)...........................................................24

4900-3355-9665.v2

## I.    INTRODUCTION

After considering Plaintiffs' allegations and applying the relevant legal standards, Magistrate Judge Taylor carefully examined each of Defendants' falsity arguments and rejected them, finding the majority of Defendants' excess inventory misstatements actionable.    Report and Recommendation (ECF 70) ("R&R") at 12-14.[1]   Next, Magistrate Judge Taylor performed the holistic, comparative evaluation of scienter prescribed by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007), and found "Defendants' explanation doubtful and, at a minimum, insufficient to overcome the competing inference of scienter."  R&R at 19; *see also id.* at 6 (quoting *Tellabs*, 551 U.S. at 322-23).  Finally, Magistrate Judge Taylor found Plaintiffs adequately pled loss causation for the May 19, 2023 corrective disclosure.  *Id.* at 21.  Magistrate Judge Taylor's R&R was based on a full review of the voluminous record, including Defendants' ***more than 100 pages*** of briefing and "appendices" (ECF 59, 64), nearly ***1,300 pages*** of exhibits (ECF 60), and "roughly 43 minutes" of oral argument (ECF 69 at 38:4-5).

Dissatisfied with the result, Defendants largely advance the same arguments already considered and rejected by Magistrate Judge Taylor.  But Magistrate Judge Taylor got it right the first time.  When not regurgitating arguments, Defendants resort to mischaracterizing the R&R; for example, Defendants assert that "the R&R does not evaluate Defendants' argument that the statements are inactionable opinions" (Obj. at 10) – but the R&R explicitly considered Defendants' argument that the alleged misrepresentations "'are inactionable opinions'" and rejected it because the alleged misrepresentations are "factual statements" that are "contradicted by allegations in

---

[1]   Unless otherwise noted, citations are omitted, emphasis is added, and capitalized terms used herein have the same meaning as in Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint (ECF 63).  "Obj." refers to Defendants' Objections to Magistrate Judge's Report & Recommendation (ECF 73).  "¶__" and "¶¶__" refer to the Consolidated Complaint for Violation of the Federal Securities Laws (ECF 51).

- 1 -

Plaintiffs' AC." R&R at 12-13.[2]  Similarly, contrary to Defendants' claim that the R&R "did not address" aspects of their forward-looking-statements argument (Obj. at 6), Magistrate Judge Taylor actually **adopted** Defendants' argument with respect to certain statements and cited the very "Third Circuit precedents" they accuse her of ignoring (*see* R&R at 13 (quoting *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2014)).  Far from failing to address the argument, Magistrate Judge Taylor correctly found the majority of Defendants' misstatements were "present tense . . . statements that fall outside of the safe harbor protections." *Id.* at 12.[3]  And when inconvenient for them, Defendants ignore Plaintiffs' allegations and the R&R's findings. *Compare, e.g.*, Obj. at 23 ("Plaintiffs' proposed alternative inference is that Defendants, **lacking any motive** to commit fraud, intentionally misled investors . . . ."), *with* R&R at 4 ("Plaintiffs allege that Defendants **had a motive to mislead** investors, citing **insider stock sales totaling over $47 million during the Class Period**.").

In addition, Defendants ask the Court to ignore Plaintiffs' well-pleaded allegations and adopt Defendants' preferred version of events.  Even if the Court were not required to "'accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff'" (*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015)), Defendants' proposed narrative makes no sense. *See* R&R at 19 ("Defendants' narrative of optimism and structural transformation is **belied by the reality confronting the company,** of which the individual Defendants were aware based on their visits to the overloaded stores and/or their access to detailed weekly reports on inventory levels.").

At any rate, Defendants' story – that they expected to be able to sell the excess inventory

---

[2]    Trying to have their cake and eat it too, Defendants contradict their assertion that Magistrate Judge Taylor ignored their argument by admitting elsewhere that "the R&R concluded [other statements] were also inactionable opinions." Obj. at 14 n.11.

[3]    In fact, at oral argument Magistrate Judge Taylor referenced Defendants' arguments regarding "industry terms and things of that nature" and remarked, "I would have thought that the statements that [Defendants] were making regarding the health of DICK's Sporting Goods were present-day statements not so much forward-looking." ECF 69 at 46:23-48:10.

- 2 -

4900-3355-9665.v2

over time – misses the point.  Defendants misrepresented the ***current state of affairs*** regarding DSG's outdoor and fitness inventory and demand.  *Cf. id.* at 12-13 (quoting *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 682 (3d Cir. 2023)) ("'[D]iscovery would be reasonably likely to reveal the falsity of the[se] . . . statements.'") (second alteration in original).  Defendants repeatedly stressed that inventory was currently "***clean***," "***healthy***," and "***well-positioned***," claiming there were "***no issues with flow***" and that "***the only lump***" in inventory was in apparel.  In reality – as Defendants themselves admitted after the Class Period – "[t]here was a lump in outdoor equipment related to the pandemic" and an "overhang of the outdoor category in terms of the COVID buys."  ¶102.  Moreover, Defendants cannot now pretend that they were unaware of these "issues with flow" during the Class Period; to take just one of Plaintiffs' myriad allegations, Defendants acknowledged throughout the Class Period that they "monitor sell-throughs, inventory turns, gross margins and markdown rates at the department and style level . . . [to] improv[e] merchandise flow."  ¶226.  Combining these facts with their ***$47 million*** in suspiciously well-timed stock sales (¶258), scienter is easily pleaded.

The Court is free to place "'whatever reliance . . . in the exercise of sound judicial discretion, [it chooses] to place on a magistrate's proposed findings and recommendations.'"  *Bullock v. Hice*, 2022 WL 4535378, at *1 (W.D. Pa. Sep. 28, 2022) (Ranjan, J.).  Here, Magistrate Judge Taylor's thorough R&R merits the Court's reliance.  As set forth below, Defendants' objections to the R&R are legally and factually baseless.

## II.     STATEMENT OF FACTS[4]

During the COVID-19 pandemic years of 2020 and 2021, demand for DSG's outdoor and fitness products surged because of lockdowns and gym closures, while stimulus payments and other

---

[4]    A more detailed summary of the facts is set forth in Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint.  ECF 63 at 3-7.

economic recovery efforts increased discretionary spending by consumers. ¶¶3, 27-30. These trends drove dramatic growth in DSG's sales and merchandise margins, which increased each quarter from 2Q20 through 1Q22. ¶¶3, 31-33. But in 1Q22, DSG's merchandise margin growth slowed, and in 2Q22 it began contracting. ¶39. In contrast to eight straight quarters of expansion from 2Q20 through 1Q22, merchandise margins contracted in every quarter during the Class Period (2Q22 through 2Q23). *Id*. Defendants took credit for the pandemic "bump," largely attributing it to purported structural changes they had initiated years before the pandemic, and continued to maintain that much of the pandemic-era margin improvement was permanent even as the trends reversed. ¶¶41-55. Before and during the Class Period, analysts and investors were laser-focused on "the sustainability of sales and merch margin re-rate vs. pre-pandemic." ¶¶36, 38.

As the pandemic-era demand waned, DSG was left with what CEO Hobart would characterize – after the Class Period – as "a lump in outdoor equipment related to the pandemic." ¶102. CWs confirm that DSG had a "shocking," "astronomical" and physically "dangerous" amount of excess inventory during the Class Period, particularly in outdoor and fitness, which the Company was unable to sell at anything higher than clearance prices. ¶¶88-99. CW-2 details that DSG had aggressively purchased these products to meet pandemic-era demand, even "sourc[ing] brands that they did not previously carry." ¶89. This surge slowed substantially by early 2022. ¶90. By the start of the Class Period, outdoor and fitness inventory was piling up precipitously, as DSG brought in new inventory faster than it could be sold. ¶7. The Company was forced to rent trailers and even whole warehouses around the country to store the excess inventory due to lack of space in stores, where excess inventory was so extreme it presented a safety hazard. ¶¶7, 90-99. The CWs also confirm that Defendants were aware of these problems. *Id*., ¶¶164(b), 217-218, 223-224.[5]

---

[5]   The CWs worked in various positions and locations (including corporate HQ) throughout the Class Period. ¶¶177-215; R&R at 17 & n.4. They saw this nationwide inventory glut firsthand and in companywide tracking systems, recounted that the Individual Defendants visited stores and saw

- 4 -

Throughout the Class Period, however, Defendants minimized these issues in statements to investors. ¶72. Hobart stated at the beginning of the Class Period: "When it comes to some of our hardline categories, say, fitness and outdoor equipment, we have bought – that is – we have a lot of inventory there that we just – we're buying around for next year. *So no issues with flow there*." *Id*. The next quarter, Defendants assured investors that inventory was "*healthy and well-positioned*," with one caveat – as CFO Gupta stated: "*The only lump that we called out was on the athletic apparel side*." ¶82. Throughout the Class Period, Defendants described inventory as "*healthy*," "*clean*," and "*well-positioned*." *Id*. Thus, Defendants' statements communicated to investors that, other than the apparel overage, DSG did not have excess inventory, and that demand for outdoor and fitness products was sufficient to keep inventory flowing and avoid margin-compressing sales. ¶87. Defendants' comforting statements had their intended effect, as reflected by analyst commentary throughout the Class Period. *Id*. Critically, Defendants often sold millions of dollars' worth of their personal stock immediately after these misleading statements, reaping *$47 million* in proceeds during the Class Period in suspicious sales made outside Rule 10b5-1 trading plans. *See* R&R at 18.

The truth began to emerge on May 19, 2023, when shortly before DSG's 1Q23 results, TD Cowen released a report that undercut Defendants' positive statements regarding DSG's post-pandemic profitability. ¶57. TD Cowen lowered its sales and earnings per share estimates for DSG based on its proprietary regression model, noting: "Debates on [the] stock[] remain firmly centered on durability of margin expansion since 2019," which sent the price of DSG stock down 6.8%. ¶271. The truth concealed by Defendants' fraud was further revealed on August 22, 2023, when Defendants announced that profitability in 2Q23 was significantly lower than they had led investors to expect due to excess outdoor inventory. ¶¶65-67. These revelations stunned investors and sent

---

the situation on the ground, and described specific internal databases of key metrics showing this excess. ¶¶88-99. Defendants themselves corroborated that they had access to these databases and received reports containing the key metrics. ¶¶225-234.

- 5 -

DSG's stock price down **over 24%**.  ¶¶11, 70.

### III.    ARGUMENT

Magistrate Judge Taylor held that Plaintiffs sufficiently pleaded falsity, scienter, and loss causation for the excess inventory statements.  As explained below, Defendants' recycled arguments are just as infirm now as they were the first time around.

### A.    The Court Should Overrule Defendants' Objections to the R&R's Falsity Rulings

Magistrate Judge Taylor set forth a numbered list of the excess inventory misstatements and recommended upholding statements (1), (2), (4)-(6), (10)-(13), (14)-(16), and (18).  R&R at 9-12.  As the R&R correctly notes, "these statements are contradicted by allegations in Plaintiffs' AC," including the CW accounts and Defendants' admissions.  *Id.* at 12-13.  The R&R's findings are consistent with numerous decisions upholding similar statements.  *See, e.g.*, *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649-50 (E.D. Pa. 2015) (upholding statements that demand was "'solid,' 'strong,' and 'good'"); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *5 (D.S.C. July 25, 2016) (upholding statement that backlog inventory was "healthy" because it "fail[ed] to inform fully investors of its inventory-related difficulties"); *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (motion to dismiss denied where CEO "down-played concerns of a looming inventory bubble"); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that "the inventory situation was 'in good shape' or 'under control'" were "plainly false and misleading" where defendants "allegedly knew that the contrary was true").

The R&R considered each of Defendants' falsity arguments and correctly rejected them.

***No Safe Harbor***.  First, the R&R properly found that all but one of these statements are "present tense" statements "that fall outside of the safe harbor protections."  R&R at 12.  Indeed, statements like "[o]ur inventory is healthy and well-positioned" (¶140), "no issues with flow there" (¶145), "[t]he only lump that we called out was on the athletic apparel side" (¶148), and "all of the

- 6 -

pandemic categories . . . so bikes, outdoor equipment, generally fitness, all have rebaselined bigger" (¶150), are "***simply not forward-looking***." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at \*3 (S.D.N.Y. Feb. 5, 2024); *see also Urb. Outfitters*, 103 F. Supp. 3d at 649-50 ("'characterizations of past events or current conditions'" are not protected by the safe harbor).

Defendants strain to bring these present-tense statements within the ambit of *Aetna*, but that case involved statements regarding defendants' "'disciplined' pricing policies," which were forward-looking because they referred "to a conservative underwriting practice of setting premiums in a fixed proportion to expected future medical costs." 617 F.3d at 274. There, plaintiffs even admitted that the statements conveyed that "'these policies will be profitable.'" *Id.* at 280. *Aetna* actually supports the present-tense nature of the statements at issue here because whether or not there were "issues with flow" or a "lump" in fitness and outdoor equipment was capable of being "determined at the time [D]efendants made the statements." *Id.* at 281. In fact, Defendants contemporaneously identified a different pocket of inventory as a "lump" (¶¶44-47) – refuting their argument that "whether DSG's inventory was in fact 'healthy' could only be determined later." Obj. at 7.

Defendants also misapply *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009). *Id.* at 253 ("'[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'"). Here, as in the cases discussed in *Avaya*, the "'alleged falsehood was in the fact that the statement claimed that the Company'" currently had no issues with flow, regardless of whether Defendants hoped demand would improve. *Id.* at 255 (quoting *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005)). That is why courts routinely find statements such as those pleaded here are not protected by the safe harbor. *See* ECF 63 at 12 (collecting cases).[6]

---

[6]   The R&R also correctly found that statement (14) was accompanied by insufficient cautionary language. Defendants' mere reference to the existence of a safe harbor statement was in no way "'extensive yet specific' [enough] to prevent a reasonable investor from relying on [the statement]."

- 7 -

***Not opinions or puffery***.   The R&R correctly found that the vast majority of Defendants'

statements were objective and material, as opposed to opinions or puffery.  R&R at 12-13.  Given

Defendants' personal store visits and close monitoring of merchandise metrics, which demonstrated

excessive fitness and outdoor equipment inventory, their statements to investors and analysts that

DSG's inventory was "healthy" and "clean" were not mere opinions or corporate puffery, but

statements whose falsity was capable of contemporaneous objective verification.[7]  *See Aetna* 617

F.3d at 281; ECF 63 at 14.

The statements were also material, as opposed to vague statements "on which reasonable

investors would not have relied" (*Aetna* 617 F.3d at 284), because DSG's investors and analysts

were concerned that excess inventory was a signal of slowing sales, decreased demand, and a

significant risk to product margins (*see, e.g.*, ¶¶36, 38).  Notably, the statements were made in direct

response to analyst questions, confirming that they were not vague statements on which reasonable

investors would not rely.  *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th

Cir. 2006) (statements in response to analyst questions go "well beyond puffery"), *vacated in part on

other grounds*, 551 U.S. 308 (2007).  Finally, that DSG's stock price declined precipitously when the

truth was revealed confirms that the statements were material and not mere puffery.  *See Frater v.

Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014) (stock drop "belies any

suggestion that investors found the defendants' statements immaterial").

---

*Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000).  Finally, Plaintiffs did, of course, previously argue that Defendants' cautionary language was insufficient.  *Compare* ECF 63 at 13-14, *with* Obj. at 9.  Defendants' belated addition of yet more outside-of-the-pleadings materials (*see* ECF 74) – in addition to the nearly 1,300 pages of materials they already submitted (ECF 60) – is grasping at straws.

[7]   Defendants' argument that their statements were opinions requiring subjective judgment, and the cases they cite in support, are inapplicable and inapposite as they dealt with statements regarding adequacy of reserves and estimates of production, which inherently must be determined in the future.  *See Prudential*, 70 F.4th at 684; *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018).  Here, Defendants' comments pertained to the present state of DSG's inventory and could be measured against the contemporaneous data to which they had access.

4900-3355-9665.v2

Even if Defendants' statements could be characterized as opinions (they cannot), they are nonetheless actionable because they were """issued without a genuine belief or reasonable basis.""" *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008), *aff'd sub nom. Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010). As the R&R found, CW accounts of excess inventory coupled with Defendants' personal store visits and access to "weekly inventory and sales reports" "demonstrate[] that discovery would be reasonably likely to reveal evidence of the falsity of the[] statements." R&R at 13 (citing *Prudential*, 70 F.4th at 682).[8]

## B.    The Court Should Overrule Defendants' Objections to the R&R's Scienter Rulings

To plead scienter, a plaintiff need not plead facts of the "'smoking-gun genre,'" and may satisfy its pleading burden with "an array of circumstantial evidence." *Avaya*, 564 F.3d at 269. The pertinent question is "'whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter.'" *Id*. at 272 (emphasis in original). The R&R conducted a holistic analysis and correctly found that Plaintiffs pleaded a strong inference of scienter based on, *inter alia*, allegations of Defendants' knowledge, access to information, and Defendants' large and suspiciously-timed stock sales. R&R at 16-19.

### 1.    Defendants' Stock Sales Support a Strong Inference of Scienter

"'Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive . . . .'" *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *6 (D.N.J. Jan. 12, 2018); *see also Tellabs*, 551 U.S. at 324-25 ("personal financial gain may weigh heavily in favor

---

8    Defendants' out-of-circuit cases are inapposite. In *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424 (5th Cir. 2019), plaintiffs did not allege that defendants misrepresented the present state of their inventory, but rather the future risk of inventory markdowns. And in *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122 (D. Colo. 2011), *aff'd sub nom. Sanchez v. Crocs, Inc.*, 667 F. App'x 710 (10th Cir. 2016), the court found the CW allegations "fail[ed] to set forth sufficiently detailed allegations that the Individual Defendants were aware of the inventory problems." *Id.* at 1148-49.

of a scienter inference").  Stack, Hobart, and Gupta collectively netted over **$47 million** through unusual stock sales strategically timed to capitalize on the fraud-induced artificial inflation in DSG's stock price.  ¶258.  The R&R correctly found that these alleged "sales of company stock by insiders that are 'unusual in scope or timing . . . support an inference of scienter.'"  R&R at 18.

Defendants contend that the R&R "failed to consider" their arguments regarding their insider sales, but Magistrate Judge Taylor considered extensive briefing and heard extensive argument from Defendants and ultimately concluded that "the timing of Defendants' stock sales also supports a strong inference of scienter." *Id.*  Indeed, far from failing to consider "the trades of each Individual Defendants individually" (Obj. at 15), the R&R specifically sets forth the temporal proximity of *each* of the Individual Defendant's trades with their misleading statements.  R&R at 18.  This is appropriate because "the proximity of the sales to the false statements . . . supports an inference of fraud." *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 n.3 (S.D. Ohio 2000); *see also In re U.S. Interactive, Inc.*, 2002 WL 1971252, at *19 (E.D. Pa. Aug. 23, 2002) (sales supported strong inference of scienter where defendants sold stock for proceeds of $858,419 and $2.14 million immediately following misstatements).[9]

As the R&R details, Hobart made her first sale – for proceeds of over **$7 million** – in the two days immediately following her misrepresentations that inventory was "healthy" and there were "no issues with flow."  ¶¶145, 262-263.  Then, days after misrepresenting that "inventory [wa]s in great shape" and "healthy" at the 4Q22 earnings call, *all three* Individual Defendants engaged in massive

---

[9]    Defendants' cases (Obj. at 16-17) are inapposite.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (no allegations of proximity to misrepresentations); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("Belk sold his stock before any alleged misrepresentations were made.").  In *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282 (D.N.J. 2001), proximity to an earnings release did not render sales suspicious because the court held that the plaintiffs failed to plead the earnings release was false. *Id.* at 300.  And in *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002), only a single defendant sold 1.4% of his holdings, while "[a]ll other directors and officers fully retained their holdings." *Id.* at 1037.

insider sales while DSG's stock price was near its Class Period high: Stack for proceeds of over *$23 million*, Hobart for proceeds of over *$12 million*, and Gupta for proceeds of over *$2.5 million*. ¶¶56, 153-154, 260, 263, 266; *cf. Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (sales supported strong inference of scienter where Defendants sold while stock price was near its peak). Gupta reaped another *$2.2 million* on June 7, 2023, shortly after more misrepresentations. ¶¶63, 159, 252-254, 266.

Defendants' argument that they sold after DSG earnings calls to avoid selling on inside information (Obj. at 16) essentially seeks a safe harbor for such sales – an ironic argument given that there *is* a safe harbor for insider sales made pursuant to SEC Rule 10b5-1 trading plans, which Defendants ***chose not to use***. ¶¶260, 263, 266. Indeed, selling outside of Rule 10b5-1 trading plans further supports scienter. *See, e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) (fact that "sales were not made pursuant to any Rule 10b5-1 trading plan" supported scienter).

Defendants attempt to distract from the unusual nature of their sales by presenting their retained holdings as a "group" – hiding Hobart and Gupta's sales of between 14% and 20% of their holdings (even by Defendants' math) behind Stack's massive founder stake. Obj. at 15-16 (citing App. B, Tbls. 1(a)-(b)). And Defendants' math ignores DSG's stock ownership guidelines, the size of Defendants' sales relative to their total compensation, and the unusual nature of Defendants' sales relative to their prior trading practices. Defendants have no answer for these arguments – Plaintiffs made the same points in opposition to Defendants' motion to dismiss (ECF 63 at 26-29), yet Defendants continue to conspicuously ignore them.

***Size of Sales Relative to Holdings***. Each Individual Defendant disposed of significant portions of their Class Period holdings: Stack, Hobart, and Gupta disposed of 6.4%, 26.6%, and 24%

- 11 -

of their total Class Period holdings, respectively. ¶¶259, 262, 265.[10]  But this undercounts the proportion they sold of what was **available** to sell under DSG's stock ownership guidelines.  *See* ECF 63-5 at 43.  Those guidelines required Hobart to hold over $7 million of DSG stock (including options).  *Id.*  Thus, Hobart's sale of 147,462 shares during the Class Period amounted to **34%** of the shares she could sell as of the start of the Class Period.  Her total dispositions of 177,032 shares (ECF 59-2), including stock sales and sell-to-cover dispositions, constituted **41%** of the shares she could sell as of the start of the Class Period.

Similarly, Gupta was required to hold over $1.75 million of Company stock (including options).  *See* ECF 63-5 at 43.  Thus, Gupta's sale of 35,524 shares during the Class Period amounted to **35%** of the shares he could sell as of the start of the Class Period.  His total dispositions of 47,898 shares (ECF 59-2), including stock sales and sell-to-cover dispositions, constituted **48%** of the shares he could sell as of the start of the Class Period.  Accordingly, while defendants in *Advanta* "traded only small percentages of their holdings, with two of the defendants selling seven and five percent, respectively . . . [Hobart and Gupta are] alleged to have sold over 30 percent of [their] holdings."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006).  "While [Stack] may not have sold a large percentage of his shares . . . the amount of income he generated through his sales [**over $23 million**], is significant."  *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) ("$18 million" considered "significant").[11]

---

[10]  Stack's Class B holdings are appropriately omitted from this analysis given his incentive to maintain his voting power.  ¶259 n.11; *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 647 (E.D. Va. 2000) (insider sales "must be viewed in the context of competing motivations (profiting from alleged fraud and maintaining control of the Company)").

[11]  Further, the amount of retained holdings is just one factor courts consider.  *See Suprema*, 438 F.3d at 278 (rejecting argument that retention of a majority of defendants' holdings negated an otherwise strong inference of scienter); *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *16 (D.N.J. Dec. 6, 2018) ("the percentage of holdings sold off in this case would not affect" the strong inference of scienter, given "the timing, amount – as compared to sales from the previous year, and individuals involved").  And Defendants' cases are inapposite because each lacked indicia

***Size of Sales Relative to Compensation***.  Insider sales support a strong inference of scienter where the "profits from the trades were substantial in comparison to [defendants'] overall compensation."  *Suprema*, 438 F.3d at 278.  Here, Stack collected over ***$23 million*** in insider sales proceeds compared to his total compensation of $11,249,602 and $15,556,722 in 2022 and 2023, respectively; Hobart's ***$19 million*** in proceeds far exceeded her total compensation of $8,434,366 and $13,575,226 in 2022 and 2023, respectively; and Gupta's nearly ***$5 million*** in proceeds dwarfed his total compensation of $2,022,548 and $3,929,933 in 2022 and 2023, respectively.  ¶¶259, 262, 265; ECF 63-5 at 45.[12]

***Prior Trading Practices***.  Neither Hobart nor Stack sold ***any shares*** in the year before the one-year Class Period, and Gupta sold ***320% more*** shares during the Class Period than in the year prior.  ¶¶259, 262, 265.[13]  Thus, "the sales were not normal or routine for these Officers."  *In re Suprema*, 438 F.3d at 278.

---

of scienter that are present here.  *See Advanta*, 180 F.3d at 540 (three of the defendants had no class period sales); *Party City*, 147 F. Supp. 2d at 313 (class period sales not suspicious where consistent with previous practices and made well after the stock had begun to decline in value); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382-84 (E.D.N.Y. 2003) (sales not suspicious because CEO sold no shares prior to the only suspicious "sell-off" period, nor did eight other non-defendant officers with the same inside information).

[12]  Defendants argue that this $47 million in proceeds says nothing about their profits, but also contend that much of their compensation consisted of shares or options.  *Compare* Obj. at 18 n.16, *with id.* at 15.  "In other words, they got new shares for free," with a $0 cost basis.  *Stadium Cap.*, 2024 WL 456745, at *6.  *In re Audible Inc. Sec. Litig.*, 2007 WL 1062986 (D.N.J. Apr. 3, 2007) is inapposite; plaintiffs there failed to "provide any information on whether the stock sales were unusual in size or timing."  *Id.* at *12.

[13]  Plaintiffs intentionally omitted Gupta's 18,947-share sale (Obj. at 17) because it was a sell-to-cover for tax liabilities – which Defendants agree are appropriately omitted from the analysis.  *Id.* at 18 (citing *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 611 (E.D. Pa. 2009)).  Plaintiffs inadvertently included some sell-to-cover dispositions in Gupta's Class Period sales because his reporting was unreliable, with some sales not reported as sell-to-cover until ***after*** the Class Period and others incorrectly coded.  *See* ECF 63 at 26 n.26.  Notably, Defendants' exhibits also show a purported sell-to-cover transaction by Gupta on March 22, 2023 totaling over ***$1.7 million***, which far exceeds the value of the associated vesting shares.  ECF 60-40 at 10; *see also id.* at 11 (another purported sell-to-cover with ***no*** associated vesting or exercise).  This further suggests inaccuracies in Gupta's reporting.

- 13 -

***Options***.  Defendants also advance the outside-of-the-Complaint argument that certain sales were due to expiring options.  Obj. at 16-17.  This argument is illogical, however, because exercising an option simply allows the option holder to buy stock at a set price; it does not require the sale of the newly-acquired stock.  Rather, the fact that the Individual Defendants elected to immediately sell their newly-acquired shares bolsters scienter.  At any rate, Defendants' contention "that this was merely an exercise of options that were set to expire . . . is a factual question outside the Complaint."  *In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *8 (D.N.J. Sep. 30, 2016).[14]

***Stock Repurchases***.  Again relying on extraneous facts, Defendants argue that DSG's Class Period repurchases of 2.6 million shares negate scienter.  Obj. at 18.  But Defendants omit the context of these repurchases – DSG repurchased ***13.3 million*** and ***4.3 million*** shares in the years before and after the one-year Class Period, respectively – far more than the Class Period repurchases.  *See* ECF 63-6.  Thus, the repurchases ***bolster*** scienter because DSG "timed its repurchases based on the rise and fall of its stock price" to avoid repurchasing stock at fraudulently inflated prices.  *Stadium Cap.*, 2024 WL 456745, at *6.  Further, share repurchases do not negate scienter "in light of other factors such as the conscious misbehavior and recklessness that Plaintiff[s] ha[ve] adequately pleaded."  *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 n.23 (E.D. Pa. 2014).[15]

---

[14]   As *CommVault* demonstrates, contrary to Defendants' suggestion (Obj. at 16-17), courts in the Third Circuit do not hold that sales related to options are necessarily irrelevant to scienter.  And in *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382 (S.D.N.Y. 2020), the court found it "[s]ignificant[]" that the options-related sales occurred ***after*** a corrective disclosure, unlike the sales here.  *Id.* at 412.

[15]   As the R&R correctly concluded, DSG's Moosejaw acquisition is irrelevant to scienter.  R&R at 18-19.  Defendants' desired inference lacks any factual basis – Defendants offer nothing beyond the bare fact of the acquisition, and it is perfectly consistent for Moosejaw to operate in the general "outdoor" category but not be overstocked with the same outdoor products as DSG.  Courts commonly reject such strained inferences by defendants.  *See, e.g.*, *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *17-*18 (D.N.J. Dec. 15, 2015) (rejecting argument that defendants' "expect[ation] of continued sales growth" was demonstrated by "large investments" and increase in "raw materials inventory over 40%").

- 14 -

### 2. Defendants' Knowledge of Facts Contradicting Their Statements Supports a Strong Inference of Scienter

In addition to the motive supplied by Defendants' insider stock sales, the Complaint provides overwhelming allegations that Defendants "'knew facts or had access to information suggesting that their public statements were not accurate.'" *In re Mylan N.V. Sec. Litig.*, 2023 WL 38539371, at \*16 (W.D. Pa. May 18, 2025) (Ranjan, J.); *see also In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at \*8 (D. Del. Feb. 7, 2020) (access to negative internal reports demonstrated scienter); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (finding a strong inference of scienter where defendants "received information about the inventory buildup" and "would have been alert to information concerning increases in the company's unsold inventory" as it "was a subject about which investors and analysts often inquired"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at \*7 (N.D. Cal. May 1, 2017) (scienter adequately pleaded where inventory-related information "was disclosed to and/or discussed by Defendants"); *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at \*6 (D. Md. Sep. 10, 2007) (defendants' "access" to "numerous internal reports" supported inference that defendants "knew of the excessive inventory levels during the class period and knew that an unprecedented level of promotional activity would be required to liquidate that inventory"). Throughout the Class Period, the Individual Defendants accessed detailed reporting and tracking systems that allowed them to assess real-time data regarding key companywide performance indicators ("KPIs"), including inventory levels, sell-through, sales, and margins. ¶¶219-224.

***CWs***. The R&R properly credited the CW allegations, which demonstrate that the Company – even before the start of the Class Period – could not sell its excess inventory without aggressive, margin-crushing markdowns. R&R at 17 (citing *Mylan*, 2023 WL 3539371, at \*6). For example, CW-2 reported that excess outdoor inventory was not selling even at markdowns of up to 10% (the maximum allowed without approval from corporate), causing the inventory to pile up in stores and

- 15 -

4900-3355-9665.v2

warehouses to a shocking degree. ¶90. CW-1, CW-3 and CW-4 similarly reported that DSG was having issues flowing the product out of stores to customers, leading to excess inventory that it was unable to sell. ¶¶91-92.

What's more, CW-1, CW-2, and CW-3 explained that they knew about these issues from using the very same systems that the Individual Defendants accessed, including the Company's internal KPI database. ¶223. In addition, CW-1, CW-2, CW-3, and CW-9 recounted that every Monday they received an executive update email attaching a PDF with data and analysis of current trends at the Company. ¶224. CW-2 called this the "Score Card Report." *Id.* CW-1 stated that they were copied on these emails, ***as were the Individual Defendants***. *Id.* CW-3 stated that this report included not just inventory and sales figures, but also data and analysis such as inventory "sell-through" and clearance/markdowns. *Id.* CW-1 said the report included information regarding sales performance, inventory groups/categories that were driving the business, detailed data for each category, a section for remarks/analysis, gross margin data, inventory activities/movements, and year-over-year lookback numbers for each group's performance. *Id.* CW-2 and CW-3 both commented that these reports included lists of bottom performing categories, and that outdoor and fitness equipment were often listed as bottom performing categories in these reports. *Id.* CW-1, CW-2, CW-3, CW-5, and CW-9 also reported that meetings up and down the chain of command were typically held on Mondays. *Id.* Information from the executive update emails was discussed in these meetings. ¶¶217-218, 224. According to CW-1, every Monday morning, different product groups were required to respond to the Individual Defendants' detailed inquiries concerning that week's update. ¶217. The executive management team, including the Individual Defendants, required in-depth answers regarding inventory. ¶¶192, 194, 198, 217; *cf. Steamfitters Loc. 449 Pension Fund v. Alter*, 2011 WL 4528385, at *9 (E.D. Pa. Sep. 30, 2011) (reports of "hands-on" management supported scienter).

- 16 -

4900-3355-9665.v2

The Complaint establishes the CWs' personal knowledge of DSG's inventory problems.  For example, CW-1 was familiar with the ***companywide*** performance of the outdoor segment through DSG's performance reporting systems, including executive update emails and the KPI site.  ¶¶180-183.  CW-2 similarly accessed DSG's companywide inventory management system, the Score Card Report showing sales activities around the country, and other inventory reports providing up-to-date information on the Company's overall performance.  ¶¶191-192, 194.  Likewise, CW-3 accessed DSG's companywide Sell-Through Report that broke down each store's performance by segment, including outdoor, and CW-5 accessed DSG's internal system showing overall inventory levels.  ¶¶199, 205.  CW-6 and CW-9 explained that anyone in their position or higher could access the Company's internal reports showing the inventory buildup.  ¶¶206, 212.

Further, all of the CW accounts corroborate one another, painting a cohesive picture of excessive amounts of outdoor inventory at DSG stores, distribution centers, and warehouses throughout the country.  ¶¶178-215.  Plaintiffs' CW allegations are easily "sufficient at the motion-to-dismiss stage of the case for the Court to credit the challenged allegations."  *Mylan*, 2023 WL 3539371, at *4-*6; *see also Toronto-Dominion*, 2018 WL 6381882, at *7, *13-*14 (crediting CWs with consistent accounts from across the business at multiple levels and locations); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (crediting scienter allegations "from former employees and managers in various regions of the United States (and working in a number of different departments)"); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (crediting consistent witness statements from multiple levels and locations).[16]

---

[16]   Moreover, though the Third Circuit does not require that confidential witnesses personally interact with defendants (*Avaya*, 564 F.3d at 268-69), here, several CWs ***did*** interact with the Individual Defendants or saw them visiting stores and distribution centers where they witnessed the excess inventory firsthand.  *See* ¶194 (first half of 2022); ¶198 (summer of 2022); ¶204 (1Q22); ¶206 (April 2023); ¶¶213-215 (at least once between January to mid-2022).

***Defendants' Admissions***.  Not only do the CW accounts corroborate one another, they are also corroborated by Defendants' admissions from before, during, and after the Class Period.  *Cf. Mylan*, 2023 WL 3539371, at *6.[17]  For example, Hobart admitted after the Class Period (in November 2023) that DSG had excess outdoor inventory ***as far back as 2022***: "Last year . . . [t]here was a lump in outdoor equipment related to the pandemic."  ¶164(a).  Gupta also admitted to an "overhang of the outdoor category in terms of the COVID buys" in 2022.  *Id*.  Defendants' statements during the Class Period about their intimate knowledge of the business show these admissions were not mere hindsight; rather, Defendants were well aware of the Company's reality the whole time.  *See, e.g.*, ¶¶225-234.  And DSG's SEC Form 10-K for FY22 explained: "Senior management focuses on certain key indicators to monitor [DSG's] performance including . . . operating margin [and] [q]uality of merchandise offerings," and that "we monitor sell-throughs, inventory turns, gross margins and markdown rates at the department and style level" and "[w]e regularly review inventories."  ¶¶226-227.

The Individual Defendants' access to and use of reporting and tracking systems to monitor DSG's inventory levels, margins, and other key metrics further support a strong inference of scienter.  *See In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at *3 (S.D.N.Y. Sep. 15, 2025) (scienter where defendants "assert[ed] that they were 'monitoring very carefully' their inventory and 'we monitor pretty well inventory'"); *Swanson*, 2011 WL 2444675, at *12 (admission of "'closely monitor[ing]'" programs supported scienter); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13-*16 (S.D.N.Y. Apr. 22, 2016) (scienter where defendants confirmed "they had accurate knowledge" of inventory levels); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("tout[ing] the company's . . . inventory

---

[17]    The CWs' accounts regarding DSG's internal reporting systems are also consistent with DSG's admissions from the *SEC v. Poerio* case.  ¶¶220-223.

4900-3355-9665.v2

monitoring" supports scienter).

Moreover, analysts repeatedly grilled Defendants about fraud-related topics such as the "pandemic winner" categories, the quality of inventory, and DSG's prospects. *See, e.g.*, ¶¶142, 144, 151, 161. Defendants misrepresented that the only lump was in apparel; there were "no issues with flow" and "no[] concern[]" about toxicity; and "we are not expecting to have – to go into a major promotional cycle here." ¶¶145, 148, 162-163. When asked, "what gives you such confidence that we're not going to be over-inventoried into the back half of the year right now?" Gupta responded, "we" have "overall confidence" in "our inventory position," which is "not toxic," based on information from merchandising and supply chain teams with "***a very good pulse on the business, and we have perfected this art***." ¶228. Hobart added that "we can manage through and buy around any inventory we have" and that "we will obviously continue to monitor" any changes in the promotional environment. ¶¶228-229.

These responses to direct questions strongly support scienter. Indeed, "maybe '***the most powerful evidence*** of scienter is the content and context' of the statements made by [Defendants], which were made 'in response to . . . analyst[]' questions." *Urb. Outfitters*, 103 F. Supp. 3d at 653 (response to questions about sales and markdown activity, which omitted "actual circumstances that were contrary to their answers," demonstrated scienter); *see also STMicroelectronics*, 2025 WL 2644241, at *3 ("[S]cienter can be inferred additionally from Defendants' concrete statements regarding inventory visibility."); *Levon v. CorMedix Inc.*, 2025 WL 2400346, at *22 (D.N.J. Aug. 19, 2025) (responses to "specific questions" from analysts "implied firsthand knowledge"). That DSG's inventory position was "key to measuring [the Company's] financial performance and was a subject about which investors and analysts often inquired" further bolsters scienter. *Celestica*, 455 F. App'x at 13-14; *see also Finisar*, 2017 WL 1549485, at *7 (scienter adequately pleaded where "industry analysts had been speculating about the possibility of an inventory build-up for months,"

4900-3355-9665.v2

thus "providing further incentive for Defendants to seek out or pay attention to such information").

*Store Visits*.  The R&R also found that Defendants' "visits to the overloaded stores" support scienter.  R&R at 19.  Stack and Hobart frequently visited DSG stores and distribution centers around the country to monitor performance and meet with management.  ¶235.  Courts routinely find that such "site visits" to "inspect[] operations" support scienter.  *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sep. 30, 2020); *see also In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("trips to check on operations" supported scienter); *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at *11 (D. Conn. Mar. 31, 2018) ("personal trips" and management meetings supported scienter where "factories were visibly not operating at capacity and employee parking lots and other properties were being used to store excess inventory"); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 2018 WL 1558577, at *29 (N.D. Ga. Mar. 29, 2018) (allegations that defendants "regularly visited" site, which "would have put them on notice of the delays," supported scienter); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 608 (E.D. Va. 2015) (tour of operations supported scienter).  Here, Hobart even admitted that "for decades now, it's **go to the stores and you'll find the truth**.  That's what Ed [Stack] and the management team have always believed."  ¶235.  Between 2022 and August 2023, Hobart visited over 100 stores and 4 of the 5 distribution centers in 26 different states, meeting management and viewing inventory.  ¶¶235, 238-251.[18]  These visits show Stack's and Hobart's direct knowledge of the inventory glut, which was in plain sight.  ¶¶201, 235, 237.

*Additional Allegations*.  The inference of Defendants' scienter is further strengthened by the temporal proximity between their misstatements and the corrective disclosures.  *Avaya*, 564 F.3d at

---

[18]    The Complaint pinpoints when the Defendants visited the stores.  *See* ¶198 (summer of 2022); ¶¶237-251 (2022 until August 2023); ¶¶192, 194, 236 (first half of 2022 and in 2023); ¶204 (1Q22); ¶206 (April 2023); ¶215 (at least once in the first half of 2022).  CW-2, CW-3, CW-5, CW-8, and CW-10 also described some of the visits.  ¶¶215, 236.

- 20 -

271 (proximity between CFO's denials and disclosure of the truth supported scienter); *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 395-96 (D. Del. 2016) (same). On May 23, 2023, Hobart and Gupta insisted that inventory was "clean" and "well positioned," with Hobart emphasizing that "we are not expecting to have – to go into a major promotional cycle here." ¶252. Just three months later, on August 22, 2023, Defendants shocked the market by announcing major promotions to clean out excess outdoor inventory had significantly lowered profitability. *Id*.; *cf. Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) ("three to six months" between "the statements and the contradictory disclosures" supports scienter).

Further, outdoor and fitness products are core components of DSG's business, with Hardlines accounting for 40% of overall sales. ¶26. "[M]isstatements and omissions made on 'core matters of central importance' . . . give[] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Urb. Outfitters*, 103 F. Supp. 3d at 653-54 (44% of sales a "core operation[]"); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (32%-42% of revenue a "core operation[]"). Viewing the allegations holistically, as required, the Complaint amply pleads the Individual Defendants' scienter. Their scienter is imputed to DSG. R&R at 19 n.6 (citing *Mylan*, 2023 WL 3539371, at *18).

***Defendants' Proposed Non-Culpable Inference Is Far-Fetched***. Magistrate Judge Taylor explicitly weighed the strong inference of scienter arising from Plaintiffs' allegations against Defendants' proposed competing inferences – and accurately found "Defendants' explanation ***doubtful***" and "***belied*** by the reality confronting the company, of which the individual Defendants were aware." R&R at 18-19. Indeed, Defendants' claim that "they were simply optimistic" is baseless – especially given their millions of dollars' worth of insider sales at suspicious times throughout the Class Period. *Id.* at 18.

- 21 -

4900-3355-9665.v2

For one thing, it is implausible that Defendants, with their "years of business and DSG-specific experience," believed that "DSG would be able to sell its outdoor and fitness inventory over time without a material impact on its profitability" (Obj. at 2), while every CW, viewing the same data in the KPI site and weekly Scorecard Reports as Defendants, independently and contemporaneously knew DSG had to aggressively mark down the inventory to move through it. *E.g.*, ¶¶90-91. Defendants' narrative is also contradicted by their own admission that an outdoor inventory "lump" (*i.e.*, **excess** inventory) existed **by 2022** (¶102) – when, according to their newfound story, the Company's staggering amount of outdoor inventory did not even become a lump until the last quarter of the Class Period.

Further, Defendants postulate that outdoor and fitness inventory "can be held for a long period, potentially **months or even years**, without going obsolete." Obj. at 2 (emphasis in original). Aside from being inappropriate at this stage, this fact-bound argument is belied by Defendants' own actions. In reality, they could not wait "for years" to sell this supposedly "clean" inventory at full price; they dramatically marked it down just one month after stating that "we are not expecting to have – to go into a major promotional cycle here," sending the Company's stock into freefall. ¶¶252-253. While Defendants contend that a "decline in freight costs . . . made it less expensive to replace inventory" (Obj. at 23) (citing August 2023 call), they reported lower freight costs as early as March 2023 (4Q22, Defs. Ex. 13 at 7, 13), and at the end of May 2023 stated that DSG had a "moat" against promotions. Moreover, Defendants' *post hoc* explanation that they expected to be able to sell the inventory in the "peak" summer season at satisfactory prices (Obj. at 23) is contradicted by the fact that they had failed to do so during the previous year's "peak" season. *Cf.* ¶164(b) (alleging that much of the excess inventory was **over a year old**).

Finally, even if Defendants "may have hoped that [demand would improve] and thus that the risk of [markdowns] associated with the rising inventory would not materialize, [Plaintiffs have]

- 22 -

plausibly alleged facts that give rise to a strong inference that the decision not to disclose this information was nonetheless reckless." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *13 (S.D.N.Y. Apr. 14, 2020). "'The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.'" *Id.* (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).[19]

### C.      Loss Causation Is Sufficiently Pled for the May 19, 2023 Disclosure

"The issue of loss causation is usually not resolved on a motion to dismiss." *Dudley v. Haub*, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013). "The only thing required of Plaintiff[s] right now is 'a short and plain statement of the claim' providing Defendants with 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *In re Mylan N.V. Sec. Litig.*, 2025 WL 1874621, at *4 (W.D. Pa. July 8, 2025) (Ranjan, J.).[20]

The May 19, 2023 TD Cowen analyst report undercut Defendants' positive statements regarding post-pandemic profitability and partially revealed the truth concealed by Defendants' fraud. ¶271. The price of DSG stock declined after the report was issued, demonstrating that the report revealed new, adverse information. *Id.* "In fact, plaintiffs' allegations that the price of

---

[19]    *Pier 1* is inapposite. 935 F.3d at 437. There, "rather than concealing its inventory problem, Pier 1 'repeatedly alerted investors' that the problem 'would affect the company's output' throughout the Class Period." *Id.* And plaintiffs in *Pier 1* also made a "self-defeating" argument, requiring them to allege "both that Pier 1 said that all of its inventory is subject to markdown risk if not sold quickly (to characterize Pier 1 as a trend-driven business) and, in the same breath, that Pier 1 did ***not*** say that (to make an allegation of fraud)." *Id.* at 436 (emphasis in original). No such contradiction exists here. *Crocs*, a case involving alleged GAAP violations, is also inapposite. 774 F. Supp. 2d at 1152. There, plaintiffs alleged the company's inventory rose because of a purported breakdown of the company's inventory management and control system and lacked any allegations that defendants knew the inventory would have to be written off. *Id.* Finally, *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018), is inapposite – the Third Circuit merely affirmed the district court's finding that one particular statement revealed mere mismanagement instead of misconduct. *Id.* at 117.

[20]    While Defendants suggest that loss causation allegations should be subject to Rule 9(b), "[t]he Third Circuit has not answered this question[, and] courts in this Circuit that have recently decided the issue have rejected the stricter standard." *Mylan*, 2025 WL 1874621, at *2 n.2.

- 23 -

[DSG]'s stock fell in the immediate wake of the issuance of those reports" suffice to plead loss causation. *In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006); *see also In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006) (allegation that the stock price dropped after the truth was revealed is sufficient to plead loss causation).

Defendants argue that the TD Cowen report "did not disclose any allegedly concealed information" because it "was based on a statistical correlation between DSG's historic same store sales and public data." Obj. at 24. But Defendants' own authority, *In re Aurora Cannabis Inc. Sec. Litig.*, 2023 WL 5508831 (D.N.J. Aug. 24, 2023), found that a report "based on [the company's] public filings" qualified as a corrective disclosure. *Id.* at *6; *see also Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *13 (S.D.N.Y. Jan. 5, 2023) ("third party analyses of previously public information could be sufficient to plead loss causation") (collecting cases); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015) ("'analysts questioning financial results'" suffice to plead loss causation); *Winstar*, 2006 WL 473885, at *15 (short-seller reports disclosing, based on company's publicly reported financials, that it "had insufficient cash flow to fund its operations and that it would likely default on its credit obligations" satisfied loss causation).[21]   Here, TD Cowen did not simply report already public information. Using its own proprietary regression model, it undertook a complex analysis of DSG's financial data. Defs' Ex. 28; *cf. Aurora*, 2023 WL 5508831, at *6 (analyst report "did not merely elucidate the 'magnitude' of a previously disclosed metric, and it involved more than a 'reporter simply [doing] the math' or 'performing one subtraction and one multiplication' from information in a single public filing").

---

[21]   The TD Cowen report is not based on speculation; it employed DSG's own data in a proprietary regression analysis. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462 (4th Cir. 2011), involved whether a deal would occur and the disclosure did not reveal whether it was off the table, so it could not have qualified as corrective. *Id.* at 475-77.

4900-3355-9665.v2

Defendants also contend that the TD Cowen report cannot be causally connected unless it explicitly revealed DSG's excess inventory or declining margins. But corrective disclosures need not precisely mirror the earlier misrepresentations or admit fraud; they need only "relate[] to the same subject." *Urb. Outfitters*, 103 F. Supp. 3d at 655; *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 428-29 (3d Cir. 2007) (loss causation satisfied "'if the misrepresentation touches upon the reasons for the investment's decline in value'"). Regardless, the report did link lowered sales and EPS estimates to concerns about the "***durability of [DSG's] margin expansion since 2019***," particularly "***lower merchandise margins***." ¶271. These concerns are clearly related to the misrepresentations, which masked the true state of DSG's profitability.[22] "This is enough. Corrective disclosures 'need not . . . explicitly or exhaustively reveal[] the fraud, so long as fair inferences of fraud that would affect investors can be drawn from the disclosures.'" *Mylan*, 2025 WL 1874621, at *4 (allegations that disclosure "indirect[ly]" revealed falsity of misstatements sufficient to plead loss causation).

## IV.    CONCLUSION

The Court should reject Defendants' objections and adopt Magistrate Judge Taylor's R&R.

DATED: October 14, 2025                    Respectfully submitted,

                                           SAXTON & STUMP
                                           LAWRENCE F. STENGEL (P.A. Bar # 32809)


                                                s/ LAWRENCE F. STENGEL
                                           _____
                                                LAWRENCE F. STENGEL

---

[22]    Thus, Plaintiffs do not rely on "[t]he mere allegation that DSG's stock fell after the report." Obj. at 25 (citing *Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010)).

4900-3355-9665.v2

280 Granite Run Drive, Suite 300
Lancaster, PA  17601
Telephone:  717/556-1000
717/441-3810 (fax)
lfs@saxtonstump.com

*Liaison Counsel for Western Pennsylvania
Teamsters*

ROBBINS GELLER RUDMAN & DOWD LLP
DARRYL J. ALVARADO (admitted *pro hac vice*)
T. ALEX B. FOLKERTH (admitted *pro hac vice*)
RACHEL C. BRABY (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dalvarado@rgrdlaw.com
afolkerth@rgrdlaw.com
rbraby@rgrdlaw.com

*Counsel for Western Pennsylvania Teamsters and
Lead Counsel for the Class*

POMERANTZ LLP
JEREMY A. LIEBERMAN
J. ALEXANDER HOOD II
THOMAS H. PRZYBYLOWSKI
600 Third Avenue, 20th Floor
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com

*Counsel for Rhode Island and Lead Counsel for
the Class*

- 26 -

- 27 -

LAW OFFICE OF ALFRED G. YATES, JR., P.C.
ALFRED G. YATES, JR. (PA 17419)
GERALD L. RUTLEDGE (PA 62027)
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Telephone:  412/391-5164
412/471-1033 (fax)
yateslaw@aol.com

*Liaison Counsel for Rhode Island*

4900-3355-9665.v2