**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 719 PENSION TRUST FUND, *individually, on behalf of itself and all others similarly situated,* | ) ) ) ) ) ) | 2:24-CV-196<br><br>Hon. J. Nicholas Ranjan |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| DICK'S SPORTING GOODS, INC.; EDWARD W. STACK; NAVDEEP GUPTA; and LAUREN R. HOBART, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This is a securities-fraud case filed against DICK'S Sporting Goods (DSG). Plaintiffs allege that DSG and several of its executives made false and misleading statements about the state of its inventory coming out of the COVID-19 pandemic. DSG claimed its inventory was healthy, when, in fact, it was toxic—*i.e.*, actually, there were excesses in inventory that required DSG to lower prices. *See* ECF 51 at ¶ 76. When the truth finally came out, the stock dropped, and shareholders sued.

DSG moved to dismiss the complaint, and Magistrate Judge Taylor issued an R&R, where she found some of the statements alleged to be actionable, and otherwise found that there were sufficient allegations of scienter and loss causation to proceed past the pleading stage. Defendants objected to the R&R.

On *de novo* review, the Court agrees with much of Judge Taylor's report, but concludes that several of the statements that she found actionable are not. So, the

- 1 -

Court further trims down the actionable statements. Otherwise, the Court adopts the rest of Judge Taylor's R&R.

## BACKGROUND

### I.    Factual History

During the COVID-19 pandemic, state and local governments issued quarantine orders, and gyms closed. ECF 51 at ¶ 3. To stay fit, Americans found alternatives: exercising in home gyms and spending more time outside. *Id.* at ¶ 28. Home gyms and outdoor activities required new gear, so demand for outdoor and fitness products surged. *Id.* at ¶ 29.

DICK's Sporting Goods (DSG), one of the country's leading sporting goods retailers, capitalized on this surge "by stocking and selling outdoor and fitness products . . . in truly record quantities." ECF 84 at 4:25-5:2; *see* ECF 51 at ¶ 24, 30-33. But as the unusual economic conditions created by the pandemic began to subside in early 2022, so too did the "unprecedented demand" for these products. ECF 51 at ¶ 39. As a result, "DSG's profitability growth streak came to an end," its "merchandise margin . . . began contracting on a quarter-over-quarter basis," and its inventory began "piling up." *Id.* at ¶ 3-4 (defining "merchandise margin" as "retail sales revenue less the cost of merchandise sold").

Despite this shift, from August 23, 2022, to August 21, 2023 (the Class Period), Defendants continued to report a rosy financial situation—allegedly, to mislead investors and increase their personal profits from sales of DSG stock.[1] Among other

---

[1] During the Class Period, stock sales by DSG's Executive Chairman Edward Stack, CEO Lauren Hobart, and CFO Navdeep Gupta totaled respectively $23.02 million, $19.17 million, and $4.87 million. ECF 51 at ¶¶ 259, 262, 265. The sales came within days or weeks of Defendants' statements at issue.

statements, on an August 23, 2022, investor call, DSG CEO Lauren Hobart made clear that there were "no issues with flow" for "fitness and outdoor equipment." ECF 60-7 at 21 (statement 6). About six months later, on March 7, 2023, she made similar assessments, stating in DSG's earnings release and on the accompanying investor call that "inventory is in great shape as we start 2023" and "is healthy and well-positioned." ECF 60-25 at 7 (statement 12); ECF 60-13 at 7-8 (statement 13). And on May 23, 2023, both Ms. Hobart and DSG CFO Navdeep Gupta again affirmed that "[DSG's] inventory is clean and well positioned" during DSG's 1Q 2023 earnings call. ECF 60-10 at 8 (statement 16); *id.* at 14-15 (statement 18). Even as Defendants acknowledged the benefits of the pandemic to their business, they pointed to structural changes to justify their conclusions that inventory remained clean. *See* ECF 73 at 3.

Reports from confidential witnesses (CWs) paint a different picture of DSG's inventory during the Class Period. ECF 51 at ¶¶ 88-99. CW statements explain that storage areas in DSG's retail and distribution center locations across the country were so crowded with outdoor and fitness products that they became safety hazards. *Id.* at ¶¶ 7, 73, 90, 93-97, 99. Some locations reportedly had to rent additional trailers and warehouses to address the inventory problem. *Id.*

Defendants also appear to have known about the inventory overages. For one, Defendants' own statements, *id.* at ¶¶ 225-234; *see, e.g.*, ECF 60-7 at 21 (acknowledging on the Class Period's first day that DSG had "a lot of [fitness and outdoor equipment] inventory"), corroborated by CW accounts, *see* ECF 51 at ¶¶ 184, 193, 198-99, 204-06, 211-12, 215, show that Defendants were aware. All Defendants also appear to have had access to real-time reporting and tracking systems providing

- 3 -

detailed statistics about "inventory levels, sell-through, sales, [and] margins."[2]  ECF 51 at ¶ 219.  Even if Defendants were not regularly using these systems themselves, they received weekly "Score Card Report" emails covering a variety of in-depth metrics and analyses related to inventory and sales.[3]  *Id.* at ¶ 224.  And to dig deeper than the data and "find the truth" about inventory, sales, and demand, Mr. Stack and Ms. Hobart frequented stores and distribution centers around the country, *id.* at ¶¶ 235-51, allegedly observing excess inventory in-person and talking with local employees about the problem, *id.* at ¶¶ 198, 204, 206, 211, 215, 236-37.

At the same time Defendants were ostensibly hearing about inventory challenges, investors were articulating growing concerns.  A "debate around the durability of . . . merch[andise] margin" continued throughout the Class Period, *id.* at ¶ 38, because DSG's margins were so critical to its profitability, *id.* at ¶ 36.  That debate surfaced in many investor engagements, with analysts repeatedly asking questions relating to margins, *id.* at ¶¶ 142, 144, 149, 151, 155, 159, and, more specifically, relating to inventory, *id.* at ¶¶ 147, 161.

The risks identified by investors began to materialize toward the end of the Class Period.  On May 19, 2023, TD Cowen analysts published a report where they

---

[2] An unrelated 2024 SEC complaint against DSG, corroborated by CW reports, reveals the capabilities of some of these systems.  ECF 51 at ¶ 221.  The systems allegedly allowed executives to view and filter information like "the prior day's inventory, the prior weeks' inventory, and the corresponding year's inventory," as well as "summar[ies] of the total company audited sales for brick-and-mortar stores, web, and omni sales of the current year and the previous year."  *Id.*

[3] Several CWs noted that "outdoor and fitness equipment were often listed as bottom performing categories in these reports."  ECF 51 at ¶ 224.  The Score Card Reports also appear to have helped inform Defendants' "detailed inquiries" every Monday into the status of each DSG business unit, which "required complete in-depth answers to questions about inventory."  *Id.* at ¶ 217.

lowered Earnings Per Share (EPS) and quarterly and annual sales estimates for DSG. *Id.* at ¶ 271; ECF 60-28. The report also noted that analysts were "cautious on DKS" going into its Q1 2023 results call. ECF 51 at ¶ 271. The day of the report, DSG's stock fell 6.8%. *Id.*

Then, on August 22, 2023, DSG reported its Q2 2023 results—lower profits "driven by lower merchandise margins." ECF 60-14 at 7. Defendants attributed the unexpectedly poor results, in part, to "excess products, particularly in the outdoor category." *Id.* at ¶ 272-73; ECF 60-14 at 4-5. As Defendants explained, after the passing of the peak season for outdoor and fitness products (late May through the beginning of July), it became obvious that "the market had rebaselined below what DSG had anticipated." ECF 84 at 5:24-6:4. So, "the company took . . . decisive action to sell what it could at prices and profit margins that were below what had been anticipated." *Id.* at 6:4-6; *see* ECF 60-14 at 5. That day, DSG's stock price fell 24%. ECF 51 at ¶ 274.

## II.  Procedural History

In response, on February 16, 2024, Plaintiff Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund filed this federal securities action against the company and its Executive Chairman Edward Stack, CEO Lauren Hobart, and CFO Navdeep Gupta. ECF 1. After consolidation of the suit by affected shareholders, Lead Plaintiffs State of Rhode Island Office of the General Treasurer and Western Pennsylvania Teamsters and Employers Pension Fund Public Employees filed the operative amended complaint (ECF 51) on October 15, 2024. Plaintiffs argue that Defendants misled investors "by concealing a lump of excess inventory created by waning demand for pandemic winner products," "regarding a trend of elevated shrink

- 5 -

throughout the Class Period," and "by warn[ing] of risks that had already materialized." ECF 51 at 27, 40, 58 (cleaned up); *see* ECF 51 at ¶¶ 140-76. On December 16, 2024, Defendants responded with the pending motion to dismiss. ECF 58.

After briefing (ECF 59, 60, 63, 64) and oral argument (ECF 69) on the motion, the Magistrate Judge issued her Report and Recommendation (ECF 70) on August 12, 2025. She largely sided with Defendants, recommending dismissal of the Rule 10b-5 claim for Plaintiffs' theories of shrink and risk factors and most statements relating to Plaintiffs' inventory theory, along with the Section 20(a) claim against Defendant DICK's Sporting Goods. ECF 70 at 22. But the Magistrate Judge found that Plaintiffs met the pleading standard for certain inventory-related statements (statements 1, 2, 4-6, 10-16, and 18), scienter, both corrective disclosures alleged, and the Section 20(a) claim against corporate officer Defendants. *Id.* at 14, 19, 21.

Only Defendants objected to the R&R—to every portion where the Magistrate Judge found in Plaintiffs' favor. ECF 73. Defendants make several arguments: the remaining inventory-related statements and the facts alleged to support scienter fall short of the statutorily heightened pleading requirements; one of the two alleged corrective disclosures, the TD Cowen report, does not support loss causation; and the Section 20(a) claim should be dismissed on the same grounds or, alternatively, because Plaintiffs failed to allege Defendants' culpable participation. *Id.* at 2-3.

In deciding on Defendants' objections, the Court considered briefing (ECF 75, 76) and oral argument (ECF 84). The matter is now ripe for disposition.

## STANDARD OF REVIEW

Because Defendants timely objected to the Magistrate Judge's R&R's, "the district court must consider [those] objections and modify or set aside any part of the

order that is clearly erroneous or is contrary to law . . . .  This standard requires the District Court to review findings of fact for clear error and to review matters of law *de novo.*"  *Equal Emp. Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 99 (3d Cir. 2017) (quotations omitted).  Absent objections, the Court reviews matters of law for clear error.  *See United Steelworkers of Am., AFL-CIO v. New Jersey Zinc Co.*, 828 F.2d 1001, 1006 (3d Cir. 1987) (preference for "some level of review to dispositive legal issues raised by the report" to which the parties did not object).

## DISCUSSION AND ANALYSIS

The Court first focuses on the actionability of each of Defendants' statements and then looks to scienter, loss causation, and the Section 20(a) claim.

### I.    DSG's objections as to whether the alleged statements are actionable are sustained, in part.

As noted above, the Court agrees with the Magistrate Judge's report, but finds that certain statements she found actionable are not.  Specifically, the Court diverges on statements 1, 1A,[4] 2, 4, 5, 10, 11, 14, and 15 and the latter half of statement 18, and finds that they too are inactionable.  Statements 6, 12, 13, and 16, and 18 (first half) may proceed.  The Court rules as follows:

| R&R | MTD | Data & Source | Statement | Ruling |
|---|---|---|---|---|
| 1 | 1 | 2Q22 Earnings Release (8/23/22) ECF 60-24 at 7 Ex. 24 at Ex. 99.1, 1 | "***Our inventory is healthy and well-positioned,*** and we are excited about our assortment for the back-to-school season." (Hobart) | DISMISSED; forward-looking, part corporate optimism |

---

[4] The R&R did not explicitly address (or number) one of the statements pled—Ms. Hobart's statement "Our inventory is healthy and well positioned . . ." on DSG's 2Q 2022 earnings call.  The Court refers to this statement as statement "1A."

| | | | | |
|---|---|---|---|---|
| | | ECF 51 at ¶140 | | |
| 1A | 2 | 2Q22 Conference Call (8/23/22) ECF 60-7 at 5 Ex. 7 at 4 ECF 51 at ¶141 | "***Our inventory is healthy and well positioned*** . . . ." (Hobart) | DISMISSED; forward-looking |
| 2 | 3 | 2Q22 Conference Call (8/23/22) ECF 60-7 at 8 Ex. 7 at 7 ECF 51 at ¶141 | "As Lauren [Hobart] said, ***our inventory is healthy and well positioned*** . . . We feel really, really good about where our inventory right now is, especially as we head into the important back-to-school season. ***We feel good about the inventory levels and our overall composition of the inventory itself. It's very well positioned and very healthy***." (Gupta) | DISMISSED; part forward-looking, part opinion |
| 4 | 5 | 2Q22 Conference Call (8/23/22) ECF 60-7 at 12-13 Ex. 7 at 11-12 ECF 51 at ¶¶142-43 | Q: "Can you dig in and give us some color on how the pandemic win[n]er categories, in particular, have performed the last few quarters? Are they still normalizing and dragging on that overall comp? Or has that started to normalize and stabilize? Just trying to think through kind of how those categories are going to drag or not drag on comps from here."<br><br>A: "Warren, so the 'pandemic-winning' categories, and by the way, there were a lot of pandemic-winning categories, including footwear and apparel, which remained incredibly strong, ***some of the more specific pandemic winners like fitness or outdoor equipment[,] bikes, those are acting in line with our expectations and, in fact, are still significantly above 2019 levels. So while there is some adjustment going on year-to-year due to the surge in*** | DISMISSED; not false or misleading |

| | | | | |
|---|---|---|---|---|
| | | | *those businesses, they are significantly higher than they were pre-pandemic*." (Hobart) | |
| 5 | 6 | 2Q22 Conference Call (8/23/22) ECF 60-7 at 21 Ex. 7 at 20 ECF 51 at ¶¶144-45 | Q: "In terms of the inventory, how is the flow of goods these days in apparel versus footwear versus hardware? Like are you seeing — I mean, hardlines. Are you seeing differences among the categories and the flow of goods and are you getting things on time? Are you still finding you need to kind of accelerate orders or order more than you anticipate getting because you won't get the full order fulfilled?"<br><br>A: "Our inventory, overall, I think it's important just to restate that *our inventory is very healthy and we do not — we are not concerned that there's toxicity in our inventory*. Our flow of goods has improved significantly category by category throughout the last 2.5 years. It's been a series of different challenges. The most recent challenge was apparel, as I mentioned, but we are — that is moving now, and we are working through the backlog that was there and clearing that through, and it is affecting our sales as well." (Hobart) | DISMISSED; part forward-looking, part opinion, part not false or misleading |
| 6 | 7 | 2Q22 Conference Call (8/23/22) ECF 60-7 at 21 Ex. 7 at 20 ECF 51 at ¶145 | "When it comes to some of our hardline categories, say, fitness and outdoor equipment, we have bought — that is — *we have a lot of inventory there that we just — we're buying around for next year. So no issues with flow there*." (Hobart) | ACTIONABLE |
| 10 | 11 | Morgan Stanley Global Consumer & Retail Conference (12/6/22) | Q: "First on top line, which categories over the next few years, do you think grow the most or least? And then with respect to durables, I guess some of the big ticket durables were the torchbearers of the pandemic, what do we — what's the | DISMISSED; not false or misleading |

| | | | | |
|---|---|---|---|---|
| | | ECF 60-21 at 6<br>Ex. 21 at 5<br>ECF 51 at<br>¶¶149-50 | outlook there? And what do you see in those categories going forward?<br><br>A: "Golf is maybe the one that if you're talking about a hardline durable, that still has some pandemic hangover, so to speak. But even that has rebaselined significantly higher than it was in 2019. In fact, ***all of the pandemic categories, which are, again, smaller pieces of our business, so bikes, outdoor equipment, generally fitness, all have rebaselined bigger***. So you put that aside, and that's great." (Hobart) | |
| 11 | 12 | Morgan Stanley Global Consumer & Retail Conference (12/6/22)<br>ECF 60-21 at 6<br>Ex. 21 at 5<br>ECF 51 at<br>¶¶151-52 | Q: "You mentioned rebaseline. So what gives you that confidence that these durables have rebaselined? How do we know it's done . . . "<br><br>A: "Because the sales are significantly — so if they were 'x' in 2018 or '19, and they spiked in '20 and '21, they are here now. So ***if they're not receding to the levels that they were before***. So I think what that speaks to is that a lot of people took up outdoor activities even walking, running, biking. So — but the behaviors have changed so much. ***So there was a surge, but it's come back at a higher level***." (Hobart) | DISMISSED; not false or misleading |
| 12 | 13 | 4Q FY22 Earnings Release (3/7/23)<br>ECF 60-25 at 7<br>Ex. 25 at Ex. 99.1, 1<br>ECF 51 at<br>¶153 | "As planned, we continued to address targeted inventory overages, and as a result ***our inventory is in great shape as we start 2023***." (Hobart) | ACTIONABLE |

| | | | | |
|---|---|---|---|---|
| 13 | 14 & 15 | 4Q FY22 Conference Call (3/7/23) ECF 60-13 at 7-8 Ex. 13 at 6-7 ECF 51 at ¶154 | "As planned, during the holiday season, we provided our athletes with a series of compelling item level deals. Additionally, *we continue to address targeted inventory overages due to the late arriving Sprin[g] product. As a result of these actions, our inventory is in great shape as we start 2023* . . ."<br><br>Quarter inventory levels increased 23% compared to Q4 of last year. As a reminder, we were chasing inventory last year amidst industry-wide supply chain disruptions. Therefore, the more useful comparison is against 2019. Compared to Q4 of 2019, a 38% increase in sales was well ahead of our 29% increase in inventory. *Our inventory is healthy and well positioned*." (Gupta) | ACTIONABLE |
| 14 | 16 | Bank of America Consumer & Retail Conference (3/14/23) ECF 60-35 at 8 Ex. 35 at 7 ECF 51 at ¶¶155-56 | Q: "And then just a follow-up, what is sort of the expectation for cells and maybe the nonpriority categories, maybe the more COVID beneficiaries like bikes, camping, fishing, home fitness? Are those categories still challenged? Or should they grow this year?"<br><br>A: "So again, they are a smaller piece of our business. And *each one of them had big surges, but has landed at levels that are above 2019, and we expect that to continue*. So there are strong pieces of our business. They're just going through a cycle right now overall, not impacting the total as much as the other categories are." (Hobart) | DISMISSED; not false or misleading |
| 15 | 17 | Bank of America Consumer & Retail | Q: ["Later in the call, an analyst asked Stack about DSG's vertical brands, *i.e.*, brands that the Company itself owns."] | DISMISSED; not false or misleading, part corporate optimism |

| | | | | |
|---|---|---|---|---|
| | | Conference (3/14/23) ECF 60-35 at 13 Ex. 35 at 12 ECF 51 at ¶157 | A: "But what we have — I think, has lost at times, we have a really robust and profitable hardline side of the business from a private brand standpoint. So whether it's in Maxfli from a golf ball standpoint, what we're doing in fitness, what we're doing in the outdoor category, so I mean our #1 brand in golf are our own brands. Our #1 brand in fitness are our own brands. *It's really an important aspect of our — of the outdoor category we have, and these are all hard lines that, again, margin rates that are meaningfully higher than what the company as a whole is.*" (Stack) | |
| 16 | 18 | 1Q23 Conference Call (5/23/23) ECF 60-10 at 8 Ex. 10 at 7 ECF 51 at ¶159 | "*Our inventory is clean and well positioned.*" (Gupta) | ACTIONABLE |
| 18 | 20 & 21 | 1Q23 Conference Call (5/23/23) ECF 60-10 at 14-15 Ex. 10 at 13-14 ECF 51 at ¶¶161-62 | Q: "[My] questions basically, just kind of level set here with what you're seeing versus maybe some of the noise that we — that's been taking place within your broader space. But — so as you look at the sector now, how do you view inventories? And I know this is a follow-up to some of the prior questions, but these inventories, it seems like DICK'S is managing them well. I mean is there an inventory issue beyond DICK's, something you have to — give you worry about or you think about?"<br><br>A: "So starting with inventories, we are managing our inventory well. *Our inventory is clean. It's well positioned.* And I think what's very important for — to realize is that our inventory and our | ACTIONABLE in part, DISMISSED in part; part forward-looking, part opinion, part corporate optimism |

| | | | products now are very narrowly distributed. So **we have more of a moat against any industry-level promotion that might have affected us in a — time ago when there was just wide distribution of similar products.**<br><br>So *we are not expecting to have — to go into a major promotional cycle here. We're very proud and happy with the inventory levels that we have, and the assortment is a real asset here.* (Hobart) | |

a. **Statements 1, 1A, 2, and 5 regarding DSG's inventory being "healthy," "clean," and "well-positioned."**

The Magistrate Judge concluded that the statements about inventory being "healthy," "clean," and "well-positioned" are present-tense, not forward-looking. ECF 70 at 12. DSG argues that this is wrong and the statements are forward-looking because they used defined terms predicated on future events. ECF 73 at 6-8. On careful review, the Court finds that these particular statements are forward-looking. The Court agrees with the Magistrate Judge that describing inventory as currently "healthy," "clean," or "well-positioned" is not inherently forward-looking. But context matters. And in context, these statements are forward looking.

To begin with, the Magistrate Judge was right to conclude that statements 1, 1A, 2, and 5 contain present-tense statements, and that this is an important indicator. DSG disputes this by pointing to *Aetna*, where the Third Circuit found statements using "disciplined pricing" to be forward-looking primarily because of the phrase's inherently forward-looking nature. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 281 (3d Cir. 2010); ECF 73 at 7. There, the statements expressed the company's future expectations as an *output*—implying that defined "future economic

- 13 -

performance" would result because of the "disciplined pricing" implemented by the company. *In re Aetna*, 617 F.3d at 280-82 (statements included, "we continue to adhere to a disciplined pricing policy . . ."; "this pricing discipline has contributed to the stability we have realized . . ."; and "[membership growth] is solid and balanced growth that is representative of our dedication to disciplined pricing.").

But unlike *Aetna*, Defendants' statements about inventory health and positioning incorporate future expectations as *inputs* into their assessments, and the statements themselves make only present-tense conclusions about DSG's current inventory—asserting "fact[s] that exist[ed] at that time, regardless of future events." *Vrakas v. United States Steel Corp.*, No. 17-CV-579, 2018 WL 4680314, at *10 n.11 (W.D. Pa. Sept. 29, 2018) (Bissoon, C.J.) (ruling that statements of present capacity do not "depend on future events to be either true or false" and thus are not forward-looking statements of future economic performance). Reasonable investors would understand "healthy," "clean," and "well-positioned" to describe conditions at the time referenced in a given statement. Here, that's the present. So statements using these terms are not inherently forward-looking under Section 78u-5(i)(1)(C).

Where the Court agrees with DSG and disagrees with the Magistrate Judge is the context of some of the statements. That is, when read or considered in their broader context, these statements actually do become forward-looking. *See Laborers Loc. No. 231 Pension Fund v. Cowan*, 837 F. App'x 886, 892 (3d Cir. 2020) (finding a nearby sentence to clarify the meaning of the statement at issue, citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015), which found that a "reasonable investor understands a statement of opinion in its full context"); *see* ECF 84 at 23:6-24:18 (explaining how context affects materiality,

including as related to the forward-looking inquiry).  Because of context, such statements are not actionable.[5]

**Statement 1.**  This statement starts: "Our inventory *is* healthy and well-positioned."  ECF 60-24 at 7.  But then it immediately continues to say, "and *we are excited* about our assortment for the back-to-school season.  *We are raising* our full year 2022 outlook. . ." (forward-looking language) ". . . which continues to incorporate *an appropriate level of caution given today's uncertain macroeconomic environment*" (cautionary language).  *Id.*  Taken all together, the statements about inventory "cannot meaningfully be distinguished" from Ms. Hobart's "excitement" and specific projection about the future, especially in the context of her accompanying warning about the "uncertain macroeconomic environment" and the release's thorough cautionary language only three pages later.  *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009); *Id.* at 7, 10.  So the statement leans forward, with a healthy dose of corporate optimism, and is not actionable.

**Statements 1A and 2.**  For reasons similar to statement 1, the context of statement 1A and the portions of statement 2 describing DSG's inventory as "healthy" and "well-positioned" makes both forward-looking.  These statements come only minutes after the introductory moderator's adequate cautionary language, *see* ECF 60-7 at 5, and are surrounded by each speaker's own cautionary language and

---

[5] All these statements are "accompanied by meaningful cautionary statements" as required by Section 78u-5(c).  15 U.S.C. § 78u-5(c).  The cautionary language in DSG's written release containing statement 1 is sufficiently "extensive" and "specific." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000).  For all the other statements, the Court finds that the accompanying cautionary language is equally thorough to that introducing DSG's 3Q 2022 earnings call, *see* ECF 60-8 at 5, and that the Magistrate Judge did not clearly err in recommending, without objection, that this language passes PSLRA muster, *see* ECF 70 at 14.

forward-looking statements, *id.* at 5, 8.  In the two sentences before statement 1A, Ms. Hobart talks about "the macroeconomic environment remain[ing] uncertain" and how DSG is "uniquely positioned to capitalize on [consumer] trends" moving forward. *Id.* at 5.  In the statement after, she updates the company's projected outlook for the upcoming year and notes that her projections "incorporate an appropriate level of caution, given today's macroeconomic environment." *Id.*

As to statement 2, while a reasonable investor might have given greater weight to Mr. Gupta's statements considering his role as CFO and nearby statements describing concrete financial results, he effectively incorporated the forward-looking context of Ms. Hobart's statement 1A through his prefacing, "*As Lauren said. . .*" and then using the same words, "our inventory is healthy and well positioned." *Id.* at 8. Additionally, the sentence after this statement, Mr. Gupta speaks explicitly about the future for which DSG's inventory is well-positioned and the reasons that investors should exercise caution: "we are prepared to continue navigating *a dynamic global supply chain environment* through *the rest of the year.*" *Id.*

The remaining parts of statement 2 are inactionable opinions because Mr. Gupta expresses his feelings—"really, really good" and "good"—about DSG's inventory rather than declaring facts.  *Id.*; *see Omnicare*, 575 U.S. at 183, (distinguishing between opinions and the "untrue statements of fact" covered by Section 78u-4(b)(1), and describing "[a]n opinion [a]s a belief, a view, or a sentiment which the mind forms of persons or things[,]" often prefaced by qualifiers like "I believe" or "I think").

**Statement 5, part 1.**  The statement's first section—". . . our inventory is very healthy"—is forward-looking for reasons similar to the other 2Q 2022 earnings call statements, though arguably a closer call.  ECF 60-7 at 21.  It's temporally further

from cautionary language and other forward-looking statements, but, just as Mr. Gupta did in statement 2, Ms. Hobart incorporates the forward-looking context of her earlier statement from the same call by saying, "I think it's important *just to restate that* our inventory is very healthy." *Id.*

### b. Statements 5 and 6 regarding "flow" and "toxicity."

The Magistrate Judge ruled that statements 5 and 6 were both factual statements outside of any safe harbor. ECF 70 at 12-13. In response, Defendants contend that they are forward-looking opinions that did not mislead. ECF 73 at 10. The Court finds the relevant portions of statement 5 to be opinion and not misleading, but statement 6 to be actionable.

**Statement 5, part 2.** The part of this statement mentioning "toxicity"—"we do not . . . we are not concerned that there's toxicity in our inventory"—is an opinion. ECF 60-7 at 21. Ms. Hobart specifically rephrases her words from what might have been a more factual statement—"we do not [have toxicity in our inventory]"—to instead express DSG leadership's concerns about possible toxicity. *Id. See Omnicare*, 575 U.S. at 183. This is distinguishable from the declarative nature of Ms. Hobart's surrounding phrases and sentences (". . . our inventory is very healthy";[6] "Our flow of goods has improved significantly"; "It's been a series of challenges"; "The most recent challenge was apparel . . . but . . . that is moving now, and we are working through the backlog . . . and it is affecting our sales as well"). *Id.*

The latter part of the statement, beginning with "Our flow of goods . . .", is not false or misleading. Plaintiffs do not allege facts inconsistent with DSG's flow

---

[6] While this statement begins with "I think," the statement "our inventory is very healthy" is an actionable "embedded statement[] of fact." *Omnicare*, 575 U.S. at 185.

- 17 -

improving across categories for the prior 2.5 years or DSG's recent apparel inventory backlog. To the degree that Ms. Hobart answers the analyst's question about relative inventory across different categories, the answer is too attenuated from Plaintiffs' inventory theory to mislead investors. And to the degree that Ms. Hobart refers specifically to the flow of DSG's outdoor and fitness categories having "improved significantly," a reasonable analyst would interpret the statement as DSG improving by now having enough "movement of product" rather than not having too much—because the analyst's question concerned inventory *shortages*. *Id.* ("Are you still finding you need to kind of accelerate orders or order more than you anticipate getting because you won't get the full order fulfilled?"). This situation differs from *Tellabs*, where the executive misled in response to a targeted analyst question. *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006) *vacated in part on other grounds*, 551 U.S. 308 (2007) ("direct[ly] respon[ding] to an analyst's inquiry about a possible decline" with, "We're still seeing that product continue to maintain its growth rate," as particularly material because "it is misleading to describe a decline as equivalent to a continued growth rate"). Ms. Hobart's mention of toxicity, implying "excess inventory," *see* ECF 51 at ¶ 76, does not change the analyst's question.

**Statement 6**. Unlike the other statements at issue from DSG's 2Q 2022 earnings call, the information concealed by statement 6 would have "significantly altered the total mix of information made available." *In re Aetna*, 617 F.3d at 283 (cleaned up, quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Ms. Hobart's statement that DSG had "no issues with flow" based on "hav[ing] a lot of inventory . . . that . . . we're buying around for next year" is "literally false." ECF 60-7 at 21; *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199,

- 18 -

at *9 (D.N.J. Aug. 8, 2011) (quoting *McMahon & Co. v. Wherehouse Ent't*, 900 F.2d 576, 579 (2d Cir.1990)).  As defined by Plaintiffs, "flow" is a present-tense concept,[7] "refer[ring] to the movement of product through a retailer's supply chain, from the retailer's vendors . . . through distribution channels . . . and eventually to customers." ECF 51 at ¶78.  Assuming the facts alleged, there was a "flow issue" when Ms. Hobart stated there was not.

And the part of the statement mentioning "flow" comes right after Ms. Hobart attempted to downplay DSG's acknowledged inventory overages in fitness and outdoor equipment.  ECF 60-7 at 21 ("When it comes to some of our hardline categories, say, fitness and outdoor equipment, we have bought – that is – we have a lot of inventory there that we just – we're buying around for next year.").  Where a reasonable analyst would have interpreted statement 5 as Ms. Hobart answering the question about having enough hardlines inventory, in statement 6 she has transitioned to talking about fitness and outdoor overages.  So, the entirety of statement 6 is "so incomplete as to mislead."  *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007).

Neither does statement 6 qualify as an opinion or as a forward-looking statement.  It includes no qualifiers of belief, and, by using industry terms of art, Ms. Hobart does not make a statement "too vague to be actionable."  *In re Aetna*, 617 F.3d at 283; *see* ECF 51 at ¶¶ 77-78 (defining "buying around" and "flow").  In contrast to

---

[7] Contrary to both parties' arguments, the concept of flow is distinguishable from the other terms of art defined in the complaint.  *See* ECF 84 at 13:7-16:1 (Defendants' argument that inventory being "healthy" implies "flow" being "properly calibrated" and therefore both terms are forward-looking); *id.* at 38:14-39:3 (Plaintiffs' argument that the terms are "all sides of the same coin" and therefore, like the term "flow," not forward-looking).

- 19 -

terms like "healthy" and "well-positioned," the terms used do not have any forward-looking connotation, and the statement's operative sentences are present-tense. Its ancillary future-oriented phrase—"for next year"—can be meaningfully distinguished from the present-tense part of the statement. *See In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 207, 212-13 (1st Cir. 2005) ("has on hand and has access to sufficient sources of funds *to meet its anticipated. . . needs*" as not making the statement forward-looking because the present fact, not the future-oriented phrase, was relevant to the plaintiffs' claims). The present tense of statement 6 outweighs this ancillary phrase and the statement's proximity to statement 5's forward-looking portion, so it is not forward-looking.

### c. Statements 10, 11, and 14 regarding demand "rebaselining" and "land[ing]" at higher levels.

The Magistrate Judge found statements 10 and 11 to fall outside all safe harbors and statement 14, while forward-looking, to not be accompanied by sufficient cautionary language. ECF 70 at 12-14. Defendants object that these statements were not false or misleading. ECF 73 at 13-15. The Court agrees with Defendants' objections.

Plaintiffs have not alleged facts that contradict the truth of any of these statements by Ms. Hobart. ECF 60-21 at 6 ("all of the pandemic categories [including golf]. . . have rebaselined bigger [than in 2019]") (statement 10); *id.* ("if [sales of durables are] not receding to the levels that they were before . . . So there was a surge, but it's come back at a higher level.") (statement 11); ECF 60-35 at 8 ("each of [the COVID beneficiary categories] had big surges, but has landed at levels that are above 2019 . . . They're just going through a cycle right now overall.") (statement 14). The parties appear to agree that demand and sales for these products surged during the

pandemic, and, by the time Ms. Hobart spoke, those peaks had ended but levels remained higher than in 2019.  ECF 51 at ¶¶ 3-4, 11; ECF 73 at 8-10, 26 n.17; ECF 75 at 10-12.

Likewise, Ms. Hobart's silence about outdoor and fitness inventory overages would not have misled a reasonable investor because statements 10, 11, and 14 are too attenuated from Plaintiffs' claims.  Each statement simply answered an analyst question focused on demand and sales, not inventory.  ECF 60-21 at 6 ("which categories over the next few years, do you think grow the most or least?  And then with respect to. . . some of the big ticket durables [that] were the torchbearers of the pandemic, what do we -- what's the outlook there?  And what do you see in those categories going forward?") (statement 10); *id.* ("So what gives you that confidence that these durables have rebaselined?  How do we know it's done. . .") (statement 11); ECF 60-35 at 8 ("what is sort of the expectation for cells and maybe the nonpriority categories, maybe the more COVID beneficiaries like bikes, camping, fishing, home fitness?  Are those categories still challenged? Or should they grow this year?") (statement 14).  By focusing on demand and sales in her responses, without mention of inventory, Ms. Hobart directly answered the analysts' questions.  The optimism she implied about the company's outlook, while potentially inconsistent with her knowledge of inventory overages,[8] is not enough to mislead.  *See Winer Fam. Tr.*, 503 F.3d at 330 (a statement omitting information does not mislead if it's "[simply] incomplete or does not include all relevant facts") (cleaned up).

---

[8] Based on the extra quarter of awareness of the inventory problem and analyst debates, Ms. Hobart's knowledge was more likely inconsistent for statement 14 (March 14, 2023) than for statements 10 and 11 (December 6, 2022).

### d. Statement 15 regarding the profitability of DSG's "hardline side of the business," particularly its "private brands."

The Magistrate Judge recommended that the Court allow statement 15 to pass through the pleading stage.  ECF 70 at 12.  In response, Defendants argue that the statement was not false or misleading because it "did not purport to address inventory."  ECF 73 at 14.  The Court agrees with Defendants.

No part of statement 15 was false or misleading.  Plaintiffs have not alleged facts showing the falsity of any of Mr. Stack's assertions—that DSG's private brands are a "really an important aspect of our – of the outdoor category [DSG has,]"[9] that "[DSG has] a really robust and profitable hardline side of the business from a private brand standpoint," or that these "hardlines [have] margin rates that are meaningfully higher than what the company as a whole is."  ECF 60-35 at 13.  And these statements are too attenuated from Plaintiffs' claims about inventory overages to be misleading.  Whether private brands are "important" to the outdoor category has no bearing on Plaintiffs' claims of fraudulent statements relating to excess inventory.  The other facts asserted by Mr. Stack might have implied to some degree that DSG has "healthy" inventory and will be able to sell its inventory at sustainable rates.  But while those facts are relevant to an assessment of inventory, they also support Mr. Stack's answer to the analyst's question—about private brands.  ECF 60-35 at 13 ("Can you talk more about private label? . . . Maybe highlight what's working best in . . . vertical brands . . ."result).  Mr. Stack did not mislead; he provided a truthful answer supported by relevant facts.  His inclusion of information tangentially relevant to

---

[9] This portion of the statement is also inactionable "corporate optimism."  *See In re Aetna*, 617 F.3d at 283 (citing finding from *Advanta* that "general statements of optimism 'constitute no more than 'puffery,'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999)).

DSG's inventory does not create an affirmative duty to disclose every fact possibly affecting inventory health. *Winer Fam. Tr.*, 503 F.3d at 330 ("The duty to disclose rule does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead.") (cleaned up).

So, while Mr. Stack's assertions may be incomplete, they are not misleading.[10]

### e. Statements 12, 13, 16, and 18 regarding DSG's inventory being "in great shape," "healthy," "clean," and "well-positioned."

The R&R found this last group of Defendants' statements, all of which occurred on or after March 7, 2023, to not qualify under any of the PSLRA's safe harbors. ECF 70 at 12. Defendants' object that these statements are forward-looking opinions and corporate optimism that did not mislead. ECF 73 at 11-20. Apart from the latter half of statement 18, the Court agrees with the Magistrate Judge. The Court first considers whether these statements are opinions and then conducts individualized assessments of whether they are forward-looking or misleading.

With the exception of the last sentence in statement 18, ECF 60-10 at 15 ("We're very proud and happy with the inventory levels that we have, and the assortment is a real asset here"), which is inactionable opinion and corporate optimism, all remaining statements affirmatively declare an answer to the same overarching analyst question, and therefore do not qualify as opinions. ECF 60-25 at 7 ("we continued to address targeted inventory overages . . . our inventory is in great shape") (statement 12); ECF 60-13 at 7-8 ("we provided our athletes with . . . we

---

[10] Because statement 15 is inactionable and was Mr. Stack's only statement that survived the R&R, the Court must dismiss the Rule 10b-5 claim against him.

continue to address targeted inventory overages . . . our inventory is in great shape . . .") (statement 13); ECF 60-10 at 8 ("Our inventory is clean and well-positioned") (statement 16); ECF 60-10 at 14-15 ("we are managing our inventory well.  Our inventory is clean.  It's well-positioned . . . our inventory and our products now are very narrowly distributed.  So we have more of a moat . . . .") (statement 18).  In different context, descriptions like "in great shape" would be too vague to be actionable.  *See In re Aetna*, 617 F.3d at 283.  But not here, assuming the facts alleged by Plaintiffs.  More than halfway through the Class Period, Defendants would have been intimately aware of their inventory overages, the risks to DSG's margins from failing to sell excess inventory during the 2023 peak season, and the ongoing analyst debate about the sustainability of DSG's margins.  In this context, Defendants' statements intended to answer analysts' "persisting market question" about the "sustainability" of DSG's "[long-term] merch[andise] margin," or to at least assuage analyst concerns.  ECF 51 at ¶ 38(d).

**Statement 12**.    Statement 12 is an actionable past and present-tense statement.  ECF 60-25 at 7 ("As planned, we *continued to address* targeted inventory overages [in 4Q 2022], and as a result our inventory *is* in great shape *as we start 2023*") (emphasis added).  The ancillary phrase "as we start 2023" and Ms. Hobart's next sentence, "We couldn't be more excited about our spring assortment," are both present-tense because she made statement 12 in mid-March, at the "start" of DSG's 2023 Fiscal Year.  Her and Mr. Stack's preceding statements about the prior quarter are also not in the future tense.  *Id.* ("Our 2022 results provide a strong foundation. . . structurally higher sales and earnings."; "Following two consecutive record years, we are very pleased with our 2022 performance . . . strong execution.").  True, statement 12 is a quote on a company press release—a written document that investors could

peruse at their convenience—and it contains thorough cautionary language only four pages later. *Id.* at 11. But unlike DSG's 2Q 2022 earnings release, which contains statement 1, none of the other quotes in DSG's 4Q 2022 release caution investors. Balancing these considerations, statement 12 is not forward-looking.

At the same time, statement 12 would mislead a reasonable investor. While "great shape" isn't falsifiable, in the context of Ms. Hobart's alleged knowledge of the growing inventory problem and ongoing analyst debates about margins, the statement was so incomplete as to mislead. And in statement 12, Ms. Hobart went even further by pointing to a specific action taken ("we continued to address targeted inventory overages") to explain why DSG had no inventory problem ("as a result our inventory is in great shape"). *Id.* at 7.

**Statements 13 and 16**. These remarks, part of Mr. Gupta's introductory speech on DSG's 4Q 2022 and 1Q 2023 earnings calls, are not forward-looking. Both statements are past and present-tense and clearly separated from other nearby statements which might otherwise influence the statements' context.[11] While in each

---

[11] Statement 13 begins with Mr. Gupta speaking about DSG's past performance. ECF 60-13 at 7 (over the last quarter and specifically "during the [recent] holiday season"; then focusing on more recent "inventory overages" that occurred "due to the late arriving Sprin[g] product"). He then shifts to the present tense, talking about DSG's "continu[ing]" efforts "to address [] inventory overages" and confidently asserting that "inventory *is* in great shape *as we start 2023*" (this statement occurred at the "start" of DSG's 2023 Fiscal Year). *Id.* Following a partly forward-looking interlude not included in the statement, Mr. Gupta signals a change in tense by transitioning, "Now looking to our balance sheet. We *ended* Q4 with. . ." *Id.* at 7-8. In this second half of statement 12, he talks to how inventory fared during the prior quarter and argues why, based on those numbers, DSG's "inventory *is* healthy and well-positioned" today. *Id.* at 8. Mr. Gupta then finishes his thoughts on DSG's balance sheet, signaling an end to the current explanation and another possible tense change. *Id.* ("Turning to our fourth quarter capital allocation . . . .").

statement Mr. Gupta spoke within fifteen minutes of the cautionary language at the top of the call, this factor doesn't outweigh the statements' present tense and other context.  A reasonable investor would expect a public company's CFO to provide the financial particulars necessary for informed decisions and to signal when any details provided were only future estimates.  Mr. Gupta offered the financial particulars but failed to caution that his statements were forward-looking projections.

Statements 13 and 16 are misleading for similar reasons.  They only include assertions supporting Mr. Gupta's argument that, contrary to the facts alleged, DSG's inventory was "in great shape" and "well-positioned."  A reasonable investor would at the very least expect some caution from a CFO aware of a significant risk.  The facts alleged make it appear that DSG was banking on an incredibly successful peak season relative to 2019, the anchor year used by Mr. Gupta to justify statement 13.  *See* ECF 60-13 at 7-8 ("Importantly, when compared to 2019, Q4 '22 margin rate is 209 basis points higher . . . *The more useful comparison is against 2019* [as opposed to last year]").  It seems that, otherwise, DSG would face major inventory overages.  But rather than caution investors, Mr. Gupta attempted to downplay the problem, using the numbers to selectively paint a rosy picture of inventory in statement 13.

---

At the next quarterly earnings call, on May 23, 2023, Mr. Gupta makes very similar past and present-tense assertions, which comprise statement 16.  In the same introductory portion of the call, he signals a possible tense change by again transitioning: "*Now looking to our balance sheet*. We ended Q1 with . . ."  ECF 60-10 at 8.  All his thoughts on the balance sheet are, again, framed in the past and present tense, *id.* ("We *ended* Q1 with approximately $1.6 billion of cash and cash equivalents and no borrowings on our $1.6 billion unsecured credit facility.  Our quarter end inventory levels *increased* 7% compared to Q1 of last year."), including statement 16 itself, "Our inventory *is* clean and well-positioned," *id.*  And after the statement, Mr. Gupta again signals the end of his "balance sheet" discussion and a potential change in tense.  *Id.* ("Turning to our first quarter capital allocation . . .").

*Id.* (arguing that "targeted inventory overages [were] due to the late arriving Sprin[g] product," not a broader problem, and that unfavorable comparisons to Q4 2021 were not representative because "DSG was chasing inventory last year amidst industry-wide supply chain disruptions"). The reiteration in statement 16 that "inventory is clean and well-positioned" was misleading for the same reasons, ECF 60-10 at 8, especially its timing—the start of DSG's 2023 peak season when inventory-related risks and analyst focus on the question of post-pandemic margins were greatest.

**Statement 18.** The first half of statement 18 is consistently present-tense, not forward-looking. ECF 60-10 at 15 ("we *are managing* our inventory well. Our inventory *is* clean. *It's* well-positioned."). At this point toward the end of the earnings call, introductory cautionary language is no longer top-of-mind, and Ms. Hobart doesn't otherwise signal to investors that her statements are future projections. Instead, responding to an analyst question attempting to dig deeper into statement 16, she explains why, at the present moment, DSG's inventory is particularly secure: "our inventory and our products *now* are very narrowly distributed. So we *have* more of a moat against any industry-level promotion that might have affected us . . . when there was just wide distribution of similar products." *Id.* Then, she transitions to what this means for DSG's future: "*So we are not expecting* to have – to go into a major promotional cycle here." *Id.* This latter statement is forward-looking.

Lastly, the first half of Ms. Hobart's statement is misleading. She argues that DSG remains uniquely insulated from the inventory overages plaguing the rest of the industry, despite the facts alleged showing that DSG was facing its own mounting overages. Even if her statements were technically true—because DSG had "more of a moat" than in prior years and she believed the assessment that DSG's inventory was "clean" and "well-positioned"—it was misleading to confidently shrug off investor

- 27 -

concerns without mentioning the looming risk.  *See Tellabs*, 437 F.3d at 597-98 (finding that a direct response to an analyst's question is more likely misleading).

## II.    DSG's objections as to scienter, loss causation, and Section 20(a) liability are overruled.

DSG objects to the Magistrate Judge's recommendations on scienter, loss causation, and Section 20(a) liability.  The Court overrules those.

First, over Defendants' objections, *see* ECF 73 at 29-30, the Court agrees with the Magistrate Judge's finding that the TD Cowen report supports loss causation, *see* ECF 70 at 21.  Contrary to Defendants' arguments that the report "did not disclose any allegedly concealed information," ECF 73 at 29, its disclosures are sufficiently "related to the same subject as the misrepresentation" to create the required "causal connection between the material misrepresentation and the loss," *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

DSG's confident, mostly unqualified statements about inventory and flow would have conveyed to a reasonable investor that the company's inventory health would not drag down margins, even as publicly available industry data made it less and less likely that DSG would escape the pandemic without toxicity.  The TD Cowen report countered this narrative by "lowering [TD Cowen's] estimates for comps and EPS" of DSG, ECF 60-28 at 2, and taking a "cautious" position on DSG "going into the Q1 print," *id.* at 3.  The report justified these conclusions based on its analysts' consideration of "[d]ebates. . . [about the] durability of margin expansion since 2019" and "read-throughs show[ing] deceleration in the broader sporting goods category." ECF 60-28 at 2-3.  The report also expressly second-guessed DSG "management's H1 guidance" (which included statements 12 and 13) as "likely [] not reflect[ing]

- 28 -

decelerating trends in the category." *Id* at 2. Considering these other sections providing color to its conclusions, the report's lowered estimates and "cautious" position pointed to demand not keeping up with inventory. Combined with the market's abrupt course-correction the day of the report's publishing, this is enough to meet the pleading standard of Federal Rule of Civil Procedure 8. *See Dura*, 544 U.S. at 346.

Second, Defendants argue that Plaintiffs failed to allege facts supporting a sufficient inference of scienter. ECF 73 at 15-23. The Magistrate Judge found that Plaintiffs met their burden based on the CW accounts, DSG's inventory data available to Defendants, and the timing of Defendants' stock sales; and that Defendants' "competing narrative of optimism and structural transformation is belied by the reality [then] confronting the company." ECF 70 at 16-19. Upon careful review of the facts and reconsideration of Defendants' arguments in light of the additional statements dismissed, the Court agrees with the Magistrate Judge. *Avaya*, 564 F.3d at 260-63 (3d Cir. 2009) (interpreting *Tellabs* to require application of the *Chubb* factors to determine the weight given to CW accounts as part of the scienter inquiry, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007); *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 147 (3d Cir. 2004)); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (ruling that "sales of company stock by insiders that are unusual in scope or timing may support an inference of scienter.") (cleaned up).

Third, Defendants contend that the Section 20(a) claims should be dismissed because the Rule 10b-5 claims fail or, alternatively, because Plaintiffs did not allege culpable participation. ECF 73 at 30. Contrary to these arguments and as recommended by the Magistrate Judge, ECF 70 at 21-22, the Court finds that

- 29 -

Plaintiffs have sufficiently alleged Section 20(a) control liability for all Defendants. The underlying Rule 10b-5 violations alleged against Defendant DICK's Sporting Goods survive, and Plaintiffs have established that all other Defendants exercised control over the company. Consistent with "the overwhelming trend in this circuit," the Court finds "that culpable participation does not have to be plead in order to survive a motion to dismiss." *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003); *see In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 523 (W.D. Pa. 2002) (McLaughlin, J.); *Zhengyu He v. China Zenix Auto Int'l Ltd.*, No. 2:18-CV-15530, 2020 WL 3169506, at *13 (D.N.J. June 12, 2020); *but see Howard v. Arconic Inc.*, No. 2:17-CV-1057, 2021 WL 2561895, at *29 (W.D. Pa. June 23, 2021) (Hornak, J.) (listing cases). Even if the Court were to find culpable participation required, all senior executives and board members undoubtably reviewed and approved the quotes at the top of the 4Q 2022 earnings release that contained statement 12. ECF 60-25 at 7. The Section 20(a) claim thus survives against Defendants Stack, Hobart, and Gupta.

## CONCLUSION

For these reasons, the Court adopts the R&R of the Magistrate Judge as the opinion of the Court, but with the modifications noted above as to the scope of actionable statements. Specifically, only statements 6, 12, 13, and 16, and 18 (first half) may proceed; the Rule 10b-5 claim against Mr. Stack is dismissed with prejudice because he made no actionable statements; and otherwise, the R&R is adopted as the opinion of the Court.

DATED this 3rd day of April, 2026.

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge

- 30 -